## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| GENESIS HEALTH VENTURES, INC., et al., ) | Case No. 00-2692 (JHW) |
| Debtors, ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| JAMES J. HAYES, ) | |
| Appellant, ) | |
| ) | C.A. No. 06-103 JJF |
| v. ) | |
| ) | |
| ) | |
| GENESIS HEALTH VENTURES, INC., et al., ) | |
| Appellees. ) | |

## SUPPLEMENTAL APPENDIX OF JAMES J. HAYES IN SUPPORT OF
## MOTION TO STAY BRIEFING SCHEDULE

*Haskell, et al. v. Goldman, Sachs & Co. et al.* **C.A. 00-427 KAJ**

**Complaint**



FILED

MAR 2 4 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

RICHARD HASKELL, JAMES W. BAKER IRA by
JAMES W. BAKER, JOHN A. ROBINSON, PATRICK
T. ROONEY FAMILY LLC CORP. by 1st NAT BANK OF
OK, M & M LP. 1st TENN by 1st TENN BANK FL3,
CHARLES M. ALBERTO JR., RICHARD D.
ALMEROTH, CONSTANCE L. ALMEROTH, DONNA
KAYE ALVEY, DONNA K. ALVEY IRA by DONNA K.
ALVEY, MADISON ARNOLD, LI JUN WANG, JOSEPH
S. AUCELLO, CAROLYN L. AUCELLO, SCOTT A.
BAKER ROTH IRA by SCOTT A. BAKER, JAMES W.
BAKER III ROTH IRA by JAMES W. BAKER III,
JAMES W. BAKER JR., JAMES W. BAKER III UGMA
GA by JAMES W. BAKER JR., SCOTT ARTHUR
BAKER UGMA GA by JAMES W. BAKER JR.,
ROBERT M. BAKER MD P.S.P. by ROBERT M.
BAKER MD, WILEY P. BALLARD JR., STUART A.
BARBOUR JR., BARGAIN BOOKS & MUSIC,
RICHARD L. BARONE, ALICE L. BARONE, LINDSEY
H. BARRON, DAVID M. BATCHELOR, NATALIE J.
BATCHELOR, SHERRY LYNN BENGTSON, JUDITH
BERNHANG, JOHN BERWECKY by FRANCES
BERWECKY, GEORGE BIRNBAUM, SUSAN
BIRNBAUM, JOHN C. BISHOP, ELIZABETH L.
BISHOP, RICHARD K. BLUM, RUTH M. BLUM, LEO
BOEKMAN & ASSOCIATES LP by LEO BOEKMAN,
EDLYNE B. BOYER, EDLYNE B. BOYER IRA by
EDLYNE B. BOYER, MICHAEL F. BOYER, MICHAEL
BOYER IRA by MICHAEL F. BOYER, LYMAN C.
BRAND, ALAN BRESLER, DAVID BROWN, ANN
NOBLE BROWN, BRUSH & CO., WILLIAM J.
BURNSIDE, KELLIE LEN BURNSIDE IRR TRUST by
WILLIAM J. BURNSIDE, HELEN C. BURNSIDE IRR
TRUST by WILLIAM J. BURNSIDE, ANTONIO
CAPONE IRA by ANTONIO CAPONE, HOWARD

COMPLAINT

Index No.

(caption continued on next page)

GAIL FALECK, ALFRED J. FANTINI, MARY A.
FANTINI, MARTIN FARBENBLUM, DALE R.
FEENEY, IRVING FELDBAUM, BARBARA
FELDMAN, RICHARD FELDMAN, MELVIN
FELDMAN IRA by MELVIN FELDMAN, THOMAS T.
FOLGER JR., JAMES H. FOSTER, LAUREN FOUROS,
SAMUEL FRIEDLAND TRUST by SAMUEL E.
FRIEDLAND, BARR H. GARDNER C/F B GARDNER
by BARR H. GARDNER, BARR H. GARDNER III,
JULIA A. GASAWAY, ROBERT D. GASAWAY III,
FLORA B. GIFFUNI TRUST by FLORA GIFFUNI,
HAROLD L. GILBERT, ART GITTELMAN, MARCIA J.
PEARL, RAYMOND J. GLASS, JOHN GLOUSE IRA by
JOHN GLOUSE, GMS GROUP LLC ATLANTA
TRADING ACCT by GMS GROUP LLC, GOLDMAN
FAMILY TRUST by HAROLD S. GOLDMAN, JUDITH
GOODMAN REV TR by JUDITH H. GOODMAN,
SAMUEL GORENSTEIN, A GOTTSCHO RET PLAN by
EVA GOTTSCHO, ACCURSIO GRAFFEO, LANA
GRAFFEO, CHARLES LIVINGSTON GRIMES, KELLY
HASKELL, SUSAN S. HASKELL, RICHARD C.
HASKELL JR, AMY K. HASKELL, LOUISE I G
IRELAND TRUST by CHARLES L. GRIMES, GADFLY
FOUNDATION by CHARLES L. GRIMES, C. YVONNE
COOKE by CHARLES L. GRIMES, JANE G. BROWN
by CHARLES L. GRIMES, SERENA R. SCHWARTZ by
CHARLES L. GRIMES, GORDON W. CHAPLIN by
CHARLES L. GRIMES, MICHAEL GROSKIN,
MORTON GURRENTZ, H.G. REYNOLDS CO., INC.,
CHARLES HAASE, PATRICIA HAASE, PATRICIA A.
HAASE, PATRICIA HAASE JT, BRIANNE HAASE,
MYRTLE E. HARKER, HOMER J. HARKER, M.L.
JARVIS INC. by MARGARET HATHAWAY, RICHARD
S. HATHAWAY IRA by RICHARD S. HATHAWAY,
RICHARD SANFORD HATHAWAY, CHARLES M.
HENDERSON, JOHN A. HENDERSON

(caption continued on next page)

3

M.D., HAH LTD. PARTNERSHIP by HYMAN
HERSHMAN, ALVIN HERTZBERG TRUST by NINA
HERTZBERG, J. DAVID HIGGINS JR. IRA by J.
DAVID HIGGINS JR., EDITH G. HUDGINS R T by
ELWYN H. HUDGINS, MERRIWAY TRAVEL by
KURT HUEBNER, JOHN M. HUSTON, EILEEN C.
HUSTON, THOMAS S. IULO, LORI B. IULO, IVEY
JACKSON IRA by BEN IVEY JACKSON, SOLOMON
JACOBS TRUST by SOLOMON JACOBS, CHARLES H.
JESSEPH, MURRAY L. KAUFMAN, LINDA B.
KAUFMAN, MASAJI KELLEY, FLEETWOOD
INVESTMENTS L P by MORTON KENT, JOSEPH H.
KOCH REV TR by JOSEPH H. KOCH SR., PAUL R.
KONSIG, PAUL R. KONSIG IRA by PAUL R. KONSIG,
ERIC R. KORB, DAVID KOROSTOFF, EDGAR A.
KOVNER, G. RICHARD KRUGER by GLYNN R.
KRUGER, THOMAS L. LALLY JR., JO ANN LALLY,
ROBERT LANDE, ANITA LANDE, EDWIN H.
LEIPZIG, JEFFREY LENZI, MARK B. LEVY IRA by
MARK B. LEVY, JOHN LEWIS, LINDA LEWIS,
MATHEW J. LISENBY, SPENCER LEE LISENBY,
STEPHEN ALAN LISENBY, PATRICIA J. LISENBY,
STEVE A. LISENBY by STEVE A. LISENBY JR., YSY,
LTD by LOGBERG ASSOCIATES, HARTLEY LORD,
TERI L. LOTT, DAVID F. LOTT, ELLEN LOWE,
RICHARD LOWE, ROBERT LYONS IRA by ROBERT
A. LYONS, DAVID THOMPSON MACMILLAN, J. S.
MAJ TRUST by JANE S. MAJ, DAVID P. MAKRIS,
KATHLEEN MAKRIS, KENNETH MARKS IRA by
KENNETH MARKS, FRANK N. MARTINO, BETTY
MARTINO, ALVIN MATZER, GLORIA MATZER,
MCCORMICK FAMILY TRUST by JAMES R.
MCCORMICK, FRANK MCGANN, LAURA MCGANN
IRA by LAURA MCGANN, MCGRATH FAMILY
TRUST by WILLIAM J. MCGRATH, HERMAN
MEINDERS, ASCHER LAWRENCE MESTEL IRA by
ASCHER L. MESTEL, CRAIG W. MILLER, CRAIG W.

(caption continued on next page)

4

MILLER D.C. PLAN by CRAIG W. MILLER, CRAIG
MILLER DEF. PEN. PLAN by CRAIG W. MILLER,
CRAIG W. MILLER IRA FBO by CRAIG W. MILLER,
CRAIG W. MILLER ROTH IRA by CRAIG W. MILLER,
FLORENCE S. MITCHELL, ROBERT E. MONTANA,
WALTER S. MONTGOMERY JR., MOTIVATIONAL
ASSOC M P PLAN by MOTIVATIONAL ASSOC. c/o
GMS, ALBERT NATHANSON, SANDRA
NATHANSON, JOE L. NESBITT, LEONARD OCHS,
COLETTA OCHS, RONALD E. OSTBLOM, ELLEN
BOYER, RODNEY OWENS, CATHY S. PAGE,
SERENE PENG, LINDSEY PERRY, MARTIN
PLOTNIK, JOHN J. QUANN, JOHN J. QUANN JT,
EILEEN S. QUANN, BEATRICE RADIN, ETHEL
RAFFELOCK, NANCY REA, JOAN G. READER,
MALCOLM C. READER, RONALD REED, PATRICIA
REED, BRANDON A. REYNOLDS, SUSAN L.
ALTMAN, E. LELAND REYNOLDS, JEFFREY
REYNOLDS, REBECCA REYNOLDS, MARY G.
RICHARDSON, JOE F. RILEY, DAVID M. ROBINSON
IRA by DAVID M. ROBINSON, KILDONAN
PARTNERS by JOHN A. ROBINSON, ROBINSON EYE
PROFIT SHARE by JOHN A. ROBINSON, PATRICIA R.
ROBINSON IRA by PATRICIA R. ROBINSON, ROCK
REVOCABLE TRUST by ROCK REVOCABLE TRUST by ROCK,
ROSENBERG TRUST by LUDWIG ROSENBERG,
BONNIE RUBEN, RAMADA PLAZA HOTEL by
BONNIE RUBEN, RUDOLPH P. RUSSO, JEAN M.
RUSSO, FRANK S. RUSSO ALESI IRA by FRANK S.
RUSSO-ALESI, CATHERINE C. GARDNER by JAMIE
G. RUTAN, ALFRED SAKS, WANDA J. SCHAFFNER,
WANDA J. SCHAFFNER IRA by WANDA J.
SCHAFFNER, GEORGE SCHNEIDER, HILTON
SCHWARTZ, JOREMI ENTERPRISES INC P.S.P. by
HILTON SCHWARTZ, STUART SCHWARZCHILD,

(caption continued on next page)

5

KATHERINE RAE CLARK UGTMA by STUART
SCHWARZSCHILD, JEAN B. SHERROD, MARGARET
W. SHUTTLEWORTH REV TR by MARGARET W.
SHUTTLEWORTH, STANLEY SOMMER REV LIVING
TRUST by STANLEY SOMMER, FRED SOUSSA,
ALEXANDER C. SPEYER JR., MARC SPURR, SUSAN
SPURR, MURRAY STADTMAUER, MICHAEL
STEETS, MILLICENT STEETS, PAUL STEETS, SARA
KAVANAUGH, EILEEN STEETS QUANN, ALLAN H.
STEPHENS, SUSAN H. STEPHENS, ARTHUR F.
STOLKEY TRUST by ARTHUR F. STOLKEY,
ARTHUR F. STOLKEY, THOMAS STOLKEY, STRYK
FAMILY INVESTMENTS LTD by STRYK MGMT INC.,
CHRISTINE STUCKER, DAVID STUCKER, MARY
ROSE STUCKER, GILBERT SUNSHINE, WILLIAM H.
SWAN, ROBERT B. SYMPSON JR., MR TS ONNON
LLC by GEORGE THOLKE, CAROLINE THORNE,
DOROTHY THORNE, KATHERINE THORNE,
MARILYN TOMESKO, BEN TREADWAY, HANS F.
TRUPP, JOHN F. VELTER, WALTER VOLMAR,
LARRY WADDINGTON, JOHN W. WALDEN, JOHN
W. WALDEN IRA by JOHN A. WALDEN, DAVID C.
WATKINS, BRYAN J. WEINSTEIN by CAREN
WEINSTEIN, IRVING WELSTED, VIRGINIA
WELSTED, DOUGLAS J. WHITAKER, MARY M.
WHITAKER, RODNEY L. WHITE TRUST by RODNEY
WHITE, WINCHELL FAMILY TRUST by VERNE H.
WINCHELL, CHARLES R. WOODS IRA by CHARLES
R. WOODS, GAIL D. WOODS MELONI, and
SEYMOUR ZALDIN TRUST by SEYMOUR ZALDIN,

Plaintiffs,

-v.-

(caption continued on next page)

GOLDMAN SACHS & CO., MELLON BANK, N.A.,
HIGHLAND CAPITAL MANAGEMENT, L.P.,
GENESIS HEALTH VENTURES, INC., and GEORGE V.
HAGER,

Defendants.

This is plaintiffs' complaint for fraud and grossly negligent misrepresentation. It is based upon information and belief, except for allegations concerning plaintiffs' own actions, which are based on personal knowledge. Plaintiffs' information and belief is based, inter alia, upon documents, pleadings, testimony, expert valuations and other information produced and/or presented to the Bankruptcy Court, to the creditors committee and to individual creditors and other participants in the bankruptcy proceedings involving defendant Genesis Health Ventures, Inc. ("Genesis") and The Multicare Companies, Inc. ("MC"); upon press releases, financial filings with the SEC, and other publicly available information concerning Genesis and MC; and the investigation of their counsel into these and other matters.

## I. Introduction

1.    Plaintiffs are 275 investors who collectively held over $205 million in debentures issued by Genesis. These debentures were subordinated to about

$1.3 billion in senior debt that Genesis had originally owed to its lending banks. By the summer of 2000, a group of investment banks and other financial institutions, led by defendant Goldman Sachs & Co. ("Goldman"), had purchased from the original lending consortium about half of the Genesis senior debt participations, at a massive discount from face value. Goldman, Highland Capital Partners (another investment firm)("Highland") and the lead senior lender bank, Mellon Bank N.A. ("Mellon"), then conspired with Genesis management to put the Company into bankruptcy and "cram down" a reorganization plan that would eliminate junior creditors (including plaintiffs) and existing stockholders, while conveying virtually total ownership of Genesis to the senior creditors. By the time the reorganization plan was confirmed, the investment banks had acquired over 75% of the senior debt participations, and therefore came away with about 70% of the equity of the reorganized Genesis. In exchange for their cooperation in this vast transfer of wealth, senior members of Genesis management received new "retention bonuses", forgiveness of debt and compensation packages worth millions.

2.    Genesis filed its Chapter 11 bankruptcy petition on June 22, 2000, and a year later it proposed a reorganization plan (the "Plan") that would virtually wipe out all the junior creditors and existing stockholders, force the merger of Genesis and MC, and distribute over 94% of the newly issued common stock of the

8

reorganized, combined entities to the senior creditors.

3.     To justify this transfer of ownership to the senior creditors, the Plan represented that the enterprise value of Genesis was about $1.3 billion, and defendants submitted reports of financial advisors to support that conclusion. They deceived the Bankruptcy Court into accepting that valuation. Having determined that the Company was worth less than the senior creditor claims, the Court approved the Plan. As a result, the senior creditors walked away from the bankruptcy with over 94% of the equity of Genesis, and junior creditors, including plaintiffs, received next to nothing.

4.     The valuations of the Company, on which Court approval of the Plan was based, were based on fraudulent information. The linchpin of the fraud was the "Budgeted EBITDA" projections for fiscal 2001, issued by the Company and provided to its financial advisors, UBS Warburg ("Warburg"). Relying on the Budgeted EBITDA data, the Warburg report valued Genesis at about $1.3 billion.

5.     The Budgeted EBITDA data were well below Genesis' recent historical standards. The Budgeted EBITDA projected that Genesis would earn $158 million in EBITDA in fiscal 2001, and would improve only gradually over the ensuing years. This was far below Genesis' recent performance, which had exceeded $205-210 million for fiscal 1998 and 1999, and which had been on pace to achieve

9

similar results through the first two quarters of fiscal 2000.[1] Defendants were going to have to justify such pessimistic financial projections to the Court.

6.    By the time the Bankruptcy Court was prepared to rule on the proposed Plan in August of 2001, fiscal 2001 was almost over; it was too late, at that point, to rely solely on projected EBITDA for periods that were already in the past. By August of 2001, Genesis had reported EBITDA results through the third quarter (ending June 30). The Company therefore sought to confirm the accuracy of the projections by submitting "historical" EBITDA for the trailing 12 month period (the "LTM EBITDA"). Those results coincided *exactly* with the projected EBITDA data: $158 million. The senior creditors then submitted a valuation report prepared by their advisors, Chilmark Partners ("Chilmark"), which used the LTM EBITDA to confirm Warburg's $1.3 billion valuation of the Company.

7.    The Court was persuaded by these presentations. On October 2, 2001, it issued an order confirming a joint plan of reorganization for Genesis under Chapter 11 of the Bankruptcy Code (the "Plan"), which cancelled all the Genesis debentures, in exchange for nominal consideration, while transferring over 94% of the equity in the Company to the senior creditors.

---

[1] These EBITDA data are for Genesis on a standalone basis, without including results for its subsidiary MC.

10

8. Throughout this process defendants misled both the Court and the junior creditors at every turn. In fact, plaintiffs have subsequently discovered that both the Budgeted EBITDA projections *and* the LTM EBITDA were "cooked", to depress EBITDA and thereby depress the valuation of Genesis. By depressing that valuation, defendants were able to persuade the Bankruptcy Court that it was fair and appropriate to award virtually all the equity in the Company to the senior creditors, to the virtual exclusion of junior creditors, primarily the plaintiffs.

9. To depress the Genesis EBITDA, Genesis management, at the behest of the senior creditors, engaged in a series of improper accounting maneuvers that collectively cut Genesis' EBITDA by over 30%. Most notably:

- It voluntarily, and *retroactively,* lowered the fees payable to Genesis under various management contracts with MC. Cost to Budgeted and LTM EBITDA: $11.6 million.

- It excluded from EBITDA all sales to Mariner Post-Acute Network, and 10% of sales to HCR Manorcare, based on spurious speculation that this business might, in the future, be lost. In fact, none of this business was lost. Cost to Budgeted and LTM EBITDA: $24.5 million.

- It took unprecedented insurance loss reserves that were not justified by its actual liability exposure, and then improperly charged them all to EBITDA. Cost to LTM EBITDA: at least $13 million.

- It improperly deducted from EBITDA certain non-recurring bankruptcy reorganization costs and costs associated with a

11

discontinued of an employee health benefit plan. Cost to LTM EBITDA: $16.7 million.

10. These actions were not bona fide business judgments; rather, they all violated GAAP (Generally Accepted Accounting Principles), generally accepted definitions of EBITDA, SEC and IACPA requirements, and/or with other established or contractual financial principles. It was no coincidence that all these decisions and "adjustments" trended in the same direction: to depress EBITDA and, hence, the calculated reorganization value of the Company. Collectively, these manipulations wiped out hundreds of millions of dollar in valuation. In the absence of these manipulations, Genesis' EBITDA would have substantially exceeded $200 million, the calculated valuation of Genesis would have exceeded $1.6 billion, and the debentureholders would have received Genesis stock equal in value to the par value of their debentures.

11. Although the perpetrators of these decisions were Genesis senior management -- and, in particular, George Hager, the CFO -- the direct beneficiaries were the senior creditors. As in most bankruptcy proceedings, management of the debtor was completely at the mercy of the senior creditors, who were going to decide which Genesis executives would remain with the Company both during and after the bankruptcy reorganization, and which would go; and who would receive "retention

12

bonuses" and other lucrative financial packages from the Company, and who would not. In this case, the senior lender power was concentrated in the hand of the seven member Steering Committee, which was dominated by its investment bank members. Shortly after confirmation of the Plan, after the scheme had succeeded and the senior creditors had taken over the Company, the four most senior Genesis executives received financial packages worth, collectively, over $23 million – many times greater than compensation concurrently being paid to executives of comparable companies in the health care industry.

12.     This action does not seek to set aside the Genesis Bankruptcy Plan or re-divide the Genesis "pie". Rather, it seeks to recover from the defendants the hundreds of millions of dollars of damages plaintiffs suffered as a result of defendants' misrepresentations to them, to the public and to the Bankruptcy Court.

## II. THE PARTIES.

13.     The 275 plaintiffs collectively held (either directly or through brokerage, retirement, corporate or other accounts) over $205 million of Genesis subordinated debentures on October 2, 2001, the date the Genesis bankruptcy reorganization plan became effective. The Company had issued three series of debentures, as follows (all amounts stated in millions of dollars in face amount):

| Date Issued | Maturity | Amount | Rate |
|---|---|---|---|
| 06/95 | 2005 | $120 | 9.75% |
| 10/96 | 2006 | $125 | 9.25% |
| 12/98 | 2009 | $125 | 9.88% |
| TOTAL | | $370 | |

Many of the plaintiffs are brokerage customers of GMS Investment Advisors, Inc. ("GMS"). Eighty three of the plaintiffs are retirement or family investment accounts. Collectively, the plaintiffs held over 55% of all the debentures outstanding.[2] A complete list of the plaintiffs and their holdings in Genesis debentures is attached as Exhibit 1.

14.    Defendant Genesis is a Pennsylvania corporation with headquarters at 101 East State Street, Kennett Square, Pennsylvania. It is a leading provider of health care and support services to the elderly. Including its subsidiary MC, Genesis has two primary business segments: pharmacy services and in-patient services.

15.    **Pharmacy Services.** Genesis provides pharmacy services in 41 states through its NeighborCare pharmacy subsidiary. NeighborCare has 59

---

[2] Although the debentures were, by their terms, secured, because the valuation of Genesis ultimately accepted by the Court was less than the senior secured debt, the debentureholders were reclassified as unsecured creditors for purposes of the bankruptcy.

15

institutional pharmacies and 22 medical supply and home medical equipment distribution centers.

16.    **Nursing Care Facilities.**   Genesis also  provides  in-patient services through nursing homes and assisted living facilities, including 33 stand-alone assisted living facilities and 19 transitional care units, located in 15 states. It currently owns, leases, manages or jointly owns 256 nursing care centers with 31,073 beds, located primarily in the eastern United States. It provides rehabilitation services, diagnostic services, respiratory services, hospitality services, group purchasing services and healthcare consulting services.

17.    Prior to its merger with Genesis in October of 2001 (as part of the court-approved bankruptcy Plan), MC was a separate entity that was also in the nursing home/assisted living facility industry. Genesis acquired a 43.6% interest in MC in October of 1997, through a leveraged buyout. In that transaction, Eldercare Corporation, owned 56.4% by Texas Pacific Group and other venture capital firms (collectively, "TPG") and 43.6% by Genesis, obtained ownership of MC. At the time of the leveraged buyout, Genesis entered into long term, arm's length agreements to manage MC's facilities and to provide pharmaceuticals and other services to MC. Pursuant to the bankruptcy reorganization Plan, MC became a wholly-owned

subsidiary of Genesis on October 2, 2001.[3]

18.    Defendant George V. Hager, Jr. ("Hager") is executive vice president and chief financial officer of Genesis, and held that position during the relevant time period. Since December of 2003 he has also been the chief executive officer of the recently spun off nursing home operations formerly owned by Genesis.

19.    Defendant Goldman is a New York limited partnership with headquarters at 85 Broad Street, New York, N.Y. It is one of the largest investment banking firms in the world, and is a member of the New York Stock Exchange. It is a wholly owned subsidiary of Goldman Sachs Group, Inc., a Delaware corporation that also is headquartered at 85 Broad Street. In the months preceding the Genesis bankruptcy, Goldman acquired $175 million in Genesis debt participations, making it by far the largest senior creditor of Genesis. Goldman's average purchase price for these debt participations was about 53¢ on the dollar. Goldman also purchased about $81 million in MC senior debt participations, and thereby became by far the largest senior creditor of MC. Goldman's average purchase price for its MC debt participations was about 48¢ on the dollar. Ultimately, Goldman received through the bankruptcy cash and securities worth far more than 100% of the face value of the

---

[3] For purposes of this complaint, unless the context otherwise requires, all references to "Genesis" for the period up to October 2, 2001, are to the stand-alone company. References to "Genesis" for the period after October 2, 2001 include its wholly owned MC subsidiary.

debts it had purchased.

20. Pursuant to the Plan, Goldman was awarded about 6.6 million shares of Genesis stock, representing about 15.7% of the total shares issued. Since approval of the Plan in October, 2001, Joseph A. ("Jody") LaNassa, III, has been Goldman's designee as one of the six directors of Genesis, and (most significantly) is one of only two members of its compensation committee. Until December of 2002 LaNassa was co-portfolio manager and Vice President-Distressed Bank Debt at Goldman, and since then he has been Managing Director - Special Situations Investing at Goldman.

21. Defendant Mellon is a Delaware corporation with headquarters at One Mellon Center, Pittsburgh, PA. It is one of the largest diversified financial institutions in the world. It was a primary lender for the original revolving credit facilities for both Genesis and MC and held almost $56 million in Genesis senior debt, and over $10 million in MC senior debt, by the time of the bankruptcy. In the bankruptcy, Mellon acted as agent and representative for all the senior creditors, a practice which enabled the other members of the senior lender group to remain virtually anonymous and to conceal the extent to which investment banks, including Goldman, had supplanted the original lending consortium as the actual senior lender group. In the reorganization Mellon acquired shares of Genesis stock and other

17

"cost plus" system was in effect, were now forced to make their debt payments from a lower revenue base.

28.     These changes had a severe impact on MC, which operated exclusively in the nursing care facility business and which had incurred very large debt obligations in the 1997 leveraged buy-out. By the end of fiscal 1999, it was in default on its debt repayment obligations.

29.     Genesis was more diversified than MC, in large part because of its pharmacy operations; it therefore suffered a lesser, though still significant, impact from the phase in of PPS. By March of 2000, Genesis was still able to meet its debt obligations as they became due, and expected that, if it could stem the cash drain to MC, that it would continue to be able to do so for the foreseeable future. Nonetheless, the risk associated with holding Genesis debt increased, and many of the original lenders to Genesis were eagerly unloaded their Genesis (and MC) debt holdings at significant discounts from par value.

30.     Certain investment banks, and in particular Goldman, perceived this situation as an investment opportunity. Their strategy was to purchase large quantities of "debt participations" from the original lending banks at tremendous discounts and then, using their clout as senior creditors, to force the companies into bankruptcy and seize control. Goldman, for example, set up an entire division to

consideration worth far more than the face value of the debt participations it held.

22.    Defendant Highland Capital Management ("Highland") is an investment advisory firm whose headquarters are in Dallas, Texas. Pursuant to the Plan, Highland received approximately 3 million shares of new Genesis stock, representing over 7% of the total issued and outstanding. Since approval of the Plan in October, 2001, Highland's president, James D. Dondero, has been one of the six directors of Genesis.

## III. FACTUAL ALLEGATIONS

### A. Background: The Investment Banks Snap Up Genesis Debt at a Hefty Discount

23.    Before their bankruptcies, both Genesis and MC had large amounts of outstanding debt. Genesis had outstanding about $120 million of senior secured debt (primarily mortgages), $1.01 billion of other senior debt and $387 million of junior debt, consisting primarily of the three series of debentures held by the plaintiffs.

24.    MC was even more heavily leveraged, relative to its revenues. By September 30, 1999, it had about $776 million of debt outstanding, consisting of $526 million of senior debt and $250 million of junior debt. Much of that debt had been incurred in connection with the leveraged buy-out in 1997.

25.    The senior credit facilities for both Genesis and MC had been sponsored by Merrill Lynch, which organized a consortium of over 60 banks, originally led by Mellon Bank, Citicorp, First Union Bank and Nations Bank. By early 2000 the institutions that held the $1.01 billion unsecured Genesis senior debt also collectively held $424 million of the $526 million senior MC debt.   However, the loan facilities were completely separate, with no cross guarantees or cross-collateralization.

26.    When these loans were originally extended, the healthcare industry was booming, largely as a result of the generous "cost plus" fee structure used by Medicare to reimburse nursing care facilities for services rendered. Genesis and MC receive most of their income from the federal Medicare and Medicaid programs.

27.    However, the year following the MC leveraged buy-out, Congress drastically revised the system for Medicare reimbursement to nursing care facilities. In 1998 it replaced the old "cost plus" reimbursement formula with a new Prospective Payment System ("PPS"), which pegged reimbursements to a fixed per diem rate that was determined by the patient's diagnosis and the treatments being provided. The three year "phase in" period for the PPS reimbursement formula began on January 1, 1999. Immediately afterwards Medicare reimbursement rates started to decline. Nursing care facilities, which were carrying huge debt loads incurred when the old

invest in the debt of distressed companies, headed by Jody LaNassa. This division invested in at least seven distressed companies in the healthcare industry.

31.   Goldman and other investment banks wasted no time in moving in on Genesis (and, in particular, on its Neighborcare pharmacy division, which Goldman viewed as the health-care jewel). The Genesis senior lender group was initially headed by Mellon Bank, but by March, 2000, Goldman and Highland had acquired so many of the debt participations that they were invited to join Mellon on the seven member Senior Lender Steering Committee. By August of 2000 investment banks, including Goldman, had purchased about half the total Genesis and MC senior debt participations from the original lending consortium, at discounts of 30% to 50% from par. Goldman itself had acquired (through its affiliate Goldman Sachs Credit Partners) about $256 million of the Genesis and MC senior debt. Goldman was therefore by far the largest senior creditor of both Genesis and MC, with claims 3 times greater than any other senior creditor, and was therefore able to dominate completely the senior creditor Steering Committee.

32.   Goldman then further enhanced its position of power and influence by (i) underwriting and administering the DIP financing, (ii) underwriting the exit financing, and (iii) becoming the largest holder of the synthetic lease financing facility. In short order, Goldman had assumed the de facto lead position in

the senior creditor group, and controlled all of the Genesis and MC purse strings.
Goldman's control over the fate of Genesis continued after Genesis emerged from
bankruptcy, to this very day.

### B. The Bankruptcy and Sudden Collapse of Genesis' EBITDA

33.    In the elder care and pharmacy industries, as elsewhere, the
primary barometer of financial performance is earnings before interest, taxes,
depreciation and amortization ("EBITDA"). EBITDA is not a line item on an income
statement, and is not certified or reviewed by outside auditors. Nonetheless, there are
standard rules for calculating EBITDA, and Genesis had a practice of announcing its
EBITDA results on a quarterly and annual basis. [4]

34.    In both 1998 and 1999 Genesis (excluding MC) had earned over
$200 million in EBITDA, which had been more than sufficient to meet its debt
payment obligations and to finance its operations. As late as March, 2000, Genesis
management had been optimistic about the Company's ability to maintain this level

---

[4] Genesis would announce consolidated EBITDA, including MC, and separate EBITDA for
MC on a standalone basis. By subtracting the second figure from the first, and adding back certain
entries that were eliminated for accounting purposes, sophisticated investors could, with great
difficulty, calculate for themselves Genesis' EBITDA on a standalone basis. For investors, such as
plaintiffs, who held Genesis debt securities, the standalone Genesis data was of paramount
importance.

of EBITDA performance, despite the changeover in Medicare payment systems.[5]

35.    The first two quarters of fiscal 2000 Genesis was on pace to achieve comparable EBITDA results for fiscal 2000. On February 3, 2000, Genesis announced EBITDA results for the first quarter, showing that it had earned, on a standalone basis, $50.8 million of EBITDA. In its written "Presentation to the Bank Group Regarding Restructuring Considerations", dated March 14, 2000, Genesis management provided a "cash flow summary" that made the following EBITDA projections for the Company (on a standalone basis) (in $ millions):

| 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|------|------|------|------|------|------|
| 191  | 205  | 213  | 221  | 230  | 239  |

36.    In a separate document prepared for the same senior lender meeting, Genesis management projected stand-alone EBITDA for the ensuing four months as follows (in $ millions):

| March | April | May | June |
|-------|-------|-----|------|
| $16,896 | $17,529 | $17,862 | $17,895 |

Thus, management was projecting that EBITDA for the third quarter of fiscal 2000

---

[5] At the Genesis stockholders meeting of March 16, 2000, Michael Walker, chief executive officer of Genesis, reported that its senior lender interest coverage ratio was about 1.8 to 1 and its total interest coverage ratio was 1.4 to 1, ratios which indicated that Genesis would be able to continue meeting its debt obligations. In contrast, management was not optimistic about MC. Walker reported that MC had negative debt coverage of 0.5 and was definitely "under water". It was not expected to meet its senior, much less its junior, debt payments.

(April-June) would exceed the $50 million rate announced for the first quarter. On May 4, Genesis announced EBITDA results for the second quarter (January-March), which showed EBITDA, on a standalone basis, of $51 million. Thus, Genesis was clearly headed towards another year of EBITDA in excess of $200 million.

37.    But once Goldman had achieved a significant position in Genesis debt, and took its seat on the seven member senior lender steering committee, optimism at Genesis suddenly vanished. Almost immediately, on June 22, 2000, both Genesis and MC filed petitions for reorganization under Chapter 11 of the Bankruptcy Code, in the federal bankruptcy court in Wilmington, Delaware.[6] This came as a shock to Genesis bondholders, who had been assured, at the March 16th shareholders meeting, that Genesis was in good financial shape and would be able to continue to service its debt and other obligations.[7] During the ensuing year, Genesis' EBITDA projections and LTM EBITDA both fell through the floor.

---

[6] MC's bankruptcy had been anticipated. Its EBITDA for fiscal 1999 was $73.3 million, just barely enough to cover its annual debt payments of $70 million; but during the first two quarters of fiscal 2000, MC's EBITDA had dropped by half, falling to about $27.7 million on an annualized basis. It was therefore a foregone conclusion that MC's senior debt would ultimately be deemed substantially "impaired".

[7] Specifically, on March 21, 2000, Jim Baker of GMS had spoken with Jack Anderson, a Genesis board member, who reiterated the sentiments expressed at the stockholder meeting, that Genesis was in stable financial condition and did not face any immediate crisis. In April of 2000, Randy Faires of GMS had also spoke to Anderson, who repeated what he had said to Baker, including that the GMS bondholders were in good shape. In contrast, he observed that MC was unable to meet its debt payments.

38.    The senior creditors were closely monitoring industry multipliers to determine the effect that particular EBITDA levels would have on the enterprise value of Genesis. On August 2, 2000, Chilmark, which had been retained by the senior creditors, made a written presentation to them in which it set out the Genesis EBITDA projections and the prevailing industry multiples for valuing health care companies. It reported that long-term care companies were currently trading at multiples of 3.1-5.8 times EBITDA, and pharmacy services at multiples of about 5.6.

39.    In or about April of 2001, Genesis released a preliminary plan of reorganization that included Budgeted EBITDA projections for fiscal 2001 (ending September 30, 2001) of only $158.443 million, a staggering $50 million below Genesis' past performance.

**C. The Warburg and Chilmark Valuations and the Approval of The Plan**

40.    In July of 2001, Genesis submitted a final proposed reorganization plan (the "Plan") that posited that the Company, on a stand-alone basis, was worth $200 million less than the senior creditor claims *alone*. The Plan provided for Genesis to merge with MC and for about 94% of the new equity of the combined entity to be conveyed to the senior creditors in satisfaction of their claims.

41.    In support of this Plan, Genesis submitted a valuation of the

25

Company prepared by the Warburg, dated July 2001. A month later, on August 22, 2001, Warburg submitted a modified valuation report. In arriving at its valuation, Warburg relied primarily on Genesis' "Budgeted EBITDA" figure of $158 million for fiscal 2001. Warburg applied a multiplier to the projected EBITDA figure, derived from price-to-EBITDA multiples exhibited by three other publicly traded healthcare companies (Beverly Enterprises, HCR Manor Care and Omnicare), to arrive at an enterprise value range for Genesis of $1.2 billion to $1.45 billion, with a midpoint of about $1.35 billion.

42. But by the time the final Warburg valuation was submitted in August of 2001, only one month was left in fiscal 2001. It would have been inappropriate for the Court, in valuing the Company, to rely solely on projections for periods that were, by now, almost all in the past, and for which historical EBITDA data now existed.

43. To cure that problem the senior creditors also submitted, on the same day, August 22, 2001, their own valuation analysis, prepared by Chilmark. Unlike the Warburg Report, which had been based on projections for fiscal 2001, Chilmark used a historical LTM EBITDA figure, also supplied by Genesis management, of $158,118,000, for the period July 1, 2000 (the fourth quarter of fiscal 2000) to June 30, 2001 (the third quarter of fiscal 2001). Relying on these EBITDA

figures, Chilmark valued Genesis at between $1.17 to $1.43 billion, with a midpoint of about $1.3 billion.

44. The primary purpose of the Chilmark submission was to put the "historical" EBITDA data before the Court, to establish that it was consistent with the Budgeted EBITDA projections for fiscal 2001, upon which the Warburg valuation had relied. Because most of the periods covered by those reports overlapped ( *i.e.* they both had the first three quarters of fiscal 2001 in common), the Court viewed the LTM data as providing *post hoc* confirmation of the accuracy of the Budgeted EBITDA projections.

45. The filing of the Chilmark report on August 22 was the first time that historical EBITDA data had been used, by any party, to support the bankruptcy reorganization Plan. It was far too late, at that point, for any interested party to challenge the LTM EBITDA figures: the deadline for objecting to the Plan had already passed; discovery was almost over; and the confirmation hearing was only one week away.

46. However, if both the projections *and* the LTM EBITDA were wrong, so, to, were the valuations. Significantly, both Warburg and Chilmark disclaimed any opinion concerning the validity or accuracy of either the projected or LTM EBITDA figures. Moreover, because EBITDA does not appear in any financial

27

statement, and because the LTM EBITDA period did not correspond with the period covered by any Genesis financial statement, its auditor, KPMG, never considered any of Genesis' EBITDA data in its opinions certifying Genesis' financial statements. This scenario gave senior management of Genesis a clear opportunity to manipulate the results of the valuation, by manipulating their own EBITDA pronouncements.

47.    The Delaware Bankruptcy Court held a confirmation hearing on August 28 and 29, 2001, seven weeks after the Plan was first filed and, as noted above, six days after the Chilmark and the final Warburg reports were first made available. On September 12, 2001, the Court issued an opinion confirming the essential elements of the Plan. *Matter of Genesis Health Ventures, Inc., et al., Debtors,* 266 B.R. 591. The centerpiece of the Court's ruling was its determination that, based on the valuation report prepared by Warburg, the reorganization value of Genesis was so low, compared to the size of the senior creditor claims, that an allocation of 94% of the new Genesis equity to the senior creditors was reasonable.

48.    In accepting the projections on which the Warburg valuation was based, the Court relied heavily on the testimony of Genesis' CFO, defendant Hager, to the effect that "the actual results for the first 10 months of the 2001 fiscal year were on target with budget projections." That conclusion was based on the LTM EBITDA figures that had been supplied to Chilmark and which were the basis of its report.

49.    Pursuant to the Plan approved by the Court, the senior creditors were credited with $195 million in "adequate protection payments" they had previously received, and were awarded new senior notes in the face amount of $94.9 million, shares of new convertible preferred stock with an aggregate liquidation preference of $31 million, and about 94.3% of the newly issued common stock of the Company.

50.    In an attempt to procure the consent of the Unsecured Creditors Committee of Genesis, the Plan threw a bone to the provided that the debentureholders would receive about 3.8% of the new Genesis common stock and would receive warrants to purchase an additional 5.7% of the new Genesis stock at an exercise price of $20.33 per share. The warrants were to expire one year later, on October 2, 2002. Although the unsecured creditors committee approved the Plan[8], the debentureholders, voted overwhelmingly to reject it. In bankruptcy parlance, the Plan was "crammed down" on the dissenting debentureholders.

51.    In its original form, the Plan also contained sweeping releases from liability not only for Genesis but also for the senior creditors and their advisors. Those proposed releases would have absolved Genesis and its senior creditors, and

---

[8] Although the bondholders represented 75% of the dollar amount of unsecured claims, they had only 33% of the votes on the committee, which was dominated by trade creditors who had ongoing business relationships with Genesis.

their "members, officers, directors, employees, agents or professionals" from "any liability to any holder of any claim or equity interest for any act or omission" in connection with the bankruptcy case or the approval of the bankruptcy plan of reorganization. In its decision approving the Plan, the Court held that "the release of third-party claims against the Senior creditors must be stricken". 266 B.R. at 609. The revised release, which was ultimately approved by the Court, did not extinguish any potential claims against the senior creditors; nor did it extinguish any potential claims against Genesis, MC or their insiders or advisors for fraud or gross negligence.

52. On the effective date of the Plan, Genesis' pre-existing common stock and debentures (plaintiffs' holdings) were deemed cancelled, and the Company authorized the issuance of 41 million shares of its "New Common Stock", approximately 3.8% of which was eventually issued to former Genesis debentureholders, including the plaintiffs. In addition, Genesis issued "new warrants", expiring on October 2, 2002, to purchase an additional 4,559,475 shares (approximately 5.7%) of "New Common Stock" at an exercise price of $20.33 per share. Neither the New Common Stock nor the new warrants had yet been issued at the time of the misrepresentations alleged herein.

## D. The Scheme

### 1. Overview

53.    The Warburg and Chilmark valuations represented that Genesis

had suffered a drastic loss of value in a very short time. If, as expected in early 2000,

Genesis had maintained the EBITDA performance it had demonstrated during 1998,

1999 and the first two quarters of fiscal 2000 -- annual EBITDA of $205-210 million

-- application of either the Warburg or Chilmark valuation methods would have led

to a reorganization value for Genesis of $1.7 - $1.9 billion, $300 - $600 million above

the total claims of the senior lenders. If that had happened, there would have been

enough value for junior creditors, most notably the subordinated debentureholders,

to recover the full par value of their debentures.

54.    But somewhere between March of 2000 and August of 2001, when

the financial advisors submitted their final reports to the Bankruptcy Court, over half

a billion dollars of enterprise value had disappeared, and there was now next to

nothing left over for the debentureholders. Defendants brought about that result by

manipulating and falsifying both the projected and LTM EBITDA data.

55.    The Budgeted EBITDA projections used by Warburg started with

the baseless presumption that corporate level payroll expenses would increase by $35

million for additional staff, despite the fact that the company was shrinking. These

2001 Budgeted EBITDA projections also included the following additional, contrived, negative "adjustments", which were made, as needed, to keep the end result as close as possible to $158 million for valuation purposes -- and, thus, to maximize the recovery for the senior creditors, at the expense of everyone else:

- $13.242 million was taken out because of the anticipated loss of business supplying pharmaceuticals to Mariner Post-Acute Network ("Mariner"), even though there was never any possibility that this business would be lost.

- $11.6 million was also taken out to reflect the retroactive reduction in the management fees and other charges payable by MC to Genesis. This "renegotiation" was not undertaken to make these contracts more "fair", but to arbitrarily transfer value, retroactively, out of Genesis.

- a deduction for the loss of the AGE Institute business was overstated by about $4 million.

- about $2 million should have been, but was not, added because of an increase in the proportion of Medicare patients at Genesis facilities.

Collectively, these manipulations whittled down the projections by over $70 million. But for these manipulations, projected EBITDA would have been consistent with Genesis' recent historical performance in 1998, 1999 and the first two quarters of 2000.

56.    The artificially depressed Budgeted EBITDA projections were "confirmed" by the submission of "historical" LTM EBITDA data, which coincided

32

almost exactly with the projections. But the LTM data had been manipulated as well.

These manipulations included the following:

- As with the projections, 100% of the EBITDA from Mariner, totaling $13.4 million, was excluded on the spurious ground that this income would probably be lost.

- As with the projections, MC management, pharmacy and therapy charges were retroactively lowered by $11.6 million, reducing EBITDA by this same amount, on the spurious ground that this would make them more "fair".

- Excessive insurance reserve expenses of about $13 million were improperly subtracted.

- Non-recurring expenses of about $13 million for terminated First Choice employee health plan were improperly subtracted.

- 10% of the pharmacy revenues payable by Manorcare, totaling about $11 million, were not reported, without a reasonable basis to believe that those charges would probably not be paid.

- $6 million in expenses for the non-recurring "Special Recognition Program" were improperly subtracted.

- $4 million in expenses the for non-recurring executive deferred compensation were improperly subtracted.

- Pharmacy costs of goods sold were artificially inflated by about $13 million.

These manipulations whittled down Genesis' LTM EBITDA by as much as $80 million. In the six days between the first release of the LTM EBITDA and the confirmation hearing, it was simply impossible for the debentureholders to uncover

this elaborate fraud, much less prove it.

## 2. Specifics

57.    The Genesis "DIP" Financing Agreement with the senior creditors

defines EBITDA as net income, as determined by GAAP,

> *plus* (a) the sum of depreciation expense, amortization expense, other non-cash expenses, adjustments for inventory valuation, net total federal state and local income tax expenses, gross interest expense less gross interest income, extraordinary losses, *non-recurring charges* or restructuring charges, effect of changes in accounting principles and Chapter 11 expenses [emphasis added],

> *minus* (b) extraordinary gains,

> *plus or minus* (c) the amount of cash received or expended which was taken into account in determining EBITDA for the current or any prior period.

This definition used in the Genesis DIP loan agreement is typical of those used in the financial community, for reporting as well as for valuation purposes and, upon information and belief, was the definition both Warburg and Chilmark assumed Genesis had used in preparing its projected and LTM EBITDA data.

### a. Improper Deduction from LTM EBITDA of Additions to Insurance Reserves that were Well In Excess of Potential Liability Exposure

58.    Nursing homes and pharmacies, including those operated by Genesis, carry general/professional liability ("GL/PL"), workers compensation

34

("W/C"), and employee health and casualty insurance. Prior to June of 2000, Genesis had been self-insured for WC and had purchased GL/PL insurance from a third party carrier. On June 1, 2000, just before filing its bankruptcy petition, Genesis restructured its insurance program (which included MC) by obtaining third party WC insurance and switching its GL/PL coverage to its own wholly owned insurance subsidiary, Liberty Health Corporation ("Liberty"), which is domiciled in Bermuda. Liberty never filed bankruptcy.

59.    Liberty maintained four layers of reinsurance for this GL/PL coverage, which collectively provided "stop loss" limits to Genesis' exposure. That limit (which included claims pertaining to MC)was initially $14 million, including $9 million for its Florida elder care facilities and $5 million for its other facilities. Thus, for the twelve month period June 1,2000-May 30, 2001, Liberty's maximum possible GL/PL exposure, for both Genesis and MC, could not exceed $14 million. For the period June 1, 2001 through May 30, 2002, this aggregate stop loss limit was raised to $19 million.

60.    In this line of business "stop loss" limits are generally very high, and would never be reached absent some catastrophic liability incident. That was true for Genesis as well. For the twelve month insurance period ending May 30, 2001, Genesis (including MC) had approximately 1600 operating beds in Florida, for which

35

the actuarial loss experience, as determined by Genesis' risk management actuary,

Tillinghast Towers-Perrin, was $2,888 per bed. For 1600 beds, the actuarial exposure

was about $4.6 million, about half the $9 million stop loss limit for Genesis' Florida

homes during that period. It would therefore have been appropriate to set aside

reserves, and charge them against earnings, in the total amount of $4.6 million for the

Florida facilities, for the period ending May 30, 2001.

      61.    But Genesis went far beyond posting reserves commensurate with

its actual exposure. Instead, it posted reserves equal to its total stop loss limits and

fully expensed those payments immediately. Between July 1 and August, 2, 2000,

Genesis (on a consolidated basis) fully funded the GL/PL self-insurance program for

2000-2001, by transferring to Liberty $14 million (in the form of letters of credit), the

aggregate stop loss limit, and fully expensed that entire payment during the LTM

period. Moreover, it appears that Genesis posted significant additional reserves on

the insurance renewal date, June 1, 2001. The LTM EBITDA period ended on June

30, 2001. During the month of June large deposits were made to Liberty and were

fully expensed at the time they were made, so that they could be used to reduce LTM

EBITDA. These deposits not only exceeded, on a pro rata basis, the actuarial risk, but

they were also paying to cover risks that were already covered by the stop loss

provisions of the reinsurance carriers.

62.   The senior creditors were well aware of these transactions and the effect they would have on the LTM EBITDA; but neither the public nor the junior creditors, including the bondholders, were informed.

63.   Normally, the payment of insurance claims and deposits to reserves ought to be comparable, leaving the total reserve balance relatively static. But the reserve levels maintained by Genesis were anything but static. The great increases in insurance reserves, held by Liberty and posted by Genesis during this period, were reflected in the consolidated Genesis/MC 10Qs and 10Ks, as follows:

| Date | Reserve Balance ($ thousands) |
|---|---|
| 9/30/99 | 24,599 |
| 9/30/00 | 27,899 |
| 9/30/01 | 51,625 |
| 6/30/02 | 74,912 |

However, the last two of these figures were not disclosed until after the confirmation hearing. The rapid build-up in reserves shows that Genesis was making payments to Liberty, and expensing them, far more quickly than Liberty was paying out claims.[9]

_____

[9] These data also show that the practice of over-depositing into reserve accounts, and expensing those deposits, continued post-confirmation. This had the effect of keeping EBITDA consistent with the data that had been used to value the Company, thus preventing suspicions from arising; by depressing post-confirmation EBITDA, the trading price for Genesis stock was also kept down, rendering valueless the options that had been provided to the debentureholders in the Plan, which had an exercise price of $20.33 per share. Now that those options have expired, the excessive

64.    GAAP requires that companies deduct contingent liabilities from earnings under certain circumstances. SFAS No. 5, "Accounting for Contingencies", provides, in part, as follows:

> 1. ... a "contingency" is defined as an existing condition, situation or set of circumstances involving uncertainty as to possible gain ... or loss (hereinafter a "loss contingency") to an enterprise that will ultimately be resolved when one or more future events occur or fail to occur. ....
>
> 3. When a loss contingency exists, the likelihood that the future event or events will confirm the loss or impairment of an asset or the incurrence of a liability can range from probable to remote. .... This Statement uses the term *probable* ...as follows:
>
>> a. *Probable.* The future even or events are likely to occur. ...
>
> 4. Examples of loss contingencies include: .... risks of loss from catastrophes assumed by property and casualty insurance companies ....
>
> 8. An estimated loss from a loss contingency (as defined in paragraph 1) shall be accrued by a charge to income if *both* of the following conditions are met:
>
>> a. Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this

---

deposits can be returned to Genesis at any time, benefiting the defendant Genesis equity holders but not the former debentureholders.

> condition that it must be probable that one or
> more future events will occur confirming the
> fact of the loss.
>
> b. The amount of loss can be reasonably
> estimated.

Thus, under GAAP, charges to earnings, based on contingent insurance liabilities, are
to be accrued only when the liability is probable and the amount can be reasonably
estimated.

65. Genesis did not report publicly, until the third quarter of 2002: (i)
what its aggregate stop loss limits were for its GL/PL insurance, (ii) that it had
deposited reserves equal to 100% of those limits, and (iii) that it had fully expensed
all those deposits in the current period, regardless of whether those deposits exceeded
Genesis' actual exposure to claims, in violation of GAAP. Genesis never reported that
it had deposited, and expensed, amounts in excess of the stop loss limits.

66. Genesis has never explained the reasons for these surcharges to
reserves; nor has it ever disclosed the total insurance claims it actually received during
this period, so that the amount of claims could be compared to the size of the reserves
being taken. Instead, Genesis management made vague, conclusory pronouncements
to the unsecured creditors, in their quarterly and annual reports, and in statements to
the financial wire services, to the effect that insurance costs were "spiraling upwards".

These statements had the effect of explaining away the sudden tripling in insurance reserves reported by the Company within an 18 month time period.

67.     Genesis was, however, telling the truth to the senior creditors. On August 8, 2000, it explained the stop loss provisions and the fact that it was funding the self-insurance deposits via a letter of credit from the DIP financing provided by the senior creditors. It also told the senior creditors that W/C costs were declining from 1999 levels, and that rates had declined slighty from 2000 to 2001. In June of 2001, Genesis explained to the senior creditors that the GL/PL retention (the amount up to the stop loss limit) had been fully funded and expensed. Hager, other members of Genesis management, and the senior creditors all knew that the actuarially experienced losses were $2,888 per Florida bed, and $152 per bed in all other states, an amount far lower than the amounts being reserved and expensed.

68.     Plaintiffs estimate that the excessive insurance reserve charges deducted from EBITDA, during the valuation period, were at least $13 million.

**b. Improper Deduction from Budgeted and LTM EBITDA of $11.6 million by Renegotiating Genesis' Management Agreements with MC**

69.     A major part of the inducement for Genesis to acquire its stake in MC in 1997 was that it also would be able to earn significant revenues by (a) providing management services to MC, (b) selling pharmaceuticals to MC from the

Genesis institutional pharmacy division, NeighborCare, and (c) selling therapy services from its therapy division.

70.   On October 9, 1997, MC signed a five year management contract with Genesis with an automatic two-year renewal. At about the same time, separate therapy and pharmacy contracts were also signed. These contracts were negotiated at arm's length, with Texas Pacific Group and Cypress Group, which collectively owned over 56% of the MC stock, representing MC. The management services contract provided for payment of a fee equal to 6% of MC's gross revenue. This fee was well within industry norms, as were the pharmacy and therapy contracts as well.

71.   In its Disclosure Statement, ultimately disseminated in support of the bankruptcy reorganization Plan, Genesis recounted that

> At the time the management services agreement and other agreements were entered into, Multicare was controlled by parties unrelated to Genesis or the Genesis Debtors. The terms of these agreements were the product of arm's-length negotiations between Genesis and the parties controlling Multicare and the agreements were approved by Multicare's independent board of directors. In addition, the terms were disclosed at the time off the issuance of Multicare's senior subordinated notes (Class M5).

72.   By March of 2000, about the time when Goldman joined the senior lender steering committee, these senior Genesis/MC managers had begun an examination of the management, pharmacy, therapy and service contracts between

41

Genesis and MC. The stated reason for the examination was to determine the "fairness" of the very contracts that Genesis continued to represent had been negotiated at arm's length less than three years earlier. The real purpose of this exercise, however, was to divert as much value as possible from Genesis (and its bondholders) to MC, and thereby minimize the share of Genesis to which the Genesis bondholders would be deemed entitled.

73.    But renegotiation of the agreements was complicated by the fact that the same senior executives were in charge of both companies. Immediately after the acquisition of MC in 1997, management of the two companies had been kept separate; but by November of 1999, MC's financial condition had deteriorated so severely that its board of directors had resigned and managerial control had been transferred to an operating committee consisting of George Hager, Michael Walker and Rick Howard, who were also the CFO, CEO and Vice president of Genesis, respectively. Therefore, someone else had to be brought in to give the appearance of an arm's length renegotiation.

74.    Mellon suggested Beverly Anderson for that position. Notes taken by Chilmark at a steering committee meeting of April 13, 2000, show that Sherman White, an executive vice president of Mellon, had suggested Anderson's name, and the senior creditors selected her for the task. On April 13, 2000, Anderson was hired

42

as an "independent restructuring officer", and Anderson retained E&Y Capital Advisors ("E&Y") to work with her in the renegotiations. E&Y could not be retained directly by either Genesis or MC because of a conflict of interest.

75.    Although Genesis represented in the Plan disclosure statement, and in its 10K report, that Anderson was independent, she was, in fact, financially beholden both to Goldman and to Genesis. Anderson had done consulting work for Mariner Post Acute Network ("Mariner"), and had run up an unpaid bill of over $500,000.00. By 2000 Mariner had filed for bankruptcy, and Anderson's claim was now just another unsecured pre-petition claim, which ordinarily would have had little chance of repayment. Anderson's only hope of payment was to be designated a "critical vendor" to Mariner, which would be highly unusual for a consultant unless the creditors consented.

76.    Yet the Mariner creditors were for the most part the very same institutions that controlled the Genesis Bank Steering Committee. Four members of the Genesis Steering Committee held at least $380 million of Mariner's senior debt, with Goldman alone holding $242.3 million (over 25%) of it. Because Genesis was also a major creditor of Mariner, David Barr of Genesis chaired the Mariner unsecured creditors committee. Goldman and Genesis were therefore perfectly placed to determine whether Anderson's $500,000 bill would ever be paid.

77.    Although the renegotiated contracts between Genesis and MC were not signed until August of 2001, the Steering Committee had set the final terms eight months earlier. On October 10, 2000, Hager gave the Genesis unsecured creditors committee a preview: the contract renegotiation, he said, would result in a reduction of the management contract rate from 6% to 4.6%.

78.    A few weeks later, on November 13, 2000, E&Y made a presentation to the unsecured creditors committee of MC, during which it discussed its view of the fairness of the various existing contracts with Genesis, and the effect of changes that had been achieved in negotiations. At the time, a total of $16 million in contract reductions were being discussed, broken down as follows:

| | |
|---|---|
| Rehabilitation: | $2.8 million |
| Pharmacy | $3.0 million |
| Hospitality | $1.7 million |
| Management fees | $8.5 million |

79.    Yet E&Y reported that it had concluded that, for rehabilitation services, the existing arrangements were far from "unfair". It specifically determined that, compared to market rates,

- Medicare part A per diem rates as a whole were the same or better for Multicare facilities

44

- • Medicare Part B fee schedule percentages were the same or better for Multicare facilities

- • Non-Medicare payor rates and premium service rates were the same or better for Multicare facilities.

In sum, E&Y characterized the fees Genesis had been charging for rehabilitation services as "market rate". Despite this, E&Y reported that Genesis had agreed to lower these fees by $2.8 million per year, even though a cut of that magnitude would cut its margins for these services by 46%.

100.    Similarly, E&Y concluded that the existing pharmacy deal MC had with Genesis was also fair and reasonable:

- • [Prescription] Drug costs - Multicare pays slightly more than unaffiliated customers.

- • OTC [over the counter drug costs] - Prices are market.

- • IV's - No disadvantage identified

- • Medical Supplies - Multicare receives better pricing than unaffiliated customers.

Once again, Genesis was ready to improve upon an already fair deal: E&Y reported that it had consented to lower its prescription medication charges by about $2 million per year, and to lower its medical supply charges – which were already "better" than those charged to other customers – by another $1 million.

101.    Hospitality rate charges tell the same story: although E&Y

45

concluded that Genesis' "rates are market", Genesis had agreed to reduce them dramatically, saving MC $1.7 million in 2000 and $2.1 million in 2001, and costing Genesis equal amounts.

102. Finally, E&Y determined that management contract services in the industry range from a "base rate" of 3% to 6% of revenue, and that incentive fees range "up to 7% of gross or 1 to 25% of NOI [net operating income]". Although the Genesis contract had a base rate that was at the high end of this range, it did not have either a budget incentive fee or a stretch incentive fee. Moreover, the existing contract included a provision that prevented it from receiving 2% (one third) of its base rate in the event that MC fell below certain financial parameters. Because of MC's weak financial condition, it had consistently operated well below those financial parameters. Consequently, Genesis had actually been receiving only a 4% base rate fee.

103. Nonetheless, Genesis had once again acquiesced in still further reductions, bringing the base rate down from 6% to 4.6%, a change which would boost MC's EBITDA (and reduce Genesis') by $8.5 million per year.

104. Further negotiations apparently followed the November 13 presentation, because by January 23, 2001, the senior financial advisor to the banks, Policano & Manzo, advised Chilmark, the banks' valuation experts, that the total MC

contract adjustments were set at $11.6 million.

105. On January 9, 2001, Policano & Manzo had advised the senior creditors that Genesis' costs to manage Genesis, MC and a few third party beds was $80.4 million per year. Using customary industry formulas for apportioning these expenses, the cost of providing the management services to MC was about $35.8 million per year. At the original 6% base rate, the revenues generated from the MC management contract were about $38 million (as calculated by E&Y), providing a razor thin "profit" margin of about $2.2 million. But even that profit margin was illusory; 2% of the fees were "accruing", unpaid, totaling about $13.1 million annually. As a result, under the existing management contract Genesis was actually *losing* about $10 million per year. Moreover, substantial additional amounts were not being paid at all.

106. By reducing the base rate to 4.6%, an already bad situation was being made even worse. Now there would not even be a paper profit: management fee revenues would drop to $29.6 million – $6.2 million *below* the cost of providing those services. The unsecured creditors were not informed of these facts. To the contrary, they were misled by Hager about the true costs of providing the management services, because he showed them only the payroll costs of providing the management services.

107. Adding to the unreality of this renegotiation is that these new

47

agreements had *no prospective application whatsoever*. By the date they were signed and submitted for Court approval, Genesis and MC had already submitted a joint plan of reorganization pursuant to which the two companies would be merged and all intercompany management and other agreements would be extinguished. The *only* purpose of this renegotiation, therefore, was to achieve *retroactive* reductions in these fees, and thereby affect the relative valuations of these companies for purposes of the bankruptcy proceedings. The new contract rate was applied retroactively to reduce LTM EBITDA and projected EBITDA for the valuation period by $11.6 million. At the multiples used by the valuation experts, defendants had transferred, by this stroke of the pen, about $97 million in value from Genesis to MC -- and, therefore, from the Genesis bondholders to the senior creditors.

108. This benefitted the Genesis senior creditors by lowering the valuation of Genesis dramatically, thereby proportionately increasing the share of Genesis stock they could obtain through the bankruptcy. Virtually all of these same creditors were also senior creditors of MC. But raising the value of MC did not have any negative affect on the MC senior creditors. MC had so little value that, even after adding $11.6 million to the bottom line, it was still worth substantially less than the senior creditor claims.

109. In short, the "renegotiation" of the Genesis and MC agreements

was not a bona fide transaction done in good faith. It was simply a contrivance to transfer value, for bankruptcy purposes, from Genesis to MC and thereby help the Genesis senior creditors achieve a greater share of the Genesis equity, at the expense of the Genesis bondholders, including plaintiffs.

### c. Improper Deduction of $11 Million from Budgeted and LTM EBITDA By Excluding 10% of the Pharmacy Sales to Manorcare

110. In August of 1998, Genesis purchased the Vitalink Pharmacy from HCR Manorcare ("Manorcare") and also entered into an agreement requiring Manorcare to purchase pharmaceuticals from Genesis through 2004 at scheduled pricing rates. When the PPS Medicare reimbursement system went into effect in 1999, Manorcare demanded unwarranted price concessions from Genesis to help compensate for reduced reimbursement rates from Medicare. When Genesis refused, Manorcare purported to terminate its contract with Genesis, and Genesis commenced litigation to compel enforcement of the agreement. Manorcare also commenced its own arbitration proceeding, and all pending actions were ultimately consolidated before the arbitrator.

111. At the March, 2000, meeting with the Steering Committee, Genesis management touched upon the Manorcare situation but gave no hint of any possibility that the Manorcare account might be lost, or that any substantial portion

of the Manorcare income was in jeopardy or would soon be excluded from income.

112.   On May 23, 2000, the arbitrator announced that, in view of the imminent bankruptcy filing of Vitalink and Genesis, the trial of the case, which had been scheduled for June of 2000, would be postponed indefinitely. Genesis subsequently reported in its 10K for 2000 that

> in connection with this stay, the parties agreed that [Manorcare] may pay, on an interim basis, ... 90% of the face amount of all invoices .... The remaining 10 percent must be held in a segregated account by Manorcare.

Thus, the withholding agreement was not compelled by any ruling of the arbitrator.[10]

113.   Although Genesis disclosed the existence of the withholding agreement, it did not disclose, in any 10K or 10Q filing issued during the period, or anywhere else, that when the holdback agreement was entered it had booked a prepaid expense equal to 10% of the Manorcare revenue. That expense reduced Genesis' LTM EBITDA by about $11 million, but that fact was not disclosed. The Chilmark valuation report also did not disclose the impact of this 10% holdback on its valuation of the Company. The unsecured creditors therefore had no idea that such an expense had been booked and that 10% of the Manorcare revenues had thereby been excluded from EBITDA.

---

[10] Nor was the 10% holdback tied to the stay of the arbitration. Although the stay was announced in May of 2000, the holdback did not begin until November or Deceber of 2000.

114. In addition, the Genesis budgeted EBITDA figures included a $4 million "adjustment" for "price compression", to reflect the possibility that Genesis might be forced to make price concessions, in the future, in order to retain the Manorcare business. However, no price concessions were made to Manorcare during the 2001 fiscal year.

115. In April of 2002, several months after the Court approved the bankruptcy Plan, the arbitrator ruled that the Genesis contract with Manorcare was fully enforceable, and required Manorcare to turn over all the escrowed funds, with interest, totaling $21.7 million. In its 10Q for the second quarter of 2002, Genesis described the arbitrator's ruling and disclosed, for the first time, that it had been, in effect, excluding 10% of the Manorcare revenue from EBITDA up to that point.[11]

116. Under SFAS No. 5, it is improper to accrue a loss contingency unless it is "probable" that an event will occur that will cause the loss, and the amount of that loss can be reasonably estimated. Where, as here, the putative loss contingency arose from a pending litigation, it would be inappropriate to accrue any

---

[11]To reflect the release of the escrowed funds, Genesis booked a credit, which it categorized as "non-recurring". Because non-recurring income is not included in EBITDA, the use of this accounting device had the effect, once again, of excluding this income from post-confirmation EBITDA. In other words, $21.7 million of earnings from sales to Manorcare were forever excluded from Genesis' EBITDA. As noted above, by keeping Genesis' post-confirmation EBITDA down, defendants were able to keep "under water" the warrants the bondholders had received as part of the bankruptcy Plan.

loss unless counsel representing the debtor had rendered an opinion that it was probable that a loss of this particular magnitude would occur. No such opinion would have been rendered here, because it was never "probable" that Manorcare would succeed on its claims. The original contract fee schedule was reasonable and enforceable. Manorcare's fabricated claim was frivolous and should have been treated as such.

117. This 10% exclusion of the Manorcare revenues from EBITDA reduced LTM EBITDA by about $11 million, and the valuation of Genesis by close to $90 million.

118. Moreover, the $4 million "price compression adjustment" to budgeted EBITDA had no basis because no price concessions were made during that fiscal year.

### d. Improper Deduction of $13.4 Million from Budgeted and LTM EBITDA by Retroactively Excluding All Sales to Mariner

119. Like Genesis, Mariner operated nursing care facilities and also had a separate pharmaceutical subsidiary, American Pharmaceutical Supply Company ("APS"). Genesis had a contract to supply pharmaceuticals to fifty-eight Mariner nursing homes that were not in APS service locations, and the contract generated revenue of about $53 million per year.

52

120.  In January of 2000, Mariner filed for bankruptcy. Genesis continued to sell pharmaceuticals to Mariner, and as a "critical vendor" of pharmaceutical supplies, Genesis was entitled to receive "most favored vendor" treatment in the Mariner bankruptcy and therefore had little fear of non-payment. Genesis also had the additional protection of having its executive, David Barr, serve as chairman of the Mariner unsecured creditors committee. As a result, despite the bankruptcy, Genesis continued to be paid, in full, for all products it was delivering to Mariner, even though Mariner had not formally elected to affirm the supply contracts. As of March of 2000, Genesis had made no provision to reserve any of the receivables from Mariner; nor was any provision even discussed for the possible loss of the Mariner business.

121.  By August 30, 2000, Genesis had began negotiating to purchase APS from Mariner. On October 10, 2000, Hager told the unsecured creditors committee that an "opportunity" had presented itself to acquire APS, but that a "risk" of losing the Mariner pharmaceutical contract had also arisen. By linking the two, Hager suggested that unless APS were acquired, the entire Mariner business might well be lost.

122.  By the end of October, Genesis and the financial advisors to the senior creditors were hypothesizing that a complete loss of the Mariner business could

occur, and if it did it would reduce Genesis revenue by $52.8 million and EBITDA by $15.6 million. They further hypothesized that, in order to keep the Mariner business, Genesis might have to reduce its prices to Mariner (and, hence, its EBITDA) by $7.5 million.

123. But the prospect of losing the Mariner business never became a serious possibility, for two reasons: prior to approval of the bankruptcy Plan, Genesis reached an agreement to continue to provide pharmaceuticals to Mariner *regardless* of what happened with APS; and, in any event, it had also signed a contract to acquire APS. But defendants took steps to make sure that the Mariner issue was not formally resolved until after confirmation of the Plan.

124. On April 30, 2000, Genesis filed an "emergency" motion in the Mariner bankruptcy to compel Mariner to affirm or reject the pharmacy contracts, claiming that an immediate resolution was necessary to prevent "irreparable harm" to Genesis. This "emergency" motion was then adjourned by agreement eight times, for a total of 18 months, until October of 2001. It was only then, when the Genesis Plan had been safely approved, that the extension of the pharmaceutical supply contract was "finalized" and disclosed.

125. In fact, negotiations to acquire APS and to extend the supply contract had been ongoing for almost a year before the Plan was approved. As early

as November, 2000, several of the senior creditors, led by Goldman, had put together a financing package to enable Genesis to acquire APS; simultaneously, negotiations were proceeding for the continuation of the Mariner pharmaceutical supply contract, under slightly altered pricing terms. The senior creditors assented to the acquisition of APS by Genesis, and drafts of letter agreements were exchanged in September, November, March and on April 12, 2001. Genesis signed a final letter agreement as of April 12, 2001, and APS accepted it on April 17 – a development which obviated any legitimate concerns that the Mariner business might be lost, but which was not disclosed to the court or to the unsecured creditors. Meanwhile, the motion to compel affirmation or rejection of Genesis' contracts with Mariner was repeatedly adjourned, to avoid a formal resolution of the matter that could not have been concealed.

126. The prospect of acquiring APS should have led to a positive adjustment to Budgeted EBITDA, because this transaction was projected to enhance Genesis' revenues and earnings significantly.[12] Instead, in the spring of 2001 defendants disclosed that Budgeted EBITDA projections of $158 million had been prepared, and that they reflected a downward "adjustment" that assumed that the

---

[12] In fact, Houlihan Lokey, advisors to the unsecured creditors committee, determined that the acquisition of APS would add so much to Genesis' reorganization value that it would add 6% to the percentage of the new reorganized company that the debentureholders would be entitled to receive, increasing that percentage from 20.1% to 26.6% of the entire reorganized company.

entire Mariner business would be lost. This adjustment was originally set at $11.123 million, but had grown to $13.424 million by the time it was incorporated into the Budgeted EBITDA. Goldman and Highland made an all-out, successful effort to persuade the unsecured creditors committee and its financial advisors, Houlihan Lokey, that the Mariner business was likely to be lost and that a downward adjustment of EBITDA was therefore warranted. The creditors committee was persuaded and agreed to the reduction.

127.   But at that very moment Hager was advising the senior creditors that, even if the APS acquisition never went through, the Mariner business would *still* not be lost. On April 3, 2001, he told the senior lender steering committee that the pharmacy supply contract with Mariner would be in force for another 18 months, with Genesis having the right to match any competitive bid for two years after that. Handwritten notes of that meeting also indicate that Hager reported that Mariner was legally prohibited from lowering its pharmacy rates from Genesis. In short, he told the senior creditors that the Mariner pharmaceutical business was locked in, at full rates, until the end of 2002, and at somewhat reduced pricing up to 2005, irrespective of whether or not APS was acquired.

128.   Neither the signing of the letter of intent to acquire APS, nor the extension of the pharmacy supply contract, was disclosed to the unsecured creditors;

nor were they informed that the supply contract would remain in effect until 2005, *regardless* of whether or not Genesis acquired APS. In fact, Genesis actually signed *both* a formal extension agreement with Mariner *and* a contract to acquire APS before the Genesis Bankruptcy Plan was approved, and those agreements were not disclosed either, until well after the reorganization Plan had been approved. The final agreement to buy APS was executed on or about September 24, 2001, but defendants did not disclose it until October 8, 2001, *6 days* after the Court approved the Genesis bankruptcy Plan. Genesis did not disclose the extension of the Mariner supply contract until its 10Q for the first quarter of 2002, which was filed 4 months after the confirmation of the Plan. Both the purchase and the supply agreement extension were approved in the Mariner bankruptcy on November 1, 2001, about a month after the court approved the Genesis bankruptcy Plan.

129. As noted above, SFAS No. 5 permits the accrual of a loss contingency *only* when the potential loss is "probable". Here, the loss of the Mariner business was never "probable". The exclusion of over $13 million from the EBITDA projections and LTM EBITDA (and, therefore, of over $100 million from the Genesis valuation) for this reason was improper.

### e. Excessive Deduction from Budgeted EBITDA
### for Loss of AGE Institute Business

130.   Genesis had a contract to provide management, pharmacy and rehabilitation services to AGE Institute, a not-for-profit company that owned 20 nursing homes, mostly in Florida. On 2000, AGE Institute notified Genesis that it was unilaterally terminating the contract effective October 31, 2000. The annual revenues from this contract totaled $19.224 million.

131.   AGE Institute had been encountering serious financial difficulties for over a year, and by the date of the termination Genesis had run up an account receivable from AGE Institute of over $20 million, about a year's worth of unpaid bills. Recognizing AGE Institute's weak financial condition, Genesis had been setting aside substantial reserves against that receivable and the future fee income. Genesis had determined that approximately two-thirds of this amount was collectible. It filed suit for the unpaid balance, seeking $28 million in damages.

132.   At a meeting with the senior creditors in September of 2000, Genesis reported the loss of the AGE Institute business. It specifically advised them that the management contract had a 20% EBITDA margin and that the adverse impact on EBITDA would therefore be about $2,226,000. This was consistent with the subsequent disclosures in the Genesis 10K for 2000, which stated that Operating

Income from the AGE contracts was $2 million annually. At the September meeting Management also represented that it had already reserved $1 million through the end of July, 2000, as against the AGE Institute business. The setting aside of such reserves, and the accruing of the commensurate loss, had already reduced Genesis' EBITDA.

133.   On October 10, 2000, three weeks after the September meeting with the senior creditors, Genesis made a presentation to the Unsecured Creditors Committee concerning the loss of the AGE Institute business, and asked the Committee to approve an adjustment to the budgeted EBITDA being used for valuation purposes. Although Genesis used the same presentation boards it had recently used for the senior lender presentation, certain key data was changed. Now the EBITDA margin on the AGE Institute management contract was represented to be 74%, rather than 20%, and the adverse effect on EBITDA was represented to be $5.25 million, rather than $2.23 million. Those amounts took into consideration some, but not all, of what had already been reserved with respect to the loss of the AGE Institute business. Genesis management requested that budgeted EBITDA be adjusted downward by $5.25 million to reflect the loss of this business, and the Unsecured Creditors Committee, being unaware of the much lower figures that had been used in the presentation to the senior creditors, and of the reserve already set aside for the

loss of the AGE Institute business, agreed.

134.  Under SFAS No. 5, the loss contingency that should have been accrued was the "reasonable estimate" of the actual loss of earnings. The $5.25 million figure used by defendants was not a "reasonable estimate" of the actual loss caused by the loss of the AGE Institute business, and it was therefore improper to take such a charge against earnings (and, hence, EBITDA). At most, the adjustment should have been in the amount represented to the senior creditors, $2.23 million. Given the possibility that much of that amount had already been reserved against, it is likely the true amount of the adjustment should have been far lower still.

135.  Through this device, Genesis management improperly lowered Budgeted EBITDA by about $3 million and thereby reduced the calculated valuation of Genesis by more than 8 times that amount.

### f. Improper Deduction from LTM EBITDA of Non-Recurring Employee and Management Retention Bonuses

136.  As noted above, non-recurring charges and restructuring charges are not to be included in EBITDA. Bankruptcy reorganization expenses are expressly defined, by GAAP, as non-recurring expenses. See AICPA Statement of Position 90-7 (paragraph 27) (provisions for losses resulting from the reorganization and restructuring of the business should be reported separately as reorganization items ...).

Paragraphs 28 and 49 of SOP 90-7 further provide that restructuring and reorganization expenses, professional fees and similar types of expenditures directly relating to the Chapter 11 proceeding are, by definition, non-recurring, as defined by APB 30, paragraphs 19 through 24.

137. On September 5, 2000 (in the fourth quarter of fiscal 2000), Genesis obtained Bankruptcy Court approval for a "Special Recognition Program" totaling over $11 million. The program was allegedly designed to assure that key employees remained with the Company despite the ongoing bankruptcy.

138. This program fit the classic definition of one-time, non-recurring charges and expenses, unusual in nature and infrequent of occurrence, which are not part of EBITDA. Accordingly, Genesis categorized these expenses reorganization costs, separate and apart from its statement of operations, in its consolidated financial statements for fiscal 2001.

139. Of this $11 million, approximately $6 million of these charges improperly found their way into the Genesis standalone LTM EBITDA, improperly reducing it by that amount.

### g. Improper Deduction from Budgeted and LTM EBITDA of Non-Recurring Costs for the "First Choice Plan"

140. On January 1, 2000, Genesis started a new employee health

insurance plan called the "First Choice Plan", which was made available to certain Genesis and MC employees. The plan quickly proved unaffordable and by the end of the 2000 fiscal year (September 30, 2000), at the latest, Genesis had announced that the plan would be discontinued after March 31, 2001. The decision to discontinue the plan was disclosed in the Genesis 10-K for fiscal 2000.

141. In the last quarter of fiscal 2000, Genesis took a charge to earnings (on a consolidated basis, including MC) for an "insurance adjustment" of $35,235,000. Of that amount, approximately $21 million represented exit costs of the First Choice Health Plan; and of that amount, about $13 million was attributed to Genesis on a standalone basis. Because the Plan had already been designated for termination by this time, the insurance adjustment was a non-recurring charge, as defined in APB 30, paragraph 26, and was treated as such in the Genesis 2001 10-K. Nonetheless, it was improperly included in the calculation of LTM EBITDA.

142. At meetings with the unsecured creditors committee, Hager tried to explain away the sharp spike in insurance costs by claiming that those types of costs had skyrocketed industry-wide. These statements were designed to, and did, cover up the fact that Genesis' insurance charges had been manipulated upwards by the inappropriate inclusion of the non-recurring charges incurred in connection with the First Choice Plan.

143. At a meeting of management and the senior creditors steering committee of March 13, 2001, Goldman and the other lenders present recognized that the First Choice Plan had been discontinued and that the charges associated with that plan were non-recurring. Nonetheless, they did nothing to take these costs out of the LTM EBITDA calculation.[13]

### h. Improper Reduction of Budgeted EBITDA based on Sudden Increase in Pharmacy Cost of Goods Sold

144. Genesis' "Neighbor Care" pharmacy subsidiary contributes about $1 billion in revenues to the Company each year, representing about 55% of the total. The NeighborCare cost of goods sold ("CGS"), as a percentage of revenue, was 58.7% in fiscal 1998 and 58% in fiscal 1999. In fiscal 2000 the budgeted CGS was 59.2% and, on August 2, 2000, Genesis management reported to the senior lender steering committee that as of mid-2000, the actual average CGS had been 59.8%. Two months later, Genesis management told the unsecured creditors committee that the budgeted EBITDA for fiscal 2001 assumed a pharmacy CGS of 61.9%, based on the most recent two months' results.

145. There was no legitimate basis for that assumption. In its 10Q for

---

[13] Ironically, the improper inclusion of these non-recurring Choice Plan costs in EBITDA triggered an EBITDA "covenant default" under the Genesis DIP loan agreement.. Rather than correct this "default" by excluding the charges from EBITDA, as Genesis should have done, it agreed to pay the DIP lenders a $1 million "default fee" in exchange for a "waiver" of this non-existent default.

the second quarter of fiscal 2002, issued about seven months after the Plan was confirmed, Genesis disclosed for the first time the pharmacy CGS for the first two quarters of fiscal 2001. CGS had been 59.3%, not 61.9%, as represented to the unsecured creditors committee and used as a basis of the budgeted EBITDA figures.

146.    Because of the large volumes involved, the inflation of pharmacy CGS by 2.6% would have reduced EBITDA by about $26 million on an annualized basis.

### i. Failure to Adjust Budgeted EBITDA to Reflect Increased Medicare Population Mix

147.    Even after the advent of PPS, Medicare daily reimbursement rates were about $140 per day higher than Medicaid rates and, as a result, Medicare patients were far more profitable than other patients and were therefore highly coveted by nursing care facilities.

148.    Beginning in early 2001 and building steadily through the year, Genesis was experiencing a greater percentage of Medicare patients than it had in fiscal 2000. In fact, Medicare patient days had increased from 12.2% of total patient days in 2000, to 14.5% in 2001. Nonetheless, in projecting EBITDA, Genesis used the patient mix data for 2000 and assumed that it would continue unchanged into the future. The benefit of this additional 2.3% Medicare patient ratio would have been

several million of additional EBITDA for the remainder of fiscal 2001.

149.    Genesis management advised the senior creditors of the improvement in the Medicare census, but did not inform other creditors, or the Bankruptcy Court. More importantly, although Genesis management had pounced on every opportunity to make negative adjustments to EBITDA, it never sought a positive adjustment to reflect this favorable development. Defendants should have, but did not, make an upward adjustment to budgeted EBITDA to reflect this development.

150.    Genesis did not disclose its overall Medicare census for the first two quarters of 2001 until April 30, 2002, over four months after the Plan was approved, when it filed its 10-Q for the second quarter of 2002.

151.    Had they adjusted the EBITDA data to reflect the improved Medicare census, EBITDA would have increased by about $4 million.

### j.  Unjustified Increase of $35 Million in Budgeted EBITDA for Projected Additional Personnel Costs

152.    One of the fundamental assumptions, on which the Budgeted EBITDA data were based, was that personnel expenses at the corporate level were going to increase by $35 million, even though Genesis was actively divesting itself of nursing beds and would, presumably, not need additional personnel to oversee this shrinking operation. In fact, the new positions that Genesis created, and factored into

Budgeted EBITDA, were not filled.

153. Included among the projected personnel costs were new management performance driven incentives, which the Budgeted EBITDA assumed would be awarded even though the performance criteria for awarding those bonuses were utterly unrealistic and unreachable.

### k. Increasing the Senior Creditor Claims

154. In July of 2000, Goldman, Highland, Mellon and two other senior creditors committed to providing debtor-in-possession ("DIP") financing of $200 million for Genesis and $50 million for MC. The DIP financing proposal was approved by the Bankruptcy Court on July 18, 2000. By the time the Plan was approved, Genesis had drawn down $200 million in DIP financing; but MC had drawn down nothing. Repayment of DIP financing is the highest priority claim in bankruptcy.

155. Genesis used the proceeds of its DIP borrowings as follows:

| | |
|---|---|
| Repay Tranche II prepetition senior debt: | $40 million |
| Pay pre-petition senior interest: | 44 million |
| Pay post petition senior interest: | 112 million |
| Other | 4 million |
| Total: | $200 million |

156. Had the senior creditors not interfered, Genesis could have paid these charges out of its regular cash flow, without utilizing the DIP credit facility and without gratuitously increasing the claims of the senior creditors by $200 million.

157. But the senior creditors *did* interfere, effectively forcing Genesis to draw down the DIP credit facility. First, they "deemed" all $25 million in free cash that was held in the accounts of Genesis and MC to belong to MC only, and then "froze" those funds so that they could not be paid out. Then they prevented MC from drawing down any of its $50 million DIP facility to pay its bills to Genesis. By shutting off the financial spigot, the senior creditors prevented MC from using any of this $75 million to pay its Genesis bills. But for the intervention of the senior creditors and the acquiescence of Genesis/MC management (who were the same people), MC could have, and should have, paid at least $75 million of the $109 million pre-petition claims of Genesis.

158. All the while, Genesis continued to supply management and other

services, as well as pharmaceutical products, to MC throughout the bankruptcy, without being paid anything on its pre-petition charges. Genesis could have been paid for some of its pre-petition charges had it been deemed a "critical vendor" under the Bankruptcy Code. But, shockingly, Genesis never sought, and never received, such status – even though in other bankruptcy cases involving Genesis customers, such as Mariner, Genesis *had* routinely been granted such status, and even though MC was paying about 75% of pre-petition claims of other vendors who were far less "critical" than Genesis.

159.   The status of Genesis' enormous account receivable from MC for pre-petition charges was not disclosed until August of 2001, when Genesis filed with the Court its "settlement agreement" with MC. In addition to reducing its fee for services rendered under the various management and operational contracts, as described above, this "settlement agreement" also relieved MC of its $109 million contractual obligations to pay Genesis for pre-petition goods and services provided. As justification for this raw give-away, the settlement agreement recited that, because of the fairness analysis prepared by Beverly Anderson, MC had come to realize that it had $22 million in "claims" against Genesis for past overcharges under the various inter-company agreements -- and that Genesis had agreed to cancel its entire $109 million claim against MC in exchange for the "release" of this newly-discovered $22

million "claim". Genesis' failure to insist upon payment of MC's outstanding obligations contributed mightily to forcing it to draw down its DIP credit facility.

160. Genesis took additional actions that exacerbated its own cash crunch, including: (a) unnecessarily transferring excessive insurance reserve payments to Liberty, described above; (b) allowing accounts payable to shrink dramatically while accounts receivable grew, also dramatically, and (c) allowing Manorcare to withhold 10% of amounts due. During the bankruptcy, accounts receivable increased by $70 million, *despite* the write-off of $14 million of other receivables; while accounts payable were *decreasing* by $59 million. This reflects a a speed-up in payments to vendors, coupled with slow-down in efforts to collect on debts due and owing.

161. Collectively, these actions stripped Genesis of well over $200 million in operating capital and contributed directly to its need to draw upon the equivalent amount of DIP financing, further assuring that the senior creditors would be deemed impaired.

### 3. Summary of the Misrepresentations

162. To effectuate their scheme, defendants made the following misrepresentations to the Court and to the unsecured creditors:

1. They misrepresented that LTM EBITDA data supplied by Genesis, for

valuation purposes, had been prepared in good faith, without disclosing the accounting and financial manipulations described herein.

2.    They misrepresented the Budgeted EBITDA data supplied to Warburg had been prepared in good faith, without disclosing the accounting and financial manipulations described herein.

3.    They gave false testimony to the bankruptcy court supporting the validity of these EBIDTA data, including the testimony of George V. Hager.

4.    They gave false and misleading information to the Unsecured Creditors Committee concerning the fairness of the management contract with MC, to persuade it to go along with the renegotiation of that contract and its consequent adverse consequences on the Genesis EBITDA and valuation. They also failed to disclose the blatant conflicts of interest of the so-called "independent" restructuring officer, Beverly Anderson, who negotiated these contractual revisions.

5.    They gave false and misleading information to the Unsecured Creditors Committee concerning the EBITDA margin that the Company had been realizing on its business with the AGE Institute, and failed to disclose the far lower EBITDA margins management had disclosed to the senior lender group, to persuade the Unsecured Creditors to go along with an exaggerated adjustment to EBITDA, and the reduction of the Genesis valuation resulting from the loss of that business.

6.    They represented that there was a serious possibility that the Mariner business would be lost, without disclosing that the Mariner agreement had been extended, and that APS had signed an agreement to be acquired by Genesis.

7.    They failed to disclose that the EBITDA calculations excluded 10% of the Manorcare revenue, and that it was not probable that this revenue would be lost.

8.    They failed to disclose that Genesis had booked, as current expenses, payments into insurance reserves that far exceeded current liability exposure and stop loss limits.

9.    They failed to disclose that non-recurring expenses, including those associated with cancelling the First Choice plan, and special payments made to executives to induce them to stay during the bankruptcy proceedings, were being deducted from EBITDA.

10.    They misrepresented the pharmacy cost of goods sold.

11.    They failed to disclose that the Budgeted EBITDA assumed that personnel expenses at the corporate level were going to increase by $35 million, at a time when Genesis was actively divesting itself of nursing beds.

### 4. Each Defendant Participated and Had Knowledge of the Misrepresentations

160.    Defendant Hager was the chief financial officer of Genesis and of

MC during the relevant period and, as such, was directly involved with, and responsible for, the preparation of the Genesis financial statements and actual and "budgeted" EBITDA figures. He was aware that the budgeted EBITDA numbers grossly understated Genesis' prospective financial performance for the relevant period, and that the adjustments requested and obtained to those numbers were based on misrepresentations and nondisclosures of material facts. He participated in the fraud in order to secure the approval of the senior creditors of a lucrative compensation package for himself, and in the hope of retaining his position with the Company after the senior creditors formally became controlling stockholders or, failing that, to obtain lucrative severance packages.

161.    Goldman orchestrated and directed the scheme described herein, with the cooperation of Mellon and Highland. Goldman and Highland aggressively purchased Genesis debt participations at drastic discounts, seeing an opportunity to double or triple their money within the space of 18 months. In a bankruptcy their claims, acquired at a discount of about 50 percent, would be scheduled at 100 percent of face value. If they could convince the bankruptcy court that Genesis was worth less than the face amount of their claims, they could seize the equity of the company and be free of hundreds of millions of dollars of pre-existing indebtedness.

162.    Goldman inserted itself into these proceedings in about March of

2000, at a time when Genesis management was optimistic about Genesis' prospects and was projecting EBITDA for the Company in the $200 million range. First, it joined the senior lender steering committee. Its attitude manifested itself immediately: at the March meeting of Genesis with the steering committee, management proposed that Genesis' debts be restructured so that the junior bonds could be repurchased at a deep discount to market. The response of the Goldman representative, Jody LaNassa, as recorded in his notes, was "R U Nuts?" This revealing comment unmasks Goldman's intent to enrich itself, as much as possible, at the expense of the debentureholders.

163. Then, in July of 2000, it took a lead position in the DIP lending facility. After that point Goldman, Mellon and Highland, acting in concert, effectively controlled all of the Genesis purse strings for the duration of the bankruptcy, and they also controlled the financial fate of the individual Genesis senior managers, including the four individual defendants named in this action. Contemporaneously with Goldman's ascendancy, the outlook of Genesis management took a 180 degree turn and became relentlessly pessimistic as both the reported and the projected financial results for the Company nose-dived.

164. Goldman, Mellon and Highland procured the cooperation of Genesis senior management by offering them immensely lucrative retention bonuses,

including stock grants, options and the forgiveness of debt they had incurred to purchase Genesis shares. The packages offered to the four most senior managers had an aggregate post-reorganization value of about $23 million, not including severance benefits. These packages are now worth about $28 million. Moreover, although they were justified as retention incentives to assure that these key executives would remain with the company, within a year after confirmation of the Plan three of the four recipients of these retention payments had departed from the Company and had cashed in their severance benefits, totaling an additional $10 million in cash and other benefits. Only one, defendant George Hager, remains with the Company. These packages, when offered, had a value that was about three times the value of compensation paid to senior executives at comparable companies.

165. Under the guise of monitoring compliance with DIP loan covenants, Goldman quarterbacked the entire panoply of financial manipulations detailed in this complaint. They conducted monthly meetings with Genesis management. Goldman's notes of those meetings show that they were tracking, in minute detail, (a) the actual EBITDA being generated, (b) the targeted EBITDA level necessary in order to achieve a finding of senior lender impairment; (c) reconciliation of the LTM EBITDA being used for valuation purposes to the pro forma budgeted EBITDA, which was also being used for valuation purposes, to make sure that they

were in agreement; (d) the EITDA relationship of Genesis and MC; (e) the "current state of play"; (f) the various adjustments discussed in this complaint, and their affect on the "current state of play"; (g) anticipated Medicare revenue and its potential affect on the "current state of play"; (h) the "significant exposure" created by the fact that the valuation multipliers the experts were going to be using was 20 to 30% higher for the Genesis pharmacy sector than for the nursing home sector.

166. To assure that the predetermined valuation was achieved, adjustments to Budgeted EBITDA were fed to Hager by the senior creditors' financial advisors, Policano & Manzo and Chilmark, through the Steering Committee.

167. Moreover, as noted above, Goldman took all the steps necessary to strip Genesis of cash, so that it would be forced to draw down its entire $200 million DIP loan facility. It "froze" MC's available cash and prohibited MC from drawing down on its $50 million DIP loan facility, to pay its obligations to Genesis.

168. After confirmation of the Plan, Goldman took complete control of Genesis. It holds over 15% of the common stock (the largest block by a factor of two)and its managing director, Jody LaNassa, is one of the six members of the board and is also a member of the compensation committee. James Dondero of Highland Capital (the second largest holder)also sits on the Genesis board and its audit committee.

## IV. PLAINTIFFS DID NOT HAVE A FULL AND FAIR OPPORTUNITY TO LITIGATE THESE ISSUES IN THE BANKRUPTCY COURT

169.   Plaintiffs did not discover the manipulations during the course of the bankruptcy proceedings and could not have done so through the exercise of reasonable diligence.

170.   Until the last week of the bankruptcy proceedings, the valuation of Genesis was being assessed solely on the basis of the budgeted (projected) EBITDA figures, which management (i.e. George Hager) had represented had been constructed from the "bottom up". These budgeted EBIDTA figures had never been reviewed or tested by the Genesis auditors, KPMG, or by Warburg or Chilmark, who nonetheless relied on them in reaching their valuations. Moreover, by asserting that the figures had been constructed from the "bottom up", Genesis was representing that this data had not been extrapolated from prior actual EBITDA data, but was instead based exclusively on unspecified internal assessments that would defy any efforts to test, to tie them in or to compare them to previous financial information.

171.   Compounding the difficulties in uncovering the manipulations, there was no forewarning, until one week before the confirmation hearing, that any of the plan proponents would be relying on historical LTM EBITDA data to support confirmation of the Plan. The deadline for filing Plan objections was August 17,

2001. On August 22, Chilmark submitted its valuation report, based on LTM EBITDA data. This was the first time any valuation had been submitted that was ostensibly based on historical LTM data; yet it was submitted, without advance notice, after the objection deadline had passed, and only 6 days before the Plan confirmation hearing.

172. The fraud was greatly facilitated by the last-minute production of documents and the extremely time-compressed, limited depositions that followed. About 25% of the documents were produced by August 8; the balance were produced the following week. More than 50,000 documents were produced at the last minute, in disorganized, incomplete and piecemiel fashion, compounding the problems of reviewing them in a timely fashion. Depositions began on August 16, 2001, and were completed by August 24. Creditors were allowed to examine Hager, at his deposition on August 23, for only three hours. It was simply not possible for the debentureholders to uncover the massive deceptions inherent in the EBITDA data in the time allotted before the confirmation hearing of August 28 and 29. Moreover, because the debentureholders did not, at that time, suspect that a fraud was being committed, they did not review the documents with that possibility in mind.

173. The deposition of George Hager, Genesis' chief financial officer, occurred on August 23, 2001, a single day after the Chilmark and final UBS reports

were submitted. Plaintiffs have subsequently discovered that Chilmark had been retained as early as 2000 to prepare a valuation study of Genesis. Its work product was withheld until the last possible moment, to make it virtually unchallengeable in the time available. There was no opportunity within this short time period to analyze, much less refute, the myriad assumptions and manipulations that infected the LTM EBITDA data. There was not even sufficient time to review the tens of thousands of pages of documents produced, at the last minute, by Chilmark, Warburg, Goldman and the Company, among others.

174.    Moreover, because never, until one week prior to the confirmation hearing, had actual EBITDA data been used as a basis for approving the Plan, junior creditors and other objectors did not have an incentive to challenge and investigate "actual" EBITDA results. Had actual LTM EBITDA data been used from the start as a basis for valuing Genesis, the bondholders would have subjected those data to intense scrutiny and would have hired a forensic accounting firm to do it.

175.    As a result, none of the objections raised to confirmation of the Plan touched upon the manipulations alleged here. There were no objections in the bankruptcy proceeding to the way EBITDA had been defined or calculated. Two objections to confirmation of the Plan were filed by debentureholders: one by the GMS Group, whose investors collectively held approximately $172 million of Genesis

debentures; and the other by Charles L. Grimes, who held $20 million of Genesis debentures. In accordance with the Court-ordered schedule, both objections were filed *before* the Chilmark and the final Warburg valuations were submitted. The GMS Group and Grimes alleged that the Plan should be rejected because senior creditors were *not* impaired but, rather would be receiving stock worth substantially more than 100% of their claims under the plan, while other creditors would receive a minimal recovery. But neither objection could, or did, challenge the EBITDA data on which the Chilmark and Warburg valuations were based.

176.   In its objection the GMS Group specifically alleged that Warburg had undervalued the Company because it utilized "an unreasonably low EBITDA multiplier, and applied this multiplier to an EBITDA that is undisputedly out of date, resulting in unreasonably low market capitalization compared to comparable companies in the same industry". None of the holders of the subordinated debentures challenged the accuracy or bona fides of the management projections used by Warburg in its valuation.

177.   The GMS Group retained the services of its own valuation expert, the Evercore Group. Although Evercore reached a much higher valuation of Genesis, its report also relied on management's EBITDA figures.

## V.  Plaintiffs' Discovery of the Scheme

178.   Subsequent to confirmation of the Plan, disturbing information was disclosed, over a period of months, that cast into doubt, for the first time, the veracity of the EBITDA data that had been used in support of the Plan:

a.      In November of 2001, Genesis disclosed for the first time the massive increases in insurance reserves that Liberty had taken, and expensed, during the relevant valuation period. In its 10-K issued on December 28, 2001, well after Plan confirmation, showed that reserves had shot up by $23.7 million, doubling in a single year.

b.      In its 10-Q for the first quarter of fiscal 2002, dated February 12, 2002, Genesis disclosed that it had not lost the Mariner/APS business, because the service agreement had been extended through 2003. This had happened even though another company had actually acquired APS.

c.      In its 10-Q for the second quarter of fiscal 2002, dated May 15, 2002, Genesis disclosed that its cost of goods sold in its pharmacy operations was 59.2% of revenues, rather than 62.5%, the percentage used to calculate the historical LTM data used for valuation purposes; and it also disclosed for the first time that 10% of Manorcare revenues had been excluded from income (and EBITDA) during the LTM period.

179.   These revelations and others collectively raised a red flag, for the first time, concerning potential manipulations of the Genesis EBITDA figures used in the valuation process.

## VI. THE AFTERMATH: MANAGEMENT REAPS ITS REWARDS AND GOLDMAN AND HIGHLAND SEIZE TOTAL CONTROL

180.   Within one year after the consummation of the Plan, three of the four most senior management figures had resigned from their positions at Genesis, after receiving enormous special incentives, during the bankruptcy, to stay with the Company.

a.   Michael Walker resigned as chief executive officer and received $5,100,000 of severance, $425,000 of incentive compensation, and life insurance and other related benefits of $91,367. In addition, unrestricted shares of common stock valued at $2,744,550 vested upon his resignation.

b.   David Barr resigned as Vice Chairman and received $1,500,000 of severance, and life insurance and other related benefits of $310,000. In addition, unrestricted shares of common stock valued at $1,372,275 vested upon his resignation.

c.   Richard Howard, who had succeeded David Barr as Vice Chairman, entered into a "voluntary separation agreement" with Genesis in October of 2002, pursuant to which he received $2,797,000 of severance, incentive

compensation of $250,000 and life insurance and other benefits of $418,000. In addition, unrestricted shares of common stock valued at $1,220,000 vested upon his resignation.

181. Goldman, the largest single stockholder of Genesis, with about 15.7%, has placed one of its own managing directors, Joseph A. LaNassa, on the 6-person Genesis board, and he is one of the members of the compensation committee. Highland Partners, another member of the senior lender group, is the second largest shareholder, with just over 7% of the outstanding stock. Highland Partners has placed one of its executives, James D. Dondero, onto the Genesis board as well.

### FIRST CAUSE OF ACTION: FRAUD

182. Plaintiffs incorporate by reference paragraphs 1-181.

183. By their participation in the scheme described above, each defendant has committed a fraud on the plaintiffs and on the Bankruptcy Court. Defendants' actions constitute willful misconduct and was therefore not released in the Genesis bankruptcy proceeding.

184. Genesis and Hager were directly involved in the preparation of all the misleading financial information that led to the under-valuation of Genesis.

185. Goldman, Mellon and Highland controlled this entire process, periodically reviewing in detail the financial information prepared by Genesis

management on a monthly basis, to assure that EBITDA data were matching the "target" of about $158 million, and that sufficient adjustments were being made to the budgeted EBITDA to bring about the same result. They offered enormous financial inducements to Genesis management to perpetrate this fraud, and they were the principal beneficiaries of the fraud. Goldman also took all the steps needed to freeze MC's cash and lines of credit so that it could not pay its obligations to Genesis, thus forcing Genesis to draw down almost $200 million from its DIP lending facility.

186. Pursuant to §523(a)(2)(B) of the Bankruptcy Code, Genesis was not discharged from liability for its fraud by the Court's approval of the Plan, because this is a claim for money obtained by use of a statement in writing that was materially false, respecting Genesis' financial condition, on which plaintiffs reasonably relied and that Genesis caused to be made or published with intent to deceive.

187. Moreover, the Plan release specifically excludes the release of any claims against officers or directors of Genesis based upon willful misconduct or gross negligence.

188. At the time of the hearing before the Bankruptcy Court to consider approval of the Genesis bankruptcy plan, plaintiffs did not know, and could not have known, that (a) the actual and projected EBITDA figures that Genesis management had provided to Chilmark and Warburg, and to plaintiffs, had been fraudulently

manipulated as described above, and (b) Genesis had consistently provided material information to the senior creditors which it withheld from the junior creditors, including plaintiffs, such as information about actual insurance costs, the agreements with Manorcare, the APS letter of intent. Plaintiffs relied on the integrity of the Budgeted EBITDA data and the LTM EBITDA data. More importantly, the Bankruptcy Court relied on that information in approving the Plan and cramming it down on the debentureholders, despite their objections.

189.    Plaintiffs were injured by defendants' fraud. But for that fraud, plaintiffs would have received the full face value of their debentures, plus accrued interest.

## SECOND CAUSE OF ACTION: CONSPIRACY TO COMMIT FRAUD

190.    Plaintiffs incorporate by reference paragraphs 1-188.

191.    Goldman, Mellon and Highland were aware that the financial information being released by Genesis, and upon which the reorganization valuation of the Company would be determined, was false and misleading and had been designed to defraud the junior creditors of Genesis, and would be relied upon by the plaintiffs and the Court.

192.    Goldman, Mellon and Highland conspired with, orchestrated and rewarded Genesis and its management, and in particular defendant George Hager, for

84

perpetrating this fraud.

193.  Plaintiffs were injured by this conspiracy to commit fraud. But for that conspiracy, plaintiffs would have received the full face value of their debentures, plus accrued interest.

### THIRD CAUSE OF ACTION: GROSS NEGLIGENCE

194.  Plaintiffs incorporate by reference paragraphs 1-187 and 191.

195.  By virtue of their positions as debtor in a bankruptcy proceeding, as the chief financial officer of the debtor, as senior creditors of the debtor, and as proponents of a bankruptcy reorganization plan that would drastically affect the junior creditors, defendants owed the junior creditors of Genesis a duty of care, including the duty to provide fair, accurate and complete information.

196.  Defendants violated that duty of care by disseminating false and misleading financial information that misled the bankruptcy court and the plaintiffs concerning the true financial condition and prospects of Genesis. Defendants' conduct was such an extreme and severe departure from due care as to constitute gross negligence, and was therefore not released as a result of the Genesis bankruptcy.

197.  Plaintiffs were injured by defendants' gross negligence. But for that gross negligence, plaintiffs would have received the full face value of their debentures, plus accrued interest.

WHEREFORE, plaintiffs seek an award of damages against the defendants, jointly and severally, in an amount to be determined by the Court, but not less than $200 million, plus interest, costs and fees incurred in this action, together with such other and further relief as the Court deems just and proper.

Dated:     New York, New York
           January 27, 2004

                                        POMERANTZ HAUDEK BLOCK
                                        GROSSMAN & GROSS LLP

                                        By _____
                                           Stanley M. Grossman
                                           H. Adam Prussin
                                           Ronen Sarraf
                                        100 Park Avenue, 26th Floor
                                        New York, N.Y. 10017-5516
                                        (212) 661-1100

                                        Attorneys for Plaintiffs