

**ORIGINAL**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| GENESIS HEALTH VENTURES, INC., et al., ) | Case No. 00-2692 (JHW) |
| Debtors, ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| JAMES J. HAYES, ) | |
| Appellant, ) | |
| ) | C.A. No. 06-103 JJF |
| v. ) | |
| ) | |
| ) | |
| GENESIS HEALTH VENTURES, INC., et al., ) | |
| Appellees. ) | |
| ) | |

**FILED**

MAY - 1 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

**Brief In Support Of Appellant's Motion to Disqualify Reorganized Debtors' Counsel**

Dated: April 28, 2006
      Annandale, VA 22003

James J. Hayes
Pro Se
4024 Estabrook Dr.
Annandale, VA 22003
(703) 941-4694

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

RELEVANT BACKGROUND........................................................................................... 1

   A. Goldman and Highland Take Control of the Debtor.................................................. 1

   B. Genesis Debtors Agree To Post-Petition Financing To Pay Senior Lenders
      During Bankruptcy .................................................................................................. 4

   C. Genesis Debtors Agree To A Contingency That Pays Senior Lenders
      Post-Petition Interest ............................................................................................... 4

   D. Junior Bondholders Allege Fraud on the Bankruptcy Court...................................... 5

   E. Independent Market Valuations Support A Billion Dollar Fraud.............................. 7

   F. Conflict of Interest Issues Raised In Junior Bondholder Litigation........................... 8

   G. Reorganized Debtors Oppose Appointment of Post-Confirmation and
      Pre-Termination Equity Committees ...................................................................... 10

ARGUMENT .................................................................................................................. 12

   A. Agreement To Pay Senior Lenders During Bankruptcy Begins A Pattern Of
      Genesis Debtors Favoring The Senior Lenders......................................................... 12

   B. Agreement to Pay Senior Lenders Post-Petition Interest Is Clearest Example
      Of Genesis Debtors Breaching their Fiduciary Duty And Favoring
      The Senior Lenders ................................................................................................. 13

   C. Reorganized Debtors' Failure To Pursue Fraud On The Bankruptcy
      Court Allegations Against Senior Lenders Violates the Debtors' Fiduciary Duty ..... 15

   D. The Reorganized Debtors Opposition To Appointment Of Post-Confirmation And
      Pre-Termination Equity Committees Only Favors the Senior Lenders ................... 16

   E. Reorganized Debtors' Counsels' Representation of NeighborCare In the Fraud
      On The Bankruptcy Suit Raises A Potential Conflict Of Interest.............................. 17

   F. Reorganized Debtors' Counsel Has a Conflict Of Interest In Opposing The
      Appointment of A Pre-Termination Equity Committee That Disqualifies It From
      Representing The Reorganized Debtors In This Appeal........................................... 19

CONCLUSION ............................................................................................................... 21
CERTIFICATE OF SERVICE......................................................................................... 22

APPENDIX: Motion For Appointment of Pre-Final Decree Equity Committee................. 23

## TABLE OF AUTHORITIES

Cases:

*In Re Arochem Corp.*, 181 B.R. 693, (Bkrtcy. D. Conn. 1995).......................................n.14,18

*B H & P, Inc.*, 949 F. 2d. 1300 (3rd Cir. 1991) ................................................................17

*In Re Genesis Health Ventures, Inc.* 266 B.R. 591 (Bkrtcy D. Del. 2001).....................5,15,16

*Richard Haskell, et al., v. Goldman, Sachs & Co., et al.,* Bankr. Case No. 002692 .......5,10,17

*James J. Hayes v. Genesis Health Ventures*, 3d Cir. Case No. 05-4005 .........................10

*In re Kauffunger*, 16 B.R. 666 (D. N.J. 1981) ..................................................................14

*In re Ken Davis Industries Intern., Inc.*, 91 B.R. 742, 751 (Bkrtcy, N.D. Tex. 1988) ....20

*In re Ladycliff College*, 46 B.R. 141, 143, (Bkrtcy. 1985) ..............................................14

*In re MCorp. Financial Inc.*, 137 B.R. 219 (Bankr. S. D. Tex. 1992) ............................16

*In re Marvel Entertainment Group Inc.*, 140 F. 3rd 463 ( 3d Cir. 1998)..........................17,18

*In Re Palombo Farms of Colorado, Inc.*, 43 B.R. 709 (Bkrtcy. 1984)............................14

*In re Stamford Color Photo Inc.*, 98 B.R. 135, 138 (Bkrtcy. D. Conn. 1988).................n.14, 18

*In Re Temp-Way Corp.* 95 B.R. 343 (E.D. Pa. 1989) ......................................................16

*Rome v. Braunstein*, 19 F. 3d. 54 ( 1st Cir. 1994) ...........................................................18

*Matter of Wilson Dairy Co.,* 30 B.R. 67 (Bankr. D. Ohio 1983).....................................14

Bankruptcy Code Statutes:

101(2)(a) .........................................................................................................................20

327(a).. ........................................................................................................................18,19,20

327(e)..............................................................................................................................19

328(c)..............................................................................................................................18

506(b)).............................................................................................................................14

## TABLE OF AUTHORITIES CNTD.

Bankruptcy Code Statutes:

1102(a)(2) ........................................................................................................................10

1103(c)(5) ........................................................................................................................11

1109(b)..............................................................................................................................11

Bankruptcy Court Rules:

2104(a) ..............................................................................................................................18

9011....................................................................................................................................10,11

Miscellaneous:

*Haskell, et al., v. Goldman, Sachs & Co., et al.*, Complaint............................................6,7,9

*Disclosure Statement For Debtors' Joint Plan of Reorganization*...................................1,3,4,12,13,14

## RELEVANT BACKGROUND
### (Factual Allegations Underlying A Billion Dollar Fraud and Emerging Legal Scandal)

1) From the commencement of the Genesis bankruptcy on June 22, 2000, Richards Layton & Finger, P.A. and Weil, Gotshal & Manges LLP represented the Genesis estate as Debtors' counsel and Reorganized Debtors' counsel.

2) The Final Report In The Reorganized Debtors' Chapter 11 Cases, filed on November 23, 2005, disclosed that Richards, Layton & Finger, P.A. had been paid $466,513 and Weil Gotshal & Manges LLP, $5,790,290 in legal fees for representing the Genesis Debtors and Reorganized Debtors in the bankruptcy proceedings.

3) The Senior Lenders were represented by separate counsel paid by the Genesis Debtors' estate. [1] The Senior loans were unsecured, with first priority security interests in substantially all the Debtors' assets and junior security interests in certain properties already subject to liens. Regardless of their classification, these loans were under-secured. The principal assets securing the Senior loans were Genesis' cash and accounts receivable. Based on December 31, 2000 data, the net value of these assets was $400 million, which secured about 33% of the Senior loans. *Disclosure Statement For Debtors' Joint Plan of Reorganization*, pgs. 12 & 44. ("the Plan")

### A. Goldman and Highland Take Control of the Debtor

4) The Haskell complaint alleged that in the months preceding the bankruptcy, that Goldman acquired $175 million in Genesis senior debt participations for about 53 cents on the dollar and $81 million Multicare senior debt participations for 48 cents on the dollar. (C. 19) By March 2000, Goldman and Highland had acquired so many of the

---

[1] Includes holders of bank loans of Genesis and their Multicare subsidiary administered by Mellon Bank. The compensation paid to the Senior Lenders' counsel has not been disclosed.

Senior Lender debt participations that they were invited to join Mellon on the seven member Senior Lender Steering Committee. In fact, with claims three times greater than any other senior creditor, Goldman was able to dominate completely, the Senior Lender Steering Committee. (C 31)

5) Evidence of Goldman's control of the Debtor is shown by facts alleged in the Haskell complaint that: "Goldman participated in (i) underwriting and administering of the DIP financing, (ii) underwriting the exit financing, and (iii) became the largest holder of the synthetic lease financing facility." (C 32)

6) During the bankruptcy, investment banks (other than Goldman and Highland) purchased an additional 25% of the Senior debt participations from the original lending consortium. (C. 1)  By the time the Plan was confirmed the investment banks had acquired over 75% of the Senior debt participations from the original lending consortium of over 60 banks. (C 1)  As inferred from the Haskell complaint, the price paid for the post- bankruptcy loan participations increased to 70 cents on the dollar from the 53 cents paid by Goldman pre-bankruptcy. (C. 19 & 31)  The increasing prices likely indicates the new investment banks were getting advance information on the Plan's favorable treatment of the Senior debt participations, likely from Goldman, which in turn increased Goldman's control of the Debtor.

7) In the Genesis bankruptcy, the management of the Debtor was completely at the mercy of the Senior Lenders, who decided which executives would remain with the Company and who would receive "retention bonuses" and other lucrative financial packages from the Company.[2]  "Shortly after confirmation of the Plan, after the

---

[2] Genesis had a special retention program for its top four executive officers. The program included an estimated \$2.1 million payment on August 31, 2001 if that date was the "Effective

2

[bankruptcy fraud] had succeeded and the [Senior Lenders] had taken over the Company,

the four most senior Genesis executives received financial packages worth, collectively,

$23 million, which at the time was many times greater than compensation being paid to

executives of comparable companies in the health care industry."[3] (C. 11)

8) In addition, George Hager, who was the CFO of Genesis during the bankruptcy

and is a defendant in the Haskell litigation, was named as the CEO of the eldercare when

that operation was spun off in December 2003.

9) Goldman's control over the fate of Genesis continued even after Genesis

emerged from bankruptcy. This is evidenced by the fact that the spin-off of Genesis'

elder care business, which was designed to increase the Reorganized company's value,

occurred after the warrants provided the junior bondholders had expired.[4] And when

NeighborCare was acquired on July 28, 2005, Goldman's control enabled it to earn

---

Date" of the Plan. This amount increased for an earlier Effective Date and decreased for a later
Effective Date. In addition these executives were provided severance equal to two times the base
salary and the forgiveness of $2.5 million in certain loans and money to pay any taxes on these
gifts. Plan 69.

[3] Within one year after the consummation of the Plan, three of the four most senior officers had
resigned from their positions at Genesis, after receiving enormous special incentives, during the
bankruptcy, to stay with the Company. At their resignations these officers received the benefits
shown:

| Officer | Severance | Incentive Comp. | Life Insurance | Unrestricted Stock |
|---|---|---|---|---|
| | ($ in millions) | ($ in millions) | ($ in millions) | ($ in millions) |
| CEO Walker | 5.1 | .42 | .09 | 2.7 |
| Vice Chairman Barr | 1.5 | | .31 | 1.4 |
| Vice Chairman Howard | 2.8 | .25 | .42 | 1.2 |

(C 180)

[4] On December 1, 2003, Genesis Health Ventures, Inc. ("GHVI") completed the tax-free spin-off
of its eldercare and rehabilitation businesses into a separate publicly traded company, Genesis
HealthCare Corporation. Genesis Health Ventures also announced that it would change its name
to NeighborCare, Inc. effective December 2, 2003. *Market Wire*

3

lucrative investment banking fees by influencing NeighborCare to retain Goldman as its financial advisor.

## B. Genesis Debtors Agree To Post-Petition Financing To Pay Senior Lenders During Bankruptcy

10) On July 18, 2000, the bankruptcy court approved a debtor in possession agreement ("DIP") that provided for maximum borrowings of $250 million. (Plan VI.C.1, p. 66) The Haskell defendants Goldman, Highland, and Mellon along with two other senior creditors committed to providing the DIP financing for the Genesis Debtors. (C 154)

11) By June 30, 2001, the Genesis Debtors had drawn down $200 million DIP financing. Significantly, only 4 million of this financing was used for the Debtors' business, with $196 million being paid to the Senior Lenders that were characterized as "adequate protection payments." (Plan II.E.2, p.19 & 20)  12) Thus, the DIP financing, benefited only the Genesis Senior Lenders, who received these payments and the DIP lenders, including Goldman, Highland and Mellon, who earned interest on a lucrative low risk loan. The Debtors bore all the costs of the DIP loan, yet received few if any benefits.

## C. Genesis Debtors Agree To A Contingency That Pays Senior Lenders Post-Petition Interest

13) On September 20, 2001, the bankruptcy court confirmed the Debtors Joint Plan of Reorganization ("the Plan") that provided the Senior Lenders 93.4 % of the new common stock in the reorganized enterprise. About 70% of the new common stock went to investment banks that had purchased their Senior debt participations from the original consortium. (C. 1)

4

14) The Plan also provided the Senior Lenders an additional $112 million in post-petition interest pursuant to 11 USC 506(a).[5] *In Re Genesis Health Ventures, Inc.* 266 B.R. 591, 616 (Bkrtcy D. Del. 2001) The Plan negotiated and advocated by Debtors' counsel provided post-petition interest in the event the bankruptcy court approved a valuation of the Genesis estate greater than $1.5 billion. (Plan at 20, 49 & 51) Based on higher updated valuations, the bankruptcy court accepted an enterprise valuation of $1.75 billion for the Genesis estate, which was near the mid-point of the Debtors experts' valuations. (Id. 616) The Bankruptcy Code, (11 USC 506(b)), however, allows consideration of post-petition interest awards for secured claims only when these claims are oversecured.[6] The Senior loans were secured by Genesis cash and receivables that were only sufficient to secure about 33 per cent of these loans. (Plan Pgs. 12 & 44)

## D. Junior Bondholders Allege Fraud on the Bankruptcy Court

15) On January 27, 2004, a group of 275 investors, headed by Richard Haskell, who collectively held over $205 million in debentures issued by Genesis, filed a fraud on the bankruptcy suit against Goldman Sachs & Company, Highland Capital Partners, and Mellon Bank, N.A, as agent and representative for all the senior creditors. (*Richard Haskell, et al., v. Goldman, Sachs & Co., et al.*, Bankr. Case No. 002692)[7] The Haskell complaint listed a number of allegations that the defendant investment banks had

---

[5] Post-petition interest is actually provided for in 11 USC 506(b). Had this Court heard the merits of the Hayes appeal of the Confirmation it would have considered the legality of this payment at that time.

[6] "To the extent that an allowed secured claim is secured by the property the value of which, after any recovery under subsection (c) of this section, is greater that the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim,..."

[7] On March 29, 2006, the bankruptcy court order dismissing this action against Goldman Sachs, Highland, and Mellon was vacated by this Court and remanded to the bankruptcy court for further proceedings. (CA No. 05-427-KAJ.

5

conspired with Genesis management, principally its chief financial officer (CFO), George

Hager, to understate Genesis' EBITDA (earnings before interest, taxes, depreciation, and

amortization) that in turn caused the Debtors' investment advisors to undervalue the

Genesis estate by hundreds of millions of dollars.

16) Individual allegations and the associated EBITDA reductions are shown

below:

| Bondholder Allegation | EBITDA Reductions ($ millions) | Long Term Care | Pharmacy | Complaint Reference # |
|---|---|---|---|---|
| a) Excessive Insurance Reserves | 13.0 | 5.8 | 7.2 | 68 |
| b) Multi Care Management Fees | 11.6 | 11.6 | 0.0 | 9 & 107 |
| c) Manor Care Pharmacy Sales | 11.0 | 0.0 | 11.0 | 117 |
| d) Mariner Contract | 13.4 | 0.0 | 13.4 | 129 |
| e) AGE Loss | 3.0 | 1.3 | 1.7 | 135 |
| f) Management Retention Bonus | 6.0 | 2.7 | 3.3 | 39 |
| g) Discontinued Health Plan | 13.0 | 5.8 | 7.2 | 9 & 141 |
| h) Pharmacy Costs Of Goods Sold | 26.0 | 0.0 | 26.0 | 146 |
| i) Increased Medicare Mix | 4.0 | 4.0 | 0.0 | 151 |
| j) Additional Personnel Costs | 35.0 | 15.7 | 19.3 | 152 |
| Total Adjustments | 136.0 | 46.9 | 89.1 | |
| Valuation Increase (Chilmark EBITDA Multiples) | 1,152.4 | 328.5 | 824.0 | |

17) The potential understatement of $1.152 billion dollars[8] is sufficient to fully

pay all creditor claims and leave a substantial recovery for the equity class. Instead the

Senior Lenders received windfall profits that were hundreds of millions of dollars in

excess of their claims.

---

[8] The Haskell complaint does not estimate the undervaluation of the Genesis estate as a result of the $136 million EBITDA understatement. A computation using the EBITDA multiples of the senior lenders' investment banker of 7.0 for Genesis long term care assets and 9.5 for its pharmacy assets with a pro rata allocation of adjusted EBITDA between long term care and pharmacy – where appropriate, based on the relative revenue of the two businesses – provides an undervaluation of $1.152 billion. While expert analyses would likely produce a range of estimates, an undervaluation of a billion dollars certainly reflects the correct order of magnitude.

This table is corrected from an earlier version that was incorporated in the Motion for a Pre-Termination Equity Committee which is attached to this motion. The total adjustments for the earlier table did not include item a) excessive insurance reserves, and that number had been misstated as 16.7 million.

18) Count One of the Haskell complaint alleged that Genesis and George Hager were directly involved in the preparation of all the misleading financial information that led to the undervaluation of Genesis. Haskell contended that Genesis management improperly decreased the Debtors' value by improperly deducting from EBITDA the amounts shown in items a thru e in the table shown in paragraph 16.

19) In Count Two, the Haskell complaint alleged that: "Goldman, Mellon and Highland were aware that the financial information being released by Genesis, and upon which the reorganization valuation of the Company would be determined, was false and misleading and had been designed to defraud the junior creditors of Genesis..." (C 191)

20) In Count Three, the Haskell plaintiffs allege that:

By virtue of their positions as debtor in a bankruptcy proceeding, as the chief financial officer of the debtor, as senior creditors of the debtor, and as proponents of a bankruptcy reorganization plan that would drastically affect the junior creditors, defendants owed the junior creditors of Genesis a duty of care, including the duty to provide fair, accurate and complete information.

Defendants violated that duty of care by disseminating false and misleading financial information that misled the bankruptcy court and the plaintiffs concerning the true financial condition and prospects of Genesis.

(C 191, 192)

**E. Independent Market Valuations Support A Billion Dollar Fraud**

21) On July 28, 2005, the publicly traded, but undervalued NeighborCare, was acquired by Omnicare for $34.75 per share, cashing out the defendant investment banks interests in this part of the Reorganized Debtor. The transaction placed the enterprise value of NeighborCare at about $1.8 billion.

7

22) On July 28, 2005, GenesisHealth Care Corp., the nursing home company split off from the Reorganized Debtor, had an enterprise value of about $1.2 billion.[9] Thus, on July 28, 2005, the enterprise value of the Reorganized Debtor was about $3.0 billion. In contrast, the Haskell plaintiffs allege that the enterprise value of the Genesis estate was misrepresented at the confirmation at about $1.75 billion. The $1.25 billion difference supports the $1.1 billion undervaluation caused by the allegedly fraudulently understated EBITDA estimated in paragraph 16.

## F. Conflict of Interest Issues Raised In Junior Bondholder Litigation

23) In the Haskell litigation, Richards, Layton & Finger and Weil, Gotshal & Manges defended NeighborCare, Inc., the successor corporation after Genesis split its long-term health care and pharmacy business into two companies on December 1, 2003.

24) Richards, Layton & Finger, P.A. and Weil, Gotshal & Manges LLP continued representing the Reorganized Debtors from a variety of claims in the bankruptcy court. They defended the Reorganized Debtors in an appeal of a May 13, 2004 denial by bankruptcy court of a request by this appellant for the appointment of a Post-Confirmation Equity Committee and in this appeal of the bankruptcy court's denial of a Pre-Termination Equity Committee.

25) Additional factual allegations in the Haskell complaint raise the issue whether Senior Lender defendants in Haskell were an "affiliate" and controlled the Reorganized Debtor. [10] According to the Haskell complaint, "by early 2000 the

---

[9] GHCI's enterprise value consisted of its equity value of $807 million, plus debt of $409 million, less cash of $82 million.

[10] The only way Debtors' counsel could resolve their conflict is through the appointment of an special counsel to investigate the alleged fraud. Even better would be to appoint an equity

8

institutions that held the Genesis Senior debt participations also held 80% of the Multicare Senior debt participations. (C 25) In the bankruptcy, Mellon acted as agent and representative for all the Senior Lenders, which concealed the extent to which investment banks, including Goldman had supplanted the original lending consortium as the actual Senior Lenders. (C 21) Together the Haskell defendants Goldman and Highland, controlled 22.7% of the Reorganized Debtor, exceeding the 20% of voting ownership that would classify the defendant investment banks as an "affiliate of the Reorganized Debtor. (C 20 & 22)

26) Other facts alleged in the Haskell complaint raise additional issues of potential or actual conflicts between the Genesis Debtor or the Reorganized Debtor and Weil, Gotshal & Manges LLP. The Haskell complaint alleged that Goldman perceived Genesis as an investment opportunity and set up an entire division to invest in the debt of distressed companies. This division invested in at least seven distressed companies in the healthcare industry. (C 30) With the country's largest bankruptcy practice, Weil, Gotshal & Manges LLP. would have a potential or actual conflict of interest with the country's largest investment bank actively taking controlling positions in debt of other corporations that were then or in the future seeking bankruptcy protection. Clearly, Goldman was an important source of new business for Weil Gotshal and their favorable treatment of the Senior Lenders' interests in Genesis would place them in advantageous position to win new business.

committee. With the lowest bankruptcy priority, an equity committee is most incented to manage the effort to evaluate and recover the estate's fraud losses.

## G. Reorganized Debtors Oppose Appointment of Post-Confirmation and Pre-Termination Equity Committees

27) In December, 2005, the Reorganized Debtors, filed a *Motion for Entry of a Final Decree* in the cases of Genesis Health Ventures, Inc. (Case No. 00-2692) and Multicare AMC Inc. (Case No. 00-2494) The motion noted that two matters that were once before the bankruptcy court were on appeal: *James J. Hayes v. Genesis Health Ventures*, 3d Cir. Case No. 05-4005 (filed 8/31/05) (concerning the bankruptcy court's refusal to appoint an equity committee) and *Haskell v. Goldman Sachs & Co., et. al.*, D. Del. Case No. 05-4-427 (filed 6/23/05) (concerning a claim of damages for fraud in connection with the confirmation order.)[11]

28) By the objection deadline on December 8, 2005, the United States Trustee and James J. Hayes objected to the Final Decree. Subsequently, the Hearing scheduled for December 15, 2005 was postponed indefinitely. As of March 2, 2006, the hearing on the Final Decree has been continued to a date to be determined.

29) On December 11, 2005, James J. Hayes filed a Motion for the Appointment of a Pre-Final Decree Equity Committee. This motion pursuant to section 1102(a)(2) of the bankruptcy code, and the due process clause of Amendment V of the United States Constitution sought an equity committee to represent the interests of the Genesis Common Stock Class: 1) in proceedings on his recently filed Motion For Reconsideration of the Genesis and Multicare Senior Lender Claims; and the Genesis and Multicare Senior Subordinated Note Claims; 2) a new Motion for Sanctions for Professional Misconduct pursuant to Rule 9001 of the Federal Rules of Bankruptcy Procedure; 3) a

---

[11] On March 29, 2006, this Court vacated the bankruptcy court's decision that the fraud on the bankruptcy court claims against Goldman, Highland, and Mellon were barred by res judicata and collateral estoppel and remanded the case to the bankruptcy court for further proceedings.

10

potential suit for damages on behalf of the Reorganized Debtor against the Haskell

defendants pursuant to 1103(c)(5) and 1109(b); and a 4) potential Constitutional

challenge to the confirmation pursuant to the Takings and Just Compensation Clauses of

the Fifth Amendment.

30) On January 11, 2006, the Reorganized Debtors filed their objections to the

Hayes motions and added a Cross-Motion for Sanctions. Simultaneously, Counsel for the

Reorganized Debtors established a January 19, 2006 hearing date in Wilmington,

Delaware for the Hayes' motions and the Cross-Motion for Sanctions. Counsel noted that

the Objection Deadline on the Cross-Motion was at the Hearing, which did not allow

Hayes sufficient time to respond to the request for sanctions.

31) The Reorganized Debtors Counsels' sanctions Cross-Motion was pursuant to

Section 1927 of Title 28 of the United States Code. At the hearing, the Reorganized

Debtors' counsel explained why the Reorganized Debtors had not sought sanctions under

Rule 9011 of the Bankruptcy Code:

> I mean, we could have done it as 9011. Frankly, Your Honor, the main
> reason we didn't do 9011 is because the hearing was in 2 weeks, and 9011
> doesn't translate that well to a contested matter in a Bankruptcy Court
> because you have to give it 20 days safe – I think its 20 days – whatever it
> is safe harbor notice. We would have been more than happy to file a safe
> harbor notice and proceed under 9011, but we didn't have sufficient time
> before today's hearing. I think the principles of 9011 apply.

Bankruptcy courts, however, are not authorized to sanctions under Title 28. In order to

use Title 28 provisions, bankruptcy courts make findings of fact and conclusions of law

that are referred to the district court for consideration on sanctions.

32) On March 30, 2006, the Reorganized Debtors filed an objection in this Court

to Hayes' motion to stay its briefing schedule to provide the time needed to prepare this

11

motion to disqualify Reorganized Debtors' counsel. While characterizing the Hayes allegations as "erroneous" and "baseless attacks", Counsel offered no substantive defense that their legal obligations to the Reorganized Debtor required them to evaluate the merits of Haskell's understated EBITDA allegations.

33) Included in the March 30, 2006 Objection, was another Cross-Motion that requested this Court to (A) impose monetary sanctions, (B) bar appellant from filing any additional motions in connection with this appeal, and (C) relieve the Reorganized Debtors of their obligation to respond to any additional pleadings filed by the Appellant. Counsel attributes Judge Wizmur as recognizing that Hayes has "history of filing frivolous and duplicative pleadings in both this Court and the Bankruptcy Court."[12] In assessing sanctions, however the bankruptcy court failed to make the required findings of fact that any pleading filed in the bankruptcy court was duplicative or frivolous.

## ARGUMENT

From the commencement of the bankruptcy, Genesis Debtors' counsel has acted upon a conflict of interest with the Senior Lenders by favoring the Senior Lenders' interests in preference to the Debtors' interests.

### A. Agreement To Pay Senior Lenders During Bankruptcy Begins A Pattern Of Genesis Debtors Favoring The Senior Lenders

At the commencement of the bankruptcy on June 22, 2000, the Genesis Debtors agreed to make periodic payments to the Genesis Senior Lenders during the bankruptcy that were equal to the interest due on their loans if Genesis had not declared bankruptcy. (Plan VI.D.1, p. 67) Then on July 18, 2000, the bankruptcy court approved the Genesis

---

[12] This Court, however, recognized that the only duplication in the district court was the Notice of Appeal which this Court recognized resulted from a clerical error which both parties should have recognized.

Debtors request for DIP financing to make these payments. (Plan VI.C.1, p. 66) So structured, these agreements provided no benefit to the Genesis Debtors while gratuitously providing $196 million for the Senior Lenders, and a low risk opportunity to earn interest for the Senior Lenders making the DIP loans, which included Goldman and Highland. The Genesis Debtors incurred the interest on DIP loans that were not needed to maintain the Debtors' business.

The Genesis Debtors' actions contrast markedly with those of the Multicare Debtors. Multicare, the Genesis subsidiary in this joint bankruptcy, entered into similar DIP credit and Cash collateral protection agreements except for the provisions to make periodic payments to the Senior Lenders during the bankruptcy. Not making periodic payments to their Senior Lenders, the Multicare Debtors didn't need to draw any of their $50 million in DIP financing which benefited the estate by avoiding interest expense on the DIP balances. In contrast, the Genesis Debtors drew $200 million of DIP financing, $196 million went to pay the Senior Lenders.

Since Genesis managed Multicare, the disparate treatment of the respective Senior Lender groups reflected entirely on the respective Debtors' counsels. Obviously, the Genesis Debtors' counsel breached its fiduciary duty to the Genesis Debtors by making and supporting one-sided agreements with the Senior Lenders while the Multicare Debtors' counsel represented the interests of the Multicare Debtors by not entering into similar agreements with its Senior Lenders.

## B. Agreement to Pay Senior Lenders Post-Petition Interest Is Clearest Example Of Genesis Debtors Breaching their Fiduciary Duty And Favoring The Senior Lenders

The clearest example showing the Genesis Debtors breach of their fiduciary duties to the Genesis estate is the Plan contingency, which the Debtors advocated that the

13

bankruptcy court approve, to pay the Senior Lenders $112 million in post-petition interest. However, the task of securing post-petition interest for the Senior Lenders, if appropriate, is the responsibility of the Senior Lenders, not the Debtors who have fiduciary duties to a wider constituency. This is particularly true in this bankruptcy case, as the Senior Lenders were separately represented by leading bankruptcy counsel compensated by the Genesis Debtors. (Plan VI.D.1, p.68) Of course, if the Senior Lenders had asserted a claim for post-petition interest, it would have been the Debtors' obligation to oppose that claim. (See *In Re Palombo Farms of Colorado, Inc.*, 43 B.R. 709, 711 (Bkrtcy. 1984)).

Most revealing of the Debtors' intentions to favor the Senior Lenders is the legal problem in awarding post-petition interest in this bankruptcy. The Bankruptcy Code, (11 USC 506(b)), allows post-petition interest only for secured claims and then only to the extent the claims are oversecured. "Bankruptcy Code [Section] 506(b)... allows interest on a secured claim to the extent that the collateral has a value greater than the amount of the underlying claim." *In re Kauffunger*, 16 BR 666, 667 (1981). 'Section 506(b) only applies to oversecured claims and therefore interest on all other pre-petition claims stops accruing as of the date of filing the petition.' *In re Ladycliff College*, 46 B.R. 141, 143, (Bkrtcy. 1985); affd, 56 B.R. 765 (S.D.N.Y. 1985) citing *Matter of Wilson Dairy Co.*, 30 B.R. 67,72 (Bankr. D. Ohio 1983). The Genesis Senior loans were clearly undersecured as the cash and accounts receivable securing them was only about 33 per cent of the loans' value. Thus, the Plan, which provided post-petition interest to the Genesis Senior Lenders, clearly violated the Bankruptcy Code. It would be surprising if Debtors' counsel was unaware of these facts, the law, or its fiduciary duty to oppose an award of

14

post-petition interest. Such an extreme lapse suggests that the collusion alleged in the Haskell complaint extends to Debtors' counsel.

In any event, providing the Senior Lenders post-petition interest, which is not allowed under the Bankruptcy Code, is the clearest showing that Genesis Debtors have totally ignored their fiduciary duties by favoring the Senior Lenders. This conclusion is strengthened by the fact that the Multicare Debtors, whose Senior loans were 28% secured, did not seek post-petition interest for their Senior Lenders.

## C. Reorganized Debtors' Failure To Pursue Fraud On The Bankruptcy Court Allegations Against Senior Lenders Violates the Debtors' Fiduciary Duty

Allegations in the Haskell complaint on the undervaluation of the Genesis estate also shows that the Reorganized Debtors' are favoring the Senior Lenders. Had the Reorganized Debtors applied conservative valuations to the EBITDA adjustments itemized in the Haskell complaint, for example, they would have realized that the Genesis estate was undervalued by more than a billion dollars![13] (See paragraphs 16 and 17.) The Senior Lender deficiency, including post-petition interest, was only $132, as determined by the bankruptcy court based on the Debtors' allegedly fraudulent valuations.[14] Such a straight forward examination of the Haskell allegations would have shown the Reorganized Debtors' counsel that the Plan provided the Senior Lenders a windfall of hundreds of millions of dollars.

The Bankruptcy Code prohibits confirmation of reorganization plans that provide distributions that are greater than the claims. "A corollary of the absolute priority rule is

---

[13] *In Re Temp-Way Corp.*, 95 B.R., 343 (E.D. Pa. 1989) found that where a creditor makes "wide-ranging allegations" of fraud against management of the debtor and its owner; that assurance that an investigation has been conducted and that the allegations are baseless are "inadequate to fulfill the obligations... [of] the Debtor-in-Possession. Id. 345

[14] *In Re Genesis Health Ventures, Inc.* 266 B.R. 591, 616 (Bkrtcy D. Del. 2001)

15

that a senior class cannot receive more than full compensation for its claims." *In Re Genesis Health Ventures, Inc.* 266 B.R. 591, 612 (Bkrtcy D. Del. 2001); citing *In re MCorp. Financial Inc.*, 137 B.R. 219, 225 (Bankr. S. D. Tex. 1992).

At a minimum, the Reorganized Debtors' fiduciary obligations to the junior bondholders and equity holders required consultation with financial and accounting experts to assess the validity of the Haskell allegations. "[I]t is clear that counsel for Temp-Way has a duty to pursue vigorously all potential claims of fraud committed against the corporation. *In Re Temp-Way Corp.* 95 B.R. 343, 345 (E.D. Pa. 1989). Here there is no evidence that the Reorganized Debtors have undertaken any investigations with respect to the merits of the understated EBITDA alleged in the Haskell complaint. The Reorganized Debtors' inaction on investigating the Haskell allegations only serves the Senior Lenders and is evidence that Reorganized Debtors counsel is acting on a hidden conflict of interest.

## D. The Reorganized Debtors' Opposition To Appointment Of Post-Confirmation And Pre-Termination Equity Committees Only Favors the Senior Lenders

At the same time that the Reorganized Debtors' counsel was defending NeighborCare, it was opposing appointments of post-confirmation and pre-termination equity committees in the bankruptcy court and in subsequent appeals before this Court. Having decided to forego a review of the EBITDA understatements in the Haskell complaint, the Reorganized Debtors had a fiduciary obligation to support appointment of an equity committee which could act in the "best interests of the estate" given the Reorganized Debtors' counsels' potential conflicts in representing a Haskell defendant. By supporting the appointment of an equity committee, the Reorganized Debtors' counsel could have met their Section 327(e) obligation to appoint a special attorney in matters

16

where a conflict of interest would have precluded their representation of the Reorganized
Debtors. However, by opposing Post-Confirmation and Pre-Termination Equity
Committees while, at the same time, defending NeighborCare; the Reorganized Debtors'
counsel is ignoring its potential conflicts and indeed is assisting the Senior Lenders in
avoiding the alleged fraud.

## E. Reorganized Debtors' Counsels' Representation of NeighborCare In the Fraud On The Bankruptcy Suit Raises A Potential Conflict Of Interest

NeighborCare is the successor corporation to the Reorganized Genesis. Formerly
Genesis' institutional pharmacy business, it was spun off to shareholders of the
Reorganized Debtor on December 1, 2003. Richards, Layton & Finger, P.A. and Weil,
Gotshal & Manges LLP represent NeighborCare in the Haskell fraud on the bankruptcy
suit that was recently remanded by this Court to the bankruptcy court for further
proceedings. Richards, Layton & Finger, P.A. and Weil, Gotshal & Manges LLP
concurrently represents the Reorganized Debtors' in opposing the appointment of a Pre-
Termination Equity Committee. The Motion For a Pre-Termination Equity Committee
suggested that there was an opportunity for a committee to investigate recovering the
damages alleged in the Haskell complaint for the Debtors' estate. The Reorganized
Debtors, however, for some reason, have not seen the positive aspects that the fraud
allegations portend for the Debtors' estate.

The above facts raise potential conflict of interest issues for Richards, Layton &
Finger, P.A. and Weil, Gotshal & Manges LLP that they were required to investigate
before undertaking to defend NeighborCare in the Haskell fraud on the bankruptcy court
suit. The First Circuit warns counsel of the dilemma of emerging conflict of interest
situations:

17

> As with other prophylactic ethical rules constraining attorney conduct, sections 327(a) and 328(c) cannot achieve their purpose unless court-appointed counsel police themselves in the first instance, especially in circumstances... where nominal applicant for [counsel's] appointment is corporate debtor in possession who can only act through its officers... and *may not command appointee's primary loyalty*.... Thus, as soon as counsel acquires even constructive knowledge reasonably suggesting an actual or potential conflict, a bankruptcy court ruling should be obtained.
>
> .    .    .
>
> Absent the spontaneous, timely, and complete disclosure required by 327(a) and Bankruptcy Rule 2104(a), court-appointed counsel proceed *at their own risk*. (Emphasis in the opinion)

*Rome v. Braunstein*, 19 F. 3d. 54, 59 (1st Cir. 1994)

After acquiring constructive knowledge of the of the fraud on the bankruptcy court allegations, Richards, Layton & Finger, P.A. and Weil, Gotshal & Manges LLP, failed to obtain a bankruptcy ruling on potential conflicts before undertaking representation of NeighborCare in matters that likely put themselves into an actual conflict with their obligations to give their undivided attention to the interests of the Genesis Debtors.[15]  Counsel, for example, ignored the implications of the possibility of a billion dollar fraud with hundreds of millions of dollars in overcompensation for the Senior Lenders that could be recovered for the Genesis estate.

Having failed to raise the potential conflicts in undertaking the NeighborCare representation with the bankruptcy court, at a minimum, it is counsels' burden to show that this representation has not impaired their representation of the Genesis Debtors estate.  Without court certification, the concurrent representation of NeighborCare and

---

[15] "[C]ourts... have drawn a distinction between actual and potential conflicts of interest, the question of adverse interest ultimately turns on whether the particular facts at issue... call into question the incentive of counsel to act with undivided loyalty to the estate. 'Counsel should be disqualified when a conflict casts some doubt as to the vigor with which [the attorney] will represent the client's interest...'" *In Re Arochem Corp.*, 181 B.R. 693, 700 (Bkrtcy. D. Conn. 1995) citing: *In re Stamford Color Photo Inc.*, 98 B.R. 135, 138 (Bkrtcy. D. Conn. 1988)

18

the Reorganized Debtors must be considered an actual conflict that would require

disqualification of Richards, Layton & Finger, P.A. and Weil, Gotshal & Manges LLP as

counsel for the Reorganized Debtors under 327(a).

## F. Reorganized Debtors' Counsel Has a Conflict Of Interest In Opposing The Appointment of A Pre-Termination Equity Committee That Disqualifies It From Representing The Reorganized Debtors In This Appeal

In *Marvel Entertainment*, the Third Circuit expressly reiterated the holding of its

earlier case, *B H & P, Inc.*, 949 F. 2d. 1300 (3rd Cir. 1991), that articulated the general

principles which require the disqualification of counsel in a bankruptcy case.

" 1) Section 327(a), as well as section 327(c), imposes a per se disqualification as

trustee's counsel of any attorney who has an actual conflict of interest; 2) the district

court may within its discretion – pursuant to section 327(a) and consistent with section

327(c) – disqualify an attorney who has a potential conflict of interest..." *In re Marvel*

*Entertainment Group Inc.*, 140 F. 3rd 463, 476 ( 3d Cir. 1998)

At the consummation of the Plan, the defendant investment banks in the *Haskell*

suit, Goldman and Highland, became "affiliates" of the Reorganized Debtors. This

relationship created a conflict of interest with the Reorganized Debtors' counsel in

representing the Reorganized Debtors in matters that affected the Senior Lenders in

general and Goldman and Highland in particular. Specifically, the Reorganized Debtors'

counsel has acted on this conflict of interest by opposing the appointment of an equity

committee. This opposition benefits the Senior Lenders in protecting their windfall

gains from the fraud on the bankruptcy suit allegedly perpetrated by Goldman and

Highland and is adverse to the interests of the defrauded Genesis Debtors. Under these

19

circumstances, the Third Circuit in *Marvel* requires the disqualification of the Reorganized Debtors' counsel pursuant to Section 327(a).

Section 101(2)(a) of the Bankruptcy Code defines an affiliate as an "entity that directly or indirectly owns, controls, or holds with power to vote 20% or more of the outstanding voting securities of the debtor." As alleged in the Haskell complaint, after the consummation of the Plan, Goldman and Highland received a distribution of 22.7% of the equity in the reorganized Genesis. (See paragraph 25.) A finding that Goldman and Highland are affiliates of the Reorganized Debtors creates a statutory conflict of interest with the Senior Lenders that would disqualify the Reorganized Debtors' counsel from representing the Reorganized Debtors in matters where the Senior Lenders have an interest adverse to the Genesis Debtors' estate.

The Reorganized Debtors' could argue that, at best, this was a potential conflict as until the Haskell complaint was filed in January 2004 they were unaware that any of the Senior Lenders were affiliates of the Reorganized Debtors. This argument, even if successful, would not resolve counsels' conflict of interest problems. The district court for the Northern District of Texas found in a bankruptcy that posed similar Section 327(a) issues that:

> The evidence supporting the finding of a conflict of interest in this case is admittedly circumstantial, since neither Locke Purnell, nor the Davis family has ever stated that Locke Purnell represented anyone other than the Debtors.... However from the totality of the evidence, together with the objective manifestations of Locke Purnell's conduct throughout this proceeding can lead to only one factual conclusion – that Locke Purnell actually represented the interests of the Davis family throughout the pendency of the case and that representation was a conflict of interest.

*In re Ken Davis Industries Intern., Inc.*, 91 B.R. 742, 751 (Bkrtcy, N.D. Tex. 1988)

In this bankruptcy, the objective manifestations that Richards, Layton & Finger,

P.A. and Weil, Gotshal & Manges LLP actually represented the interests of the Senior

Lenders throughout the pendency of the case include the:

> o  Genesis Debtors' Support Of Post-Petition Financing That Paid
>    The Senior Lenders The Equivalent Of Interest On Their Loans
>    During Bankruptcy;
>
> o  Genesis Debtors' Support Of A Plan Contingency That Paid The
>    Senior Lenders Post-Petition Interest That They Were Not Entitled
>    To Receive Under The Bankruptcy Code;
>
> o  Reorganized Debtors' Failure To Investigate Or Pursue The
>    Hundreds Of Millions Dollars In Windfalls To The Senior
>    Lenders Due To The Fraudulent Undervaluation Of The
>    Reorganized Debtors' Estate As Alleged In The Haskell
>    Complaint;
>
> o  Reorganized Debtors' Opposition To Appointments Of Post-
>    Confirmation And Pre-Termination Equity Committees, Which
>    Could Act To Recover The Windfall Gains For The Benefit Of
>    The Genesis Estate.

The Debtors' counsels cannot claim that their advocacy of an allegedly fraudulent

Plan that favors the Senior Lenders was undertaken in good faith. Each of the cited

actions favoring the Senior Lenders required counsel to breach their fiduciary duty to the

Debtors and the award of post-petition interest to the Senior Lenders was even contrary to

the Bankruptcy Code. The inescapable conclusion here, like *Davis*, is that the Debtors'

counsels' representation is a conflict of interest that requires disqualification.

## CONCLUSION

For the all the above reasons, James J. Hayes, respectfully requests this Court

grant his motion to disqualify Richards Layton & Finger, P.A. and Weil, Gotshal &

Manges LLP from representing the Reorganized Debtor in the appeal of the bankruptcy

courts denial of a Pre-Termination Equity Committee or alternatively to reverse the

bankruptcy court's denial of an equity committee.

Dated: April 28, 2006
   Annandale, VA 22003

Respectfully Submitted,

James J. Hayes
Pro Se

## CERTIFICATE OF SERVICE

I certify a copy of the foregoing Motion was mailed from the Northern
Virginia Regional Post Office on April 28, 2006 to the following counsel:

Russell C. Silberglied
Richards Layton and Finger P.A.
One Rodney Square
Wilmington, DE 19899; and

Adam P. Strochak
Weil, Gotshal & Manges LLP
1300 Eye Street, NW, Suite 900
Washington, DC 20005; and

Katherine B. Gresham
Assistant General Counsel
Bankruptcy and Appellate Litigation
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549

James J. Hayes

# APPENDIX

Motion For The Appointment Of Pre-Final Decree Equity Committee

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                          )        Chapter 11
                                                )
GENESIS HEALTH VENTURES, INC., et al.,          )        Case No. 00-2692 (JHW)
                                                )
                                                )
                                                )
Reorganized Debtors                             )
_____ )

## MOTION FOR APPOINTMENT OF PRE-FINAL DECREE EQUITY
## COMMITTEE

Pursuant to section 1102(a)(2) of chapter 11 of title 11 of the United States Code,

11 U.S.C. 101-1330, and the due process clause of Amendment V of the United States

Constitution, James J. Hayes, a member of Genesis Equity Class respectfully requests

this Court to appoint a Pre-Final Decree Equity Committee to represent the interests of

the Genesis Common Stock Class: 1) in proceedings on the recently filed Motion For

Reconsideration of the Genesis and Multicare Senior Lender Claims; and the Genesis and

Multicare Senior Subordinated Note Claims; 2) a new Motion for Sanctions for

Professional Misconduct pursuant to Rule 9001 of the Federal Rules of Bankruptcy

Procedure; 3) a potential suit for damages on behalf of the Debtor against the Haskell

defendants pursuant to 1103(c)(5) and 1109(b);, and a 4) potential Constitutional

challenge to the confirmation pursuant to the Takings and Just Compensation Clauses of

the Fifth Amendment.

## Background[1]

1.    On November 23, 2005, Reorganized Debtors filed their *Motion for Entry of a Final Decree* in the cases of Genesis Health Ventures, Inc. (Case No. 00-2692) and Multicare AMC Inc. (Case No. 00-2494)

2.    On December 5. 2005, Hayes filed by U.S. Mail a letter to this Court opposing the issuance of a Final Decree in the lead Genesis case, no. 00-2692 (JHW); and on December 7, Hayes sent the same letter opposing the issuance of a Final Decree in Multicare, case no. 00-2494(JHW). Also on December 7, Hayes filed a *Motion For Reconsideration of the Genesis and Multicare Senior Lender Claims; and the Genesis and Multicare Senior Subordinated Note Claims*.

3.    The Motion for Reconsideration noted Hayes' intention to file a *Motion for Sanctions for Professional Misconduct* pursuant to Rule 9001 of the Federal Rules of Bankruptcy Procedure.

4.    On July 18, 2004, two days after a hearing on the defendant's motion to dismiss the Haskell fraud complaint, Hayes sent a confidential letter to this Court. This letter enclosed an August 6, 2001 confidential letter to Genesis' President, Michael Walker, which criticized Debtors' counsel as showing "a serious lack of perception and competence... in the preparation and advocacy of their reorganization plan." The letter to this Court noted that the letter to Mr. Walker was provided to Genesis CFO, George Hager, an alleged conspirator in the Haskell fraud suit, who then provided the letter to Debtor's Counsel. My letter concluded: "the fact that the chairman ignored the

---

[1] The Background only includes information after this Court's May 13, 2004 bench decision denying a post-confirmation equity committee. At the hearing this Court noted that it had been apprised that case In *the matter of GENESIS HEALTH VENTURES INC.*, Debtors: Richard HASKELL, et al., Plaintiffs v. GOLDMAN, SACHS & CO. et al., has been referred to the Court.

increasing equity values of health care stocks and breached his fiduciary obligations to shareholders is circumstantial evidence there were illicit understandings among Genesis management and the Senior Lenders and that the Debtor's Counsel was a tacit co-conspirator in the alleged scheme."

5.    On May 3, 2005, this Court dismissed the case: *Richard HASKELL, et.al, Plaintiffs v. GOLDMAN, SACHS & Co.; Genesis Health Ventures. Inc.; Mellon Bank, N.A.; Highland Capital Management, L. P., George V. Hager Defendants in* its entirety. The opinion held the case against the debtor is time barred by *section 1144* and violated the order of confirmation, which enjoined claimants from prosecuting claims that occurred prior to the Effective Date. The defendants have appealed to the district court.

6.    The complaint listed a number of allegations that certain senior lenders had caused the understatement of Genesis' EBITDA that in turn caused the investment bankers to undervalue Genesis by hundreds of millions of dollars. The individual allegations and associated EBITDA reductions are shown in the table below:

| Bondholder Allegation | EBITDA Adj. ($ millions) | LT Care | Pharmacy | Reference p. no. |
|---|---|---|---|---|
| a) excessive insurance reserves | 16.7 | 7.5 | 9.2 | 68 |
| b) Multi Care management fees | 11.6 | 11.6 | 0.0 | 9 & 107 |
| c) Manor Care pharmacy sales | 11.0 | 0.0 | 11.0 | 117 |
| d) Mariner contract | 13.4 | 0.0 | 13.4 | 129 |
| g) discontinued health plan | 13.0 | 5.8 | 7.2 | 9 & 141 |
| h) pharmacy costs of goods sold | 26.0 | 0.0 | 26.0 | 146 |
| I) increased Medicare mix | 4.0 | 4.0 | 0.0 | 151 |
| j) additional personnel costs | 35.0 | 15.7 | 19.3 | 152 |
| f) management retention bonus | 6.0 | 2.7 | 3.3 | 39 |
| e) AGE loss | 3.0 | 1.3 | 1.7 | 135 |
| Total Adjustments | 123.0 | 41.1 | 81.9 | |
| Valuation Increase (Chilmark multiples) | 1,045.3 | 287.7 | 757.5 | |

3

The potential billion dollar understatement[2] is sufficient to fully pay all creditor claims

and leave a substantial recovery for the equity class.

## Argument

### A. Statutory Support for Appointment of a Committee

7.  The principal inquiry in the appointment of an equity committee is whether

the equity security holders are adequately represented.

> (2) ...the court may order the appointment of additional committees of
> creditors or of equity security holders if necessary to assure adequate
> representation of creditors or of equity security holders.

11 U.S.C. 1102(a) (2) (1994)

The question on whether shareholders have received adequate representation is a

determination in the court's discretion.

> The statute involves two inquiries. It must first be determined whether
> the appointment of a committee is necessary to assure adequate
> representation.[3]

*In re Wang Laboratories, Inc.*, 149 B. R. 1 2 (Bankr. D. Mass. 1992)

8.  In one of the few appeals on this fundamental issue, the District Court for the

Southern District of New York concluded:

> the proper legal standard to apply in determining whether to appoint an
> official equity committee for equity shareholders is whether an official
> committee is necessary to provide adequate representations of the equity
> holders' interests.

*In Re Johns-Manville Corp.*, 68 B.R. 155 163 (S.D.N.Y. 1986)

---

[2] The allocation of adjusted EBITDA between LT Care and Pharmacy is pro rata, based on the revenue of
these divisions.

[3] The second inquiry is "whether [the court] should exercise its discretion and make the appointment. Id. 2

4

9.     The Genesis equity class has not been represented either formally or informally since Genesis filed for bankruptcy on June 22, 2000. No court has held to the contrary. In denying shareholders a post-confirmation equity committee this Court expressed the concern "that such a process may not be countenance within the framework of the Bankruptcy Code. And, even if it is, it would be available only in the most extraordinary of situations. And, I cannot fit this set of facts into that kind of equation." [4]

10.    In reaching this conclusion, the Court is placing itself on the committee and then deciding what situations might warrant committee action. This Court concluded that a post-confirmation committee is warranted only in "extraordinary situations" and then could see no facts that would fit this situation. Sections 1103(c) (5), however, provides that an equity committee may "perform such other services as are in the interest of those represented." Section 1109(b) grants a committee the right to raise, appear, and be heard on any matter. Such language provides for a spectrum of activities from the mundane of asking the court to consider the priority of Senior Lender speculative claims, for example, to the spectacular of suing the Haskell defendants on behalf of the Debtor.

11.    In the second example, the Second Circuit held that 1103(c) (5) and 1109(b) implies a qualified right for committees to initiate suit, with approval of the Bankruptcy Court:

> Most bankruptcy courts that have considered the question have found an implied, but qualified right for creditors' committees to initiate adversary proceedings in the name of the debtor in possession under 11 U.S.C. 1103(c)(5)and 1109 (b)...We agree with these bankruptcy courts.

*Re STN Enterprises, 779 F.2d 901 904* (2nd Cir. Vt. 1985)

---

[4] Transcript of Hearing Before the Honorable Judith H. Wizmur, May 13, 2004, p. 27.

5

In other words, the Bankruptcy Code provides for the committee to decide what actions are necessary to represent the interests of its class and then to seek court approval for those actions. The Code simply does not contemplate the bankruptcy court being both judge and advocate.

12. Setting aside the notion that the court needs to approve the committee's activities as a condition in appointing a committee; the instant motion requires this Court to assess whether the interests of the equity class are adequately represented by the pro se efforts of a class member. Considering the complexity of the case, the cram down confirmation, the unresolved fraud allegations and the power the Bankruptcy Code provides of a committee under 1103(c)(5) and 1109(b) and the answer is clearly "No."

13. The *Motion For Reconsideration of the Genesis and Multicare Senior Lender Claims; and the Genesis and Multicare Senior Subordinated Note Claims*, now before the court, certainly falls within the confines sections 1103(c)(5) and 1109(b) as would a Motion for Professional Misconduct. Who but a committee for the unrepresented, could be expected to file a misconduct motion against parties who agreed on the financial underpinnings of the reorganization plan before the confirmation hearing and would not renegotiate the plan after market increases in health care stocks increased the debtors' estate by hundreds of millions of dollars?

14. This Court should appoint a committee even if it believes there is nothing for the committee to do.[5] Ethically, a newly appointed committee counsel could not pursue frivolous actions against the probity of the confirmation. If this is the case, then ratification of the confirmation by an equity committee would set the stage for a Final

---

[5] With $37 million authorized to pay compensation and expenses for parties supporting the plan, the relatively small additional cost of an equity committee cannot be a factor in resolving a continuing controversy with hundreds of millions of dollars at stake.

Decree that would really be final and not just another intermediate point in this saga. Given the complexities of the case; the challenges to the confirmation; the allegations of fraud; and continuing appeals: a final review of the case by an equity committee that has not participated in the confirmation would be a prudent exercise of this Court's discretion.[6]

## B. Constitutional Support for Appointment of a Committee

15. This Court simply avoided the representational issues in its previous denials. It cannot do so now at the point of issuing a final decree. The Fifth Amendment provides in part that "*No person shall... be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.*" The confirmed plan deprived the equity class of its ownership of Genesis in bankruptcy proceedings where it was not represented. The equity class was also denied an equity committee to undertake an appeal.

16. Although no authority has commented on what constitutes Constitutional due process in a chapter 11 bankruptcy proceeding, it must, at a minimum, require the representation by a committee provided by 1102(a) (2) at some point in the bankruptcy process. Having failed to appoint a Committee earlier, the instant motion is the final opportunity to respect the equity holders Constitutional rights.

17. Whether appointing an equity committee at the very end of a bankruptcy is sufficient to pass Constitutional muster will only be determined after the committee pursues all its remedies. If unsuccessful, the committee would then be the first to test the

---

[6] Both Hayes and the Haskell plaintiffs' for independent reasons believe that the confirmed plan did not satisfy the fair and equitable provisions of subsection 1129(b) (2).

7

meaning of Fifth Amendment Due Process in a direct challenge to the confirmation; a

challenge that could not dismissed by the judicial doctrine of equitable mootness.

18.    While not considering an appellant with a constitutionally protected right,

the dissenting opinion in the 7-6 en banc *Continental* decision has serious doubts about

the judicially crafted remedy of equitable mootness. Writing for the dissent, it is Judge

Alito's view that:

> The majority's decision in this case creates a bad precedent for our
> circuit. The majority adopts the curious doctrine of "equitable mootness,"
> which it interprets as permitting federal district courts of appeals to refuse
> to entertain the merits of live bankruptcy appeals over which they
> indisputably possess statutory jurisdiction and in which they can plainly
> provide relief. According to the majority there is no clear rule for
> determining when a bankruptcy appeal is "equitably moot" Instead, this is
> said to be a discretionary determination to be made in the first instance by
> the district court based on a weighing of five factors that the majority has
> culled from the opinions of our "sister circuits." **In my view, if the
> doctrine has any validity, it is more limited than the majority holds
> (Emphasis added.)**

*In re Continental Airlines*, 91 F. 3d 553 567 (3rd Cir. 1996) en banc.

19.    The undefined relationship between the Bankruptcy Code and the

Constitution is illustrated by the *Marshall* case, where the Bankruptcy Court for the

Central District of California found:

> There is a significant difference, with respect to the Bankruptcy
> Power, between property interests and contract rights. In the bankruptcy
> context, property rights enjoy at least a measure of protection under Due
> Process and Just Compensation Clauses of the Fifth Amendment.

*In re Marshall,* 300 BR 507 525 (Bkrtcy. C.D. Cal. 2003)

The *Marshall* court explained that "a measure of protection" was defined by a 1937

Supreme Court opinion:

8

But if Congress is acting within its bankruptcy power, it may authorize the bankruptcy court to affect those property rights, provided the limitations of the due process clause are observed.

*Wright v. Union Central Life Ins. Co.*, 304 U.S. 502 518 (1937)

20.    With respect to the Just Compensation clause, the Rehnquist court favorably

cited *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555 (1935):

The bankruptcy power is subject to the Fifth Amendment's prohibition against taking private property without compensation.

[T]he Fifth Amendment commands that, however great the Nation's need, private property shall not be thus taken even for a wholly public use without just compensation. If the public interest requires, and permits, the taking of property of individual mortgagees in order to relieve the necessities of individual mortgagors, resort must be had to proceedings by eminent domain; so that, through taxation, the burden of the relief afforded in the public interest may be borne by the public.

Id 602.

The foregoing discussion satisfies us that there is substantial doubt whether the retroactive destruction of appellees' liens in this case comports with the Fifth Amendment.

*United States v. Security Industrial Bank*, 459 U.S. 70 74 (1982)

21.    But Congress in "establish[ing] ...uniform Laws on the subject of

Bankruptcies..." [7] and the Federal Courts interpreting these laws both must respect the

Constitution. In 1957, for example, the Supreme Court examined the denial of passports

to certain groups on the question whether this denial violated the Fifth Amendment rights

of liberty to these citizens.

We deal here with a constitutional right of the citizen, a right which we must assume Congress will be faithful to respect. We would be faced with important constitutional questions were we to hold that

---

[7] Article I, Section 8, Clause 4 of the Constitution

9

> Congress...had given the Secretary authority to withhold passports to citizens because of their beliefs or associations.
>
> Kent v. Dulles, 357 U.S. 116 130 (1957)

22. Both the Rehnquist Court and the Burger Court follow the statutory interpretation presumption that Congress intends to respect the Constitution in constructing its laws:

> We consider the statutory question because of the "'cardinal principal that this Court will first ascertain whether a construction of the statute is fairly possible by which the constitution question can be avoided.'"
>
> *United States v. Security Industrial Bank*, 70 78 (1982) citing: *Lorillard v. Pons*, 434 U.S. 575 578 (1978)

23. We do not need to know how the potential conflicts between the Bankruptcy Code and the Constitution will ultimately be resolved to know that the Constitution supports the appointment of an equity committee on the instant motion. This Court's timeliness concerns in denying previous motions simply evaporate under Constitutional Due Process.

24. In hindsight, perhaps it would have been better had the U.S. Trustee appointed an equity committee at the beginning, or failing that, had the Securities and Exchange Commission intervened to request the appointment of an equity committee. Perhaps the addition of another committee and additional lawyers and investment bankers would not have brought anymore clarity to a complicated and allegedly fraudulent situation. Perhaps now, with only the securities claims under challenge and specific fraud allegations on the table, is the best time to consider a final resolution. Whatever.

25. The Constitutional right to representation does not expire. There is no

statute of limitations on the Constitution. *In re Kendavis Holdings Co.*, 249 F 3rd 383 (5th Cir. 2001), the court reviewed and upheld due process claims in a bankruptcy case fifteen years after the bankruptcy court's order confirming the reorganization plan:

> Protection of an individual's due process right to adequate notice requires more than a cursory review...

> Id. 386

26.     The equity holders were not represented in the negotiations that produced the reorganization plan; they were not represented at the confirmation hearings; they were not represented in the appeal; but because their property was taken and they were not provided due process under the Fifth Amendment they must now be represented by a committee.

27.     WHEREFORE, James J. Hayes respectfully requests a) that this Court appoint a Pre-Final Decree Equity Committee, and b) grant such other and further relief as is necessary and proper.

Dated:  December 11, 2005
        Annandale, VA.

Respectfully Submitted,

James J. Hayes
Pro Se
4024 Estabrook Dr.
Annandale, VA 22003
(703) 941-4694

11

4024 Estabrook Dr.
Annandale, VA 22003



PRIORITY
MAIL
UNITED STATES POSTAL SERVICE ™
www.usps.gov

LABEL 107R, OCT 1997



Office of clerk
U.S. District Court
844 N. King Street, Lockbox 18
Wilmington, DE 19801



U.S. POSTAGE
PAID
MERRIFIELD, VA
APR 26, 06
AMOUNT
$4.05
0004505-53

0000
19801