ORIGINAL

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GENESIS HEALTH VENTURES, INC., et al., Debtors. | Case No. 00-2692 (PJW) |
| JAMES J. HAYES Appellant, | |
| v. | C.A. No. 06-103 JJF |
| GENESIS HEALTH VENTURES, INC., et al., Appellees. | |

## APPELLANT'S OPENING BRIEF



FILED

JUN 07 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

BD scanned

James J. Hayes, Pro Se
4024 Estabrook Dr.
Annandale, VA 22003
(703) 941-4694

# TABLE OF CONTENTS

Table of Authorities ............................................................................................. ii

Statement of Case............................................................................................... 1

   A.  Debtors' Counsel Disclose Client Relationships With Senior
       Lenders Who Are The Debtors' Largest Unsecured Creditors ............ 4

   B.  Confirmed Plan Awards Ninety Four Per Cent Of Reorganized
       Genesis To The Senior Lenders ............................................................ 6

Summary of Argument ...................................................................................... 8

Statement of Facts.............................................................................................. 9

Argument............................................................................................................ 12

   A. Lack of Adequate of Representation Requires An Equity Committee.. 12

      a.  Statutory Inquiry on Adequacy of Representation............................ 15
      b.  Constitutional Inquiry on Adequacy of Representation .................. 16
      c.  Post-Confirmation Allegations of Fraud Sufficient to Fully
          Compensate Creditors Requires Pre-Termination Equity
          Committee......................................................................................... 18

   B. Reclassification of Senior Lender and Subordinated Debenture
       Holder Claims Required by 502(j) ........................................................ 20

   C.  Sanctions Inappropriate in this Case........................................................ 22

Conclusion ......................................................................................................... 24

Certificate of Service ........................................................................................ 25

Appendix:

   A. Hearing Transcript (Including Ruling).................................................... Tab A
   B.  Motion for Pre-Final Decree Committee ............................................. Tab B
   C.  Motion for Reconsideration of Claims .................................................. Tab C

## TABLE OF AUTHORITIES

**Cases:**

*ASAI v. Costillo*, 593 F. 2d., 1222 (D.C. Cir. 1978) ...................................... 23

*In re Courtesy Inns, Ltd., Inc.*, 40 F. 3d., 1084 (10 Cir. 1994) ..................... 23

*In re Genesis Health Ventures, Inc., et al.*, 266 B.R.591
(Bankr. D. Del.) ............................................................................ 1,7,16,19,20

*In the matter of Genesis Health Ventures, Inc., Debtors: Richard
Haskell, et al. v. Goldman Sachs & Co. et al.,* Complaint .. 1,2,3,6,7,19,21

*In re Johns-Manville Corp.,* 68 B.R. 155 (S.D.N.Y. 1986) ........................... 16

*Kent v. Dulles,* 357 U.S. 116 (1957) ............................................................. 18

*In re Kendavis Holdings Co.,* 249 F. 3rd 383 (5th Cir. 2001) ........................ 23

*Loretto v. Teleprompter Manhattan CATV Corp.,*
458 U.S. 419 (1982) ............................................................................ n.6,p.17

*In re Marshall,* 300 BR 507 525 (Bkrtcy. C.D. Cal. 2003) ........................... 17

*Oliveri v. Thompson,* 803 F. 2d 1265, ( 2d. Cir. 1986) ................................. 22

*In Re Seitel et. al.*, U.S.B.C. D. Del., No. 03-12227 PJW (2004) ....... n.5,p.14

*In re Wang Laboratories, Inc.*, 149 B. R. 1 (Bankr. D. Mass. 1992) .......... 15

*Wigton v. Rosenthall,* 137 F.R.D. 4 (S.D.N.Y. 1991) .................................. 22

*Wright v. Union Central Life Ins. Co.*, 304 U.S. 502 (1937) ........................ 17

**Constitution:**

Amendment V (1791) .......................................................................... 8,13,15

**Statutes:**

Bankr. Code, 11 U.S.C.

502(j) .............................................................................................. 9,20,21,23

506(b) ............................................................................................... 7, n.2,p.7

510(c)(1) ...................................................................................................... 21

1102(a) (2) ......................................................................... 7,8,9,13,15,18,22

1103(c)(5)......................................................................................................... 9

1109(b) .......................................................................................................... 10

Courts, 28 U.S.C. 1927 ........................................................................ 21,22,23

## STATEMENT OF CASE

The Genesis bankruptcy is a hostile Wall Street takeover masquerading as a bankruptcy. Wealthy and powerful investment bankers led by Goldman Sachs purchased huge amounts of senior loan participations in Genesis Health Ventures and its Multicare subsidiary, took the firms into bankruptcy, and then gamed the bankruptcy proceedings enabling the Senior Lenders to take 94 per cent the equity in the reorganized firm. [1] (C 2)

This case is an appeal of the Bankruptcy Court's denial of Hayes' motions to: 1) Reclassify Senior Lender and Subordinated Bondholder claims, 2) Appoint of a Pre-Final Decree equity committee, and 3) granting the Reorganized Debtors' Cross Motion for sanctions.

Goldman advanced its scheme by co-opting Genesis senior management, particularly the firm's top four officers and directors, through "retention programs" that included $11.5 million in bonus payments, forgiveness of $2.5 million in loans the top four officers used to purchase Genesis stock and an additional $2.1 million for achieving an August 31, 2001 effective date for the reorganization. These payments provided incentives to Genesis' top four officers and directors to abandon their representation of shareholders, leaving the equity class without representation during the entirety of the bankruptcy proceedings. *In Re Genesis Health Ventures, Inc.* 266 B.R. 591, 609-10,12,16 & 17 (Bkrtcy. D. Del. 2001) (C 180)

---

[1] Most of the factual assertions in this description of the case are taken from the complaint of a fraud on the bankruptcy court suit against Goldman Sachs & Co., Mellon Bank, N.A., Highland Capital Management, L. P., Genesis Health Ventures, Inc., and George V. Hager. This suit captioned as *Richard Haskell, et al., v. Goldman, Sachs & Co., et al.*, Bankr. Case No 00-2692 is currently before the Bankruptcy Court on remand from the District Court. The complaint referenced as *Haskell* was included was included with the previous Motion to Disqualify Reorganized Debtors' Counsel is cited here as "C 1" referring to paragraph 1 in the complaint.

1

The scheme closely followed Goldman's acquisition of $175 million in Genesis senior debt participations for about 53 cents on the dollar and $81 million Multicare senior debt participations for 48 cents on the dollar in the months preceding the Genesis bankruptcy. (C 19) By March 2000, Goldman and another investment bank Highland Capitol Management had acquired so many of the Senior Lender debt participations that they were invited to join Mellon Bank on the seven member Senior Lender Steering Committee. With claims three times greater than any other senior creditor, Goldman was able to dominate completely, the Senior Lender Steering Committee. (C 31)

Genesis management was optimistic about Genesis' prospects and was projecting EBITDA earnings in the $200 million range before Goldman's assention on the steering committee. At the March meeting with the steering committee, Genesis management proposed that Genesis' debts be restructured so that the junior bonds could be repurchased in the market at deep discounts to par. The response of the Goldman representative, Jody La Nassa, as recorded in his notes, was "R U Nuts?" This revealing comment unmasked Goldman's intent to enrich itself, as much as possible, at the expense of the debenture holders and shareholders. (C 162)

With Goldman in control, Genesis managers began renegotiating the management, pharmacy, therapy and service contracts between Genesis and Multicare. But by the date the renegotiated contracts were signed and submitted for the Bankruptcy Courts approval, Genesis and Multicare had already submitted the Plan pursuant to which the two companies would be merged and all inter-company management and other agreements would be extinguished. The only purpose of this renegotiation, therefore, was to achieve retroactive reductions in these fees, and thereby affect the relative valuations

2

of these companies. The new contract reduced Genesis EBITDA by $11.6 million. At

the multiples used by the valuation experts about $97 million in value was transferred

from Genesis to Multicare as shown in the table below, which summarizes *Haskell's*

individual allegations and the associated EBITDA reductions. (C 72-107)

| Bondholder Allegation | EBITDA Reductions ($ millions) | Long Term Care | Pharmacy | Complaint Reference # |
|---|---|---|---|---|
| a) Excessive Insurance Reserves | 13.0 | 5.8 | 7.2 | 68 |
| b) Multi Care Management Fees | 11.6 | 11.6 | 0.0 | 9 & 107 |
| c) Manor Care Pharmacy Sales | 11.0 | 0.0 | 11.0 | 117 |
| d) Mariner Contract | 13.4 | 0.0 | 13.4 | 129 |
| e) AGE Loss | 3.0 | 1.3 | 1.7 | 135 |
| f) Management Retention Bonus | 6.0 | 2.7 | 3.3 | 39 |
| g) Discontinued Health Plan | 13.0 | 5.8 | 7.2 | 9 & 141 |
| h) Pharmacy Costs Of Goods Sold | 26.0 | 0.0 | 26.0 | 146 |
| i) Increased Medicare Mix | 4.0 | 4.0 | 0.0 | 151 |
| j) Additional Personnel Costs | 35.0 | 15.7 | 19.3 | 152 |
| Total Adjustments | 136.0 | 46.9 | 89.1 | |
| Valuation Increase (Chilmark EBITDA Multiples) | 1,152.4 | 328.5 | 824.0 | |

With Goldman in control, Genesis retained Weil Gotshal & Manges, the law firm

with the nation's largest bankruptcy practice. This selection was hardly a coincidence as

Goldman was a client of Weil Gotshal. From March 6, 2000 to the June 22, 2000 filing

of the bankruptcy petition, Genesis paid Weil Gotshal $1.4 million for its pre-petition

work. The same day Genesis filed its bankruptcy petition, George Hager, the Genesis

CFO petitioned the Bankruptcy Court to engage Weil Gotshal and Richards Layton and

Finger as Debtors counsel. (C 162)

3

## A. Debtors' Counsel Disclose Client Relationships With Senior Lenders Who Are The Debtors' Largest Unsecured Creditors

The Debtors' application to engage Weil Gotshal included an affidavit listing the

firm's current clients. Included were parties to the Mellon Bank Credit Agreement which

encompassed $1.64 billion in Genesis and Multicare unsecured loans and pre-petition

interest as follows:

> ABM AMRO Bank, N.V., Bank America, N.A., Bankers Trust Co., Bank
> of Nova Scotia, CIBC, Inc., Chase, Citi Bank, N.A., Credit Suisse First
> Boston, DLJ Capital Funding, Dresdner Bank AG, First Union Bank, Fleet
> National Bank, and General Electric Capital.

> *Affidavit and Disclosure Statement on behalf of Weil, Gotshal & Manges*,
> June 22, 2000.

The Debtors' application to engage Richards Layton included an affidavit that

identified current clients who in addition were parties to the Mellon Credit Agreement as:

> ABM AMRO Bank, Alliance Capital Management, Bank America, The
> Bank of New York, CIBC, Inc., Citicorp USA, Inc., Credit Suisse First
> Boston, Crestar Bank, Deutsche Bank AG, DLJ, Eaton Vance, Erste Bank
> Sparkassen AG, First Union National Bank, Fleet Bank, General Electric
> Capital Corporation, ING Group, INVESCO, Keycorp Capital, Lehman
> Commercial Paper, Inc., Mellon Bank, N.A., Keycorp Capital, Lehman
> Commercial Paper, Inc., Merrill Lynch & Co., Metropolitan Life
> Insurance Company, Morgan Stanley Dean Witter, Natexis Banque BFCE,
> Octagon Loan Investors and Toronto-Dominion, Inc.

> *Creditors and Affiliates Thereof Currently Represented by Richards
> Layton, Exhibit A of Affidavit of Mark D. Collins*, June 22, 2000.

Most significantly, Richards Layton listed Mellon Bank and Weil Gotshal listed

Goldman as "current clients". These firms were on the aforementioned Senior Lender

Steering Committee that controlled Genesis. Both these firms, as well as George Hager,

the Genesis CFO, were later named as defendants in the *Haskell* suit that alleges a

4

conspiracy to undervalue the Genesis estate by providing understated EBITDA earnings to the Debtors' financial advisors.

Other current clients of the Debtors' counsel included UBS Warberg & Company (Weil Gotshal), and Credit Suisse First Boston (Richards Layton and Weil Gotshal). These investment banks were appointed as the Joint Debtors' financial advisors. The financial advisors used the understated EBITDA provided by George Hager to value the Genesis and Multicare estates. Remarkably, Credit Suisse is listed as a participant in the Mellon Credit Agreement. If Credit Suisse held any Genesis or Multicare Senior Lender claims while acting as Multicare's financial advisor, that firm's role as Multicare's financial advisor is an actual conflict of interest which, separately from the Haskell suit, jeopardizes the legitimacy of the Bankruptcy Court's confirmation.

The Weil Gotshal affidavit stated that the firm would:

continue to apply the Firm Disclosure Procedures as additional information concerning entities with a connection to the Debtors is developed and will file supplemental disclosure with [the Bankruptcy Court] if necessary.... and will not represent any of the aforementioned entities, or any of their respective affiliates or subsidiaries, in matters directly related to the Debtors or their chapter 11 cases.

*Affidavit and Disclosure Statement on behalf of Weil, Gotshal & Manges*, June 22, 2000.

The Debtors' application also provided that Counsel would:

take all necessary action to protect and preserve the Debtors' estates, including the prosecution of actions on the Debtors' behalf, the defense of any actions commenced against the Debtors... [and] negotiate and prepare on behalf of the Debtors any plan(s) of reorganization...

*Application of the Debtors for Authorization To Employ Weil, Gotshal*, June 22, 2000.

5

The Debtors' counsels' disclosures raise conflict of interest issues that have not been examined, perhaps because the equity class – the party most interested in exposing conflicts between the Debtors' counsel and the powerful Senior Lenders – were not represented in the bankruptcy proceedings.

The large number of Senior Lenders who were clients of the Debtors' counsel raises questions as to the size of these clients' holdings of the Senior Lender claims that have not been answered. At the effective date of the reorganization, Goldman received 15.7% of the shares of the reorganized Genesis as a partial distribution for its Senior Lender claims. (C 20) If the Debtors' counsels' remaining clients collectively held 4.3% of the Senior Lender claims, these clients might be considered "affiliates" of the Debtor, creating a statutory conflict of interest requiring disqualification of Weil Gotshal, at least, from representing the Debtor.

These conflict of interest problems only intensified with the filing of the *Haskell* suit. The two investment bank defendants, Goldman and Highland controlled 22.7% of the Reorganized Debtor more clearly stating the problem of a statutory conflict with an affiliate.

In addition, the Reorganized Debtors' counsel defended Genesis Health Ventures, Inc., the penultimate defendant in the *Haskell* action. Most telling, however, is the Sherlock Homes dog that didn't bark as the Reorganized Debtors' counsel have not taken any action to investigate or recover the Senior Lenders' windfall gains for the benefit of the Genesis estate, which is their obligation as Debtors' counsel.

## B. Confirmed Plan Awards Ninety Four Per Cent Of Reorganized Genesis To The Senior Lenders

On September 20, 2001, the Bankruptcy Court confirmed the Debtors' Joint Plan of Reorganization ("the Plan") that provided the Senior Lenders 93.4 % of the new common stock in the reorganized enterprise. About 70% of the new common stock went to investment banks, including about 22% to Haskell defendants, Goldman and Highland that had purchased their Senior debt participations from the original consortium. (C 1, 21 & 25)

The Plan also provided the Senior Lenders an additional $112 million in post-petition interest pursuant to 11 USC 506(a).[2] *In Re Genesis Health Ventures, Inc.* 266 B.R. 591, 616 (Bkrtcy. D. Del. 2001) The Plan negotiated and advocated by Debtors' counsel provided post-petition interest in the event the Bankruptcy Court approved a valuation of the Genesis estate greater than $1.5 billion. Based on higher updated valuations, the Bankruptcy Court accepted an enterprise valuation of $1.75 billion for the Genesis estate, which was near the mid-point of the Debtors experts' valuations. (Id. 616) The Bankruptcy Code, (11 USC 506(b)), however, does not permit post-petition interest awards for under secured claims. The Senior loans were under secured as the cash and receivables backing the loans covered only 33 per cent of the amount of the loan.

The payment of post-petition interest, in contravention of 11 U.S.C. 506(b), is one of issues that would have been raised in the Hayes appeal of the Confirmation Order had this Court not dismissed the appeal for equitable mootness. The Third Circuit upheld this

---

[2] Post-petition interest is actually provided for in 11 USC 506(b) which states: "[t]he extent that an allowed secured claim is secured by property the value of which... is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim,"

decision as it found that Hayes had not made a timely appeal on the equitable mootness issue.[3]

## SUMMARY OF ARGUMENT

The principal inquiry for the courts in determining whether or not to appoint a post-confirmation equity committee pursuant to 11 U.S.C. 1102(a)(2) is whether the equity security holders are were adequately represented in the bankruptcy proceedings. While that determination is left to the discretion of the courts, it nonetheless requires an inquiry into the representation provided the equity class followed by an assessment on the adequacy of that representation.

The Bankruptcy Court bench decision and Order denying the appointment of a Pre-Final Decree equity committee did not consider either question. This failure is an abuse of the Bankruptcy Court's discretion and requires the case be remanded for a determination on whether the Genesis equity class was adequately represented during at least one of the critical periods in the bankruptcy proceedings. These critical periods include those when the Plan was: 1) negotiated, 2) confirmed, or 3) appealed.

An equity committee is also needed to represent the Debtors' estate as the Reorganized Debtors' counsel is hopelessly conflicted in its representation of the Debtors' estate which is causing counsel to ignore the billion dollar damage claim against the Senior Lenders.

The second issue for this Court is whether the Bankruptcy Court erred in denying the Motion to Reconsider the Senior Lender and Subordinated Note Claims. The Bankruptcy Court concluded that "cause" needed to be established before the court could

---

[3] Hayes believes the duplicative Notice of Appeal which caused the procedural problems that doomed this appeal were not due to an error by the clerk but were rather caused by Reorganized Debtors' counsel.

8

reconsider the claims and that "no such cause has been provided here." ((App. A, Tr. 24:10-12)  The motion cited – "[t]he enormous windfall profits captured by Goldman and other Senior Loan speculators..." – as cause for reconsideration. The Bankruptcy Court then acknowledged the abuses were cited as cause: "[t]here have been all kinds of articles and concerns expressed about transfers of claims, about manipulation of the process." Id.23-25. The Bankruptcy Court erred in dismissing a 502(j) motion that satisfied all the statutory requirements without citing any contradictory authority.

The third issue for this Court to decide is the availability of court sanctions for Hayes persistent efforts to secure appointment of an equity committee. In this case, sanctions are not appropriate because multiple requests for an equity committee were necessary because the Bankruptcy Court ignored its judicial duty to decide 1102(a) adequacy of representation requirements and most importantly Constitutional due process questions. In any event, bankruptcy courts lack jurisdiction to assess sanctions under Title 28.

## STATEMENT OF FACTS

Appellant, James J. Hayes, brought the Motion For Appointment of Pre Final Decree Equity Committee pursuant to section 1102(a)(2) of Bankruptcy Code, 11 U.S.C. 1102(a)(2) and the due process clause of Amendment V of the United States Constitution. The motion, included Appendix B to this brief, listed four causes in which an equity committee was needed to represent the equity class before the Bankruptcy Court issued a Final Decree.

> 1) in proceedings on the recently filed Motion For Reconsideration of the Genesis and Multicare Senior Lender Claims,

9

2) a new Motion for Sanctions for Professional Misconduct pursuant to Rule 9001 of the Federal Rules of Bankruptcy Procedure,

3) a potential suit for damages on behalf of the Debtor against the Haskell defendants pursuant to 1103(c)(5) and 1109(b); and

4) potential Constitutional challenge to the confirmation pursuant to the Takings and Just Compensation Clauses of the Fifth Amendment.

The Bankruptcy Court summarily denied the motion because the court believed it

was simply rehearing motions it had already rejected.  In its opening soliloquy, the

Bankruptcy Court announced its decision before hearing the argument.[4]

> THE COURT: Mr. Hayes.
>
> MR. HAYES: Good morning, your Honor.
>
> THE COURT: Good morning. You've filed 2 motions. One, to reconsider the order allowing the senior lender claims and two, to appoint an equity security committee. At this point I am more than puzzled, disturbed, by these motions, because, as I've read the amazing post confirmation history of these issues, I'm appalled, really, that the issues are coming back. And I say that with an understanding that the reconsideration motion on the claims is really aimed at, from your description of what you're looking for, a restructuring of the plan, a re-prioritization of the position of the secured lenders, a focus on your claim of windfall on their part, of unfairness, of improper allocations, and an adjustment of claims on those bases. In terms of the equity security holder committee, it was well laid out by the objection to your motion that you — this is the 4th time that you're here on that. Not — perhaps 3 times before the Bankruptcy Court and one before the District Court, with appeals to the Circuit. I'm not sure about the status of the last appeal. That was apparently filed on the denial of the District Court I think for - - on the motion for appointment of an equity security committee. I could be corrected on that. But you've been there, you've done that, you've been denied your relief. Why should I consider this again? What's different now? How many times, how many bites at the apple do you get?
>
> MR. HAYES: Your Honor, the equity class in this bankruptcy has been denied representation.

---

[4] The dialog has been edited to enhance the readability.

THE COURT: Your contention is not that there has been no opportunity to be heard.

MR. HAYES: No.

THE COURT: - - but no opportunity to be paid from the estate for legal fees?

MR. HAYES: The equity class has not been adequately represented.

THE COURT: Do you contend that there is an absolute right to representation paid for by the estate in every case for equity.

MR. HAYES: No. But in this case, since there was no adequate representation, there are a number of ways that it can be provided. The normal way, the shareholders are normally represented by company management who has a fiduciary obligation to represent shareholders interests. And in a normal case, the company officers, in fulfillment of the fiduciary obligations provide representation for the equity class. In the recent Loral bankruptcy, which I cited, the chairman of the company, Chairman Schwartz, argued that the valuations prepared by the investment bankers were low. But in this case, which is rather unusual, the officers of the company have now been charged with conspiracy to commit fraud.

THE COURT: Have now been charged in the Haskell matter?

MR. HAYES: Well, that was the allegations.

THE COURT: the allegations, and that complaint I dismissed, I believe.

MR. HAYES: But you - -

THE COURT: I think the District Court has affirmed, if I'm not incorrect.

MR. HAYES: But your dismissal didn't address any of the allegations.

THE COURT: That's correct....

MR. HAYES: Well, the shareholders have a constitutional right. Among all the creditors and participants, the shareholders are the only

11

ones whose property rights are protected by the 5th Amendment of the Constitution.

THE COURT: And have you - -

MR. HAYES: - - a protected right - -

THE COURT: - - addressed that issue before? Have you - - is this the first time that you've raised the constitutional dimensions of the shareholders opportunities?

MR. HAYES: I have attempted to raise it throughout.

THE COURT: And you've been rejected. Have you not?

MR HAYES: None of the courts have addressed the constitutional issue.

.    .    .

THE COURT: ...You're quite right to assert that as a basic proposition constitutional issues don't go away by the passage of time. That's a valid proposition. But in this context you can't just keep coming back and thinking up new theories to raise the same request for relief that you have all along.

MR. HAYES: I'm not raising new theories. I mean, both the law and the constitution require that adequate representation be provided to the equity class. No court has said that the equity class has been provided adequate representation.

(App. A, Tr. 4:6 to 7:23)

## ARGUMENT

### A. Lack of Adequate Representation Requires An Equity Committee

The cited Hearing dialog illustrates a misperception by the Bankruptcy Court on

the necessity for the equity class to be adequately represented at critical times in the

bankruptcy process. Adequate representation of the equity class is required at a

minimum during at least one of the critical times – 1) during the negotiations, 2) during

the Confirmation Hearing, 3) in an appeal of the Confirmation Order, and if not then 4)

12

before issuing a Final Decree – for the Confirmation Order to have constitutional legitimacy.

Thus, Hayes' earlier requests for the appointment of an equity committee – to insure that the equity class would have adequate representation at the Confirmation Hearing and then in the appeal of the Confirmation Order – were necessary to protect the Constitutional legitimacy of the reorganization. The Bankruptcy Court's denials of the earlier requests, without finding that the equity class was adequately represented, necessitated the later requests. The multiple requests that piqued the Bankruptcy Court into assessing sanctions resulted from its refusal to recognize that 1102(a) and the Fifth Amendment require that the equity holders be adequately represented.

The Bankruptcy Court views the multiple requests for an equity committee as giving the equity holders many bites at the proverbial apple. But without adequate representation at key times in the bankruptcy process, shareholders haven't even gotten one bite at the apple. Even more galling to the equity holders is that it was their apple before the bankruptcy petition.

The Bankruptcy Court's inordinate concern with legal fees that would be borne by the estate further complicates the situation. But having spent $34 million in this case (not including the Senior Lenders counsel who was paid independently by Genesis) for legal and financial advisors, a few million for an equity committee should not be a big factor in the decision. In fact, with allegations of a billion dollar fraud against the Senior Lenders, and a hopelessly conflicted Reorganized Debtors' counsel preventing any action to recover these huge fraud losses, a Pre-Final decree equity committee is the only party

13

that could obtain a recovery for the estate. The Bankruptcy Court's concerns with the costs of a committee are clearly misplaced in this case.

The Bankruptcy Court's bias that equity committees only add to the costs of administrating bankruptcies follows from historical misperceptions that have become embedded in the case law. In today's world, the routine appointment of equity committees in complex reorganizations is a good investment. Equity committees are needed today to reduce the opportunities for corruption and to provide better reorganization plans. For example, the costs of six sets of lawyers and financial advisors with a creditors' biases would be better spent by adding an equity committee that could develop a competing plan. An approach that stimulates the formulation of competing plans is particularly suited to complex bankruptcies by increasing the opportunity for an innovative plan that would maximize the value of the estate and increase distributions to all the constituencies.[5] Costs could be better contained by reducing the number of creditor committees or placing spending caps on the amount a single committee could spend.

---

[5] The economic benefits of an equity committee is illustrated by the Seitel bankruptcy, which ironically was heard by the same judge newly assigned to the Genesis bankruptcy. Seitel is an oil and gas exploration service company that leases seismic data from one of the largest land seismic data libraries in North America. The firm also participated in joint venture exploration with its data clients. After gross mismanagement and self dealing, debt holders forced the company into bankruptcy. In a rare move bankruptcy investors acquired a dominant equity position and requested and received the appointment of an equity committee.

The debtor proposed a reorganization plan that offered unsecured note holders about 71 per cent of the face amount of the notes and equity holders $0. 40 per share. The equity committee, with the assistance of its legal and financial advisors, urged shareholders to vote against the debtor's plan and that it had prepared an alternative plan that it would propose if the debtors' plan was defeated.

The equity committee's plan allowed shareholders to retain all their equity and cashed out the unsecured note holders at 100 per cent of face value. This plan was confirmed by the bankruptcy court. Following confirmation, Seitel's common stock traded in excess of $4.50 per share and as this investor can attest about three times this amount since. In Re Seitel et. al., U.S.B.C. D. Del., No. 03-12227 PJW (2004).

14

Thus, providing an equity committee in complex bankruptcies should not be viewed as increasing the costs of administering the estate, but as a tool that would increase the value of the estate, and maximize the distributions to all constituencies.

In any event, a judge's duty is to interpret the law as written by Congress and to protect the citizens' constitutional rights. In denying shareholders a Pre-Final Decree equity committee, the Bankruptcy Court has violated its judicial oath by denying thousands of former Geneses shareholders their Constitutional rights.

### a. Statutory Inquiry on Adequacy of Representation

The principal inquiry in the appointment of an equity committee is whether the equity security holders are adequately represented. 11 U.S.C. 1102(a) (2) The question on whether shareholders have received adequate representation is a determination in the court's discretion.

> The statute involves two inquiries. It must first be determined whether the appointment of a committee is necessary to assure adequate representation.

*In re Wang Laboratories, Inc.*, 149 B. R. 1 2 (Bankr. D. Mass. 1992)

In denying the request for a pre-final decree equity committee, the Bankruptcy Court never considered whether the equity holders were adequately represented in either the pre-confirmation proceedings or in the post-conformation proceedings.

---

The Seitel example shows the value of a competing reorganization plans in furthering the intent of Congress in saving bankrupt firms from liquidation and finding superior reorganizations that provide equitable distributions and allocations to the firm's pre-petition creditors, bondholders and shareholders. An equally good result will follow from the appointment of an equity committee in the Genesis bankruptcy.

15

In one of the few appeals on this fundamental issue, the District Court for the

Southern District of New York concluded:

> [T]he proper legal standard to apply in determining whether to appoint an official equity committee for equity shareholders is whether an official committee is necessary to provide adequate representation of the equity holders' interests.

*In Re Johns-Manville Corp.*, 68 B.R. 155 163 (S.D.N.Y. 1986)

The Bankruptcy Court's failure to evaluate the only factor required by the

Bankruptcy Code in determining whether to appoint an equity committee requires the

case be remanded for a determination on whether the equity class was adequately

represented in the post-confirmation and pre-confirmation proceedings.

### b. Constitutional Inquiry On Adequacy Of Representation

The Fifth Amendment guarantees citizens that: *"No person shall… be deprived of*

*life, liberty, or property, without due process of law; nor shall private property be taken*

*for public use, without just compensation."* The property of Genesis shareholders, their

ownership of Genesis, was taken by the Bankruptcy Court's confirmation of a

reorganization plan that did not provide the shareholders any compensation. The equity

class was not represented in bankruptcy proceedings in which the plan was negotiated or

at the confirmation hearings or in the appeal of the Confirmation Order.  Requests by

individual shareholders for an equity committee and a trust were denied by the United

States trustee and the Bankruptcy Court.  *In Re Genesis Health Ventures, Inc.* 266 B.R.

16

591, 620 (Bkrtcy. D. Del. 2001) These facts create a prima facie case for a "categorical"

taking under the Fifth Amendment.[6]

A legal analysis by a California bankruptcy court shows the relationship between

the Bankruptcy Code and the Constitution.

> There is a significant difference, with respect to the Bankruptcy
> Power, between property interests and contract rights. In the bankruptcy
> context, property rights enjoy at least a measure of protection under Due
> Process and Just Compensation Clauses of the Fifth Amendment.

*In re Marshall,* 300 BR 507 525 (Bkrtcy. C.D. Cal. 2003)

The *Marshall* court explained that "a measure of protection" was defined by a

1937 Supreme Court opinion:

> But if Congress is acting within its bankruptcy power, it may
> authorize the bankruptcy court to affect those property rights, provided the
> limitations of the due process clause are observed.

*Wright v. Union Central Life Ins. Co.,* 304 U.S. 502, 518 (1937)

The issue in this appeal is whether the shareholders who were denied due process

in the bankruptcy proceedings leading to the Bankruptcy Court confirmation of the plan

that took their property without compensation are entitled to a Pre-Final Decree equity

committee to pursue the four causes listed in the motion..

The Supreme Court has long held that statutory interpretation of rules and

regulations in areas of constitutionally protected rights must favor the interpretation that

best protects the citizen's rights. When the government denied visas to certain citizens,

the Supreme Court acted to reverse that denial.

---

[6] This so called "categorical" taking triggers a Fifth Amendment right to compensation. A
taking occurred because the property owner had a "historically rooted expectation to
compensation." *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 441
(1982)

17

> Since we start with an exercise by an American citizen of an activity included in constitutional protection, we will not readily infer that Congress gave the Secretary of State unbridled discretion to grant or withhold it. ...And as we have seen, the right of exit is a personal right included within the word "liberty" as used in the Fifth Amendment. Where activities or enjoyment, natural and often necessary to the well-being of an American citizen, such as travel are involved, we will construe narrowly all delegated powers that curtail or dilute them.

*Kent v. Dulles*, 357 U.S. 116 129 (1957)

> To repeat, we deal here with a constitutional right of the citizen, a right which we must assume Congress will be faithful to respect. We would be faced with important constitutional questions were we to hold that Congress...had given the Secretary authority to withhold passports to citizens because of their beliefs or associations.

Id. 130

These principles of constitutional interpretation also apply to the courts. In this case, the principles of constitutional interpretation in the first instance require courts to determine whether the shareholders were represented in a manner adequate to provide constitutionally protected due process. Consequently, this Court need not consider the constitutional questions now, if it reminds the Bankruptcy Court that 1102(a)'s adequacy of the equity representation must satisfy the due process standards of a constitutionally protected right.

## c. Post-Confirmation Allegations of Fraud Sufficient To Fully Compensate Creditors Requires Pre-Termination Equity Committee

The $1.15 billion dollars of understated enterprise value estimated from the *Haskell* complaint[7] would satisfy all the creditor claims and leave a substantial recovery

---

[7] *Haskell* does not estimate the undervaluation of the Genesis estate resulting from the $136 million understatement of EBITDA. Rather, this value is estimated by applying the EBITDA multiples of the Senior Lenders' investment bankers which were 7.0 for the Genesis long term care assets and 9.5 for its pharmacy assets. A pro rata allocation of adjusted EBITDA between long term care and pharmacy – where appropriate, based on the relative revenue of the two

for the equity class. The maximum amount of unsatisfied claims is $730 million based on the Plan confirmed by the Bankruptcy Court. (*In Re Genesis Health Ventures, Inc.* at 597-98 & 616.) This leaves a minimum of $385 million for the Genesis common and preferred stock interests. The Plan awarded the Senior Lenders about ninety four per cent of the reorganized enterprise and a windfall that was many hundreds of millions of dollars in excess of their claims while leaving unsecured creditors about seven per cent of their claims and nothing for shareholders. The Bankruptcy Code does not allow windfall gains that exceed allowed claims and representation of the equity class is required to recover the Senior Lender windfall for the benefit of the Genesis estate.

In the appeal for a Post-Confirmation equity committee, this Court questioned the relevance of this "new evidence". (O. n.1 at 5.)    The more pertinent question, however, is why the Reorganized Debtors have not engaged its counsel and financial experts to evaluate the billion dollar undervaluation contained in the *Haskell* complaint? This answer is obvious considering that the Senior Lenders controlled ninety four per cent of the Reorganized Debtor and would not have been expected to voluntarily give up their windfall. (*In Re Genesis Health Ventures, Inc.* at 598 )  (C 2)

The pertinent question left for the courts to address is why the Reorganized Debtors' counsel has not met its fiduciary obligation to the Debtors' estate and, at a minimum, engaged a special counsel or at least not has opposed an equity committee to investigate the *Haskell* claims. By defending NeighborCare, the company surviving the reorganization, Reorganized Debtors' counsel has placed itself in a hopeless conflict of interest situation with the Senior Lenders causing it to  ignore its fiduciary obligation as

businesses – provides an undervaluation of $1.152 billion. Although expert analyses would produce a range of estimates, an undervaluation of a billion dollars certainly reflects the correct order of magnitude.

19

Reorganized Debtors' counsel. Having decided to act on its conflict of interest and not
to pursue recovering damages from the Senior Lenders, the Reorganized Debtors' are
now attempting to cover up the problem by seeking sanctions that would coerce the
Appellant to drop this appeal.

Even more disturbing is that Counsel's breach of its duty to the Debtors began
early in the bankruptcy proceedings. For example, Counsel negotiated a contingency in
the Plan that awarded the Senior Lenders $112 million in post-petition interest despite the
fact Section 506(b) of the Bankruptcy Code does not permit post-petition interest on
under secured claims. Id. 616. It appears that Counsel, who was paid more that eight
million in legal fees for the pre and post- petition representation of Genesis, was selected
because of their pre-petition relationships with Mellon and Goldman, the alleged co-
conspirators in the *Haskell* litigation.

In any event, neither the Debtors' estate nor the equity class are being adequately
represented with respect to Senior Lenders' windfall that is derived from understated
enterprise value of the Reorganized Debtor. These facts require the appointment of an
equity committee, as a committee would be the only party willing and able to evaluate
and prosecute claims that could benefit the Genesis estate by more than a billion dollars.

## B. Reclassification of Senior Lender and Subordinated Debenture Holder Claims Required by 502(j)

Section 502(j) of the Bankruptcy Code provides that a claim that has been
allowed or disallowed may be reconsidered for "cause" and that a reconsidered claim
may be allowed or disallowed according to the "equities of the case." The terms "cause"
and "equities of the case" area not defined and will be determined on a case by case basis.

The Bankruptcy Court denied this motion in the first instance because cause had not been established. "[W]e understand that 502(j) requires that cause be established in order to justify such a reconsideration... and no such cause has been provided here." (App. A, Tr. 24:10-12) (Motion App. C)

The Genesis bankruptcy is really a hostile Wall Street takeover masquerading as a bankruptcy. As alleged in the Haskell complaint, wealthy and powerful investment bankers led by Goldman Sachs purchased huge amounts of senior loan participations in Genesis Health Ventures and its Multicare subsidiary, took the firms into bankruptcy, and then conspired with Genesis management to undervalue Genesis so that the Senior Lenders received nearly all the equity in the reorganized firm. By the time of confirmation, the investment banks had acquired about 75% of the Genesis and Multicare Senior Lender claims at huge discounts to their face value. (C 1)

The Bankruptcy Court rejected as "mind boggling" that "allegations in a complaint that has been dismissed" could be a cause for reconsidering claims and that bankruptcy courts could apply principals of equitable subordination under 11 U.S.C. 510(c)(1) to subordinate part of an allowed claim to all or part of another claim for claims reconsidered under 502(j). (App. A, Tr. 24:12-18) "Mind boggling" is an apt description for a billion dollar fraudulent transfer of wealth from the junior creditors and shareholder to the Senior Lenders in the *Haskell* complaint but hardly describes the partial recovery of this windfall by reclassifying claims according to "the equities of the case" as provided by 502(j). In any event, the Bankruptcy Court cited no legal basis for not reconsidering the Senior Lender and Subordinated Bond Holder claims.

21

## C. Sanctions Inappropriate In This Case

The Reorganized Debtors' response to Hayes' motions for Reconsideration of the Senior Lender and Subordinated Debenture Holders' claims and for a Pre-Final Decree equity committee included a Cross Motion for sanctions pursuant to section 1927 of title 28 of the U.S. Code. The Reorganized Debtors requested the Bankruptcy Court order Hayes to reimburse the Reorganized Debtors for their fees and costs incurred in filing their pleading.[8]

"In order to impose sanctions against an attorney under 1927 there must be a 'clear showing of bad faith.'" *Wigton v. Rosenthall*, 137 F.R.D. 4, 6 (S.D.N.Y. 1991) citing *Oliveri v. Thompson*, 803 F. 2d 1265, 1273 ( 2d. Cir. 1986), cert. denied. "An award under 1927 is proper when an attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose." Id. 6. The Reorganized Debtors have made no credible showing, nor does the record reveal, any improper purpose behind the offending motions. The purpose for seeking an equity committee is simply to provide the adequate representation to the equity class that was lacking at every critical time in the bankruptcy proceedings. Adequate representation is required by 1102(a)(2) and is guaranteed by the due process

---

[8] Mellon Bank sought sanctions against Hayes pursuant to Fed. R. Bankr. P. 9011(b)(2). Reorganized Debtors' counsel, however, had decided against seeking sanctions under 9010. Counsel explained:

> Frankly, your Honor, the main reason why we didn't do 9010is because the hearing was in 2 weeks, and 9011 doesn't translate that well to a contested matter in a Bankruptcy Court because you have to give it 20 days safe − I think it's 20 days − whatever it is safe harbor notice. We would have been more than happy to file a safe harbor notice before today's hearing and proceed under 9011, but we didn't have sufficient time before today's hearing. (App. A, Tr. 18: 9-17)

22

clause of the Fifth Amendment. The purpose for reconsideration of the debt securities claims is to diminish the incentives for distressed debt speculators to abuse the Bankruptcy Code by taking companies into bankruptcy merely to gain windfall profits. The motions were filed with the best intentions and consequently the award of sanctions must be reversed.

The D. C. Circuit denied requests for 1927 sanctions in a matter the court "had not previously addressed". *ASAI v. Costillo*, 593 F. 2d., 1222, 1225 (D.C. Cir. 1978) In this case, the Bankruptcy Court has not addressed the question of whether Fifth Amendment due process applies in bankruptcy proceedings and whether it would require a Pre-Final Decree equity committee where equity holders were not represented in bankruptcy proceedings. The Fifth Circuit reversed similar sanctions a bankruptcy court had assessed for violation of its confirmation order because inadequate notification violated Fifth Amendment due process rights. "Protection of an individual's due process right to adequate notice requires more than a cursory review". *In re Kendavis Holdings Co.*, 249 F. 3d. 383, 386 (5th Cir. 2001). Neither had the Bankruptcy Court previously considered the matter of reclassifying claims pursuant to 502(j). The classification of Senior Lender and Subordinated Debenture holder claims had never previously been challenged.

Even if 1927 sanctions were appropriate in this case, the Bankruptcy Court lacks jurisdiction to order them. According to the Tenth Circuit: "We agree with *In re Perroton* [958 F. 2d., 889 at 893-96.] that the bankruptcy court may not impose sanctions under 1927. *In re Courtesy Inns, Ltd., Inc.*, 40 F. 3d., 1084, 1086 (10 Cir. 1994).

## CONCLUSION

For all the foregoing reasons, James J. Hayes, respectfully requests that this Court

reverse the Bankruptcy Court's January 19, 2006 decision denying the Motion for

Reconsideration of Senior Lender and Subordinated Debenture Holder Claims, denying

the Motion for a Pre-Final Decree Equity Committee, and granting the Reorganized

Debtors' Cross Motion for Sanctions.

Dated June 5, 2006
Annandale, Virginia

Respectfully Submitted,

James J. Hayes, Pro Se
4024 Estabrook Dr.
Annandale, VA 22003
(703) 941-4694

24

## CERTIFICATE OF SERVICE

I certify a copy of the foregoing brief was mailed from the Northern

Virginia Regional Post Office on June 5, 2006 to the following counsel:

Russell C. Silberglied
Richards Layton and Finger P.A.
One Rodney Square
Wilmington, DE 19899; and

Teresa K. D. Curier
Klett Rooney Lieber & Schorling, PC
1000 West Street, Suite 1410
Wilmington, Delaware 19801

Katherine B. Gresham
Assistant General Counsel Bankruptcy and Appellate Litigation
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549, and

Joseph McMahon
Office of the United States Trustee
844 King Street, Suite 2313
Wilmington, DE 19801

James J. Hayes

7624 Estabrook Dr.
Annandale, VA 22003



Office of C.
U.S. Distric
844 N King St
Wilmington, D

1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

2

3   IN RE:                                    .    Chapter 11
                                              .
4   GENESIS HEALTH VENTURES, INC., .              Case No. 00-2692(JHW)
    et al.,                                   .
5                                             .
                    Reorganized Debtors. .
6                                             . ·
                    _____    .
7   IN RE:                                    .    Chapter 11
                                              .
    GENESIS ELDERCARE CORP.                   .    Case No. 00-2564(JHW)
8                                             .
                                              .
9                   Reorganized Debtors. .
                    _____    .
10  IN RE:                                    .    Chapter 11
                                              .
    NORRISTOWN NURSING AND                    .    Case No. 00-2716(JHW)
11  REHABILITATION ASSOCIATES, L.P..
                                              .
12                                            .
                    Reorganized Debtors. .        January 19, 2006
13                                            .    9:30 a.m.
                                              .    (Wilmington)
14

15                        TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE JUDITH H. WIZMUR
16              UNITED STATES BANKRUPTCY COURT JUDGE

17

18

19

20

21

22

23      Proceedings recorded by electronic sound recording;
          transcript produced by transcription service.

24

25

2

1    THE CLERK: All rise.

2    THE COURT: Please be seated.

3    MR. SILBERGLIED: Good morning, Your Honor.

4    THE COURT: Good morning.

5    MR. SILBERGLIED: For the record, Russ Silberglied

6    of Richards, Layton, and Finger on behalf of the Reorganized

7    Debtors.  We have a short agenda for today.  The first matter

8    on the agenda is continued.  A brief word as to why it's

9    continued in case Your Honor wanted an update, that is the

10   motion for entry of a final decree itself.  The US Trustee

11   has pointed out that there are some quarterly operating

12   reports that were not filed, and we are working with the

13   company to get those quarterly operating reports filed.

14   There's been a series of post confirmation transactions at

15   the company, so employees are a little bit harder to find

16   than they once were.  But we're working on it, and we hope to

17   go forward with that at the next hearing which actually Ms.

18   Collins reminded me on our way over here we don't have a next

19   hearing.  So I don't know if Your Honor knows the next time

20   you're going to be in Delaware.

21   THE COURT: Turns out March 2nd might work.  I might

22   be here on February 16th.  It sounds like March 2nd might be

23   better for you.

24   MR. SILBERGLIED: March 2nd would be fine.  Thank

25   you, Your Honor.

3

**1**          THE COURT: Let's make that 9 o'clock.

**2**          MR. SILBERGLIED: Thank you, Your Honor.  The next

**3**  two items on the agenda are both motions of Mr. Hayes.  He's

**4**  here.  The first is with respect to the lenders themselves,

**5**  and the second is with respect to the appointment of an

**6**  equity committee, so I will cede the podium to Mr. Hayes.

**7**          THE COURT: Mr. Hayes.

**8**          MR. HAYES: Good morning, Your Honor.

**9**          THE COURT: Good morning.  You've filed 2 motions.

**10**  One, to reconsider the order allowing the senior lender

**11**  claims and two, to appoint an equity security committee.  At

**12**  this point I am more than puzzled, disturbed, by these

**13**  motions, because, as I've read the amazing post confirmation

**14**  history of these issues, I'm appalled, really, that the

**15**  issues are coming back.  And I say that with an understanding

**16**  that the reconsideration motion on the claims is really aimed

**17**  at, from your description of what you're looking for, a

**18**  restructuring of the plan, a re-prioritization of the

**19**  position of the secured lenders, a focus on your claim of

**20**  windfall on their part, of unfairness, of improper

**21**  allocations, and an adjustment of claims on those bases.  In

**22**  terms of the equity security holder committee, it was well

**23**  laid out by the objection to your motion that you - - this is

**24**  the 4th time that you're here on that.  Not - - perhaps 3

**25**  times before the Bankruptcy Court and one before the District

4

1   Court, with appeals to the Circuit.  I'm not sure about the

2   status of the last appeal.  That was apparently filed on the

3   denial of the District Court I think for - - on the motion

4   for appointment of an equity security committee.  I could be

5   corrected on that.  But you've been there, you've done that,

6   you've been denied your relief.  Why should I consider this

7   again?  What's different now?  How many times, how many bites

8   at the apple do you get?

9         MR. HAYES: Your Honor, the equity clients in this

10   - - throughout this bankruptcy has been denied

11   representation.  I don't think there's any dispute that at no

12   point - - at not time in the bankruptcy has the equity

13   interest been represented.  That is - -

14         THE COURT: Well, the equity interest has appeared

15   and been heard in - - at the confirmation hearing.  You,

16   yourself, presented objection to the plan, and your concerns

17   were addressed and denied.  Your contention is not that there

18   has been no opportunity to be heard - -

19         MR. HAYES: No.

20         THE COURT:  - - but no opportunity to be paid from

21   the estate for legal fees.

22         MR. HAYES: The equity class has not been adequately

23   represented.

24         THE COURT: Do you contend that there is an absolute

25   right to representation paid for by the estate in every case

1    for equity?

2         MR. HAYES:  No.  But in this case, since there was

3    no - - I mean, adequate representation, there are a number of

4    ways that it can be provided.  The normal way, I mean, you

5    know, the shareholders are normally represented by company

6    management who has a fiduciary obligation to represent

7    shareholders interests.  And in a normal case, the company

8    officers, in fulfillment of the fiduciary obligations provide

9    representations for the equity class.  I mean, in the recent

10   Morale (phonetic) bankruptcy, which I cited, the chairman of

11   the company, Chairman Schwartz, argued that the valuations

12   prepared by the investment bankers were low.  But in this

13   case, which is rather unusual, the officers of the company

14   have now been charged with conspiracy to commit fraud.

15        THE COURT:  Have now been charged in the Haskell

16   (phonetic) matter?  Is that what they're - -

17        MR. HAYES:  Well, that was the allegations.

18        THE COURT:  Those are - -

19        MR. HAYES:  In the Haskell matter.

20        THE COURT:  - - the allegations, and that complaint

21   I dismissed, I believe.

22        MR. HAYES:  But you - -

23        THE COURT:  I think the District Court has affirmed,

24   if I'm not incorrect.

25        MR. SILBERGLIED:  No, Your Honor.  We're in the

6

1   middle of briefing in the District Court.

2        THE COURT: I see.  So that's under appeal.

3        MR. HAYES: But your dismissal didn't address any of

4   the allegations.

5        THE COURT: That's correct.  So how can I address

6   the allegations here.  There were issues of *res judicata* and

7   collateral estoppel.  Issues under 1144.  What's different

8   here?  Why - -

9        MR. HAYES: Well, the shareholders have a

10  constitutional right.  Among all the creditors and

11  participants, the shareholders are the only ones whose

12  property rights are protected by the 5th Amendment of the

13  Constitution.  And as - -

14       THE COURT: And have you - -

15       MR. HAYES:  - - a protected right - -

16       THE COURT:  - - addressed that issue before?  Have

17  you - - is this the first time that you've raised the

18  constitutional dimensions of the shareholders opportunities?

19       MR. HAYES: I have attempted to raise it throughout.

20  But none - -

21       THE COURT: And you've been rejected.

22       MR. HAYES:  - - of the courts - -

23       THE COURT: Have you not?

24       MR. HAYES: None of the courts have addressed the

25  constitutional issue.

**1** THE COURT: So that because they didn't address the

**2** constitutional issue, because they decided that you were not

**3** entitled, for any reason, to assert, because - - for a number

**4** of reasons, including the timing of your request, that you

**5** were not entitled to an equity security committee, including

**6** back in September of 2001, including as late as May of 2004,

**7** all of those times you had the opportunity - - you raised - -

**8** you took the opportunity, whether you had it or not is

**9** another question, you took the opportunity to raise the issue

**10** of equity security committee on various grounds. I don't

**11** recall that you raised the constitutional grounds in front of

**12** me, but you might have raised it otherwise. It doesn't

**13** matter whether it was taken up or not. You're quite right to

**14** assert that as a basic proposition constitutional issues

**15** don't go away by the passage of time. That's a valid

**16** proposition. But in this context you can't just keep coming

**17** back and thinking up new theories to raise the same request

**18** for relief that you have all along.

**19** MR. HAYES: I'm not raising new theories. I mean,

**20** both the law and the constitution require that adequate

**21** representation be provided to the equity class. No court has

**22** said that the equity class has been provided adequate

**23** representation.

**24** THE COURT: There has, there was - - I did say, in

**25** my confirmation opinion, that the value in the company - -

1    you may disagree with it, other people have disagreed with it
2    - - the proofs as I found them to be were that there was no
3    value to reach equity, and therefore equity could be - - the
4    plan as proposed could be confirmed, and the plan proposed
5    that there would be no distribution to equity.  That was the
6    decision.  If - - and that's the decision, I believe, was
7    appealed and approved.  And there it stands right or wrong.
8    And nobody can say whether a particular decision, in
9    retrospect, was right or wrong.  But there it stands as a
10   final judgment.  If that's so, then how can we say that the
11   equity was not adequately represented?

12          MR. HAYES: Well, adequate representation requires
13   some form of representation.

14          THE COURT: Well you represented the equity, didn't
15   you?  I mean you - -

16          MR. HAYES: I - -

17          THE COURT:  - - took it upon yourself.

18          MR. HAYES: Well nobody has said that it's adequate.
19   Everybody is saying my representation has been quite
20   inadequate.

21          THE COURT: Did you contemplate hiring an attorney
22   to help you make your presentation in the first instance?

23          MR. HAYES: Yes I did.  I have talked to attorneys.

24          THE COURT: Um-hum.

25          MR. HAYES: $34 million is spent on professional

9

1  fees in this case.  I'm an individual shareholder.  I am not

2  wealthy.  As part of adequate representation is having

3  representation equivalent to what, to what the other side

4  has.  And I - - even if I'm considered to be representing, I

5  - - and I guess I don't see objecting.  When I objected, I

6  didn't have any - - couldn't cross examine a witness,

7  couldn't present any evidence, couldn't do anything but

8  complain.

9       THE COURT: You didn't have the chance to cross

10  examine witnesses or - -

11       MR. HAYES: No.

12       THE COURT:  - - at the hearing?  At the

13  confirmation hearing?

14       MR. HAYES: No.

15       THE COURT: Did you - -

16       MR. HAYES:  All the objectors were told that their

17  objections would be heard at the end of the proceeding.  I

18  mean, it was kind of a - -

19       THE COURT: There was testimony presented, cross

20  examination of witnesses.  Did you stand up and say, I would

21  like to cross examine a particular witness?

22       MR. HAYES: No.  Because the Debtors' counsel said

23  - - told me what the procedure was.

24       THE COURT: I see.

25       MR. HAYES: Even the objectors - - well.

| 1 | THE COURT: We did consider experts presented by |
| 2 | some of the objectors. Let me remind myself that - - |
| 3 | MR. HAYES: But they weren't equity members. |
| 4 | THE COURT: They weren't equity. Did you have - - |
| 5 | do you understand that you had a chance to present expert |
| 6 | witnesses if you chose to do that? |
| 7 | MR. HAYES: No I didn't. |
| 8 | THE COURT: Let me ask you another question just to |
| 9 | round out the record. Before - - when was the first time |
| 10 | that you raised the issue of an equity committee? You'll |
| 11 | recall that you filed a motion before confirmation that was |
| 12 | ruled on in the context of confirmation asking for that |
| 13 | relief. That was in August of 2001. Did you raise the issue |
| 14 | before then? |
| 15 | MR. HAYES: The issue of an equity committee? |
| 16 | THE COURT: Yes. |
| 17 | MR. HAYES: No. I raised the issue of an equity |
| 18 | committee after - - immediately - - fairly soon after I had |
| 19 | gotten the disclosure statement that indicated that |
| 20 | shareholders were not going to participate in the |
| 21 | distribution. And I - - and almost on the same day. It was |
| 22 | kind of fortuitous. I'm not an attorney, and I don't - - I'm |
| 23 | an investor. I don't follow the bankruptcies of the |
| 24 | companies I happen to own. But it was somewhat fortuitous |
| 25 | that I was notified of the bankruptcy at the same time that I |

11

1 | had gotten a new copy of my Investor's Daily Graphs

2 | (phonetic). As a part of the daily graphs, it shows stock

3 | appreciation at certain indexes. And the leading performer

4 | had been the healthcare index. And that's when I started

5 | looking, reading the disclosure statement. Seeing that the

6 | valuation of the company was done in April, and that since

7 | April, the Healthcare index that I was looking at had

8 | appreciated by 60%. I mean that told - - that significant

9 | thing said, you know, everything in this disclosure statement

10 | is inaccurate. Everything that it's based on.

11 | THE COURT: And you did address me at confirmation,

12 | did you not?

13 | MR. HAYES: Yes.

14 | THE COURT: And I considered your comments. Let me

15 | ask you this, you've - - the level of litigation that you've

16 | conducted since then is quite impressive. You've traveled to

17 | the District Court and to the Court of Appeals. On several

18 | occasions you've asked for *en banc* consideration. You've

19 | tried to have the Supreme Court weigh in on these issues.

20 | You've really tried to exhaust your opportunities to have

21 | these issues considered. How can I - - why wouldn't the - -

22 | the attorneys are seeking sanctions against you saying enough

23 | is enough, he's dragging us into this again, we've briefed

24 | these issues up and down the chart of the Federal court

25 | system, and we've received the same answer. Why shouldn't we

1  impose upon Mr. Hayes to pay our court fees at this point in

2  light of the fact that he's dragging us, again, yet again,

3  into court?  What's my answer to that?  Why shouldn't I say,

4  You know, you're right?  I'm amazed at this history of up and

5  down.  And back again.

6       MR. HAYES: I think their motion for sanctions is

7  completely out of order at this time.

8       THE COURT: Why?

9       MR. HAYES: Because it's prejudicing the Court

10 against the merits of the case.

11      THE COURT: In other words, I shouldn't consider the

12 fact that this - - these issues have been up and down and

13 around and through?  That these issues have been - - don't I

14 have to consider that?  Isn't there such a thing as finality,

15 and principles that govern the way that we do business in the

16 court system?

17      MR. HAYES: You know, there cannot be any finality

18 until the courts address the constitutional issues.  Let me

19 - - this isn't in my brief, but it's part of what I prepared.

20 This Court cannot avoid the constitutional issues of adequate

21 representation of the equity clients.  In Marlboro versus

22 Madison (phonetic) Chief Justice Marshall's opinion stated,

23 It is emphatically the province and the duty of the judicial

24 department to say what the law is.  Those who apply the rules

25 to a particular case must, of necessity, expound and

1 | interpret that rule. If two laws conflict with each other,
2 | the courts must decide on the operation of each. So if a law
3 | be in opposition to the constitution and both the law and the
4 | constitution apply to a particular case so that the court
5 | must either decide that a case conforming to the law,
6 | disregarding the constitution, or conforming to the
7 | constitution disregarding the law, the court must decide
8 | which of these conflicting rules govern the case. This is
9 | the very essence of judicial duty. None of the courts have
10 | addressed one, whether the 5th Amendment applies to, or
11 | whether the property of an equity holder is the property
12 | that's under the definition of the 5th Amendment. There's no
13 | opinion that talks about whether adequate representation is
14 | required by the constitution. About what adequate
15 | representation is.

16 | THE COURT: Understood. Thank you Mr. Hayes.

17 | MR. SILBERGLIED: For the record again, Russ
18 | Silberglied on behalf of Genesis. I'm not going to take a
19 | lot of time, Your Honor. I'm going to respond to a couple of
20 | points briefly, and then talk about the sanctions motion. I
21 | don't think Your Honor needs to hear much more from me about
22 | the background of this, because it's quite clear Your Honor
23 | has read the papers. A couple of points raised by Mr. Hayes.
24 | One, this issue of nobody has addressed the constitutional
25 | argument. Leaving aside for a minute that there simply is no

PENGAD • 1-800-631-6989

FORM FED-25

1  constitutional argument here, and it's not a constitutional

2  issue, let's leave that aside for a moment. I believe what

3  Mr. Hayes read is word for word out of his brief to the 3rd

4  Circuit Court of Appeals. He briefed this to the 3rd Circuit

5  Court of Appeals. I don't recall specifically on what

6  grounds the 3rd Circuit rejected his argument, but suffice it

7  to say it did. It rejected it again en banc. He made the

8  same constitutional argument in his petition for cert.

9  (phonetic) to the United States Supreme Court, and cert. was

10  denied. This issue is finished. It's not equitably moot,

11  it's actually moot in the words of Judge Farnan. Second,

12  Your Honor, the point that Mr. Hayes made that he couldn't

13  cross examine witnesses and that he couldn't present

14  evidence. Frankly I don't remember whether he cross examined

15  or not, it's too long ago in my memory to remember that level

16  of detail. I do remember that he made oral argument. I do

17  remember, obviously, that counsel for Mr. Grimes, counsel for

18  GMS cross examined our witnesses and put on their own

19  witnesses as well. Cross examined Mr. Zelmonvitz's witnesses

20  as well. And what I would additionally add to the record,

21  Your Honor might recall that Mr. Hayes in fact did attempt to

22  introduce evidence to this Court in the form of the famous

23  cartoons that he submitted. Not only did Your Honor admit

24  those cartoons into evidence, but Your Honor - - but Mr.

25  Hayes has also attached them to pretty much every appellate

1  brief he has filed since then.  So it's flatly incorrect that

2  he didn't have the opportunity to present evidence.  It's

3  flatly incorrect that he didn't present evidence.  So I will,

4  then, skip over, in the remainder of my argument, why his two

5  motions today ought to be denied.  I'm sure Mr. Zelmonvitz

6  might want to say something more on the motion leveled to his

7  client.  I'm going to skip right to the sanctions portion,

8  unless Your Honor has questions about the first portion.

9           THE COURT: Please proceed.

10          MR. SILBERGLIED: Thank you, Your Honor.  You know,

11  in short this does has to stop.  Have to stop, excuse me.  It

12  doesn't cost Mr. Hayes anything to file these motions because

13  he's not paying an attorney, but it most assuredly does cost

14  my client something.  Courts expect responses.  And that

15  means that my client must pay me or Weil Gotshal or somebody

16  else to respond to these motions.  And it is inflicting a

17  cost upon us.  It's inflicting a cost also on the federal

18  system because Your Honor has to keep hearing these, the

19  District Court has to keep hearing these, the 3rd Circuit has

20  to keep hearing these.  And in short Mr. Hayes needs a

21  message that this is time to stop.  If Your Honor has any

22  doubts whatsoever about what Mr. Hayes' intentions are if he

23  is not sanctioned today, all you have to do is open up to

24  paragraph 14 of his motion itself, and look at the sentence

25  that starts in the second to last line of page 6 in paragraph

1    14 where he says, quote, "Ratification of the - - and this is

2    the motion for today.  Quote, "Ratification of the

3    confirmation by an equity committee would set the stage for a

4    final decree that would really be final and not just another

5    intermediate point in this saga."  End quote.  In other

6    words, he has absolutely no intention of letting a final

7    decree, if entered by Your Honor at the March hearing, stand

8    in his way of continuing to file these motions.  He thinks

9    that that would be an intermediate point in the saga.  That's

10   exactly why we need an order from your court awarding

11   sanctions.

12            THE COURT: As a point of procedure, if the appeals

13   are still pending, what opportunities do I have to enter a

14   final decree?

15            MR. SILBERGLIED: And that's - - perhaps that's for

16   the March hearing.  We have put that in the motion.  That

17   there was case law on the subject of being able to enter a

18   final decree when there's nothing currently pending in the

19   Bankruptcy Court as opposed to things that are on appeal to

20   appellate courts from the Bankruptcy Court.  While I guess I

21   didn't necessarily spell it - - there are cases - -

22            THE COURT: I'm sure there are, and - -

23            MR. SILBERGLIED:  - - and they're cited in that

24   motion.

25            THE COURT:  - - I'm not deciding the issue.  My

1    facial expression is that there may be some doubt on the

2    issue since the jurisdictional opportunity to hear the case

3    comes up as it's opened, as it's referred from the District

4    Court.  And so it's an interesting issue.

5         MR. SILBERGLIED: Well, understood, Your Honor.  And

6    I'll be prepared to speak more to those cases at the March

7    hearing.  But suffice it to say that I believe the proper

8    remedy would be - - we really don't think the Haskell case is

9    coming back.  We really don't think that the Hayes motion is

10    coming back on remand.  But that's my opinion, obviously.  If

11    it does, there's always the ability to reopen the bankruptcy

12    case.  Just as if somebody needs to file a motion.  You know,

13    if you enter the final decree in March and some creditor

14    comes and violates the confirmation order, and violates the

15    discharge injunction in May, well then what I would do, like

16    is done in many, many cases, is I would file a motion that

17    asks for the Court to reopen the case for the sole purposes

18    of hearing a motion for sanctions for violating discharge

19    injunction and confirmation order, or something of the like.

20         THE COURT: Yeah.  You've cited §1927 - -

21         MR. SILBERGLIED: Yes, Your Honor.

22         THE COURT:  - - of Title 28 as a basis for awarding

23    sanctions, and you're aware that there is some controversy

24    about whether the Bankruptcy Court qualifies as any court of

25    the United States.  There is case law around the country that

1   disagrees with that proposition. I gather that you're also

2   relying, for instance, on the United States Supreme Court

3   Chambers case for inherent authority of a court to address an

4   abuse of the process, if you will. In a limited way.

5   Because we're not talking about 9011, it's not a separate

6   motion. Well, it is, I guess. But it's - -

7         MR. SILBERGLIED: It's a cross motion. It is a

8   separate motion. I mean, we could have done it as 9011.

9   Frankly, Your Honor, the main reason why we didn't do 9011 is

10   because the hearing was in 2 weeks, and 9011 doesn't

11   translate that well to a contested matter in a Bankruptcy

12   Court because you have to give it 20 days safe - - I think

13   it's 20 days - - whatever it is safe harbor notice. We would

14   have been more than happy to file a safe harbor notice and

15   proceed under 9011, but we didn't have sufficient time before

16   today's hearing. I think that the principles of 9011 apply.

17   I think 1927 itself, there is case law that supports it under

18   - -

19         THE COURT: I don't recall that the 3rd Circuit has

20   ever weighed in on the issue of whether a Bankruptcy Court

21   can utilize 1927. Am I right?

22         MR. SILBERGLIED: You're right, Your Honor. Or, at

23   least we uncovered no such case.

24         THE COURT: Yeah. I'm not aware of any, but anyhow.

25         MR. SILBERGLIED: So there are those principles.

PENGAD • 1-800-631-6989

FORM FED-25

1 And, you know, and of course there is the inherent power of
2 the Court, and there's equitable principles in 105 for Your
3 Honor to be able to control your own docket. And as we just
4 read from paragraph 14 of Mr. Hayes own motion, he's
5 admitting to the Court that he's going to keep filing
6 motions. And I think that, you know, 105 would also support
7 - - would support the issue in terms of the Court controlling
8 its own docket.

9 THE COURT: Indeed it would. I'm confident of that.
10 Thank you Mr. Silberglied.

11 MR. SILBERGLIED: Thank you, Your Honor.

12 THE COURT: Other comments? Sir.

13 MR. ZELMONVITZ: Menachem Zelmonvitz of Morgan Lewis
14 on behalf of Mellon Bank, the agent for the senior lenders.
15 I'll be very brief, Your Honor. I just wanted to touch on
16 first of all the reconsideration motion, which is addressed
17 not only to our clients, but also actually to our opponents
18 in the Haskell litigation. Because he's seeking to
19 essentially have their claims also reconsidered. The basic
20 requirement, as we've noted in our short objection, is that
21 there has to be cause for reconsideration. Absolutely no
22 cause has been shown. The only one even suggested would be
23 either the Haskell litigation, which has been dismissed, and
24 secondly really the ability of some of the senior lenders, or
25 the other lenders, who have gotten a so-called windfall. But

1    that is not the test. As the 3rd Circuit has said, a claim is

2    determined by the consideration received by the Debtor, not

3    the amount paid by the current holder of the claim.  That's

4    been upheld by every case that I'm aware of.  So that if you

5    purchase a note, you're entitled to a claim in the amount of

6    that note, not the amount of what you paid for that

7    particular claim.

8         THE COURT: What about cause in terms of

9    constitutional impairment?

10        MR. ZELMONVITZ: Well that really deals with also

11   the equity committee motion.  And I don't understand where

12   there is a constitutional issue here.  There's a right to

13   counsel.  No one has deprived Mr. Hayes that right of

14   counsel.  He could have gone out and retained his own

15   counsel.  The issue here is do you pay for that counsel out

16   of the estate?  The estate was not his money.  The estate was

17   our client's money.  And that's what Your Honor actually

18   found in the valuation part of the confirmation hearing.  The

19   equity holders actually had no stake left in this company.

20   And therefore, it was not right to even suggest that they, or

21   their counsel, be paid from the estate.  No one deprived him

22   of counsel.  He had every right to go out and retain counsel.

23   Therefore, I don't see any issue here.  Any constitutional

24   issue here whatsoever.  And that was the second point which I

25   really wanted to get to, Your Honor.  And the final thing I

1   wanted to mention is what Your Honor touched upon on the

2   final decree. We actually had a conversation yesterday. The

3   senior lenders are, to some extent, a little bit concerned to

4   make sure that this Court retains jurisdiction until the

5   Haskell litigation is over and done with. We do agree with

6   Mr. Silberglied that there is law out there which would allow

7   for the reopening of the case in the unlikely event of a

8   remand, which we agree with Mr. Silberglied is very, very

9   unlikely. However, it may be for consideration by the Court

10  to at least leave one of the cases open so that there is

11  continuing jurisdiction. We can leave this of course for

12  further discussion for March 2nd.

13         THE COURT: Indeed.

14         MR. ZELMONVITZ: Thank you, Your Honor.

15         THE COURT: Thank you. If there are no other - -

16         MR. HAYES: May I respond to these?

17         THE COURT: You may, Mr. Hayes. Come on up.  Last

18  comment.

19         MR. HAYES: On the motion for reconsideration. I

20  mean, they're misreading what I propose in the

21  reconsideration. I am not saying - - I am not reducing the

22  claims of the secondary purchasers. They're retaining their

23  claims. I'm just dividing a claim into 2 parts. That's the

24  reconsideration proposal. Part of the claim would be - -

25  maintain the same priority as it has now, what I call the

PENGAD · 1-800-631-6889

FORM FED-25

1    speculative part of the claim would still remain a claim.  It

2    would be given a lower priority in a separate class with all

3    the speculative claims, which include the subordinated note

4    holders and the shareholders.  So I'm not reducing the claim.

5    And in the very case that, the Richfield Property Case, I

6    mean this parallels the way in which a mortgage obligation

7    which was secured by property as treated.  A valuation of the

8    property was less than the mortgage, and part of the claim is

9    considered as secured and part of it is considered as

10   unsecured.  I mean, this parallels that in every respect.

11             THE COURT: Understood.

12             MR. HAYES: And the second thing on cause.  These

13   claims, the assertion is made in the cases cited that cause

14   has to be from a Rule 60 cause, because Rule 60 is the normal

15   means for reconsideration.  But that only applies in cases

16   where the claims were considered in the first place.  These

17   claims were never considered, these claims were merely

18   asserted as  -  -  and it didn't come out until, as far as I

19   know, until the Haskell litigation, that the secondary

20   claims, or secondary transactions in the loans was to the

21   extent that it is.  I mean, Haskell they just  -  - 75% of the

22   senior loan were acquired secondarily.  That these senior

23   lenders, and these are the investment banks and these are the

24   defendants in the Haskell litigation, never paid Genesis

25   anything.  They acquired these claims in the secondary

PENGAD • 1-800-631-6989

FORM FED-25

1    market.  And the claims were, senior lender claims are like

2    $1.4 billion, and 75% of that, and the allegation is made or

3    alleged that these loans were picked up at 50¢ on the dollar.

4    I mean, that's a $500 million shift in priority of claims.

5    And it would allow money to fully compensate the other senior

6    lenders who I think that the bankruptcy laws are trying to

7    protect.  Creditors who actually provided capital to the

8    corporation and are trying to recover a hundred percent of

9    their claim, and are being prevented by doing so by

10   speculators who are asserting that their claim should be of

11   equal priority to those.

12              THE COURT: Thank you Mr. Hayes.

13              MR. HAYES: And - -

14              THE COURT: Did you - - go ahead.

15              MR. HAYES: And I think Mellon Bank has a conflict

16   of interest in representing only the defendants in the

17   Haskell litigation and ignoring the original senior lenders

18   who have a claim.  Because they would be very much in support

19   of this motion.

20              THE COURT: I don't see them here.  Thank you Mr.

21   Hayes.

22              MR. HAYES: But - -

23              THE COURT: That's enough.  Thank you, sir.  I read,

24   Mr. Hayes, your recitation and you've included these

25   comments, many of them, in your papers.  By these comments

1  you seek that I basically rewrite the Bankruptcy Code.  That

2  I inject my own sense of what I think is fair, what I think

3  is appropriate, what I think may have been unfair in the

4  process into the equation of who gets what and how.  That's

5  not the way it works.  I am duty bound to apply the

6  Bankruptcy Code as Congress has passed it, and that's what I

7  will do.  There are 2 motions presented here.  One is a

8  motion to reconsider the order allowing the Genesis and

9  Multicare senior lender claims.  And we understand that

10  502(j) requires that cause be established in order to justify

11  such a reconsideration, if you will, and no such cause has

12  been provided here.  One suggestion is that because there are

13  allegations in a complaint that has been dismissed that one

14  senior lender, or several senior lenders, who were senior

15  lenders at the time of the confirmation achieved their

16  position at a discount, that that is a basis to warrant a re-

17  prioritization of the entire plan that was confirmed over 4

18  years ago.  That's mind boggling.  That's not available as an

19  opportunity for relief.  There is no opportunity to

20  reclassify into speculative and non-speculative portions.

21  There's no provision of the Bankruptcy Code that allows for

22  that.  Indeed, out there in the marketplace this may be an

23  area that generates abuse of one sort or another.  There have

24  been all kinds of, I think, articles and concerns expressed

25  about transfers of claims, about manipulation of the process.

1  And indeed it may be a proper area of congressional review.
2  To determine whether any, excuse me, any control should be
3  applied, any modifications of the Bankruptcy Code
4  appropriate, to control or revise the processes by which
5  investors can operate. Right now we're operating in the
6  framework that it does not permit a division of a claim based
7  on the price at which the holder of the claim achieved that
8  interest. Not to mention that it's 4 years after
9  confirmation and what's sought is a complete revision of the
10 confirmed plan, which has been affirmed on appeal and which
11 cannot be disturbed at this point. So that motion must be
12 denied. On the motion for the appointment of pre-final
13 decree equity committee, I will not belabor this record to
14 recite the very lengthy and difficult history of attempts by
15 Mr. Hayes to have this issue considered. I will adopt the
16 recitation that has been provided in the response to the
17 motion. Suffice it to say that Mr. Hayes has turned the
18 system inside and out to try to obtain this particular
19 relief. Whether or not he has raised the constitutional
20 dimensions, to the extent that there are any, of the issue he
21 has had his chance, more than once and over the course of
22 years, to assert this position and it is time to stop. There
23 is no opportunity in this system to keep coming back to the
24 same issue. The same party, the same issue, the same
25 response. The response being that there was no entitlement

1 to have the estate pay for representation of equity in this

2 case. There was every opportunity to retain representation.

3 Mr. Hayes, for one, chose to present his case on his own. He

4 was heard at confirmation, he was heard on appeal at various

5 junctures. Enough is enough. Indeed there is the need for

6 sanctions, there is a need to impress upon Mr. Hayes the fact

7 that he cannot continue to try to assert issues in the

8 Bankruptcy Court, or in the District Court, or in the Court

9 of Appeals, without consequences. Once you have an answer to

10 a question that you raise, a basic tenet of of our court

11 system, or our jurisprudence, is that you cannot continue to

12 come back to assert those issues again, and again, and again.

13 The consequence here, and I do rely on 105, indeed if 1470, I

14 think it is, is available, then that may also be a basis.

15 The kinds of activities that are seen here are clearly in

16 line with the proscription of that statute. I'm sorry, 1927.

17 I don't know where I got 1940. Where a litigant unreasonably

18 and vexatiously multiplies the proceedings. That's exactly

19 what we have here. But even if, and there is frankly

20 reasonable basis to conclude that a Bankruptcy Court is not

21 quote, "any court of the United States", unquote, only

22 because - - and this I'm going on memory, I think it's 28 USC

23 451, I'm not positive about that cite - - defines, quote,

24 "any court of the United States", unquote, for purposes of

25 this statute. And that statute does not include Bankruptcy

1   Courts.   One could argue that it should, but nevertheless,

2   that kind of analysis is fairly straightforward.   It's, you

3   know, not too complicated, and does cause a shadow to be

4   placed upon the application of this statute by the Bankruptcy

5   Court.   Nevertheless, counsel is certainly correct to reflect

6   that 105 offers, and indeed I think compels, a Bankruptcy

7   Court to control proceedings, and to address issues of

8   vexatious and unreasonable litigation.   And indeed it

9   dovetails on the Chambers' expressions in - - offered by the

10  United States Supreme Court.   And there has been, I think, I

11  could be wrong on this, but I think unanimous support for the

12  proposition that Chambers and its recitation of the inherent

13  authority of all Federal Courts, where the tools otherwise

14  available are not present to rely on its inherent authority

15  to control the processes in its court, and that includes, for

16  instance, and I think this was the context of the Chambers

17  decision, the imposition of attorney's fees where litigation

18  is unreasonable and vexatious, to use the words of 1927.   So

19  I think that that sanction is appropriate in this case.   I

20  will ask counsel to submit affidavits of services, and of

21  course with a copy to Mr. Hayes.   Mr. Hayes may respond in

22  terms of the amount of attorneys fees sought by the

23  responders, and I will then enter an award on the papers.   I

24  don't believe there will be a need to address, by further

25  argument, any issues.   So I would ask that the affidavit of

1   services be filed within 20 days, perhaps.  If that's doable.

2         MR. SILBERGLIED: We can certainly do that, Your

3   Honor.

4         THE COURT: And then Mr. Hayes, you're welcome to

5   take another 15 days to respond to those affidavits, if you

6   choose to do that.  Any questions?

7         MR. HAYES: May I be heard?

8         THE COURT: Your last comment, sir.  Come on up.

9         MR. HAYES: Before you assess sanctions, I would

10  request that you refer to the case in re: Ken Davis Holdings

11  Company 249 f3rd 383, 5th Circuit, 2001.  I mean, this was an

12  issue that was at the heart of that case.

13        THE COURT: I'll gladly refer to it.  I stand by my

14  ruling.  If I look at that case, and I see that there's some

15  basis to depart from it, I will do that.  I believe I'm

16  familiar with the case.  Could you give me the name of it

17  again?

18        MR. HAYES: In re: Ken Davis, d-a-v-i-s, Holdings

19  Company.

20        THE COURT: Oh, no.

21        MR. HAYES: 249 f3rd 383.  It's an Oklahoma

22  bankruptcy case.

23        THE COURT: Actually no, I don't recall it.  I will

24  tell you that I've certainly looked closely at this issue,

25  generally and extensively over time.  So the issue is not new

1    to me.  The 1927 issue, the inherent authority issue, the 105

2    aspects, the 9011 aspects, these are areas, these are

3    subjects that come up, as you might imagine, and I'm quite

4    confident that this is the quintessential case for the

5    application of sanctions.  It is meant to, as I said, impress

6    upon you that you cannot return again and again without

7    consequences.  Where the issues are the same, where you're

8    seeking the same relief, and where - - I don't want it

9    reargued now.  I'm done.  And I've ruled.  And I thank you

10   all.  If there's nothing else, the matter is adjourned.

11          MR. SILBERGLIED: Thank you, Your Honor.

12          (Whereupon at 10:13 a.m. the hearing in this matter was

13   concluded for this date.)

14

15

16

17

18

19          I, Jennifer Ryan Enslen, approved transcriber for

20   the United States Courts, certify that the foregoing is a

21   correct transcript from the electronic sound recording of the

22   proceedings in the above-entitled matter.

23

24   Jennifer Ryan Enslen                          1/30/06

25   18 Bar Drive
     Newark, DE 19702
     (302) 836-1905

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GENESIS HEALTH VENTURES, INC., et al., | ) | Case No. 00-2692 (JHW) |
| | ) | |
| | ) | |
| | ) | |
| Reorganized Debtors | ) | |
| | ) | |

## MOTION FOR APPOINTMENT OF PRE-FINAL DECREE EQUITY COMMITTEE

Pursuant to section 1102(a)(2) of chapter 11 of title 11 of the United States Code, 11 U.S.C. 101-1330, and the due process clause of Amendment V of the United States Constitution, James J. Hayes, a member of Genesis Equity Class respectfully requests this Court to appoint a Pre-Final Decree Equity Committee to represent the interests of the Genesis Common Stock Class: 1) in proceedings on the recently filed Motion For Reconsideration of the Genesis and Multicare Senior Lender Claims; and the Genesis and Multicare Senior Subordinated Note Claims; 2) a new Motion for Sanctions for Professional Misconduct pursuant to Rule 9001 of the Federal Rules of Bankruptcy Procedure; 3) a potential suit for damages on behalf of the Debtor against the Haskell defendants pursuant to 1103(c)(5) and 1109(b);, and a 4) potential Constitutional challenge to the confirmation pursuant to the Takings and Just Compensation Clauses of the Fifth Amendment.

## Background[1]

1. On November 23, 2005, Reorganized Debtors filed their *Motion for Entry of a Final Decree* in the cases of Genesis Health Ventures, Inc. (Case No. 00-2692) and Multicare AMC Inc. (Case No. 00-2494)

2. On December 5. 2005, Hayes filed by U.S. Mail a letter to this Court opposing the issuance of a Final Decree in the lead Genesis case, no. 00-2692 (JHW); and on December 7, Hayes sent the same letter opposing the issuance of a Final Decree in Multicare, case no. 00-2494(JHW). Also on December 7, Hayes filed a *Motion For Reconsideration of the Genesis and Multicare Senior Lender Claims; and the Genesis and Multicare Senior Subordinated Note Claims.*

3. The Motion for Reconsideration noted Hayes' intention to file a *Motion for Sanctions for Professional Misconduct* pursuant to Rule 9001 of the Federal Rules of Bankruptcy Procedure.

4. On July 18, 2004, two days after a hearing on the defendant's motion to dismiss the Haskell fraud complaint, Hayes sent a confidential letter to this Court. This letter enclosed an August 6, 2001 confidential letter to Genesis' President, Michael Walker, which criticized Debtors' counsel as showing "a serious lack of perception and competence... in the preparation and advocacy of their reorganization plan." The letter to this Court noted that the letter to Mr. Walker was provided to Genesis CFO, George Hager, an alleged conspirator in the Haskell fraud suit, who then provided the letter to Debtor's Counsel. My letter concluded: "the fact that the chairman ignored the

---

[1] The Background only includes information after this Court's May 13, 2004 bench decision denying a post-confirmation equity committee. At the hearing this Court noted that it had been apprised that case In *the matter of GENESIS HEALTH VENTURES INC.*, Debtors: Richard HASKELL, et al., Plaintiffs v. GOLDMAN, SACHS & CO. et al., has been referred to the Court.

2

increasing equity values of health care stocks and breached his fiduciary obligations to

shareholders is circumstantial evidence there were illicit understandings among Genesis

management and the Senior Lenders and that the Debtor's Counsel was a tacit co-

conspirator in the alleged scheme."

5.    On May 3, 2005, this Court dismissed the case: *Richard HASKELL, et.al,*

*Plaintiffs v. GOLDMAN, SACHS & Co.; Genesis Health Ventures. Inc.; Mellon Bank,*

*N.A.; Highland Capital Management, L. P., George V. Hager Defendants in* its entirety.

The opinion held the case against the debtor is time barred by *section 1144* and violated

the order of confirmation, which enjoined claimants from prosecuting claims that

occurred prior to the Effective Date. The defendants have appealed to the district court.

6.    The complaint listed a number of allegations that certain senior lenders had

caused the understatement of Genesis' EBITDA that in turn caused the investment

bankers to undervalue Genesis by hundreds of millions of dollars. The individual

allegations and associated EBITDA reductions are shown in the table below:

| Bondholder Allegation | EBITDA Adj. ($ millions) | LT Care | Pharmacy | Reference p. no. |
|---|---|---|---|---|
| a) excessive insurance reserves | 16.7 | 7.5 | 9.2 | 68 |
| b) Multi Care management fees | 11.6 | 11.6 | 0.0 | 9 & 107 |
| c) Manor Care pharmacy sales | 11.0 | 0.0 | 11.0 | 117 |
| d) Mariner contract | 13.4 | 0.0 | 13.4 | 129 |
| g) discontinued health plan | 13.0 | 5.8 | 7.2 | 9 & 141 |
| h) pharmacy costs of goods sold | 26.0 | 0.0 | 26.0 | 146 |
| l) increased Medicare mix | 4.0 | 4.0 | 0.0 | 151 |
| j) additional personnel costs | 35.0 | 15.7 | 19.3 | 152 |
| f) management retention bonus | 6.0 | 2.7 | 3.3 | 39 |
| e) AGE loss | 3.0 | 1.3 | 1.7 | 135 |
| Total Adjustments | 123.0 | 41.1 | 81.9 | |
| Valuation Increase (Chilmark multiples) | 1,045.3 | 287.7 | 757.5 | |

3

The potential billion dollar understatement[2] is sufficient to fully pay all creditor claims and leave a substantial recovery for the equity class.

## Argument

### A. Statutory Support for Appointment of a Committee

7.    The principal inquiry in the appointment of an equity committee is whether the equity security holders are adequately represented.

> (2) ...the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders.
>
> 11 U.S.C. 1102(a) (2) (1994)

The question on whether shareholders have received adequate representation is a determination in the court's discretion.

> The statute involves two inquiries. It must first be determined whether the appointment of a committee is necessary to assure adequate representation.[3]
>
> *In re Wang Laboratories, Inc.*, 149 B. R. 1 2 (Bankr. D. Mass. 1992)

8.    In one of the few appeals on this fundamental issue, the District Court for the Southern District of New York concluded:

> the proper legal standard to apply in determining whether to appoint an official equity committee for equity shareholders is whether an official committee is necessary to provide adequate representations of the equity holders' interests.
>
> *In Re Johns-Manville Corp.*, 68 B.R. 155 163 (S.D.N.Y. 1986)

---

[2] The allocation of adjusted EBITDA between LT Care and Pharmacy is pro rata, based on the revenue of these divisions.

[3] The second inquiry is "whether [the court] should exercise its discretion and make the appointment. Id. 2

4

9. The Genesis equity class has not been represented either formally or informally since Genesis filed for bankruptcy on June 22, 2000. No court has held to the contrary. In denying shareholders a post-confirmation equity committee this Court expressed the concern "that such a process may not be countenance within the framework of the Bankruptcy Code. And, even if it is, it would be available only in the most extraordinary of situations. And, I cannot fit this set of facts into that kind of equation." [4]

10. In reaching this conclusion, the Court is placing itself on the committee and then deciding what situations might warrant committee action. This Court concluded that a post-confirmation committee is warranted only in "extraordinary situations" and then could see no facts that would fit this situation. Sections 1103(c) (5), however, provides that an equity committee may "perform such other services as are in the interest of those represented." Section 1109(b) grants a committee the right to raise, appear, and be heard on any matter. Such language provides for a spectrum of activities from the mundane of asking the court to consider the priority of Senior Lender speculative claims, for example, to the spectacular of suing the Haskell defendants on behalf of the Debtor.

11. In the second example, the Second Circuit held that 1103(c) (5) and 1109(b) implies a qualified right for committees to initiate suit, with approval of the Bankruptcy Court:

> Most bankruptcy courts that have considered the question have found an implied, but qualified right for creditors' committees to initiate adversary proceedings in the name of the debtor in possession under 11 U.S.C. 1103(c)(5)and 1109 (b)...We agree with these bankruptcy courts.

*Re STN Enterprises, 779 F.2d 901 904* (2nd Cir. Vt. 1985)

---

[4] Transcript of Hearing Before the Honorable Judith H. Wizmur, May 13, 2004, p. 27.

In other words, the Bankruptcy Code provides for the committee to decide what actions

are necessary to represent the interests of its class and then to seek court approval for

those actions. The Code simply does not contemplate the bankruptcy court being both

judge and advocate.

12. Setting aside the notion that the court needs to approve the committee's

activities as a condition in appointing a committee; the instant motion requires this Court

to assess whether the interests of the equity class are adequately represented by the pro se

efforts of a class member. Considering the complexity of the case, the cram down

confirmation, the unresolved fraud allegations and the power the Bankruptcy Code

provides of a committee under 1103(c)(5) and 1109(b) and the answer is clearly "No."

13. The *Motion For Reconsideration of the Genesis and Multicare Senior
Lender Claims; and the Genesis and Multicare Senior Subordinated Note Claims*, now

before the court, certainly falls within the confines sections 1103(c)(5) and 1109(b) as

would a Motion for Professional Misconduct. Who but a committee for the

unrepresented, could be expected to file a misconduct motion against parties who agreed

on the financial underpinnings of the reorganization plan before the confirmation hearing

and would not renegotiate the plan after market increases in health care stocks increased

the debtors' estate by hundreds of millions of dollars?

14. This Court should appoint a committee even if it believes there is nothing

for the committee to do.[5] Ethically, a newly appointed committee counsel could not

pursue frivolous actions against the probity of the confirmation. If this is the case, then

ratification of the confirmation by an equity committee would set the stage for a Final

---

[5] With \$37 million authorized to pay compensation and expenses for parties supporting the plan, the
relatively small additional cost of an equity committee cannot be a factor in resolving a continuing
controversy with hundreds of millions of dollars at stake.

6

Decree that would really be final and not just another intermediate point in this saga. Given the complexities of the case; the challenges to the confirmation; the allegations of fraud; and continuing appeals: a final review of the case by an equity committee that has not participated in the confirmation would be a prudent exercise of this Court's discretion.[6]

### B. Constitutional Support for Appointment of a Committee

15. This Court simply avoided the representational issues in its previous denials. It cannot do so now at the point of issuing a final decree. The Fifth Amendment provides in part that "*No person shall... be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.*" The confirmed plan deprived the equity class of its ownership of Genesis in bankruptcy proceedings where it was not represented. The equity class was also denied an equity committee to undertake an appeal.

16. Although no authority has commented on what constitutes Constitutional due process in a chapter 11 bankruptcy proceeding, it must, at a minimum, require the representation by a committee provided by 1102(a) (2) at some point in the bankruptcy process. Having failed to appoint a Committee earlier, the instant motion is the final opportunity to respect the equity holders Constitutional rights.

17. Whether appointing an equity committee at the very end of a bankruptcy is sufficient to pass Constitutional muster will only be determined after the committee pursues all its remedies. If unsuccessful, the committee would then be the first to test the

---

[6] Both Hayes and the Haskell plaintiffs' for independent reasons believe that the confirmed plan did not satisfy the fair and equitable provisions of subsection 1129(b) (2).

7

meaning of Fifth Amendment Due Process in a direct challenge to the confirmation; a

challenge that could not dismissed by the judicial doctrine of equitable mootness.

18.    While not considering an appellant with a constitutionally protected right,

the dissenting opinion in the 7-6 en banc *Continental* decision has serious doubts about

the judicially crafted remedy of equitable mootness. Writing for the dissent, it is Judge

Alito's view that:

> The majority's decision in this case creates a bad precedent for our
> circuit. The majority adopts the curious doctrine of "equitable mootness,"
> which it interprets as permitting federal district courts of appeals to refuse
> to entertain the merits of live bankruptcy appeals over which they
> indisputably possess statutory jurisdiction and in which they can plainly
> provide relief. According to the majority there is no clear rule for
> determining when a bankruptcy appeal is "equitably moot" Instead, this is
> said to be a discretionary determination to be made in the first instance by
> the district court based on a weighing of five factors that the majority has
> culled from the opinions of our "sister circuits." **In my view, if the
> doctrine has any validity, it is more limited than the majority holds
> (Emphasis added.)**

*In re Continental Airlines*, 91 F. 3d 553 567 (3rd Cir. 1996) en banc.

19.    The undefined relationship between the Bankruptcy Code and the

Constitution is illustrated by the *Marshall* case, where the Bankruptcy Court for the

Central District of California found:

> There is a significant difference, with respect to the Bankruptcy
> Power, between property interests and contract rights. In the bankruptcy
> context, property rights enjoy at least a measure of protection under Due
> Process and Just Compensation Clauses of the Fifth Amendment.

*In re Marshall,* 300 BR 507 525 (Bkrtcy. C.D. Cal. 2003)

The *Marshall* court explained that "a measure of protection" was defined by a 1937

Supreme Court opinion:

8

But if Congress is acting within its bankruptcy power, it may authorize the bankruptcy court to affect those property rights, provided the limitations of the due process clause are observed.

*Wright v. Union Central Life Ins. Co.*, 304 U.S. 502 518 (1937)

20. With respect to the Just Compensation clause, the Rehnquist court favorably

cited *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555 (1935):

The bankruptcy power is subject to the Fifth Amendment's prohibition against taking private property without compensation.

.    .    .

[T]he Fifth Amendment commands that, however great the Nation's need, private property shall not be thus taken even for a wholly public use without just compensation. If the public interest requires, and permits, the taking of property of individual mortgagees in order to relieve the necessities of individual mortgagors, resort must be had to proceedings by eminent domain; so that, through taxation, the burden of the relief afforded in the public interest may be borne by the public.

Id 602.

.    .    .

The foregoing discussion satisfies us that there is substantial doubt whether the retroactive destruction of appellees' liens in this case comports with the Fifth Amendment.

*United States v. Security Industrial Bank*, 459 U.S. 70 74 (1982)

21. But Congress in "establish[ing] ...uniform Laws on the subject of

Bankruptcies..."[7] and the Federal Courts interpreting these laws both must respect the

Constitution. In 1957, for example, the Supreme Court examined the denial of passports

to certain groups on the question whether this denial violated the Fifth Amendment rights

of liberty to these citizens.

We deal here with a constitutional right of the citizen, a right which we must assume Congress will be faithful to respect. We would be faced with important constitutional questions were we to hold that

---

[7] Article I, Section 8, Clause 4 of the Constitution

9

Congress...had given the Secretary authority to withhold passports to citizens because of their beliefs or associations.

Kent v. Dulles, 357 U.S. 116 130 (1957)

22.    Both the Rehnquist Court and the Burger Court follow the statutory interpretation presumption that Congress intends to respect the Constitution in constructing its laws:

We consider the statutory question because of the "'cardinal principal that this Court will first ascertain whether a construction of the statute is fairly possible by which the constitution question can be avoided.'"

*United States v. Security Industrial Bank*, 70 78 (1982) citing: *Lorillard v. Pons*, 434 U.S. 575 578 (1978)

23.    We do not need to know how the potential conflicts between the Bankruptcy Code and the Constitution will ultimately be resolved to know that the Constitution supports the appointment of an equity committee on the instant motion. This Court's timeliness concerns in denying previous motions simply evaporate under Constitutional Due Process.

24.    In hindsight, perhaps it would have been better had the U.S. Trustee appointed an equity committee at the beginning, or failing that, had the Securities and Exchange Commission intervened to request the appointment of an equity committee. Perhaps the addition of another committee and additional lawyers and investment bankers would not have brought anymore clarity to a complicated and allegedly fraudulent situation.  Perhaps now, with only the securities claims under challenge and specific fraud allegations on the table, is the best time to consider a final resolution.  Whatever.

25.    The Constitutional right to representation does not expire. There is no

statute of limitations on the Constitution. *In re Kendavis Holdings Co.*, 249 F 3rd 383 (5th Cir. 2001), the court reviewed and upheld due process claims in a bankruptcy case fifteen years after the bankruptcy court's order confirming the reorganization plan:

> Protection of an individual's due process right to adequate notice requires more than a cursory review...

> Id. 386

26. The equity holders were not represented in the negotiations that produced the reorganization plan; they were not represented at the confirmation hearings; they were not represented in the appeal; but because their property was taken and they were not provided due process under the Fifth Amendment they must now be represented by a committee.

27. WHEREFORE, James J. Hayes respectfully requests a) that this Court appoint a Pre-Final Decree Equity Committee, and b) grant such other and further relief as is necessary and proper.

Dated: December 11, 2005
      Annandale, VA.

                                      Respectfully Submitted,

                                        James J. Hayes
                                        Pro Se
                                        4024 Estabrook Dr.
                                        Annandale, VA 22003
                                        (703) 941-4694

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GENESIS HEALTH VENTURES, INC., et al., | ) | Case No. 00-2692 (JHW) |
| | ) | |
| | ) | |
| | ) | |
| Reorganized Debtors | ) | |
| _____ | ) | |
| | ) | Chapter 11 |
| In re: | ) | |
| | ) | Case No. 00-2494(JHW) |
| MULTICARE AMC, INC., et al. | ) | |
| | ) | |
| | ) | |
| | ) | |
| Reorganized Debtors | ) | |
| _____ | ) | |

## NOTICE OF MOTION

To:    Reorganized Debtors Genesis Health Ventures, Inc.
       Reorganized Debtors Multicare AMC, Inc.

Please take notice that the Genesis Common Stock Class by one of its

members, James J. Hayes, has today filed the attached **Motion for Reconsideration of**

**the Orders Allowing the Genesis and Multicare Senior Lender Claims; and the**

**Genesis and Multicare Senior Subordinated Note Claims** with  the United States

Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington,

Delaware 19801.

Dated: December 7, 2005
       Annandale, Virginia

James J. Hayes
4024 Estabrook Drive
Annandale, VA 22003

Member of the Genesis Equity Class

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| GENESIS HEALTH VENTURES, INC., et al., ) | Case No. 00-2692 (JHW) |
| ) | |
| ) | |
| ) | |
| Reorganized Debtors ) | |
| ) | |
| ) | Chapter 11 |
| In re: ) | |
| ) | Case No. 00-2494(JHW) |
| MULTICARE AMC, INC., et al. ) | |
| ) | |
| ) | |
| ) | |
| Reorganized Debtors ) | |
| ) | |

### GENESIS COMMON STOCK CLASS'S
### MOTION FOR RECONSIDERATION OF THE GENESIS AND MULTICARE
### SENIOR LENDER CLAIMS; AND THE GENESIS AND MULTICARE SENIOR
### SUBORDINATED NOTE CLAIMS

Pursuant to section 502(j) of chapter 11 of title 11 of the United States

Code, 11 U.S.C. 101-1330, Rule 3008 of the Federal Rules of Bankruptcy Procedure, the

Genesis Common Stock Class respectfully requests that the Court reconsider the orders

allowing the Genesis and Multicare Senior Lender Claims; and the Genesis and Multicare

Senior Subordinated Note Claims.

### Background

1.    On November 23, 2005, Reorganized Debtors filed their *Motion for Entry of

a Final Decree* in the cases of Genesis Health Ventures, Inc. (Case No. 00-2692) and

Multicare AMC Inc. (Case No. 00-2494)

2.    On August 31, 2005, James J. Hayes, a member of the Genesis common

equity class, filed an appeal of this Court's denial of a post-confirmation equity

committee: *James J. Hayes v. Genesis Health Ventures*, 3rd Cir. (Case No. 05-4005) An

appellate briefing schedule has not been issued.

3.    This motion will be followed by a *Motion for a Pre- Final Decree Equity*

*Committee*, to represent the interests of the Genesis Common Stock Class: 1) in

proceedings on the instant motion; and 2) a Motion for Sanctions for Professional

Misconduct pursuant to Rule 9001 of the Federal Rules of Bankruptcy Procedure.

4.    On May 3, 2005, this Court issued an opinion: *In the matter of GENESIS*

*HEALTH VENTURES INC.*, Debtors: Richard HASKELL, et al., Plaintiffs v.

GOLDMAN, SACHS & CO.; Genesis Health Ventures, Inc.; Mellon Bank, N.A.;

Highland Capital Management, L.P.; George V. Hager Defendants.  This Court's

dismissal has been appealed to the district court.

5.    The Haskell complaint alleged the following facts: a) by the summer of

2000, a group of investment banks and other financial institutions led by defendant

Goldman Sachs & Co. had purchased from the original lending consortium about half of

the outstanding Genesis Senior Loans at a massive discount from face value; b) the

investment banks had acquired over 75% of the Genesis and Multicare Senior Lender

Claims by the time the reorganization plan was confirmed; and c) the confirmed

reorganization plan provided the investment banks with about 70% of the new equity in

the reorganized Genesis.   The alleged facts imply that the confirmed Plan provided the

investment banks an additional $133 million in cash, $79 million in new senior notes and

$22 million in new convertible preferred stock.  The Senior Lenders distribution provided

investment banks, who never loaned Genesis anything, windfall profits of several hundred million dollars on an investment made shortly before and during the bankruptcy.

6.    The plaintiffs in the Haskell suit included 275 investors who collectively held about 53% of the Genesis Senior Subordinated Note Claims. Like Goldman, many of the Haskell plaintiffs were drawn to their Genesis investment in the months preceding the bankruptcy. These purchases in the secondary markets were an even more "massive discount" to face value than Goldman's purchase of the Senior Loans. It is not known if the Haskell plaintiffs acquired any "Claims" subsequent to the bankruptcy. The confirmed Plan provided the Note Claims 3.2% of the new Genesis common stock.

7.    The Table below shows end of month prices for the Genesis and Multicare Senior subordinated notes. Two facts are important to this Court's reconsideration of Genesis and Multicare Claims: 1) the 2009 notes (Bold type in Table.) were issued at a discount in a private placement; and consequently 2) did not trade in the public markets. The Disclosure Statement recognizes the "original issue discount" and the claim for this issue was reduced by about $ 4 million.[1] All other Senior Loan and Subordinated Note Claims are equal to the instrument's face or contractual value.

| Genesis Notes | Moody's | 2000 Prices | | | | | |
|---|---|---|---|---|---|---|---|
| | Rating | May | June | July | Hi | Low | Issued |
| Sr. sub. nt. 9.75 2005 | C | 16 5/8 | 15 1/2 | 20 1/2 | 37 3/8 | 11 1/2 | 6/15/95 |
| Sr. sub. nt. 9.25 2006 | C | 15 | 14 | 11 | 41 | 9 1/2 | 10/7/96 |
| Sr. sub. nt. 9.875 2009* | C | ~ | ~ | ~ | ~ | ~ | 12/19/98 |
| **Multicare Notes** | | | | | | | |
| Sr. sub. nt. 9.00 2007 | C | 5 | 4 | 6 | 20 | 2 1/5 | 8/4/97 |

* Private placement issued at 96.16

*Mergent Bond Record*, U.S. Corporate Bonds Section (end of month prices)

---

[1] *Disclosure Statement for Debtors' Joint Plan of Reorganization*, July 6, 2001, p. 23.

8.     Based on estimates in the Disclosure Statement, the confirmed Plan provided
the Subordinated note holders about 6.9% of their face value.[2] Thus, the speculators in
the Genesis notes, including the Haskell plaintiffs, lost 56% of their investment in the
bankruptcy, based on the average price of the two issues at the end of May 2000. (See
Table above.) Investors who provided Genesis capital for its business in the December
1998 private placement lost 93% of their investment.

## Argument

9.     The confirmed Plan produced results that, on their face, are manifestly unfair
both among members of the same class and between classes. Speculators in Senior Loans
like Goldman gained windfall profits of hundreds of millions of dollars, while the
original lenders, who provided Genesis the capital to build its business, incurred
devastating losses. Original lenders in the Subordinated Note private placement lost 93%
of their investment while the speculators' in this class lost only 56% of their investment.
Speculators in the common and preferred stock lost their entire investment. The
investment bank speculators enormous windfall profits from their Senior Loans comes at
the expense of the members of every other securities class.

10.     The maldistribution of assets in bankruptcy is becoming increasingly
common as speculators in bankruptcy debt become knowledgeable in gaming or
manipulating the bankruptcy process to produce enormous profits for themselves while
increasing the losses of every other impaired creditor. This summer, for example, the
U.S. Bankruptcy Court for the Southern District of New York confirmed a bankruptcy
plan that exchanged new Loral stock for $ 2 billion in old debt leaving nothing for the

---

[2] Based on 41 million shares of new common stock and an estimated value of $20.33 per share. *Disclosure Statement for Debtors' Joint Plan of Reorganization,* July 6, 2001 p. 34.

4

common stock interests.[3] The CEO of Loral Space and Communications, who argued at the confirmation hearing that his company was seriously undervalued by the debtors' experts summarized the inequity: "[t]here's something wrong with a system where one class of the constituency comes out with absolutely zero and another class – the creditors – gets a multiple of their investment back." [4]

11.    Section 502(j) of the Bankruptcy Code provides that a claim that has been allowed or disallowed may be reconsidered for "cause" and that a reconsidered claim may be allowed or disallowed according to the "equities of the case."[5] The enormous windfall profits captured by Goldman and other Senior Loan speculators at the expense every other creditor and shareholder is certainly cause for reconsideration. The equities of the case require reconsideration of the debt securities claims that exceed the price the claimant paid to acquire the debt security or claim. Under principles of equitable subordination, this Court may, after notice and a hearing, subordinate all or part of an allowed claim to all or part of another claim. 11 U.S.C. 510 (c) (1)

12.    Speculators who acquired Genesis Senior Loans and Subordinated Notes in secondary transactions are masquerading as Genesis creditors and have filed claims based on the amount of money provided Genesis by the original lenders. Treating the entire claim of speculators as equal in priority to the claims of the original lenders is contrary to every fairness provision in the Bankruptcy Code. The speculative gain – the difference between the amount of the loan and the secondary sale price –  is equivalent to equity

_____

[3] Debtors' Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, June 3, 2005, *In re Loral Space & Communications, et al., Debtors*, U.S. Bankruptcy Court S.D.N.Y. Lead case 03-41710 (RRD)

[4] The Little Guy Loses Out In Loral's Bankruptcy Reorganization, *Barron's* Aug. 1, 2005, p. 25.

[5] The terms "cause" and "equities of the case" are not defined and will be determined on a case by case basis.

and is properly provided an equity priority. A prospective subordination hearing might consider dividing the claims of speculative creditors into two parts: 1) a priority claim with the same bankruptcy priority as the original instrument; and 2) a non-priority claim that would not participate in the distribution until the common and preferred stock holders recovered the pre-bankruptcy trading value of their issues.[6] After the recovery by equity holders, the remaining non-priority debt claims would be divided among the speculative debt holders and the common and preferred stockholder's, pro-rata, based on the pre-bankruptcy trading values of the respective financial instruments.

13.    The re-prioritization of the speculative part of debt creditors' claims would preserve the pre-bankruptcy market assessment of the contractual value of the firm's debt instruments. Re-prioritization is important to prevent debt class speculators with the highest bankruptcy priorities from gaming bankruptcy rules to extract windfall profits at the expense of debt creditors and stockholders with lower bankruptcy priorities.

14.    Gaming the bankruptcy process has devastating public policy implications. It creates opportunities for speculators to entice firms like Genesis with cash flows sufficient to meet current obligations, but relatively high amounts of distressed debt, to declare bankruptcy. Even the Debtor's counsel affirmed that: "obviously solvent entities may file for bankruptcy", confirming the opportunity for powerful speculators like Goldman to game the bankruptcy process.[7]    But putting solvent companies into bankruptcy to generate windfall profits for speculators comes at high public cost. For example, the Genesis bankruptcy's accumulated costs for legal,

---

[6] Under principles of equitable subordination, the court may, subordinate part of an allowed claim to all or part of another claim. 11U.S.C. 510 (c) (1)

[7] Transcript of Hearing Before The Honorable Judith H. Wizmur, May 13, 2004, p. 16:23-25

6

investment banking and accounting professionals has exceeded $37 million.[8]   Then there are additional unquantifiable costs of usurping the resources of an overburdened Federal judiciary, and the high opportunity costs of employing highly talented professionals in work that substantially damages the national economy.

15.    The diminution of National wealth – caused by the undervaluation of firms with weak balance sheets or relatively high amounts of debt in the market is the biggest cost of speculators gaming the bankruptcy process. This country is blessed with many astute investment professionals who – knowing the devastating consequences a bankruptcy has on the value of equity and junior debt – pre-emotively cause lower market prices of all firms with a possibility of a bankruptcy.[9]   Allowing speculators the full priority of a creditor's bankruptcy claim only enlarges the number of firms that are undervalued in the market. Conversely, reducing the incentives to game the bankruptcy process by re-prioritizing the speculative portion of high priority debt claims reduces the number of "at risk" companies and increases National wealth.

### Conclusion

16.    WHEREFORE, the Genesis Common Stock Class respectfully requests this Court a) reconsider the orders allowing the Genesis and Multicare Senior Lender Claims; and the Genesis and Multicare Senior Subordinated Note Claims and b) grant such other and further relief as is necessary and proper.

---

[8] And this does not include the substantial costs generated by the Haskell fraud on the bankruptcy court litigation.

[9] Genesis is a good example how an efficient market works preemptively to depreciate the value of companies with a possibility of bankruptcy. From the beginning of February to the end of March 2000, three months before the firm filed for bankruptcy, the Genesis common stock dropped 74% to levels it traded at during bankruptcy.   This example shows how the efficient market would depreciate the value of other firms with the possibility of a bankruptcy and in aggregate reduce National wealth.

Dated: December 7, 2005
Annandale, VA.

Respectfully Submitted,

*[signature: James J. Hayes]*

James J. Hayes
Pro Se
4024 Estabrook Dr.
Annandale, VA 22003
(703) 941-4694

## CERTIFICATE OF SERVICE

I certify a copy of the foregoing Motion was mailed from the Northern Virginia Regional Post Office on December 7, 2005 to the following counsel:

Russell C. Silberglied
Richards Layton and Finger P.A.
One Rodney Square
Wilmington, DE 19899; and

Robert S. Brady
Young Conaway Stargatt & Taylor LLP
1000 West Street, 17th floor
Wilmington, DE 19801

*[signature: James J. Hayes]*

James J. Hayes