IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------x
In re:                                        :        **Chapter 11**
                                              :
**GENESIS HEALTH VENTURES, INC.,** :          **Case No. 00-2692 (PJW)**
*et al.,*                                     :
                                              :
          **Reorganized Debtor.**             :
--------------------------------------------------------x
**JAMES J. HAYES,**                           :
                                              :
          **Appellant,**                      :
                                              :
          **v.**                              :        **C.A. No. 06-103 (JJF)**
                                              :
**GENESIS HEALTH VENTURES, INC.,** :
*et al.*                                      :
                                              :
          **Appellees.**                      :
--------------------------------------------------------x

## APPENDIX TO ANSWERING BRIEF OF APPELLEES GENESIS HEALTH VENTURES, INC. AND ITS FORMER DEBTOR AFFILIATES

Michael F. Walsh
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153

and

Adam P. Strochak
Joanne M. Guerrera
WEIL, GOTSHAL & MANGES LLP
1300 Eye Street, NW
Suite 900
Washington, D.C. 20005

Dated:  June 22, 2006
          Wilmington, Delaware

Mark D. Collins (No. 2981)
Russell C. Silberglied (No. 3462)
Michael J. Merchant (No. 3854)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
*Collins@rlf.com*
*Silberglied@rlf.com*
*Merchant@rlf.com*

Attorneys for Appellees Genesis
Health Ventures, Inc. and Its
Former Debtor Affiliates

# INDEX

Page

1.  Objection to Debtors' Plan to Extinguish Common Stock of Current Genesis
    Shareholders............................................................................................RD1-2

2.  Motion for Appointment of Official Committee of Equity Security Holders ............RD3-5

3.  Brief in Support of Motion for Appointment of Official Committee of Equity
    Security Holders.......................................................................................RD6-10

4.  September 12, 2001 Opinion on Confirmation.......................................................RD11-55

5.  Motion for the Appointment of Official Committee of Equity Security
    Holders for the Purpose of Appealing Confirmation of the Genesis
    Reorganization Plan and Delay of Appellants Brief Pending the Appointment
    of Counsel [Civil Action No. 01-718-JJF]..............................................................RD56-59

6.  Appellees' Joint Opposition to Motion for Appointment of an
    Official Committee of Equity Security Holders for the Purpose
    of Appealing Confirmation of the Genesis Reorganization Plan
    and Delay of Appellant's Brief Pending the Appointment of Counsel
    [Civil Action No. 01-718-JJF] ...........................................................................RD60-72

7.  September 30, 2002 Memorandum Order [Civil Action No. 02-16-JJF]................RD73-74

8.  September 30, 2002 Memorandum Order [Civil Action No. 01-718-JJF]..............RD75-76

9.  March 12, 2003 Order [Civil Action No. 01-718-JJF] .................................................RD77

10. Motion to Reopen [Civil Action No. 01-718-JJF].................................................RD78-80

11. February 26, 2004 Memorandum Order [Civil Action No. 01-718-JJF]................RD81-83

12. Hayes' Petition for a Writ of Certiorari to the U.S. Supreme Court.......................RD84-99

13. Motion for Appointment of Official Committee of Equity Security
    Holders for the Purpose of Appealing Conformation of the Genesis
    Reorganization Plan ...........................................................................................RD100-102

14. Brief in Support of Motion for Appointment of Official Committee of
    Equity Security Holders for the Purpose of Appealing Confirmation of
    the Genesis Reorganization Plan ......................................................................RD103-108

15.   Reorganized Debtors' Objection to Motion for Appointment of Official
      Committee of Equity Security Holders for the Purpose of Appealing
      Confirmation of the Genesis Reorganization Plan...............................................RD109-125

16.   May 13, 2004 Hearing Transcript................................................................RD126-157

17.   <u>Hayes v. Genesis Health Ventures, Inc.</u>, No. 04-04787, 2005 U.S. Dist., LEXIS
      14904 (D. Del. July 23, 2005)....................................................................RD158-160

18.   Motion for Appointment of Pre-Final Decree Equity Committee......................RD161-173

19.   Genesis Common Stock Class's Motion for Reconsideration of the Genesis
      and Multicare Senior Lender Claims; and the Genesis and Multicare Senior
      Subordinated Note Claims...........................................................................RD174-182

20.   Reorganized Debtors' (I) Objection to "Motion for Stay of Order Granting
      Reorganized Debtors' Cross Motion for Sanctions for the Pendency of
      the Appeal" and (II) Cross-Motion for the Entry of an Order (A) Imposing
      Further Monetary Sanctions Against Mr. Hayes, (B) Barring Mr. Hayes
      From Filing Additional Pleadings in This Case and (C) Relieving
      the Reorganized Debtors of Their Obligation to Respond to Any
      Additional Pleadings Filed by Mr. Hayes......................................................RD183-242

21.   Mellon Bank N.A.'s Joinder in Reorganized Debtors'(I) Objection
      to "Motion for Stay of Order Granting Reorganized Debtors' Cross
      Motion for Sanctions for the Pendency of the Appeal" and (II) Cross-Motion
      for the Entry of an Order (A) Imposing Further Monetary Sanctions Against
      Mr. Hayes, (B) Barring Mr. Hayes From Filing Additional Pleadings in This
      Case and (C) Relieving the Reorganized Debtors of Their Obligation to
      Respond to Any Additional Pleadings Filed by Mr. Hayes................................RD243-245

22.   January 19, 2006 Hearing Transcript...........................................................RD246-274

23.   March 2, 2006 Order Granting Reorganized Debtors' Cross-Motion for
      Sanctions and Denying (1) Motion for Reconsideration of the Orders
      Allowing the Genesis and Multicare Senior Lenders Claims; and the Genesis
      and Multicare Senior Subordinated Note Claims (2) Motion for
      Appointment of Pre-Final Decree Equity Committee ......................................RD275-276

24.   Motion to Stay Briefing Schedule for Pro Se Appellant to Prepare a Rule
      9011 Motion to Sanction Debtors' Counsel and a Section 327 Motion to
      Disqualify Debtors' Counsel from Arguing This Appeal; or Alternatively,
      a 30-Day Extension, If the Sanctions Award Against Appellant and the
      Motion to Reconsider Claims Are Stayed Until After the Appeal for the
      Appointment of a Pre-Termination Equity Committee is decided
      [Civil Action No. 06-103-JJF] ....................................................................RD277-329

25.    Motion for a Stay of Order Granting Reorganized Debtors' Cross Motion
       for Sanctions for the Pendency of the Appeal ...................................................RD330-335

26.    May 15, 2006 Order (I) Denying, with Prejudice, Mr. Hayes' "Motion for
       Stay of Order Granting Reorganized Debtors' Cross Motion for Sanctions
       for the Pendency of the Appeal; and (II) Denying, Without Prejudice that
       "Reorganized Debtors' Cross-Motion for the Entry of an order (A) Imposing
       Further Monetary Sanctions Against Mr. Hayes, (B) Barring Mr. Hayes from
       Filing Any Additional Pleadings in This Case and (C) Relieving the
       Reorganized Debtors of Their Obligation to Respond to Any Additional
       Pleadings Filed By Mr. Hayes" ........................................................................RD336-337

27.    Pro Se Appellant's Motion to Disqualify Reorganized Debtors'
       Counsel from Representing the Reorganized Debtors or Alternatively
       Reversing the Bankruptcy Court's Denial of an Equity Committee
       [Civil Action No. 06-103-JJF] ...........................................................................RD338-341

28.    May 23, 2006 Memorandum Opinion [Civil Action No. 06-103-JJF] ..............RD342-350

29.    May 23, 2006 Order [Civil Action No. 06-103-JJF] ........................................RD351-353

30.    Disclosure Statement for Debtors' Joint Plan of Reorganization .......................RD354-367

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

FILED

2001 JUN 28 PM 2:

CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

In re
GENESIS HEALTH VENTURES, INC., et al.,
    Debtors

Chapter 11
Case No. 00-2692 (JWH)

In re
MULTICARE AMC, INC., et al.,
    Debtors

Chapter 11
Case No. 00-2494 (JWH)

## OBJECTION TO DEBTORS PLAN TO EXTINGUISH COMMON STOCK OF CURRENT GENESIS SHAREHOLDERS

My name is James J. Hayes. I reside at 4024 Estabrook Dr., Annandale, Virginia 22003. I am a current owner of the common stock of Genesis Health Ventures, Inc.

I received my Notice by mail on June 25, 2001

I object to the Debtors plan to extinguish the common stock of current Genesis shareholders. Any plan which extinguishes the common and preferred stock rights of current Genesis and Multicare shareholders violates the United States Constitution which prohibits the taking of property without due process of law and the payment of fair compensation for the property taken, and which prohibits the impairment of contracts by legislation.

RD1

1899
6/28/01

## CERTIFICATE OF SERVICE

I certify a copy of the foregoing
objection was mailed from the Northern
Virginia Regional Post Office on June
26, 2001 to the following at the
addresses shown.

James J. Hayes

Gary D. Holtzer
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

Mark D. Collins
Richards. Layton & Finger PA
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

Paul V. Shalhoub
Willkie Farr & Gallagher
787 Fifth Avenue
New York, NY 10019-6099

Robert S. Brady
Young Conaway Stargatt & Taylor
Wilmington Trust Co. 11th Floor
PO Box 391
Wilmington, DE 19899-0391

Richard S. Toder
Morgan, Lewis & Bokius
101 Park Avenue
New York, NY 10178

Teresa Currier
Klett Rooney Lieber & Schorling
The Brandywine Bldg.
1000 West Street
Wilmington, DE 19801

Lisa Beckerman
Akin, Gumpp, Strauss, Hauer & Feld
590 Madison Ave.
New York, NY 10022

Laur Davis Jones
Pachulski, Stang, Ziehl, Young, & Jones
919 Market Street, 16th Fl.
Box 8075
Wilmington, DE 19899-8705

David S. Rosner
Kasowitz, Benson, Torres & Friedman
1633 Broadway
New York, NY 10019

Mark Minuti
Saul Ewing LLP
222 Delaware Ave., Suite 1200
P.O. Box 1266
Wilmington, DE 19899

Joseph McMahon
United States Trustee
601 Walnut Street, Suite 950
West Philadelphia, PA 19106

RD2

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

FILED

2001 AUG 10  PM 2:25

CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

In re                                              )
GENESIS HEALTH VENTURES, INC.,                     )
et al,                                             )
                                                   )
                Debtors,                           )      Chapter 11 Case No. 00-2692 (JHW)
                                                   )      (Jointly Administered)
and                                                )
                                                   )      Chapter 11 Case No. 00-2494 (JHW)
In re                                              )      (Jointly Administered)
MULTICARE AMC, INC., et al.,                       )
                                                   )
                Debtors.                           )
                                                   )

## MOTION FOR APPOINTMENT OF OFFICIAL
## COMMITTEE OF EQUITY SECURITY HOLDERS

The undersigned, James J. Hayes, is and has been a holder of common stock of Genesis Health Ventures, Inc. ("Genesis"), and pursuant to Bankruptcy Code § 1102(a)(2), respectfully requests that the Court order that a committee of equity security holders of Genesis be appointed by the United States Trustee. The grounds for this motion are as follows:

1.    As of December 31, 2000, 48,653,344 shares of Common Stock were held of record by 770 shareholders. In addition, there were 589,714 outstanding shares of Series G Preferred Stock which are convertible into 7,926,411 shares of common Stock; 34,369 shares of Series H Preferred Stock which are convertible into 27,850,590 shares of Common Stock; and 17,631 shares of Series I Preferred Stock which are convertible into 20,149,410 shares of non-voting common stock. In addition to the record owners of Genesis common and preferred stock, there are many more owners of Genesis common stock whose shares are held in the name of a nominee. The number of such beneficial owners is known to Genesis.

1/841314.1

# 33858 2218
810101

RD3

2.    This Chapter 11 proceeding is extremely complex because, among other things, it involves 153 Genesis Debtors, 197 Multicare Debtors and the merger of Genesis and Multicare, AMC, Inc. as a part of the Plan of Reorganization.

3.    The cost of appointing a committee of equity security holders does not outweigh the need to furnish adequate representation for equity security holders of Genesis. Genesis is an operating business, it's common stock is still being publicly traded on the OTC Bulletin Board, and Genesis may not be hopelessly insolvent. The market value of nursing home common stocks has increased 60% since April 1, 2001. As of January 16, 2001, the aggregate market value of voting and non-voting common stock held by non-affiliates of Genesis was $7,599,652 based upon the last reported sale price of Genesis Common Stock on January 16, 2001.

4.    By a letter dated July 10, 2001, sent to the United States Trustee by facsimile, the undersigned requested that the United States Trustee appoint a committee of equity security holders of Genesis. The undersigned supplemented the July 10, 2001 request with letters faxed to the United States Trustee on July 18, 2001 and August 3, 2001.

5.    By letter dated August 2, 2001, the United States Trustee rejected the undersigned's request for the appointment of a committee of equity security holders.

6.    This motion also constitutes an objection to the confirmation of the Plan of Reorganization.

For the reasons stated herein and in the accompanying brief, the undersigned requests the Court to order the appointment of a committee of equity security holders of Genesis.

Respectfully submitted

Dated August ___8___, 2001

James J. Hayes
Pro se

1/841314 1

RD4

## CERTIFICATE OF SERVICE

The undersigned, James J. Hayes, hereby certifies that he served a copy of the foregoing motion and accompanying brief in support of the motion by depositing copies thereof in the United States first class mail on August __8__, 2001, addressed to the following persons:

Gary D. Holtzer
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

Mark D. Collins
Richards, Layton & Finger, PA
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

Paul V. Shalhoub
Wilkie Farr & Gallagher
787 Fifth Avenue
New York, NY 10019-6099

Robert S. Brady
Young Conaway Stargatt & Taylor
Wilmington Trust Co. 11th Floor
P.O. Box 391
Wilmington, DE 19899-0391

Richard S. Toder
Morgan, Lewis & Bokius
101 Park Avenue
New York, NY 10178

Teresa Currier
Klett Rooney Lieber & Schorling
The Brandywine Bldg.
1000 West Street
Wilmington, DE 19801

Lisa Beckerman
Akin, Gumpp, Strauss, Hauer & Feld
590 Madison Avenue
New York, NY 10222

Laur Davis Jones
Pachulski, Stang, Ziehl, Young & Jones
919 Market Street, 16th Floor
Box 8075
Wilmington, DE 19899-8705

David S. Rosner
Kasowitz, Benson, Torres & Friedman
1633 Broadway
New York, NY 10019

Mark Minuti
Saul Ewing LLP
222 Delaware Avenue
Suite 1200
P.O. Box 1266
Wilmington, DE 19899

Joseph McMahon
United States ~~Treasurer~~ *Trustee*
~~601 Walnut Street~~ *J. Caleb Boggs Federal Bldg.*
~~Suite 950~~ *844 King Street, Suite 2313*
~~West Philadelphia, PA 19106~~ *Wilmington, DE 19801*

1/841314.1

**FILED**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

2001 AUG 10 PM 2: 26

CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

In re                                    )
GENESIS HEALTH VENTURES, INC.,           )
et al,                                   )
                                         )
            Debtors,                     )    Chapter 11 Case No. 00-2692 (JHW)
                                         )    (Jointly Administered)
and                                      )
                                         )    Chapter 11 Case No. 00-2494 (JHW)
In re                                    )    (Jointly Administered)
MULTICARE AMC, INC., et al.,             )
                                         )
            Debtors.                     )
                                         )

### BRIEF IN SUPPORT OF
### MOTION FOR APPOINTMENT OF OFFICIAL
### COMMITTEE FOR EQUITY SECURITY HOLDERS

The undersigned, James J. Hayes, is and has been a holder of common stock of

Genesis Health Ventures, Inc. ("Genesis") for many years.  On June 25, 2001 the undersigned

received the notice of the hearing to consider approval of the Disclosure Statement with respect to

the Joint Plan of Reorganization of Genesis and Multicare AMC, Inc. ("Multicare").  The

undersigned filed a written objection to the Disclosure Statement, and a proxy holder representing

the undersigned attended the hearing on July 6, 2001 and objected to the failure of the United States

Trustee to appoint an official committee of equity security holders.  By letter dated July 10, 2001,

delivered to the United States Trustee by facsimile on July 10, 2001, the undersigned requested the

United States Trustee to appoint a committee of equity security holders.  By facsimile letters dated

July 18 and August 3, 2001, the undersigned supplemented his request for the appointment of an

equity security holders committee.  By letter dated August 2, 2001, the United States Trustee

declined to appoint an equity security holders committee.

1/841333 1

8/10/01
#33858 2219

The Bankruptcy Code provides in § 1102(a)(2) that on the request of a party in interest, the Court may order the appointment of a committee of equity security holders if necessary to assure adequate representation of equity security holders. In the case of In re Johns-Manville Corp., 68 B.R. 155 (S.D.N.Y. 1986), the Court indicated that the following factors should be considered in determining whether or not to appoint an equity security holders committee: (i) the number of shareholders of the debtor (ii) the complexity of the case, and (iii) whether the cost of the equity committee significantly outweighs the concern for adequate representation of shareholders. This analysis was followed in the case of In re Wang Laboratories, Inc., Debtor, 149 B.R. 1 (Bankruptcy, D.Mass. 1992), in which the Bankruptcy Court did order the appointment of an equity security holders committee based upon such factors.

In this case, Genesis has a significant number of common and preferred shareholders. Form 10-K filed by Genesis with the Securities and Exchange Commission for the fiscal year ended September 30, 2000, reflects that Genesis had 770 holders of record of common stock. In addition, Genesis had an unknown number of owners of Genesis common stock whose stock was held in the name of a nominee. In a publicly held company, the number of beneficial owners of stock in the company substantially exceeds the number of record owners of stock in the company. There are a significant number of shareholders of Genesis who have not been and should be represented in establishing a plan of reorganization.

There can be no question that this Chapter 11 proceeding is extremely complex, involving 153 Genesis Debtors, 197 Multicare Debtors and the merger of Genesis and Multicare as a part of the Plan of Reorganization.

The United States Trustee did not state why he declined to appoint an equity committee. Counsel for Genesis and counsel for the unsecured creditors urged the United States Trustee not to appoint an equity committee on the grounds that Genesis was hopelessly insolvent.

1/841333.1

RD7

Valuations of the debtors' estates which form the basis for the Plan of Reorganization do not take into account the improvement in the nursing home industry since April 1, 2001. The Index of Nursing Home Stocks maintained by the publication, *Investors Business Daily*, has increased by approximately 60% since early April 2001. This increase in the value of nursing home common stocks suggests that evaluations of the debtors' estates previously submitted now substantially understate the equity value of Genesis and Multicare. If the value of Genesis and Multicare has increased in parallel with this index, the value of Genesis would increase by 600 hundred million dollars.

UBS Warburg advised Genesis that as of April 6, 2001, the enterprise value of Genesis would be between $1 billion and $1.25 billion. As of March 31, 2001, Genesis had liabilities subject to compromise of $1.6 billion. The valuation of Genesis by UBS Warburg included an analysis of comparable companies based upon conditions as of April 6, 2001. A valuation based upon today's conditions could be hundreds of millions of dollars more than the valuation based upon April 6, 2001 conditions. At a minimum, UBS Warburg should be asked to update its valuation of Genesis to a current date in view of the performance of the Index of Nursing Home Stocks.

Pursuant to the Balanced Budget Act of 1977, reimbursement under the Medicare program changed from a retrospective system to a prospective-payment system ("PPS") for Medicare Part A services. The changes also limited and capped reimbursement for Medicare Part B therapy services. Since Medicare patients account for a substantial portion of Genesis and Multicare revenue, these changes materially and adversely affected the financial condition of both Genesis and Multicare.

On December 15, 2000, Congress passed the Benefit Improvement and Protection Act of 2000 which, among other provisions, increased the nursing component of Federal PPS rates

by approximately 16.7% for the period <u>April 1, 2001 through September 30, 2002</u>. The legislation will also change the 20% add-on to 3 of the 14 rehabilitation RUG categories to a 6.7% add-on to all 14 rehabilitation RUG categories <u>beginning April 1, 2001</u>. The Part B consolidated billing provision of BBRA will be repealed except for Medicare Part B therapy services and the moratorium on the $1,500 therapy caps will be extended <u>through calendar year 2002</u>. These changes will affect materially the performance of the comparable companies which UBS Warburg used in its valuation of Genesis.

Counsel for Genesis, Michael F. Walsh, notes that the appointment of a shareholders committee would delay confirmation of the debtors' Plan of Reorganization now scheduled for August 28 and consequently would prejudice the rights of thousands of creditors. That plan allocates 74.35% of the new Genesis stock to its senior lenders which combined with additional allocations of other securities and cash would provide for a 79% recovery of their loans. The increase in value of the new Genesis stock, however, would boost that recovery to 110%. (A similar calculation for the Multicare senior lenders increases their recovery from 77% to 100%.) Thus, the Plan, which Mr. Walsh is urging the Court to confirm, is seriously flawed and unfair to the unsecured creditors. Far from prejudicing the rights of thousands of creditors, delaying the August 28 hearing would provide the opportunity needed to correct the inequities of the current plan. Thousands of Genesis and Multicare unsecured creditors would benefit by delaying confirmation of a flawed reorganization plan.

Thousands of Genesis shareholders would receive no recovery under the proposed reorganization plan. Yet Genesis stock continues to trade, recently at higher prices with increased volume. On August 3, 2001, Genesis closed at $.081, up $.021 or 35% with 883,500 shares traded. In May, before the Plan was announced, the stock price increased steadily and traded above $.35 per share but it fell precipitously to $.05 per share after the Plan was filed on June 5. In July, the price

drifted lower, falling below $.02 per share, before its strong rebound in early August. The remarkable persistence in Genesis stock price throughout the late stages of its bankruptcy indicates that many in the investment community believe that Genesis stock has value. Now, even after having been notified about a Plan that would wipe out their equity - without an opportunity even to vote against this Plan - shareholders continue to believe that Genesis stock has value. The Trustee should not ignore these independent confirmations of Genesis' equity value.

Counsel for Genesis objects to the appointment of an equity security holders committee on the grounds that the cost of such a committee outweighs the prospect that the equity security holders committee can establish that the debtors' estates are not hopelessly insolvent. If the equity security holders committee is not able to establish that there is sufficient value in the debtors' estates to provide a benefit to the equity holders, none of the committee's expenses should be charged to the debtors' estates. In the case of In re Wang Laboratories, Inc., supra, the Court ordered the appointment of an equity committee because the debtor was still operating and its stock was still being publicly traded. The Court in Wang cautioned that if the plan of reorganization was confirmed with nothing for shareholders, it was very likely that professionals employed by the equity security holders committee would not be paid for their services. In this case, if the equity security holders committee for Genesis is unable to establish that the Plan of Reorganization should provide something for equity security holders, the professionals engaged by the equity security holders committee should not be paid for their services to the committee.

Respectfully submitted

Dated August ___8___, 2001

_____
James J. Hayes
Pro se

1/841333.1

FOR PUBLICATION

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In the matter of | : | Case No. 00-2692/JHW |
| | | (Jointly Administered) |
| Genesis Health Ventures, Inc., et al. | : | |
| Debtors | : | |

| | | |
|---|---|---|
| | : | |
| In the matter of | | Case No. 00-2494/JHW |
| | : | (Jointly Administered) |
| Multicare AMC, Inc., et al. | | |
| | : | |
| Debtors | | **OPINION ON** |
| | : | **CONFIRMATION** |

**HONORABLE JUDITH H. WIZMUR:**
(U.S. Bankruptcy Court, District of New Jersey, Sitting by Designation)

Presented here is the proposed confirmation of the debtors' joint plan of reorganization.

For the reasons expressed herein, I conclude that the plan is confirmable, subject to the

modifications noted herein.

## FACTS AND PROCEDURAL HISTORY

The Genesis debtors[1] and the Multicare debtors[2] are leading providers of healthcare and

---

[1]      The Genesis debtors include Genesis Health Ventures, Inc., a Pennsylvania
Corporation, the parent debtor, and 153 legal entities listed in Schedule A of the Plan of

-1-

support services to the elderly. They operate inpatient facilities in 5 regional areas of the United States, as well as a national pharmacy and medical supply business. In 1997, Genesis Health Ventures, Inc. ("Genesis"), along with other entities, acquired the Multicare Companies, Inc. Genesis now owns 43.6% of the common stock of the Multicare parent company. Genesis manages Multicare through a comprehensive management agreement which includes all operational, financial and administrative responsibilities. Multicare has no management or administrative infrastructure of its own.

The Genesis and Multicare debtors filed their separate Chapter 11 bankruptcy cases on June 22, 2000. The Genesis debtors' pre-petition indebtedness to the Senior Lenders is approximately $1.2 billion, and is secured by liens on substantially all of the Genesis debtors' assets. The Genesis debtors are also indebted for approximately $80 million in general unsecured claims and approximately $387 million in subordinated debt. The Multicare debtors' pre-petition indebtedness to the Senior Lenders in approximately $443 million, also secured by liens on substantially all of Multicare debtors' assets. The Multicare debtors are indebted for approximately $26.4 million in general unsecured claims and approximately $258 million in subordinated debt.

The debtors' Joint Plan of Reorganization was filed on July 6, 2001. The plan divides

---

Reorganization.

     [2]     The Multicare debtors include Genesis ElderCare Corporation, a Delaware Corporation, the parent debtor, and 197 legal entities listed in Schedule B of the Plan of Reorganization.

RD12

Genesis claims into 11 classes, and Multicare claims into 8 classes. The Senior Lender claims in each case (Classes G2 and M2) will receive cash, some of which has already been paid as adequate protection payments, New Senior Notes, New Convertible Preferred Stock and most of the New Common Stock in the reorganized Genesis Company. The general unsecured claimants in both cases (Classes G4 and M4) will receive New Common Stock, estimated in the debtors' Disclosure Statement to approximate a dividend of 7.34%, exclusive of the value of the New Warrants, which will also be distributed to these classes. Genesis and Multicare Senior Subordinated Note Claims (Classes G5 and M5) will receive the same percentage of distribution as general unsecured claimants. In both cases, punitive damages claims are separately classified (Classes G7 and M7), with no distribution except to the extent covered by insurance. All preferred and common stock interests in both companies are extinguished.

For purposes of voting and distribution under the plan, the debtors' reorganization plan contemplates the deemed consolidation of all of the Genesis Debtors as a single legal entity, and all of the Multicare Debtors as a single legal entity. Following the deemed consolidations, the common stock of Multicare will be canceled and New Common Stock of the reorganized Multicare will be deemed to be allocated to Multicare creditors. Genesis and Multicare will then merge. The creditor bodies of Multicare and Genesis will receive a proportionate share of the New Common Stock of the Reorganized Genesis.

All impaired classes in both cases voted to accept the plan, with the exception of Class 5,

-3-

Genesis Senior Subordinated Note Claims, which rejected the plan.[3]

Hearings on the confirmation of the plan were held on August 28 and August 29, 2001. Many of the filed objections were resolved. The primary objectors remaining are Class G5 claimants, including GMS Group LLC[4] and Charles Grimes[5], several G4, G7, M4 and M7 claimants, including certain tort claimants and the AGE Institute entities, the United States Trustee, and several shareholders, including James Hayes, Steven Sapperstein and Todd Martin.

## DISCUSSION

To confirm a proposed Chapter 11 plan of reorganization, the proponent bears the burden of establishing the plan's compliance with each of the thirteen elements of 11 U.S.C. § 1129(a). In re Gulfstar Indus., Inc., 236 B.R. 75, 77 (M.D.Fla. 1999). Creditors objecting to the proposed plan bear the burden of producing evidence to support their objection. In re Shortridge, 65 F.3d 169, 1995 WL 518870 (6th Cir. 1995) (Unpublished opin.); In re Goddard, 212 B.R. 233, 239 N.7 (D.N.J. 1997). The Code imposes an independent duty upon the court to determine whether a plan satisfies each element of § 1129, regardless of the absence of valid objections to

---

[3]     In Class G5, 200 ballots accepted the plan (29.54%), in the amount of $30,000,000 (14.11%). 477 ballots rejected the plan (70.46%), in the amount of $182,588,000 (85.89%).

[4]     The GMS Group LLC acts on behalf of holders of approximately $170 - $180 million in Genesis senior subordinated debt in Class G5.

[5]     Charles Grimes is the holder of approximately $20 million in Genesis senior subordinated debt in Class G5.

-4-

confirmation. In re Bolton, 188 B.R. 913, 915 (Bankr. D.Vt. 1995); In re Shadow Bay

Apartments, Ltd., 157 B.R. 363, 365 (Bankr. S.D.Ohio 1993).

A consensual plan requires the proponent to demonstrate that the plan satisfies all thirteen

elements of section 1129(a), in which case the plan must be confirmed. Beal Bank, S.S.B. v.

Waters Edge L.P., 248 B.R. 668, (D.Mass. 2000). A nonconsensual plan requires the proponent

to prove all but one of the thirteen elements, that all classes consent or are unimpaired, 11 U.S.C.

§ 1129(a)(8), plus the additional requirements of section 1129(b), that the plan does not unfairly

discriminate against dissenting classes and that treatment of such dissenting classes is fair and

equitable. The plan presented here is nonconsensual as to Class G5.

No challenge is posed by the objectors to the compliance by this plan with subsections

1129(a)(2) (proponents' compliance with Bankruptcy Code provisions, including adequate

disclosure);[6] (a)(4) (court approval of payments); (a)(5) (disclosure of management); (a)(6) (rate

of approval); (a)(9) (treatment of priority claims); (a)(10) (acceptance by impaired class); (a)(11)

(feasibility of plan); and (a)(13) (retiree benefits). I conclude that the debtors' plan meets these

requirements. I will review the sections in dispute, including sections 1129(a)(1), (a)(3), (a)(7)

and 1129(b). The dispute raised by the United States Trustee regarding the debtors' compliance

---

[6]        During the confirmation hearings, one objector posed the suggestion that the
debtors, by the disclosure statement references to the synergies to be achieved by the merger of
Genesis and Multicare, failed to reflect that the operational synergies of the companies have
already been effected. However, the debtors' approved disclosure statement fully discloses the
nature of the present operations and management of both debtors. The anticipated synergies
reflect the prospect of enhanced value of the New Common Stock of Genesis by the formal
merger of the two companies.

with subsection 1129(a)(12) will be subsequently scheduled for resolution.    The debtors have

escrowed funds to accommodate the United States Trustee's concerns.


      1.     11 U.S.C. § 1129(a)(1).


Section 1129(a)(1) provides that:

The court shall confirm a plan only if all of the following requirements are met:

(1)  The plan complies with the applicable provisions of this title.

11 U.S.C. § 1129(a)(1).


     The phrase "applicable provisions" is not defined.  The legislative history reflects that

"the applicable provisions of chapter 11 [includes sections] such as section 1122 and 1123,

governing classification and contents of plan."  H.R. Rep. No. 595, 95[th] Cong., 1[st] Sess. 412

(1977); S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978).  See In re Aspen Limousine Serv., Inc.,

193 B.R. 325, 340 (D. Colo. 1996); In re Texaco Inc., 84 B.R. 893, 905 (Bankr. S.D.N.Y.),

appeal dismissed, 92 B.R. 38 (S.D.N.Y. 1988).  The objectors contend that the classification and

treatment of punitive damages claimants differently from general unsecured claimants is

violative of various Chapter 11 provisions including section 502 and section 510(c).  As well, the

objectors contend that the provisions of the plan providing for releases and exculpation are

violative of 11 U.S.C. § 524(e) and cannot be sustained.


-6-

A.    Punitive Damages Class.

As noted above, Classes G7 and M7 of the debtors' plan provide that Genesis and Multicare punitive damages claimants shall receive no distribution under the plan. The term "punitive damages claim" is defined in the plan as:

> [A]ny Claim against any of the Genesis [and Multicare] Debtors, whether secured or unsecured, for any fine, penalty, forfeiture, attorneys' fees (to the extent such attorneys' fees are punitive in nature), or for multiple, exemplary, or punitive damages, to the extent that such fine, penalty, forfeiture, attorneys' fees, or damages is not compensation for actual pecuniary loss suffered by the holder of such Claim and not statutorily prescribed.

Paragraphs 1.33 and 1.46 of section 1A of the debtors' Joint Plan of Reorganization.

George V. Hager, Jr., Executive Vice President and Chief Financial Officer of the debtors, testified that he knows of no punitive damages awards against the debtors. To his knowledge, no punitive damage awards have ever been recovered against the debtors during his nine-year tenure with the debtors. He acknowledged that punitive damage awards will not interfere with the debtors' reorganization efforts, although such awards might dilute the recovery otherwise received by general unsecured claimants in Class G4.

Several parties, including 44 personal injury and wrongful death claimants represented by the law firm of Wilkes & McHugh, P.A., Michael Goff and various other tort claimants represented by the law firm of McCarter and English, LLP, and the AGE Entities, each of whom

-7-

holds claims in both Classes G4 and G7, have objected to the classification and treatment of the Class 7 Punitive Damages Claimants. They assert that the blanket disallowance of punitive damages claims is improper under 11 U.S.C. § 502, which requires disallowance of claims on a case-by-case basis. They contend that the classification of punitive damages separately from unsecured claims is improper because it has no reasonable business justification, and because the classification amounts to an improper "de facto" estimation of personal injury and wrongful death claims. The estimation of such claims by bankruptcy courts is proscribed under 28 U.S.C. § 157(b)(2). They also argue that the separate classification of punitive damage claims constitutes an unlawful equitable subordination of the claims which is not permitted or justified under 11 U.S.C. § 510(c) or otherwise.

The debtors respond that the classification and treatment of punitive damage claims in Classes G7 and M7 do not constitute equitable subordination, and are not an improper classification, because the distribution to general unsecured creditors (Classes G4 and M4) is attributable to the agreement by the Genesis and Multicare Senior Lenders to give up a portion of value they would otherwise receive to unsecured creditors. The Senior Lenders have determined to eliminate punitive damages claimants from the opportunity to share in the recovery. The debtors claim further that even if there is value to be distributed to unsecured creditors beyond the satisfaction of the Senior Lenders' claims, the punitive damage claims are fundamentally dissimilar from other general unsecured claims, in that they are intended to punish the debtors. In the bankruptcy context, and in particular, in the context of these cases, rather than punishing the debtors, such awards would punish other unsecured creditors by diluting their recovery.

-8-

In resolving this issue, it must first be observed that the plan provides for the recovery of punitive damages to the extent covered by insurance. As well, the plan limits punitive damage claims to those claims that are actually penalties, rather than claims that are otherwise compensatory but may be designated as punitive damages under state statutory schemes.

It has been recognized that bankruptcy courts have the equitable power to limit or disallow punitive damages claims where the claims would frustrate the debtor's reorganization. See, e.g., In re FF Holdings Corp. & Farm Fresh Inc., No. 98-37/38-JFF, 1998 U.S. Dist. LEXIS 10741 (D. Del. Feb. 17, 1998). However, the objectors correctly note that such disallowance has been rejected by the courts where there is no contention that punitive damage claims would interfere with reorganization efforts. Id. In FF Holdings, the exclusion of punitive damages from the debtors' reorganization plan was rejected in the absence of evidence that the claims would frustrate debtors' reorganization. See also In re Hillsborough Holdings Corp., 247 B.R. 510 (Bankr. M.D.Fla. 2000) (post-confirmation quest to discharge punitive damages on the basis of potential negative impact on future operations was rejected); In re Allegheny International, Inc., 106 B.R. 75 (Bankr. W.D.Pa. 1989) (debtor's quest to disallow all punitive claims rejected without prejudice as premature, before claims were liquidated and before a plan of reorganization was submitted). In cases such as In re A.H. Robins Co., 89 B.R. 555, 558 (E.D.Va. 1988), where the debtor's punitive damages exposure was "staggering" and "unpredictable", such claims were disallowed because the impossibility of estimating the liability would have destroyed the debtor's ability to reorganize. See also In re Johns-Manville Corp., 68 B.R. 618 (Bankr. S.D.N.Y. 1986), aff'd. in part, rev'd in part, 78 B.R. 407 (S.D.N.Y. 1987), aff'd, Kane v. Johns-Manville Corp.,

RD19

843 F.2d 636 (2d Cir. 1988). In contrast, here, there is no factual contention that punitive damage claims would interfere with reorganization efforts. Therefore, there would be no basis to separately classify and disallow punitive damages.

The objectors are also correct that the United States Supreme Court holding in United States v. Noland, 517 U.S. 535, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996) suggests that in the absence of specific statutory direction, a bankruptcy court cannot alter the priority scheme established in the Bankruptcy Code by approving a categorical disallowance of punitive damage claims, even if the resulting dilution of the unsecured creditor recovery would only serve to punish unsecured creditors, rather than to punish the debtors and to deter further misconduct by the debtors. In Noland, the post-petition tax penalty claims asserted by the Internal Revenue Service were specifically designated in 11 U.S.C. § 503(b) as entitled to administrative priority. The Supreme Court determined that the statutory priority afforded to the IRS could not be equitably subordinated on a categorical basis by a bankruptcy court in derogation of the established legislative priority scheme.

Nevertheless, the debtors are ultimately correct that the separate classification and treatment of the punitive damages claims asserted herein is not violative of the Bankruptcy Code in this instance. The debtors are not seeking to subordinate the claims in classes G7 and M7, notwithstanding the erroneous reference to equitable subordination in the original Disclosure Statement.[7] Rather, as the debtors assert in their omnibus response to the objections, the Genesis

---

[7]      Disclosure Statement at 21-27.

-10-

RD20

Senior Lenders and the Multicare Senior Lenders have agreed to give up a portion of the value

that they would receive, if absolute priorities were enforced, to the holders of unsecured and

subordinated claims in classes G4 and G5 and classes M4 and M5. This conclusion is premised

upon an assumption, which I agree with and which I will discuss more expansively below, that

even if the Genesis Senior Lenders and the Multicare Senior Lenders receive all of the debt and

equity distributed under the debtors' plan, the claims of the Senior Lenders would not be satisfied

in full. The Senior Lenders have agreed to share the distribution that they would otherwise be

entitled to only with classes G4, G5, M4, and M5, and have chosen to omit punitive damages

claimants from the agreement. Notwithstanding the resulting difference in the treatment of

punitive damages claimants from the treatment of unsecured claimants otherwise, there is no

impediment to the agreement.


In fact, such arrangements have been approved in other cases. See, e.g., In re McCorp

Financial, Inc., 160 B.R. 941 (S.D.Tex. 1993) (Where a junior creditor received a distribution by

agreement from a distribution otherwise due to a senior creditor, the senior creditor may share its

proceeds with the junior creditor, even if other junior creditors are left out, as long as the juniors

who do not receive a distribution from the senior receive at least as much as they would without

the sharing). See also In re SPM Mfg. Corp., 984 F.2d 1305, 1313 (1st Cir. 1993) ("[C]reditors

are generally free to do whatever they wish with the bankruptcy dividends they receive, including

to share them with other creditors," even if such sharing conflicts with the Code's distribution

and priority scheme.).

-11-

RD21

There is no suggestion that the separate classification of punitive damages claims is improper as a device "to gerrymander an affirmative vote" on the debtors' reorganization plan. In re Briscoe Enters., Ltd., II, 994 F.2d 1160, 1167 (5th Cir.), cert. denied, 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed. 2d 451 (1993).

I conclude that the classification and treatment of Punitive Damage Claims under the debtors' Joint Plan of Reorganization is proper, and overrule the objections thereto.

### B.    Release and Exculpation Clauses.

Several creditors object[8] to the release and exculpation provisions contained in the debtors' reorganization plan, as violative of 11 U.S.C. § 524(e).[9] Objectors to the release and exculpation clauses contend that non-consenting creditors are being involuntarily forced to accept the release, and that the releases are offered without consideration from the parties released. They also assert that even if releases are permitted, the necessary factors of fairness and necessity have not been established.

Although some courts have followed a strict interpretation of § 524(c) and do not permit

---

[8]    The objection of the United States Trustee to the release of the Disbursing Agent has been resolved. The Disbursing Agent will be excluded from the Exculpation clause.

[9]    Section 524(e) of the Bankruptcy Code states that "discharge of a debt of the debtor does not affect the liability of any other entity on . . . such debt." 11 U.S.C. § 524(e).

-12-

RD22

non-debtor releases and permanent injunctions,[10] those courts that have allowed injunctions or releases rely on the plain language of § 524(e), "noting that the language: does not purport to limit or restrain the power of a bankruptcy court to otherwise grant a release of third parties." In re Master Mortgage Inv. Fund, Inc., 168 B.R. 930, 934 (Bankr. W.D. Mo. 1994) (citing In re Speciality Equip. Corp., 3 F.3d 1043, 1047 (7th Cir. 1993)). Rather, the section "only provides that a discharge of the debtor does not affect the liability of non-debtors on claims by third parties against them for the debt discharged in bankruptcy." In re PWS Holding Co., 228 F.3d 224, 245 (3d Cir. 2000).

The Bankruptcy Code does not explicitly authorize the release and permanent injunction of claims against non-debtors, except in the case of asbestos claims under § 524(a). In re Continental Airlines, 203 F.3d 203, 211 (3d Cir. 2000). Section 105(a) of the Code[11] authorizes

---

[10]    See, e.g., In re Lowenschuss, 67 F.3d 1394, 1401 (9th Cir. 1995), cert. denied, 517 U.S. 1243, 116 S. Ct. 2497, 135 L.Ed.2d 189 (1996)("This court has repeatedly held without exception, that § 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors."); In re Zale Corp., 62 F.3d 746, 760 (5th Cir .1995)("[A] temporary stay prohibiting a creditor's suit against a nondebtor . . . may not be extended post-confirmation in the form of a permanent injunction that effectively relieves the nondebtor from its own liability to the creditor."); In re Western Real Estate Fund, Inc., 922 F.2d 592, 600 (10th Cir. 1990), modified by, Abel v. West, 932 F.2d 898 (10th Cir. 1991).

[11]    Section 105(a) provides:

The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

-13-

RD23

all orders that are necessary and proper to effectuate a reorganization, although it is limited in

scope and does not "create substantive rights that would otherwise be unavailable under the

Bankruptcy Code." Id. (citations omitted).

In Continental Airlines, the Third Circuit, in addressing the issue of non-debtor releases,

declined to establish a "blanket rule" to permit or proscribe non-debtor releases. Instead, the

court held open the prospect that "there are circumstances under which [it] might validate a non-

consensual release that is both necessary and given in exchange for fair consideration." Id. at

214, n.11. The reservation was made in the context of a comment about the releases and

permanent injunctions issued in mass litigation cases such as Robins, Manville and Drexel.[12]

While it is certainly unclear whether, in a more typical financial reorganization such as is

presented here, non-consensual releases may ever be validated, see, e.g., In re Zenith Electronics

Corp., 241 B.R. 92, 111 (Bankr. D.Del. 1999) (holding that releases of non-derivative third-party

claims against a non-debtor "cannot be accomplished without the affirmative agreement of the

creditor affected"), the Court of Appeals suggested that if a sufficient factual basis for both

necessity and fairness are provided, such a limited non-consensual release may be approved. Id.

at 214. ("[T]he most flexible tests for the validity of non-debtor releases" look to certain

"hallmarks of permissible non-consensual releases--fairness, necessity to the reorganization, and

---

[12]      See In re A.H. Robins Co., 880 F.2d 694 (4th Cir.), cert. denied, 493 U.S. 959, 110
S.Ct. 376, 107 L.Ed.2d 362 (1989); Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir. 1988);
In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 293 (2d Cir. 1992), cert. dismissed,
506 U.S. 1088, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993).

-14-

specific factual findings to support these conclusions").[13]

Section 5.10 of the proposed plan, entitled "Release of Representatives", provides as follows:

> [T]he respective officers, directors, employees, financial advisors, professionals, accountants, and attorneys of the Genesis Debtors, the Multicare Debtors, the respective statutory committees of unsecured creditors appointed pursuant to section 1102 of the Bankruptcy Code in the Genesis Reorganization Cases and the Multicare Reorganization Cases, and Mellon Bank, N.A., as administrative agent under the Genesis Senior Lender Agreements, the Multicare Senior Lender Agreements, and the Revolving Credit and Guaranty Agreements described in Section 2.4 hereof shall be released from any and all Claims against them by the Debtors in their capacity as representatives of the Genesis Debtors, the Multicare Debtors, the statutory committees, or Mellon Bank, N.A., as applicable, except as otherwise expressly provided in the Plan of Reorganization, the Confirmation Order, or the order of the Bankruptcy Court, dated February 23, 2001, approving a senior executive retention plan for certain employees of Genesis.

In Section 5.10, the releases pertain only to claims that would be asserted by the debtors.

---

[13]    The Continental court noted that the constitutional and statutory bases of bankruptcy subject matter jurisdiction on the issue of release and injunctions must be examined, citing Northern Pipeline Constr. Co. v. Marathan Pipe Line Co., 458 U.S. 50, 102 S. Ct. 2858, 73 L.Ed. 2d 598 (1982) and 28 U.S.C. § 1334. The court recognized that bankruptcy subject matter jurisdiction can extend to matters between non-debtor third parties affecting the debtor on the bankruptcy case, citing to Celotex Corp. v. Edward, 514 U.S. 300, 308 n.5, 115 S. Ct. 1493, 131 L.Ed. 2d 403 (1995). Id. at 214, n.12. Here, there is a jurisdictional nexus between the releases proposed in favor of non-debtor third parties and the debtors. As to the debtors' directors and officers, the plan envisions the continuation of current management. As to the Senior Lenders and their agent Mellon Bank, indemnification clauses against the debtor are implicated. The pursuit by third parties of claims against the non-debtor releasees may affect the reorganization of the debtors going forward. See also Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984)("the test for determining whether a civil proceeding is related to a bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy").

-15-

The releases are offered to the officers, directors, employees and professionals of the debtors, the

statutory committees of unsecured creditors, and Mellon Bank, N.A., as administrative agent of

the Senior Lenders, "as representatives of the Genesis Debtors, the Multicare Debtors, the

statutory committees, or Mellon Bank, N.A." In the debtors' Disclosure Statement, the debtors

explain that:

> This provision is intended to release all claims of the Debtors, whether arising
> prepetition or postpetition, and based on any theory (whether negligence, gross
> negligence or willful misconduct) against these individuals. The release is limited
> to claims that could be asserted by the Debtors and only applies to claims against
> such parties in their representative capacity. . . .
>
>     The purpose of the release of the Genesis and Multicare personnel is to
> prevent a collateral attack against those individuals based on derivative actions.
> . . . The Debtors are not aware of any pending or threatened actions, whether civil
> or criminal, against the management of the Debtors. However, in order to
> continue to retain the Debtors' management, it is important that they be relieved
> of the threat of any derivative actions against them personally by parties in these
> reorganization cases that may be dissatisfied with the treatment provided in the
> Plan.
>
>     The purpose of the release of the representatives of the other major
> constituencies in these cases, such as the creditors' committees, is to protect the
> chapter 11 process for individuals who have contributed to the restructuring
> process. The Debtors are not aware of any pending or threatened actions against
> these representatives.

Debtors' Disclosure Statement at 81.

Section 10.6 of the proposed plan, entitled "Exculpation", provides that:

Neither the Debtors, any Disbursing Agent, the respective statutory committees of
unsecured creditors appointed pursuant to section 1102 of the Bankruptcy Code in
the Genesis Reorganization Cases and the Multicare Reorganization Cases,
Mellon Bank, N.A., as administrative agent under, and any lender under, the

-16-

RD26

Genesis Senior Lender Agreements, the Multicare Senior Lender Agreements, and the Revolving Credit and Guaranty Agreements described in Section 2.4 hereof, nor any of their respective members, officers, directors, employees, agents, or professionals shall have or incur any liability to any holder of any claim or Equity Interest for any act or omission in connection with, or arising out of, the Reorganization Cases, the confirmation of the Plan of Reorganization, the consummation of the Plan of Reorganization, or the administration of the Plan of Reorganization or property to be distributed under the Plan of Reorganization, except for willful misconduct or gross negligence.

The exculpation clause is limited to claims held by creditors or equity holders which are connected with or arising out of the reorganization cases. The releases are offered to the debtors, the statutory committees, Mellon Bank as agent, and any of the Senior Lenders, as well as their respective members, officers, directors and employees for any act or omission, except for willful misconduct or gross negligence. Presumably, any pre-petition claims held by consenting or non-consenting creditors or equity interest holders are not implicated by this clause.

To a significant extent, the release provisions in Section 5.10 and 10.6 of the plan mirror the release provisions approved by the Third Circuit in PWS Holding. The pertinent release in PWS Holding provided as follows:

[n]one of the Debtors, the Reorganized Debtors, New Bruno's, the Creditor Representative, the Committee or any of their respective members, officers, directors, employees, advisors, professionals or agents shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan or the Administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence, and, in all respects, the Debtors, the Reorganized Debtors, New Bruno's, the Creditor Representative, the Committee and each of their respective members, officers, directors, employees, advisors, professionals and agents shall be entitled to rely upon the advice of counsel with respect to their

-17-

RD27

duties and responsibilities under the plan.

228 F.3d at 246.

The PWS Holding Court noted that under the release provisions governing post-petition conduct, committee members and professionals remained liable to third parties for willful misconduct or gross negligence. Under 11 U.S.C. § 1103(c), the liability of committee members and their professionals are limited to willful misconduct or ultra vires acts. Therefore, the release in the plan set forth the appropriate standard for liability that would apply to actions against committee members and the entities that provided services to the committee in the event that they were sued for participation in the reorganization, and would not affect the liability of third parties.

No separate analysis was articulated in PWS Holding regarding the standard of liability for the post-petition conduct of officers, directors, employees, advisors, professionals or agents of the debtors, the reorganized debtors or the "Creditor Representative".[14] Nevertheless, the release of all such persons from liability for any post-petition act or omission was approved, except for willful misconduct or gross negligence.

Similarly, here, to the extent that paragraphs 5.10 and 10.6 set forth the applicable standards of liability for persons associated with and providing services toward the

---

[14]     There is no explanation regarding the identity of the "Creditor Representative" mentioned in the PWS Holding release clause. I assume that the Representative resembles Mellon Bank, N.A., as agent for the Senior Lenders herein.

RD28

reorganization of the debtors, the provisions may be approved.

However, in three respects, the Release Clause and the Exculpation Clause in this case appear to extend the provisions of the PWS Holdings release clause. First, as to Paragraph 5.10, the release of the debtors' pre-petition claims against the officers, directors, employees and professionals of the debtors is beyond the post-petition focus of the PWS Holding Corporation release clause. Applying the five-factor test cited in In re Zenith Electronics, Inc., 241 B.R. 92, 110 (Bankr. D.Del. 1999), to determine whether the debtors may release any prepetition claims here,[15] several key components of the factors to be considered are missing, causing the equities to favor rejection of the releases. See Master Mortgage Investment Fund, Inc., 168 B.R. at 935 (No rigid "factor test" should be applied in every circumstance, but rather a fact specific review, weighing the equities in each case.). As to the debtors' management personnel here, there is no

---

[15]    The Zenith Electronics five-factor test, derived from the case In re Master Mortgage Investment Fund, Inc., 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994), include the following criteria:

   (1) an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate;

   (2) substantial contribution by the non-debtor of assets to the reorganization;

   (3) the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success;

   (4) an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" votes to accept the plan, and

   (5) provision in the plan for payment of all or substantially all of the class or classes affected by the injunction.

-19-

RD29

showing that the individual releasees have made a substantial contribution of assets to the reorganization. As in <u>Zenith</u>, the officers and directors of the debtors no doubt made meaningful contribution to the reorganization by designing and implementing the operational restructuring of the companies, and negotiating the financial restructuring with parties in interest. However, the officers, directors and employees have been otherwise compensated for their contributions, and the management functions they performed do not constitute contributions of "assets" to the reorganization. As well, there can be no conclusion drawn that absent such an injunction in favor of debtors' officers, directors and employees, the reorganization has little likelihood of success. It is understood that the debtors wish to retain current management, and seek to avoid potential distractions to management that such litigation might create. However, the rationale offered does not support the release of debtor's management for pre-petition conduct.[16]

Second, Paragraph 5.10 of the debtors' plan does not limit the post-petition liability of all releasees to the applicable standard of liability for the individual affected. For instance, members of the committee and professionals who provided services to the debtors do not remain liable for willful misconduct or gross negligence. As noted above, under <u>PWS Holding Corp.</u>, the

---

[16]    In contrast to the difficulties with the releases of debtors' pre-petition claims against its management, the release of debtors' claims offered to Mellon Bank, N.A., as administrative agent for the Senior Lenders, is an acceptable provision in the context of this case. It is the product of a negotiated restructuring agreement between the debtors and the Senior Lenders. Indemnification provisions in favor of Mellon Bank connect the debtors to Mellon, such that a recovery against Mellon may deplete estate assets. The Senior Lenders have made a noteworthy contribution of assets to the reorganization by the donation of value to Classes G4 and G5. Without the donation, the prospects for the debtors' successful reorganization would be diminished. In terms of impact on non-consenting creditors, it must be recalled that only the debtors' claims against Mellon Bank are released. A balancing of these factors weighs in favor of approval of the releases to Mellon Bank.

-20-

appropriate standard for liability for committee members and professionals provides for continued liability for such misconduct. There is no basis offered to extend protections to the debtor and committee releasees for post-petition actions or omissions beyond any applicable standard of liability. To the extent that Paragraph 5.10 extends such protections, it must be modified accordingly.

Third, in Paragraph 10.6, claims asserted by creditors or equity interest holders against any Senior Lenders ("any lender under the Genesis Senior Lender Agreements, the Multicare Senior Lender Agreements, and the Revolving Credit and Guaranty Agreements.") for any act or omission in connection with the Genesis and Multicare Chapter 11 cases and reorganization process are released. Rather than address a standard of liability for releasees in the context of performing services to further a Chapter 11 debtor's reorganization efforts, the Senior Lender release appears to offer to the non-debtor Senior Lenders a release of liability for causes that might be asserted by third party creditors or equity security holders against them in connection with their role as creditors in the case. Such a release must be examined in light of the Third Circuit's reservation in Continental Airlines that "there are circumstances under which [the court] might validate a non-consensual release that is both necessary and given in exchange for fair consideration." In re Continental Airlines, 203 F.3d at 214, n.11.

The question of necessity requires demonstration that the success of the debtors' reorganization bears a relationship to the release of the non-consensual parties, and that the releasees have provided a critical financial contribution to the debtors' plan that is necessary to

-21-

make the plan feasible in exchange for receiving a release of liability. Id. at 215. Unlike the

approval of releases in cases such as A.H. Robins, in which "the entire reorganization" of a

massive and complex Chapter 11 case "hinged" on the approval of certain releases,[17] the

necessity of the Senior Lender releases here is more marginal. Here, the Senior Lenders have

made a financial contribution to the debtors in the form of a portion of the equity of the

reorganized debtors which would have otherwise enured to the benefit of the Secured Lenders.

Whether a feasible plan could have been presented without the Senior Lenders' contribution is

uncertain, because the classes of unsecured creditors or Senior Subordinated Noteholders may

have received nothing under the plan, in which case they would have been deemed to reject the

plan. 11 U.S.C. § 1126(g). The relationship between the success of the Genesis reorganization

and the release of claims against the Senior Lenders is premised on the insistence by the Senior

Lenders of the inclusion of the releases of third party claims contained in the Exculpation Clause

as partial consideration for their contribution. There is nothing in this record to suggest that any

causes of action actually exist against the Senior Lenders, or that any non-consenting creditors or

equity security holders would pursue such causes. In return for the financial contributions made,

the Senior Lenders are receiving most of the debtors' enterprise value, which includes the

potential increase in the value of the merged and reorganized debtors.


As to the fairness of the releases to the Senior Lenders, the issue is whether non-

consenting creditors were given reasonable consideration in exchange for the release.

Continental, 203 F.3d at 215. One could conclude that the non-consenting creditors here,

---

[17]    In re A.H. Robins Co., Inc., 880 F.2d at 702.

particularly the objectors who hold claims in Classes G4 and G5, will receive fair consideration for their claims under the plan as proposed, at the level of a dividend of approximately 7.34%, particularly because their claims were out of the money otherwise.

However, even if the threshold Continental criteria of fairness and necessity for approval of non-consensual third-party releases were marginally satisfied by these facts, the broader context of the Continental discussion of such releases requires rejection of the Senior Lender releases proposed in Paragraph 10.6. In Continental, the court noted that the "permissive view" of other Circuits which approved such non-consensual releases was only applied "in the context of extraordinary cases" like Robins, Manville and Drexel Burnham. Id. at 212. The Continental court cited cases which warned against the exercise of "unfettered discretion to discharge non-debtors from liability," and explained "that a permanent injunction limiting the liability of non-debtor parties is 'a rare thing' that should not be considered absent 'a showing of exceptional circumstances' in which several key factors are present." Id. at 213, n.9. (citations omitted). Several bankruptcy court decisions from the Third Circuit which have rejected non-consensual releases of non-derivative third party claims against non-debtors, including Zenith Electronics, supra, were also cited. Id. at 214. By these references, the message of Continental appears to be that the type of financial restructuring plan under consideration here would not present the extraordinary circumstances required to meet even the most flexible test for third party releases.

As to the release and exculpation clauses, I conclude that paragraphs 5.10 and 10.6 of the plan may be approved, if the provisions are modified as follows:

-23-

1.    Paragraph 5.10

  a) The release of the debtors' pre-petition claims against officers, directors, employees and professionals of the debtors must be stricken.

  b) The release of Mellon Bank, N.A., as agent for the Senior Lenders, may be approved.

  c) The post-petition liability of the releasees (except Mellon Bank) is limited to the applicable standard of liability for each individual releasee.

2.    Paragraph 10.6

  The release of third-party claims against the Senior Lenders must be stricken.

II.    11 U.S.C. § 1129(a)(3).

Section 1129(a)(3) requires that:

The plan has been proposed in good faith and not by any means forbidden by law.

11 U.S.C. § 1129(a)(3).

The Code does not define "good faith" in the § 1129(a)(3) context. Courts have found a plan to be proposed in good faith where the plan: (1) fosters a result consistent with the Code's objectives, In re Block Shim Dev. Co.- Irving, 939 F.2d 289, 293 (5th Cir. 1991); In re Madison Hotel Assocs., 749 F.2d 410, 425 (7th Cir. 1984); In re Resorts Int'l, Inc., 145 B.R. 412, 469 (Bankr. D.N.J. 1990); (2) the plan has been proposed with honesty and good intentions and with

-24-

lauded. I am convinced that the proposals presented in the plan of reorganization were intensely negotiated over a substantial period of time, and the prospect of a prompt confirmation process certainly enhanced the value of the resolution to most of the parties in interest. The continuing accrual of administrative expenses alone serves as enormous incentive for a speedy exit from the Chapter 11 process.

The objectors also suggest that the plan only serves the interests of the Senior Lenders and the debtors' directors and officers, all of whom have incentive to minimize the going concern value at this time to enable them to capture all present and future value for themselves at the expense of subordinated debt and general unsecured creditors. Again, I will decline to assign bad faith motives to the debtors on this ground. After vigorous scrutiny of the evidence presented at the confirmation hearings, I am convinced that the Senior Lenders are undersecured, and that the treatment of junior creditors and equity security holders proposed in the plan is consistent with the fair and equitable requirements for confirmation. It is certainly possible that the industry may continue to experience gains, but negative trends are also noted. The debtors' present financial posture was presented fully and fairly. The plan fosters Bankruptcy Code objectives of affording value to creditors according to their status in the case and according to prescribed priorities.

I conclude that the debtors have met their burden of proof to establish that their plan of reorganization has been proposed in good faith. I am convinced that the reorganized financial structure is presented to maximize the economic viability of the various entities, that the plan has a reasonable likelihood of achieving the results intended, that the plan has been proposed with

-26-

honesty and good intentions, and that it deals with creditors with fundamental fairness.

III.    11 U.S.C. § 1129(a)(7).

Section 1129(a)(7) provides in pertinent part that:

With respect to each impaired class of claims or interests -

> (A) each holder of a claim or interest of such class -
>
> (i) has accepted the plan; or
>
> (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

11 U.S.C. § 1129(a)(7).

This section encompasses the "best interest of creditors" test, which mandates that the holders of claims or interests comprising an impaired class either unanimously accept the plan, or receive, in terms of present value, an amount not less than they would receive in a liquidation of the debtor under Chapter 7 occurring on the plan's effective date. The court must independently determine the value of the distributions under the plan in order to ascertain whether this requirement is satisfied, utilizing information that the proponent must provide. In re Tranel, 940 F.2d 1168, 1172 (8th Cir. 1991); In re Montgomery Court Apts. of Ingham County, Ltd., 141 B.R. 324, 330-31 (Bankr. S.D.Ohio 1992); In re Mortgage Investment Co., 111 B.R. 604, 615 (Bankr. W.D.Tex. 1990). The focus under this section is upon each holder of a claim, as distinguished

-27-

from the class in which the claim is placed. In re Elsinore Shore Assoc., 91 B.R. 238, 269 (Bankr. D.N.J. 1988). The proponent of the Chapter 11 plan has the burden to show compliance with the best interests of the creditor test. In re American Family Enters., 256 B.R. 377, 403 (D.N.J. 2000); In re Global Ocean Carriers Ltd., 251 B.R. 31, 46 (Bankr. D.Del. 2000).

Stephen B. Darr, a partner in the Corporate Recovery practice of KPMG, LLP, testified that KPMG assisted the debtors in performing a liquidation analysis on debtors' assets to test what creditors would receive if the assets were liquidated in a Chapter 7 mode. He opined that the most likely manner of liquidation to maximize recovery from the sale of debtors' assets is to sell the assets as lines of business in an operational mode. He acknowledged that he did not consider hard assets, such as real estate and equipment, except on a corporate level, although he explained convincingly that the best way to value the potential sale price of an operational business is to measure cash flow and to apply an appropriate multiple. He also acknowledged that he did not consult any appraisals, and had no knowledge of whether any causes could be asserted by the debtors against their directors and officers. Notwithstanding these acknowledgments, Mr. Darr's conclusion that the "best interest of creditors" test is met in these cases is convincing. As to Genesis, the range of net estimated proceeds available for distribution is $427 million to $692 million. With DIP financing, various mortgage claims, and Senior Lender claims, the total body of secured claims would amount to $1.488 billion. Miscalculations of over $800 million would be required to defeat the debtors' presentation as to Genesis.

Similarly, as to Multicare, the net estimated proceeds available for distribution is $131

-28-

million to $207 million. The total secured claims approximate $470 million. Any miscalculation is amply accommodated by the gap of over $250 million. Under both liquidation analyses, there would be no distribution to administrative, priority, and general unsecured creditors.

I conclude that the debtors have met their burden to establish compliance with § 1129(a)(7).

IV.    11 U.S.C. § 1129(b)(2).

Where, as here, at least one impaired class of claims has not consented to the proposed plan, the "cram down" provisions of 11 U.S.C. § 1129(b)(1) come into play. The cram down provisions require confirmation "if the plan does not discriminate unfairly, and is fair and equitable" with respect to each impaired non-consenting plan. 11 U.S.C. § 1129(b)(1). Each of these requirements is reviewed herein.

A.    Unfair Discrimination.

The concept of unfair discrimination is not defined under the Bankruptcy Code. Various standards have been developed by the courts to test whether or not a plan unfairly discriminates. In re Dow Corning Corp., 244 B.R. 705, 710 (Bankr. E.D.Mich. 1999), aff'd, 255 B.R. 445 (E.D. Mich. 2000). The hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a

-29-

plan without the proposed discrimination. See, e.g., In re Ambanc La Mesa L.P., 115 F.3d 650,

656 (9th Cir. 1997), cert. denied, 522 U.S. 1110, 118 S. Ct. 1039, 140 L.Ed.2d 105 (1998).

> One court has adopted a modified test for unfair discrimination, which gives rise to:
>
> a rebuttable presumption of unfair discrimination ...where there is: (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

In re Dow Corning Corp., 244 B.R. 696, 702 (Bankr. E.D.Mich. 1999) (adopting the test

proposed in Bruce A. Markell, "A New Perspective on Unfair Discrimination in Chapter 11", 72

AM.BANKR.L.J. 227 (1998)).

As discussed above in the context of 1129(a)(1), Classes G7 and M7 are dissenting

classes, because they are not receiving any distribution under the plan and are deemed to reject

under 11 U.S.C. § 1126(g). Other classes of the same priority, Classes G4 and M4, the classes of

general unsecured claimants, are receiving a distribution under the plan. Nevertheless, the

presumption that the plan is therefore unfairly discriminatory is rebutted. As noted above, the

recovery by Classes G4 and M4 of a dividend in the form of New Common Stock and Warrants

is based on the agreement of the Senior Lenders to allocate a portion of the value they would

have otherwise received to Classes G4 and G5. The disparate treatment between Classes G4 and

G7 and Classes M4 and M7 is a permissible allocation by the secured creditors of a portion of the

-30-

distribution to which they would otherwise be entitled, rather than unfair discrimination against

Classes G7 and M7 by the proponents of the plan. See, e.g., In re SPM Mfg. Corp., 984 F.2d

1305 (1st Cir. 1993); In re McCorp Financial, Inc., 160 B.R. 941 (S.D. Tex. 1993).

 

        B.     Fair and Equitable.

Subsection 1129(b)(2) provides that "the condition that a plan be fair and equitable with

respect to a class includes the following requirements." 11 U.S.C. § 1129(b)(2) (emphasis

added). The statute offers illustrative ways to satisfy the fair and equitable standard for classes of

secured and unsecured creditors, as well as for a class of interests. With respect to unsecured

claims, § 1129(b)(2)(B) provides that a plan may be confirmed notwithstanding the dissent of a

class of unsecured creditors if the plan does not offer a junior claimant any property before each

unsecured claimant receives full satisfaction of its allowed claim. 11 U.S.C. § 1129(b)(2)(B).

This portion of § 1129(b) is often referred to as the "absolute priority rule". See Bank of

America National Trust & Savings Ass'n v. 203 North LaSalle St. Partnership, 526 U.S. 434,

119 S. Ct. 1411, 143 L.Ed.2d 607 (1999). See also In re Bonner Mall Partnership, 2 F.3d 899,

912 (9th Cir. 1993) (section 1129(b)(2) "expressly leaves room for additional factors to be

considered in applying the principle in other particular circumstances"). A corollary of the

absolute priority rule is that a senior class cannot receive more than full compensation for its

claims. In re McCorp. Financial Inc., 137 B.R. 219, 325 (Bank. S.D. Tex. 1992).

Four issues are raised by the objectors regarding the "fair and equitable" requirement,

-31-

including the following:

1. The Senior Lenders are receiving more than full compensation for their claims.

2. The Management Incentive Plan improperly distributes equity to management and is otherwise excessive.

3. The "deemed consolidation" and subsequent merger of Genesis and Multicare are improper under principles governing substantive consolidation, and represent a misallocation of value from Genesis debtors to Multicare debtors to the benefit of Multicare creditors and the detriment of Genesis creditors.

4. The failure of the plan to offer some value to the common shareholders should defeat confirmation of the plan.

1. Recovery by Senior Lenders.

The issue raised by the objectors is whether the reorganized enterprise value of Genesis and Multicare, either individually or combined, provides a recovery to holders of claims in Class G2, the Senior Lenders, that is greater than 100% of their claim. If so, then the plan violates the requirement that the plan be fair and equitable as to the non-consenting Class G5 Genesis Senior Subordinated Note Claims.

Various valuations of the reorganized enterprise value of the debtors were offered in support and in opposition to the plan. The methodologies utilized, primarily the Comparable

Company analysis[18] and the Discounted Cash Flow method,[19] were similarly applied by the experts. The professionals who testified generally agreed that the Comparable Company analysis was the most significant to ascertain enterprise value in this case. The key components of the Comparable Company analysis are budgeted projections of earnings before interest, taxes, depreciation and amortization ("EBITDA"), and the selection of the appropriate multiple to apply to EBITDA to arrive at enterprise value.

        a)    EBITDA.

      As to the appropriate level of projected EBITDA, Chief Financial Officer George Hager testified that for fiscal year 2001 (October 1, 2000 through September 30, 2001), the budgeted EBITDA for the two companies, a "middle of the road" projection, was in the range of $212 million to $215 million. Mr. Hager testified that the actual results for the first 10 months of the 2001 fiscal year were on target with budget projections. A host of positive developments, such as legislative changes, effective April 1, 2001, which increased debtors' revenues, as well as continuing industry challenges, such as the shortage of skilled nursing staff, were considered. Not considered was the potential impact of a proposed acquisition by the debtors of a company

---

    [18]    The Comparable Company analysis requires a comparison of the enterprise value of selected public companies to their performance levels (EBITDA) to arrive at a benchmark multiple. Subjective assessment of how the comparable companies compare with the target company is required.

    [19]    The Discounted Cash Flows analysis determines the cash flows that would be available to a potential investor, based on a required rate of return, to determine net present value.

known as APS, from the Mariner debtors. The Mariner cases are also pending before the

Delaware bankruptcy court. The debtors have entered into a letter of intent to purchase APS. If

the purchase is consummated, the potential for an increase in the debtors' EBITDA is strong.

However, another prospective purchaser, Omnicare, Inc., may defeat the debtors' bid. The actual

consummation of the transaction was deemed too speculative for inclusion as a basis for the

calculation of a forecast EBITDA for valuation purposes.

The objectors, particularly GMS, Inc., introduced various documents that suggested that

the $215 million 2001 EBITDA utilized by the valuation experts to support the plan was too low.

Actual 1999 EBITDA figures for the two companies exceeded $299,000,000. However, Mr.

Hager explained that dramatic changes had taken place in the industry since the end of Fiscal

Year 1999, including an annual $20 million reduction due to the continued phase- in of the

Prospective Payment System initiated by Congress in 1997, significant increases in the cost of

health insurance ($13 million) and liability insurance ($6 million), and a substantial decline in

pharmacy margins ($20 million to $25 million).

GMS produced other indications that the EBITDA forecast utilized for valuation

purposes should be higher. In a February 2001 presentation to the steering committee for Senior

Lenders prepared by debtors' counsel, with the participation of debtors' management,

"normalized 2001 EBITDA", reflecting the annualization of increased payments under the

Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act[20], and "adjusted

---

[20]    Pub.L. 106-554, 114 Stat. 2763 (Dec. 21, 2000).

normalized 2001 EBITDA", reflecting certain adjustments, were noted at $223,603,000 and

$231,403,000 respectively. The numbers used in the presentation were picked up by a Goldman

Sachs presentation to the debtors dated February 28, 2001. In a presentation by debtors'

management to several ratings agencies during June and July 2001, including Standard & Poor's

and Moody's, the projected EBITDA for 2001 was noted at $214,500,000, while the projected

EBITDA for fiscal year 2002 was noted at $229,700,000, without the potential APS acquisition.

In certain negotiating documents utilized by Chilmark Partners, the financial advisor to the

Senior Lenders, Chilmark reflects that it was "provided" with a combined 2001 EBITDA run rate

of $222 million, although the actual source of the EBITDA number used is not certain. As well,

the objectors contend that third quarter results for Genesis and Multicare ($54,900,000 for

Genesis and $9,400,000 for Multicare) might support a higher EBITDA forecast.


Debtors' management, through George Hager, acknowledged that the overall prospects

for the health care industry have improved this year, and that an upward re-valuation of health

care companies is appropriate. However, the experts who testified did revise their valuations

upward since they issued their reports in March and April 2001. The fixing of a projected

EBITDA for the companies is largely a matter of judgment, and the judgment exercised by

management in this regard appeared to be balanced, taking into account both positive and

negative forces and trends. Many of the cited references were produced in various negotiating

postures, in which context the reliability of specific numbers is generally more suspect. The

experts agreed that budget projections of EBITDA are most commonly used for valuation

purposes. The fact that the debtors' actual results are on target with 2001 budget projections for

the first ten months of the fiscal year confirms the reasonableness of the management projections.

     b.     Appropriate Multiple.

     The selection of the appropriate multiple to apply to EBITDA to arrive at the debtors' reorganized enterprise value is a subjective exercise, requiring an analysis of comparable companies to the debtors. The experts generally agree that as to the long-term health care operations of the Genesis and Multicare businesses, the two publicly traded entities of Beverly Enterprises and HCR ManorCare are most similar to the debtors' operations. Of the two, Beverly Enterprises most closely resembles the debtors, from such points of comparison as the sources of revenues, known as the "payor mix", and EBITDA margins achieved. HCR ManorCare is the premier public company providing long-term healthcare services, with a more favorable payor mix, higher EBITDA margins and a higher quality of assets than either the debtors or Beverly. As to the institutional pharmacy business of Genesis, known as Neighborcare, the only comparable company is Omnicare, Inc., which is superior to Neighborcare in its financial performance.

     Utilizing the 2001 and 2002 projected EBITDA, the experts testifying on behalf of the debtors' plan applied enhancements to the Beverly multiples (in the range of approximately 7.9), but substantially discounted the ManorCare (10.7) and Omnicare (10.1 to 11.1) multiples.

     The multiples utilized by the experts testifying on behalf of the objectors were shown to

-36-

RD45

be substantially inflated and unrealistic. Unlike the financial advisors who testified on behalf of the debtors, two of whom have had extensive health care industry expertise, and all of whom have studied the debtor companies for many months, with full access to debtors' management, both experts who testified for the objectors had little or no experience with the long-term health care industry, had only up to about one month to devote to this assignment, had no contact with debtors' management in preparing their opinions, and obtained their information from public sources. On behalf of GMC, Anthony Grillo, from Evercore Partners, L.P., opined that an appropriate multiple to utilize for the long-term health care segment of the debtors' business is 9.4, a mid-point between HCR ManorCare and Beverly. Notwithstanding his recognition that Genesis and Multicare are most comparable to Beverly, which actually has an earnings rate that is higher than that of Genesis, Mr. Grillo opined that the lower Genesis earning rate may be temporary, and that the market place might apply a higher multiple to Genesis because improvements in the financial performance of the debtors would be expected.

The opinions expressed by Evercore Partners were substantially discredited, largely because Mr. Grillo lacked health care industry expertise to support his subjective evaluations. He acknowledged that his report did not take into account certain negative trends in the industry, including a severe nursing shortage, increasing labor costs, increasing professional liability costs and risks associated with the reduction of the federal budget surplus. He acknowledged that his assessment of the institutional pharmacy sector of Genesis, i.e., Neighborcare, was compared to the premier pharmacy company, Omnicare, in a "purely subjective manner", without previous experience with the industry. Even if all of the judgments applied by Evercore Partners were

-37-

affirmed, it was shown that Evercore Partners committed certain errors in its calculations.[21] With the corrections inserted, even if the increased multiples relied upon by Evercore Partners, which were not credibly supported, were retained, the Senior Lenders would receive a 99% recovery on their claims.

Charles Grimes, another objector in Class G5, offered the expert testimony of Robert Becklean, an independent consultant who has known Mr. Grimes for 45 years. Mr. Becklean opined that the two companies, Genesis and Multicare, must be valued together to achieve the full value of the combination. The range assigned by Mr. Becklean to the valuation of the combined companies is $1.7 billion to $2.2 billion. He opined that he would select the high end of the valuation because of the favorable market performance of health care industry stocks in recent months.

As with Evercore, Mr. Becklean conducted no independent research regarding health care companies, had no specific expertise in the industry, and had no contact with debtors' management in preparing his report. He specializes in the high technology industries of telecommunications and data communications. He supported his opinions by reflecting that he exercised no qualitative judgments but only imposed calculations on the numbers already provided. As to Mr. Becklean's opinion that the companies should be combined to achieve full value, the debtors' disclosure statement recognizes that although Genesis and Multicare have been valued separately because of the separate creditor bodies, the combined entity may realize a

---

[21]      Mellon Exhibit 3.

RD47

higher equity trading value in the public market because the combined company would have a larger enterprise value. However, the potential escalation in value is somewhat speculative as a basis for valuation. Most significantly, Mr. Becklean acknowledged that if the debtors' budgeted projections were utilized, by his calculations, the mid-range enterprise value to be achieved would be approximately $1.95 billion. For the combined Genesis and Multicare companies, an enterprise value of $2.064 billion would be required to reach a 100% recovery by the Senior Lenders. See Debtors' Table 2.

The valuations presented for Genesis ranged from a midpoint of $1.3 billion (Chilmark Partners) to $1.325 billion (UBS Warburg) to $1.375 billion (Houlihan Lokey Howard and Zukin). For Multicare, the valuations ranged from a midpoint of $373 million (Chilmark Partners) to $425 (Credit Suisse/First Boston). The combined valuations approximate $1.750 billion. The valuations reflect an upward adjustment to account for more favorable market conditions for health care industry stocks in recent months. To reach a 100% recovery for the Senior Lenders in Class G2, including post-petition interest through August 2001 under 11 U.S.C. § 506(a), the enterprise value of Genesis would have to be at least $1,462,558.[22] Using the midpoint Genesis enterprise value of $1.33 billion and taking into account the repayment of DIP financing, administrative claims and other secured debt, there would be $977 million available to pay to Senior Lenders, representing a recovery of approximately 88% to Genesis

---

[22]

| | |
|---|---|
| Exit Financing (DIP Financing and administrative expenses) | $ 233,000,000 |
| Other Secured Debt (Class G1) | $ 120,077,000 |
| Senior Lenders (Class G2) | $1,109,481,000 |
| | $1,462,558,000 |

RD48

account of their prepetition equity interests, whereby other equity holders will receive nothing. The objections to that management incentives provided for in the plan must be overruled for several reasons.

First, I have already approved certain management benefits to which objection is made, such as the forgiveness of loans. A Management Incentive Program for the top four executives was approved by this court prior to the confirmation proceedings by order entered February 23, 2001. The approved program provides for incentive payments to be made on the Effective Date of a Plan of Reorganization. If the Effective Date was August 31, 2001, the aggregate amount of such payments would have been approximately $2.1 million. A later Effective Date results in a decrease of 7.5% (up to a maximum decrease of 15%) for each month delayed. The program also provides for severance protection, the assumption of certain deferred compensation arrangements and the forgiveness of certain loans that three of the executives incurred in order to purchase Genesis stock in compliance with a prepetition Board of Directors requirement. The forgiveness is to occur on the earlier of the first anniversary of the Effective Date or the termination of the executive's employment. The forgiveness also includes an agreement to pay any taxes due from the executives due to such forgiveness. The aggregate amount of such loans is approximately $2.5 million. The Creditors Committee is correct that the terms of the final order entered in February 2001 cannot be disturbed by an objection to confirmation of the debtors' reorganization plan, which is presented six-months following the entry of the final order.

Second, the additional management benefits provided for in the plan are derived from

-41-

value otherwise allocable to the Senior Lenders. Under the proposed plan, the New Management Incentive Plan will provide for grants of 750,000 shares of New Common Stock allocated among 43 management employees of the reorganized Genesis. The plan also provides for options to purchase 3,480,000 shares of New Common Stock allocated to 129 management employees. The option exercise price will be $20.33 per share. The exact amount of shares and options to be allocated to each employee and the establishment of a vesting period will be determined by the new board of directors for the reorganized Genesis or pursuant to an agreement with the steering committee for the holders of the Genesis Senior Lenders Claims and the Multicare Senior Lender Claims.

As of the Effective Date, the reorganized Genesis will also enter into long term employment agreements with its top four senior executives. The four senior executives will be provided with automatically renewing three year employment terms, absent advance notice. In addition, the executives will be entitled to incentive compensation, to be determined by the new board of directors for the reorganized Genesis, in an amount not to exceed 50% of their respective base salaries.[24]

The objectors are correct that the new Management Incentive Plan, while characterized as consideration for continued employment, borders on payments to management on account of their pre-petition equity interests, particularly in light of the generous retention package

---

[24]    The base salary for Michael Walker, CEO and Chairman of the Board is $850,000; for Richard Howard and David Barr, Vice Chairmen, $500,000, and for George Hager, Jr., Executive VP and CFO, $400,000.

-42-

previously approved for the executives during the pendency of the case.    Such an allocation might indeed be violative of the absolute priority rule, in light of the relatively small dividend proposed to be paid to unsecured creditors, and the extinguishment of equity interests otherwise. Nevertheless, as I have determined with respect to the proposed distribution to unsecured creditors, the issuance of stock and warrants to management represents an allocation of the enterprise value otherwise distributable to the Senior Lenders, which the Senior Lenders have agreed to offer to the top executives as further incentive to them to remain and effectuate the debtors' reorganization. The Senior Lenders are free to allocate such value without violating the "fair and equitable" requirement. The objections to the New Management Incentive Plan are overruled.

3.    Deemed Consolidation and Merger.

As noted above, the debtors' plan proposes the deemed consolidation, for voting and distribution purposes, of all of the Genesis Debtors as a single legal entity, and all of the Multicare Debtors as a single legal entity. Following the issuance of New Common Stock in the reorganized Multicare to Multicare creditors, Genesis and Multicare will merge, with creditors of each case entitled to receive a proportionate share of the New Common Stock of the reorganized Genesis.

The objectors contest the proposed merger of the reorganized Genesis and reorganized Multicare entities to effect "a de facto substantive consolidation," which the objectors claim

-43-

misallocates value from Genesis to Multicare, to the detriment of the Genesis creditors.

The deemed consolidation of each set of entities is akin to substantive consolidation. "Substantive consolidation usually results in, inter alia, pooling the assets of, and claims against, the two entities; satisfying liabilities from the resultant common fund; eliminating inter-company claims; and combining the creditors of the two companies for purposes of voting on reorganization plans." In re Augie/Restivo Baking Co., 860 F.2d 515, 518 (2d Cir. 1988). "The sole purpose of substantive consolidation is to ensure the equitable treatment of all creditors." Id. See also In re Cooper, 147 B.R. 678 (Bankr. D.N.J. 1992) (joint administration benefits case administration without affecting the creditors while substantial consolidation ensures the equitable treatment of the creditors). "Substantive consolidation should be considered with extreme caution and granted only in extraordinary situations." In re United Stairs Corp., 176 B.R. 359, 368-69 (Bankr. D.N.J. 1995).

The D.C. Circuit has developed a three-part test under which the moving party must show:

> (1) a substantial identity between the entities to be consolidated;
>
> (2) that consolidation is necessary to avoid harm or to achieve some benefit; and
>
> (3) in the event that the creditor shows harm, that the benefits of consolidation "heavily" outweigh the harm.

In re Auto-Train Corp., 810 F.2d 270, 276 (D.C. Cir. 1987). The "first part of this analysis mirrors that used by courts to determine whether corporations are alter egos of one another. The

-44-

second and third parts of the analysis require balancing the benefits and harms of substantive consolidation." In re New Center Hospital, 187 B.R. 560, 568 (E.D.Mich. 1995). This approach was also adopted by the Eleventh Circuit in Eastgroup Properties v. Southern Motel Assoc., Ltd., 935 F.2d 245, 249 (11th Cir. 1991) (movant must demonstrate: "(1) there is substantial identity between the entities to be consolidated; and (2) consolidation is necessary to avoid some harm or to realize some benefit"). See also In re Reider, 31 F.3d 1102 (11th Cir. 1994); In re Giller, 962 F.2d 796 (8th Cir. 1992).[25]

Here, the debtors have shown both substantial identity between the entities to be consolidated, and benefit to the creditors to be achieved by the consolidation. The Genesis entities operate as business units, including units for inpatient services, pharmacy and medical supplies, rehabilitation services and management services. These business units operate as separate, integrated units, without the formality of separate corporate entities. A central cash management system is maintained for all of the entities, through which most revenues are received and accounts are paid. The Senior Lenders hold debt that is secured by substantially all of the Genesis entities. Inter-company guarantees for single claims exist among the Genesis entities.[26]

---

[25]     A substantially similar test was adopted by the Second and Ninth Circuits, which focuses on the reliance by creditors on a single economic unit, and the entanglements of the debtors such that consolidation will benefit all creditors. In re Augie/Restivo Baking Co., 860 F.2d at 518; In re Bonham, 229 F.3d 750, 766 (9th Cir. 2000).

[26]     Substantially the same factual circumstances are presented in the Multicare cases.

The deemed consolidation of the debtors will achieve substantial benefit for Genesis creditors. Inter-company claims will be eliminated from the treatment scheme, as well guarantees of the obligations of one Genesis debtor by another Genesis debtor. In addition, each claim filed in Classes G2, G4 and G5 against any of the Genesis debtors will be considered as a single claim against the consolidated Genesis debtors. In light of the indebtedness of nearly all of the Genesis debtors to the Senior Lenders, the only way to provide any recovery to individual creditors of the subsidiaries is to treat all unsecured creditors on a consolidated pro rata basis. The deemed consolidation will not affect the legal and organizational structure of the reorganized debtors.

As to the proposed merger between Genesis and Multicare, the objectors contend that value belonging to the Genesis junior classes is being used to defray losses by the Multicare Senior Lenders, who are substantially the same entities as the Genesis Senior Lenders. However, no evidence was produced by the objectors to support the contention of the misallocation of value from Multicare creditors to Genesis creditors. Rather, the debtors demonstrated that the allocation of Genesis New Common Stock is based strictly on the relative equity values of Genesis and Multicare on a pro rata basis, assuming the new capital structure proposed in the plan. There is no diversion of value from Genesis to Multicare, or substantive consolidation of the two entities. The objections to the deemed consolidation and merger of the debtors is overruled.

A corollary of the objectors' position on substantive consolidation is their opposition to

-46-

the settlement reached as part of the reorganization plan between Genesis and Multicare to relinquish pre-petition claims against each other. According to the objectors, Genesis holds a contract claim against Multicare of approximately $109 million, while Multicare's claims and defenses against Genesis are unspecified and uncertain.

Settlements are favored in bankruptcy because they serve to minimize litigation, provide a means for efficient resolution of disputes, and help to expedite the administration of the bankruptcy estate. In re Martin, 91 F.3d 389, 393 (3d Cir. 1996); In re Edwards, 228 B.R. 552, 568-69 (Bankr. E.D. Pa. 1998); In re Mavrode, 205 B.R. 716, 719 (Bankr. D.N.J. 1997). In determining whether or not to approve a settlement, the court must consider whether the settlement is "fair and equitable" and in the "best interests of the estate." In re Martin, 212 B.R. 316, 319 (B.A.P. 8th Cir. 1997). In the normal course, "the court [will] defer to the trustee's judgment so long as there is a legitimate business justification." In re Martin, 91 F.3d at 395. See also In re Dow Corning Corp., 198 B.R. 214 (Bankr. E.D. Mich. 1996); In re Sanner Contracting Corp., 181 B.R. 465 (Bankr. D. Ariz. 1995). If the settlement "falls below the lowest point in the range of reasonableness," it should be rejected. In re Edwards, 228 B.R. at 569.

Here, the settlement between Genesis and Multicare advances the interests of each creditor body. Even if Genesis would be successful in establishing its claims against Multicare, following expensive and time-consuming litigation, an outcome that is not certain, the asset base available to Genesis creditors would not change. Genesis would hold an unsecured claim against Multicare, which would be subordinated to the Multicare Senior Lenders. I conclude that the

-47-

RD55



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

In re                              )     Chapter 11
GENESIS HEALTH VENTURES, INC., et al.,   )     Case No. 00-2692
       Debtors,             )     (Jointly Administered)
                              )
_____)
                              )
JAMES J. HAYES,               )
                              )
   Appellant               )     C.A. No.01-718 JJF
                              )
       v.                 )
                              )
GENESIS HEALTH VENTURES, INC.    )
                              )
   Appellee               )

**MOTION FOR APPOINTMENT OF OFFICIAL COMMITTEE OF EQUITY SECURITY
HOLDERS FOR THE PURPOSE OF APPEALING CONFIRMATION OF THE GENESIS
REORGANIZATION PLAN AND DELAY OF APPELLANTS BRIEF PENDING THE
APPOINTMENT OF COUNSEL**

      Appellant, James J. Hayes, respectfully moves this Court to order the Bankruptcy Court

for the District of Delaware to appoint an official committee of equity security holders for the

purpose of appealing confirmation of the Genesis Reorganization Plan (Plan). The Appellant

also moves that this Court rescind its order establishing January 18 as due day for Appellant's

brief until the appointment of counsel for a shareholders equity committee. The shareholders'

appeal is meritorious but requires representation by knowledgeable counsel. The grounds for

this motion are as follows:

1)   The September 20, 2001 Bankruptcy Court Order confirming the Plan terminated the

     property rights of common stockholders in a unique company with an enterprise value

     conservatively estimated at near two billion dollars. Shareholders were not represented by

     an official equity committee in any of the bankruptcy proceedings leading up to the

     cancellation of their property rights. Paragraph 1102(a)(2) of the Bankruptcy Code provides

     for the appointment of an equity shareholders committee and the attendant selection of

     counsel. The principal inquiry in the appointment of an equity committee is whether the

equity security holders are adequately represented and clearly shareholders who were not represented by counsel in a extremely complex bankruptcy have not received adequate representation.

2) Appointment of a committee of equity security holders is required by the due process provisions of the Fifth Amendment. The Supreme Court has held that citizens must be accorded due process when being deprived of their property by the government in furtherance of public policy, here provisions of the Bankruptcy Code. Participation in appellate proceedings challenging the taking of shareholders property is such required due process.

3) The Genesis Chapter 11 proceeding is extremely and uniquely complex. The proceeding began as separate bankruptcies of Genesis and its subsidiary Multicare. The companies were of contrasting solvency with Genesis so substantially more solvent that there were questions as to whether the Genesis petition should have properly been denied. Ignoring questions of Genesis insolvency, the Plan provided for a merger between Genesis and Multicare, allocating the same recovery to the unsecured creditors of Genesis and Multicare. At an earlier stage in the proceedings the Multicare unsecured creditors had not received an allocation, but their official committee filed suit leading to a settlement. The question of whether the Multicare unsecured creditor allocation represented an improper transfer of wealth from Genesis to Multicare is a substantial issue that required representation by a official Genesis Equity Committee. The above issues significantly impact the fair and equitable provisions of subsection 1129(b)(2) and form a basis for shareholders appeal and require appointment of counsel to represent shareholders in their appeal.

4) Merging the two companies caused much confusion as to the proper valuation methodology that established the enterprise values which determined the allocations among the senior lenders and unsecured creditors and left shareholders with a zero allocation. There is a substantial issue whether the valuations and allocations should be based on Genesis and Multicare as individually structured or on the reorganized company. The valuation differences amount to hundreds of millions of dollars. In addition, there is evidence that the debtor's counsel made a $200 million dollar error in determining the threshold enterprise value that made the Senior Lenders whole. Taken together, these errors total several hundred millions of dollars and raise an issue that even under established bankruptcy

priority that shareholders would be entitled to a relatively small but monetarily significant allocation. Without representation of counsel, shareholders could not adequately develop these issues at the August confirmation hearing. Representation by counsel is required to develop theses issues on appeal.

5) The appellant is not an attorney and is not qualified to represent shareholders. The appellant's participation in the Confirmation Hearing and filing an individual appeal of the Plan's Confirmation cannot be construed as adequate representation for the shareholder class. Neither could representation of debtors' counsel or counsel for the Official Committee of Unsecured Creditors be construed as representing shareholder interests. Bankruptcy Code anticipates parties in a bankruptcy will be aggregated by classes of similar interests and that the various classes will be represented by counsel. An Official Committees of Unsecured Creditors were appointed for the proceedings and Paragraph 1102(a)(2) provides for the appointment of an equity shareholders committee and its attendant counsel. This is the only way to ensure that the equity class receive adequate representation.

6) The costs of appointing a committee of equity security holders at the appellate stage is low and does not outweigh the need to furnish adequate representation for equity security holders of Genesis. Confirmation of the reorganization plan ended the major costs associated with the bankruptcy proceedings. Thus appointment of an equity committee at the appellate stage is a cost effective way to provide equity security holders adequate representation.

For the reasons stated herein and in the accompanying brief, the undersigned requests the Court to order the appointment of equity security holders of Genesis.

Respectively submitted,

Dated January 18, 2002

James J. Hayes
Pro se

CERTIFICATE OF SERVICE

I certify a copy of the foregoing motion
and brief in support of this motion was
mailed from the Northern Virginia
Regional Post Office on January 18,
2002 to the following at the addresses
shown.

Mark D. Collins
Richards, Layton & Finger PA
One Rodney Square
P.O. Box 551
Wilmington, DE  19899

James J. Hayes

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GENESIS HEALTH VENTURES, INC., | ) | |
| et al. | ) | Case No. 00-2692 (JHW) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

0.2 – 0 1 6

01 – 718 JJF

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MULTICARE AMC, INC., et al., | ) | Case No. 00-2494 (JHW) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

| | | |
|---|---|---|
| JAMES J. HAYES, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | No. AP-01-73 (JJF) |
| | ) | |
| GENESIS HEALTH VENTURES, INC., | ) | |
| et al., | ) | |
| | ) | |
| Appellees. | ) | |

**APPELLEES' JOINT OPPOSITION TO MOTION FOR APPOINTMENT
OF AN OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS
FOR THE PURPOSE OF APPEALING CONFIRMATION OF THE GENESIS
REORGANIZATION PLAN AND DELAY OF APPELLANT'S BRIEF PENDING THE
APPOINTMENT OF COUNSEL**

Appellees submit this Response in Opposition to the Motion for Appointment of

Official Committee of Equity Security Holders for the Purpose of Appealing Confirmation of the

Genesis Reorganization Plan (the "Motion"), filed by James J. Hayes ("Hayes").[1] For the

reasons set forth herein, Appellees respectfully submit that the Motion should be denied and, for

reasons set forth in a motion filed concurrently herewith, the appeal dismissed.

## BACKGROUND

1.    On June 22, 2000 (the "Petition Date"), the Debtors commenced their

reorganization cases by filing voluntary petitions for relief under chapter 11 of title 11 of the

United States Code (the "Bankruptcy Code").

2.    The Debtors filed a Joint Plan of Reorganization (the "Plan") on July 6, 2001. The

Court conducted plan confirmation hearings on August 28 and August 29, 2001 (the

"Confirmation Hearings"). On September 20, 2001, an Order was entered in this case

confirming the Debtors' Joint Plan of Reorganization over several objections (the "Confirmation

Order"). The Court published an opinion prior to entry of the Confirmation Order. See In re

Genesis Health Ventures, Inc., et al., 266 B.R. 591 (Bankr. D. Del. 2001).

3.    Hayes was a holder of Common Stock of Genesis whose shares were extinguished

pursuant to the Plan terms. Id. at 598.

4.    Hayes objected to the Plan's confirmation at the hearing, and there requested the

appointment of an Official Committee of Equity Security Holders (an "Equity Committee"). The

Bankruptcy Court denied this request in its opinion, having "concluded that the debtors are

insolvent and that there is no possibility of a recovery for equity interests." Id. at 620.

---

[1] Appellees joining in this motion are: (1) Genesis Health Ventures, Inc., and affiliated co-debtors (the "Genesis Debtors"); (2) The Multicare Companies, Inc., and affiliated co-debtors (the "Multicare Debtors"); (3) Mellon Bank, N.A., as agent for the prepetition senior secured lenders of the Genesis and Multicare Debtors (collectively, the "Senior Lenders"); and (4) First Union National Bank, as agent for the exit financing lenders.

2

5.    Hayes filed a notice of appeal of the Confirmation Order on September 18, 2001.
He was the sole shareholder to do so. Hayes did not timely designate a record on appeal to this
Court, and to date has not designated a record on appeal at all.

6.    On January 18, 2002, the day his opening brief was due to this Court, Hayes filed
the current motion asking that this Court appoint an Equity Committee for the purpose of
appealing confirmation of the Plan and that the Court rescind its order establishing January 18,
2002 as the due date for his brief "until the appointment of counsel for a shareholders equity
committee." Hayes Motion ("Motion") at 1.

## ARGUMENT

### A.    THIS COURT AND THE UNITED STATED TRUSTEE HAVE PREVIOUSLY DENIED HAYES'S REQUESTS TO HAVE AN EQUITY COMMITTEE APPOINTED IN THE GENESIS CHAPTER 11 CASE BECAUSE THE DEBTORS ARE HOPELESSLY INSOLVENT

7.    On July 10, 2001, Hayes first requested that the United States Trustee appoint an
Equity Committee. The Debtors and the Creditors' Committee (the "Creditors' Committee")
opposed the appointment.

8.    On August 2, 2001, the United States Trustee advised Hayes that the Trustee
would not appoint an Equity Committee.

9.    On August 8, 2001, Hayes filed a Motion to Appoint an Official Committee of
Equity Security Holders. The Debtors and the Creditors' Committee opposed the motion.

10.    In support of confirmation, the Debtors, the Senior Lenders, and the Creditors'
Committee directed the Court's attention to three separate enterprise valuations of the  Debtors
prepared by independent financial advisors. Each valuation expert concluded that the Debtors'
estates were insolvent by many hundreds of millions of dollars. In fact, the valuations concluded
that the Debtors were so insolvent that their enterprise value did not even equal the amount of the

3

secured debt, administrative expenses and priority claims owed to creditors, much less the amount of secured and unsecured debt owed to creditors. <u>Genesis</u>, 266 B.R. at 620.

11.    For the Genesis common stockholders to be entitled to any recovery, all secured and unsecured claims would have to be paid in full (including post-petition interest) and the three series of preferred stock would have to receive an appropriate recovery. As the Debtors, the Senior Lenders, and the Creditors' Committee argued at the Confirmation Hearings, unless the valuations of the Genesis Debtors prepared by these experts understated the value of the estates by at least $625 million, there simply would be no value available for the Genesis common stockholders. Consequently, the Debtors and the Creditors' Committee opposed the formation of an Equity Committee, the costs of which would be borne by the Genesis unsecured creditors.

12.    The Bankruptcy Court denied Hayes's first motion in the Confirmation Order because the appointment of an equity committee was unwarranted in light of the Court's adjudication of insolvency. Upon consideration of Hayes's motion and other shareholder objections to confirmation, the Court clearly explained that insolvency was the primary basis for refusing to appoint an additional committee:

> "The motions for a trustee and/or another committee come at the
> point of confirmation of the Debtors' plan. Neither objector has
> offered any evidence of the existence of value beyond the position
> of Senior Lenders and junior creditors. *I have concluded that
> debtors are insolvent and that there is no possibility of a recovery
> for equity interests.* At this late date, the appointment of
> additional professionals and their associated administrative
> expenses cannot be viewed as a benefit to the debtors' estates. The
> objections are overruled and the related motions denied."

<u>Genesis</u>, 266 B.R. at 620 (emphasis added).

13.    The decision to appoint an equity committee begins with whether it appears that shareholder interests are adequately represented in a chapter 11 case. 11 U.S.C. §1102(a)(2)

(1994). In addition to examining the number of shareholders and the complexity of the case, a bankruptcy court must consider whether the cost of the additional committee significantly outweighs the concern for adequate representation. See In re Wang Labs, Inc., 149 B.R. 1 (Bankr. D. Mass. 1992) (citing In re Johns-Manville Corp., 68 B.R. 155, 159 (Bankr S.D.N.Y. 1986)). The bankruptcy court must balance the costs to the estate of an additional committee and its attendant professionals (e.g., counsel, financial advisors, etc.) with the likelihood of a shareholder recovery.

14.    The inherent difficulties posed by this balancing act has led to solvency becoming the primary issue in determining whether an official committee of equity security holders should be appointed in a chapter 11 case. See, e.g., In re Wang Lab, Inc., 149 B.R. 1; In re Emons Indus., Inc., 50 B.R. 692 (Bankr. S.D.N.Y. 1985); see also 7 Collier on Bankruptcy ¶ 1102.03[2][a] at 1102-22 ("The threshold consideration faced by the United States Trustee in determining whether to appoint a committee of equity security holders is whether there is sufficient equity in the estate to justify the cost and expense of a separate committee."). Solvency is generally addressed at the early stages of a case where the United States Trustee must rely on the debtor's schedules, representations concerning insolvency, and other public information to formulate a position on whether a shareholder recovery may be possible.

15.    Appointment of an equity committee in the face of undeniable evidence of insolvency is an unreasonable risk, the costs of which will be borne solely by estate creditors. The United States Trustee and a bankruptcy court are given great discretion in balancing the inherent risks and potential benefits of additional committees. Bankruptcy judges, as well as the United States Trustee, draw on debtor-specific knowledge and institutional knowledge when confronted with these requests. Most, if not all, bankruptcy courts have recognized that

appointment of an equity committee when a debtor is hopelessly insolvent is not permissible

because the nil probability of a shareholder recovery is dwarfed by the virtual certainty that

creditor recoveries will be diminished by the equity committee's futile efforts. Judge Abram

summarized this notion in Emons Industries by characterizing the appointment of an equity

committee in the face of hopeless insolvency as a gift by estate creditors:

> "This court is of the view that generally no equity committee
> should be appointed when it appears that a debtor is hopelessly
> insolvent because neither the debtor nor the creditors should have
> to bear the expense of negotiating over the terms of what is in
> essence a gift. See Bankruptcy Code § 1129(b)(2)(B)(ii). The
> court has denied a motion for appointment of an equity committee
> in a large Chapter 11 case, subsequently confirmed, on that basis.
> The court has not altered its view of the correctness of this general
> rule even though in that case the plan confirmed provided for the
> participation of equity security holders."

In re Emons Indus., Inc., 50 B.R. at 694.

16.    The futility of an equity committee under these circumstances is recognized in

Collier:

> "Many chapter 11 debtors are hopelessly insolvent and the only
> mystery in the case will be to ascertain the extent of the creditors'
> loss. In such cases, the interests of existing stockholders will be
> wiped out in a plan and stockholders do not need a committee to
> look out for their interests."

7 Lawrence P. King, ed., Collier on Bankruptcy ¶ 1102.03[2][a] at 1102-22 (15th ed. 2000).

17.    The guesswork concerning insolvency occurring in the early stages of a chapter

11 case has been obviated in the instant case. The Bankruptcy Court has had the opportunity to

consider exhaustive evidence on the subject and as a result thereof, has adjudicated the Genesis

Debtors insolvent. See Genesis, 266 B.R at 620. In light of this Court's factual finding that

shareholders are not entitled to any recovery from the Genesis Debtors, appointment of an Equity

6

Committee at this juncture would be a colossal waste of estate assets, the costs of which will be borne solely by unsecured creditors.

18.    Hayes cites no law, nor could research uncover any, that provides for or justifies the relief Hayes asks of this Court, namely the appointment of an Equity Committee by the District Court solely for the purpose of appealing a confirmation order by the Bankruptcy Court. The U.S. Trustee is the only party able to appoint an Equity Committee. In this case, the U.S. Trustee's decision not to appoint an Equity Committee was upheld by the Bankruptcy Court, and Hayes did not seek review of that decision by this Court. Hayes's attempt to short-circuit the process of appointing an Equity Committee by asking this Court to simply appoint one, without reference to the Bankruptcy Court's denial of the identical request and Hayes's failure to appeal it, is baseless.

**B.    SENIOR LENDERS AND UNSECURED CREDITORS WHO SUPPORTED THE PLAN SHOULD NOT SHOULDER THE EXPENSE OF PROSECUTING HAYES' APPEAL**

19.    The Motion is an overt attempt by Hayes to foist the costs of prosecuting his appeal on to the shoulders of the Senior Lenders and unsecured creditors. The Senior Lenders and Creditors' Committee encouraged unsecured creditors to support the Plan because it believed that it provided the best recovery available under the circumstances. Now in an ironic twist, unsecured creditors are being asked to bear the expense of attacking it. Both the Senior Lenders and the Creditors' Committee hired financial advisors that testified at the confirmation that they had reached independent conclusions that the Senior Lenders were very likely undersecured. The Debtors, Senior Lenders and Creditors' Committee negotiated a settlement whereby the unsecured creditors were allocated a portion of the distribution to which the Senior Lenders would have otherwise been entitled. The settlement terms were designed to maximize recoveries to Genesis unsecured creditors and provide for an expeditious confirmation.

7

20.    The opinions of numerous valuation experts were entered into evidence at the Confirmation Hearing. Upon consideration of such expert testimony and opinions, the Bankruptcy Court stated that, "[a]fter vigorous scrutiny of the evidence presented at the confirmation hearings, I am **convinced** that the Senior Lenders are undersecured and that the treatment of junior creditors and equity security holders proposed in the plan is consistent with the fair and equitable requirements for confirmation." Id. at 610 (emphasis added); see id. at 616 ("under the debtors' plan, the Senior Lenders will not recover 100% of their claims . . . accordingly, there is no violation of the absolute priority rule.")

21.    Rebuked in his prior efforts, Hayes now contends that appointment is appropriate because "[t]he costs of appointing a committee of equity security holders at the appellate stage is low and does not outweigh the need to furnish adequate representation for equity security holders of Genesis." Motion at 3.

22.    The Debtors disagree with Hayes's assessment of the low "costs of appeal" and the need for representation at this stage of the bankruptcy case. The virtually nonexistent probability of a shareholder recovery in this bankruptcy case has become even more remote because this Court has, by way of adjudication, determined that shareholders are not entitled to any distribution. Hayes's efforts to receive a distribution on account of his equity interests face steeper obstacles on appeal, as the Court's adjudication of insolvency will not be set aside unless the finding is determined to be clearly erroneous. See Fed. R. Bankr. P. 7052(a), 9014.[2] In light of the valuation evidence presented at the Confirmation Hearings, any possible justification for an Equity Committee has not only sharply decreased but entirely vanished. Accordingly,

---

[2] Hayes's appeal is also equitably moot because he did not stay the consummation of the Plan pending his appeal, and now the Plan has been substantially consummated. Debtors' separate motion to dismiss for equitable mootness has been filed concomitant with this Response, and the likely demise of the appeal on these grounds provides a further reason to deny the singular relief Hayes seeks.

8

virtually any cost for an Equity Committee would be outweighed by the absence of any chance of shareholder recovery.

23.    Second, Hayes fails to grasp that his interests were adequately represented by the Committee under the particular facts and circumstances of this case. The Creditors' Committee had every incentive to contest the Debtors' and Senior Lenders valuations in order to increase unsecured creditor recovery. The Committee's interests were aligned with those of Hayes in as much as a higher valuation would ultimately benefit shareholders if a 100% recovery were realized for unsecured creditors. The Creditors' Committee's independent valuation revealed, however, the likelihood that Senior Lenders were undersecured. Understanding the inexact science of business valuation and the risk that the Court would find unsecured creditors entitled to no distribution, the Creditors' Committee negotiated a settlement with the Senior Lenders in order to ensure that a recovery for unsecured creditors would occur. The distribution to unsecured creditors under the Plan is a far cry from a 100% dividend. See Genesis, 266 B.R. at 598 (unsecured creditors of Genesis will receive a dividend of 7.34%, exclusive of the value of the New Warrants). The Creditors' Committee's inability to negotiate a dividend even marginally approximating the full amount of unsecured claims suggests that shareholder interests were adequately represented, under the circumstances, in the bankruptcy case.

24.    Hayes's falsely states that "appointment of an equity committee at the appellate stage is a cost effective way to provide equity security holders adequate representation." Motion at 3. In fact, the appointment of an equity committee in the face of hopeless insolvency at the appellate stage is unprecedented, unreasonable, and unwarranted. The Bankruptcy Court carefully considered the opinions of several valuation experts, including the experts retained by individuals possessing economic interests similar to those of Hayes. Hayes is not entitled to

9

receive a second (or third) bite at the apple courtesy of the Senior Lenders and unsecured

creditors.

25.     The stay of this Court's briefing schedule should also be denied.  Hayes's motion

is a bizarre attempt to gain free representation for his appeal.  Hayes does not cite any law, nor

could research uncover any, where a *pro se* appellant may stay prosecution of his appeal until the

District Court can appoint, in effect, a lawyer to prosecute his appeal for him.  Also, Hayes does

not contend that he cannot afford an attorney but only seeks to have creditors pay for what is,

based on the substantial uniform expert testimony, a frivolous appeal.  Were Hayes to raise a

valid objection and prevail on appeal, he would be entitled to seek reimbursement under section

503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code.  11 U.S.C. 503(b)(3)(D), 503(b)(4) (1993).

### CONCLUSION

For the foregoing reasons, the Motion should be denied.

Dated: January 30, 2002
        Wilmington, Delaware

                          Respectfully submitted,

                          _____
                          Mark D. Collins (No. 2981)
                          Russell C. Silberglied (No. 3462)
                          RICHARDS, LAYTON & FINGER, P.A.
                          One Rodney Square
                          P.O. Box 551
                          Wilmington, Delaware 19899
                          (302) 651-7700

                          and

10

Michael F. Walsh
Gary T. Holtzer
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

and

Adam P. Strochak
Jeffrey L. Cimbalo
WEIL, GOTSHAL & MANGES LLP
1501 K Street, NW, Suite 100
Washington, D.C. 20005
(202) 682-7000

**Attorneys for Appellees/Reorganized Debtors
Genesis Health Ventures, Inc., et al.**

_Robert A. Brady_ by RCS w/permission
Robert S. Brady
YOUNG CONAWAY STARGATT & TAYLOR
LLP
The Brandywine Building
100 West Street, 17th Floor,
P.O. 391
Wilmington, Delaware 19801
(302) 571-6600

and

Paul V. Shalhoub
WILLKIE FARR & GALLAGHER
787 Seventh Avenue
New York, New York 10019
(212) 728-8000
**Attorneys for Appellees/Reorganized Debtors
Multicare AMC, Inc., et al.**

11

RD70

*Teresa Currier by RCS w/ Permission*

Teresa Currier
Klett Rooney Lieber & Schorling
The Brandywine Building
1000 West Street
Wilmington, Delaware 19801
(302) 552-4220

and

Menachem O. Zelmanovitz
Morgan, Lewis & Bockius LLP
101 Park Ave.
New York, New York 10178
(212) 309-0600

**Attorneys for Appellees Mellon Bank, N.A., as
Agent for the prepetition Senior Lenders and
First Union National Bank as Agent for the Exit
Lenders**

12

## CERTIFICATE OF SERVICE

I, Etta R. Wolfe, hereby certify that on January 30, 2002, I caused copies of the foregoing **Appellees' Joint Opposition to Motion for Appointment of Equity Security Holders for the Purpose of Appealing Confirmation of the Genesis Reorganization Plan and Delay of Appellant's Brief Pending the Appointment of Counsel** to be served upon the parties in interest set forth below in the manner indicated:

**Via Hand Delivery**

Laura Davis Jones, Esquire
Rachel Lowy, Esquire
Pachulski Stang Ziehl Young & Jones P.C.
919 N. Market Street, 16th Floor
Wilmington, DE  19801

Mark Minuti, Esquire
Norman L. Pernick, Esquire
Saul Ewing Remick & Saul
222 Delaware Ave., Ste. 1200
Wilmington, DE  19801

Teresa K.D. Currier, Esquire
Kathleen P. Makowski, Esquire
Klett Rooney Lieber & Schorling
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE  19801

Robert S. Brady, Esquire
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building, 1000 West St.
Wilmington, DE  19801

Joseph McMahon, Esquire
Office of the U.S. Trustee
844 King Street, Suite 2313
Wilmington, DE  19801

**Via First Class Mail**
Richard Toder, Esquire
Robert Scheibe, Esquire
Morgan Lewis & Bockius LLP
101 Park Avenue
New York, NY  10178-0060

Paul V. Shaloub, Esquire
Willkie Farr & Gallagher
787 Seventh Avenue
New York, NY  10019-6099

Lisa G. Beckerman, Esquire
Akin Gump Strauss Hauer & Feld LLP
590 Madison Avenue
New York, NY  10022

Michael F. Walsh, Esquire
Gary T. Holtzer, Esquire
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153

Adam Strochak, Esquire
Weil Gotshal & Manges LLP
1501 K Street, NW
Washington, DC 20005

James Wankmiller
Genesis Health Ventures, Inc.
101 East State Street
Kennett Square, PA  19348

**Via Express Mail**

James Hayes
4024 Eastbrook Drive
Annadle, VA 22003

_(signature)_

Etta R. Wolfe (DE Bar # 4164)

Bankruptcy Ct

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

2002 SEP 30  PM 8: 21

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| | : | |
| GENESIS HEALTH VENTURES, INC.,: | | Bankruptcy Case No. 00-2692-JHW |
| et al., | : | (Jointly Administered) |
| | : | |
| Debtors. | : | |

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| | : | |
| MULTICARE AMC, INC., et al., | : | Bankruptcy Case No. 00-2494-JHW |
| | : | (Jointly Administered) |
| Debtors. | : | |

| | | |
|---|---|---|
| JAMES J. HAYES, | : | |
| | : | |
| Appellant, | : | **CONSOLIDATED** |
| | : | |
| v. | : | Civil Action No. 02-16-JJF |
| | : | |
| GENESIS HEALTH VENTURES, INC.,: | | |
| et al., | : | |
| | : | |
| Appellees. | : | |


## MEMORANDUM ORDER

Before the Court is the Appellees' Joint Motion To Dismiss
The Appeal (D.I. 7) and Memorandum In Support of Appellee's Joint
Motion (D.I. 8).  Appellant has not filed a response to the
Motion.

Appellees contend that the appeal should be dismissed under
the doctrine of equitable mootness.  Appellant, James J. Hayes, a
single shareholder appealed the September 20, 2001 Confirmation

H338583252
9/30/02

RD73

Order of the Bankruptcy Court.  Appellant did not obtain a stay

of the Order and the Plan became effective on October 2, 2001.

From the Appellees' papers, the Court understands that Appellant

objected to the confirmation of the Plan contending that there

was sufficient enterprise value to permit a distribution to pre-

petition shareholders.  The Bankruptcy Court rejected Appellant's

objection.

In the circumstances presented, the Court concludes that the

instant motion must be granted.  The Confirmed Plan has been

implemented and distribution has occurred, thus prohibiting

Appellant from obtaining the remedy he sought before the

Bankruptcy Court.  Further, the lack of a response to Appellees'

Motion from Appellant indicates to the Court that Appellant

understands his inability to obtain relief.

NOW THEREFORE, IT IS HEREBY ORDERED that Appellees' Joint

Motion To Dismiss The Appeal (D.I. 7) is GRANTED.


9/30/02
DATE

UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

In re:                              :
                                    :    Chapter 11
GENESIS HEALTH CARE                 :
VENTURES, INC., et al.              :    Case No. 00-2692 (JHW)
                                    :    (Jointly Administered)
        Debtors,                    :
                                    :
_____ :
                                    :
JAMES J. HAYES,                     :
                                    :
        Appellant,                  :
                                    :
    v.                              :    Civil Action No.
                                    :    01-718-JJF
                                    :
GENESIS HEALTH VENTURES, INC.,      :
    et al.,                         :
                                    :
        Appellees.                  :

### MEMORANDUM ORDER

Now pending before the Court is Appellant's Motion for
Appointment of Official Committee of Equity Security Holders for
the Purpose of Appealing Confirmation of the Genesis
Reorganization Plan and Delay of Appellant's Brief Pending the
Appointment of Counsel (D.I. 7). For the reasons set out below,
the Appellant's Motion (D.I. 7) will be denied.

The Appellant provides no legal support for his contention
that this Court is empowered to appoint an Equity Committee for
the purpose of appealing a Bankruptcy Court's confirmation order.
The U.S. Trustee is the only party able to appoint an Equity
Committee. Here, the U.S. Trustee did not do so, and the

1

Bankruptcy Court upheld that decision.  The Appellant failed to appeal that decision to the district court.  Consequently, the Appellant cannot now petition the district court to appoint an Equity Commission.

NOW THEREFORE, IT IS HEREBY ORDERED this 30 day of September, 2002, that Appellant's Motion for Appointment of Official Committee of Equity Security Holders for the Purpose of Appealing Confirmation of the Genesis Reorganization Plan and Delay of Appellant's Brief Pending the Appointment of Counsel (D.I. 7) is **DENIED**.

UNITED STATES DISTRICT JUDGE

2

RD76

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE



IN RE:                          :    Bank. No. 00-2692
     GENESIS HEALTH VENTURES, :
     INC.,                       :
                                 :
          Debtor                 :

─────────────────────────────────

JAMES J. HAYES,                  :
                                 :
          Appellant              :    Civil Action. No. 01-718 JJF
                                 :
          v.                     :
                                 :
GENESIS HEALTH VENTURES, INC.,:
                                 :
          Appellee               :

## O R D E R

WHEREAS, the above-captioned matter was fully briefed and was decided under Civil Action No. 02-016 JJF;

NOW THEREFORE, IT IS HEREBY ORDERED that:

1) This case is **DISMISSED**.

2) If any party disagrees with the dismissal of this action, they shall file a motion to reopen within (20) twenty days of the date of this Order.

3 - 12 - 03
─────────────
DATE

─────────────────────────────
UNITED STATES DISTRICT JUDGE

RD77





# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GENESIS HEALTH VENTURES, INC., et al., | ) | Case No. 00-2692 (JHW) |
|     Debtors. | ) | (Jointly Administered) |
| | ) | |
| ──────────────────────── | ) | |
| | ) | |
| JAMES J. HAYES | ) | |
|     Appellant, | ) | C.A. No. 01-718 JJF |
| | ) | |
|       v. | ) | |
| | ) | |
| GENESIS HEALTH VENTURES, INC., et al., | ) | |
|     Appellees. | ) | |
| ──────────────────────── | ) | |

## MOTION TO REOPEN

Appellant, James J. Hayes, respectfully moves this Court to reopen Case No. 01-718 pursuant to this Court's ORDER of March 12, 2003 permitting disagreeing parties to file a Motion to Reopen within twenty days of the date of the ORDER. Contrary to the presumption in that ORDER, Civil Action No. 02-016 had not been fully briefed. Case 02-016 was an inactive and spurious duplicate case which had only been docketed on January 9, 2002 only three weeks prior to day that the Appellees filed their Motion to Dismiss. Appellees apparently intended to file their Motion to Dismiss in Case 01-718, which was the active appeal of the September 20, 2001 Bankruptcy Court Opinion on Confirmation of the Reorganization Plan of Genesis Health Ventures. The Appellant had filed an Opening Brief in Case 01-718 and Appellees' Answering Brief was due when the Appellees' discovered their mistake.

For each of the reasons explained in the supporting brief, the Court should reopen the active Case 01-718. And because the Appellant has filed an Opening Brief, the Court's reopening order should include a new scheduling order for Appellees' Answering Brief.

Dated: March 30, 2003                           Respectfully submitted,

                                                *James J. Hayes*

                                                James J. Hayes

CERTIFICATE OF SERVICE

I certify a copy of the foregoing Motion
and brief in support of this motion
was mailed from the Northern Virginia
Regional Post Office on March, 30, 2003
To the following at the addresses shown.

Mark D. Collins
Richards, Layton & Finger PA
One Rodney Square
P.O. Box 551
Wilmington, DE 19801

James J. Hayes

James J. Hayes



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | : Chapter 11 |
| | : |
| GENESIS HEALTH VENTURES, INC., | : Bankruptcy Case No. 00-2692 JHW |
| et al., | : (Jointly Administered) |
| | : |
| Debtors. | : |

| | |
|---|---|
| | : |
| IN RE: | : Chapter 11 |
| | : |
| MULTICARE AMC, INC., et al., | : Bankruptcy Case No. 00-2494 JHW |
| | : (Jointly Administered) |
| Debtors. | : |

| | |
|---|---|
| | : |
| JAMES J. HAYES, | : |
| | : |
| Appellant, | : **CONSOLIDATED** |
| | : |
| v. | : Civil Action No. 01-718 JJF |
| | : |
| GENESIS HEALTH VENTURES, INC., | : |
| et al., | : |
| | : |
| Appellees. | : |

<u>MEMORANDUM ORDER</u>

By his Motion (D.I. 18), the Appellant asks the Court to
reopen Civil Action Number ("C.A. No.") 01-718 JJF.  For the
reasons discussed, the Court will deny the Motion.

**I.    Background**

This is an appeal of the Bankruptcy Court's September 20,
2001, opinion on confirmation.  By mistake, the Clerk of the
Court double docketed this case in C.A. Nos. 01-718 JJF and 02-
016 JJF.  On September 30, 2002, the Court granted Appellees'
unopposed motion to dismiss the appeal in C.A. No. 02-016 JJF as
equitably moot.  (D.I. 10 in C.A. No. 02-016 JJF.)

On December 4, 2002, the Appellees submitted a letter to the Court stating that C.A. No. 02-016 JJF was the same appeal as the instant case, and therefore, contended that the Court should apply its Memorandum Order dismissing C.A. No. 02-016 JJF to this case. On March 12, 2003, the Court entered an Order dismissing the instant case because the appeal was fully briefed and decided under C.A. No. 02-016 JJF. (D.I. 17 in C.A. No. 01-178 JJF.) This is the Appellant's Motion to Reopen the Court's dismissal and closure of C.A. No. 01-718 JJF.

## II. Appellant's Contentions

The Appellant contends that the Court should reopen the instant case because it would violate his due process rights to dismiss this case based upon the Court's conclusions in a "spurious" case. The Appellant also contends that applying the judgment in C.A. No. 02-016 JJF to this case would be inappropriate because, at the time of entry of the Court's Memorandum Order in C.A. No. 02-016 JJF, he had not "made any filings in this case[.]" (D.I. 19 at 6.)

## III. Decision

The Court granted the Appellees' motion to dismiss in C.A. No. 02-016 JJF on the grounds that the appeal was equitably moot. The Appellant does not contend that he did not receive notice of the Appellees' motion to dismiss in C.A. No. 02-016 JJF. However, he did not file an opposition brief and has offered no

2

explanation. Because the Appellant is the appellant in both C.A. No. 02-016 JJF and C.A. No. 01-718 JJF, the Court concludes that the dismissal in C.A. No. 02-016 JJF controls the decision here. The Appellant cannot litigate issues in this case that he should have litigated in C.A. No. 02-016 JJF merely because of a clerical error.

NOW THEREFORE, IT IS HEREBY ORDERED that the the Appellant's Motion to Reopen (D.I. 18) is **DENIED**.


 February 26, 2004 
DATE

Joseph J. Farnan Jr.
UNITED STATES DISTRICT COURT

3

RD83

Westlaw.

2005 WL 1060939                                          Page 1
2005 WL 1060939 (U.S.)


For opinion see 125 S.Ct. 2947

Supreme Court of the United States.
James J. HAYES, Petitioner,
v.
GENESIS HEALTH VENTURES, INC., et al., Respondents.
No. 04-1460.
April 25, 2005.
On Petition for a Writ of Certiorari to the United States Court of Appeals for the
Third Circuit

Petition for a Writ of Certiorari

James J. Hayes, Petitioner, 4024 Estabrook Drive, Annandale, Virginia 22003, (703)
941-4694.

*i QUESTION PRESENTED
 Can federal courts ignore Fifth Amendment Due Process and Takings issues in
dismissing a bankruptcy appeal on the basis of the judicial doctrine of equitable
mootness or does the judicial duty to protect and defend the Constitution require
federal courts to consider the constitutional issues?

*ii PARTIES TO THE PROCEEDINGS
 The petitioner, James J. Hayes, is a shareholder of Genesis Health Ventures, Inc.
during its bankruptcy.

 The respondent, Genesis Health Ventures, Inc. is the reorganized Genesis.

*iii TABLE OF CONTENTS

Question Presented ... i

Parties To The Proceedings ... ii

Table of Authorities ... v

Opinions Below ... 1

Jurisdiction ... 2

Constitutional Provisions Involved ... 2

Statement Of The Case ... 3

 A. The Third Circuit Opinion ... 5

 B. The Third Circuit Overlooked Constitutional Issues The Petitioner Raised In The
District And Third Circuit Appeals ... 5

Arguments For Remand ... 8

 A. The Third Circuit's Jurisdiction Requires Consideration Of The Overlooked
Constitutional Issues ... 8

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

RD8.

2005 WL 1060939                                                        Page 2
2005 WL 1060939 (U.S.)

B. The Third Circuit's Jurisdiction Requires Consideration On The Constitutional
Application Of The Judicial Doctrine Of Equitable Mootness ... 13

C. The Spurious Appeal And The Procedural Barrier Allegedly Limiting The Review Of
Equitable Mootness Issues Crumbles Under The Facts ... 15

Reasons For Granting Writ ... 18

A. The Third Circuit Decision To Ignore Constitutional Issues Conflicts With Other
Circuits ... 18

B. Bankruptcy Rules Create Opportunities For Post-Bankruptcy Investors To Profit
At The Expense Of Pre-Bankruptcy Investors ... 21

*iv  C. Genesis And Kmart Are Examples Showing That The Denial Of Shareholders'
Constitutional Rights To Compensation And Due Process Facilitates Enormous Gains
For Bankruptcy Investors ... 23

D. Seitel Example Shows That Appointment Of Equity Committee Benefited
Shareholders And Bondholders ... 26

E. Recognition of Shareholders Constitutional Rights In Complex Bankruptcies Will
Increase National Wealth ... 28

Conclusion ... 29

*v TABLE OF AUTHORITIES

Cases:

In re Barton Industries, 104 F. 3d 1241 (10th Cir. 1997) ... 18

In re Cabral, 285 B.R. 563 (1st Cir. BAP) ... 18

In re Continental Airlines, 91 F. 3d 553 (3rd Cir. 1996) (en banc.) ... 13, 14

In Re Genesis Health Ventures, Inc., et al., 266 B.R.591 (Bankr. D. Del.) ... 3,23

In Re Kmart Corp. 359 F. 3d 866 (7th Cir. 2004) ... 12, 18

In re Kendavis Holdings Co., 249 F. 3rd 383 (5th Cir. 2001) ... 12, 18

Kent v. Dulles, 357 U.S. 116 (1957) ... 11

Marbury v. Madison, 5 U.S. (1Cr.) 137 (1803) ... 2,9,11,13,14,20,29

Padilla v. Rumsfeld, 352 F. 3rd 695 (2nd Cir. 2003) ... 20

In re PWS Holdings Corp., 258 F.3d 224 (3rd Cir. 2000) ... 15

Rumsfeld v. Padilla 541 U.S. 984 ... 20

In re Seitel et. al., U.S.B.C.D. Delaware, No. 03-12227 PJW (2004) ... 27

Stumpf v. Mitchell, 367 F. 3d. 594 (6th Cir. 2004) cert. granted Jan. 2005) ... 19

In Re Zenith Electronics Corp., 329 F. 3d 338 (3rd Cir. 2003) ... 15

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1060939                                          Page 3
2005 WL 1060939 (U.S.)

Constitution:

Amendment V (1791) ... 2

Article III ... 9

*vi Statutes:

Bankr. Code, 11 U.S.C., 105 thru 1141 ... Passim

Miscellaneous:

Genesis Litigation Website, http:// www.richardhaskellvsgoldmansachsetal.com/ ... n.1p.3

*The Turnaround Letter,* p. 1 Vol. 14 n. 3, Sept. 1999 ... 22

*1 James J. Hayes, on behalf of himself and the members of Genesis equity class, respectfully petitions for a writ of certiorari to remand this case to the United States Court of Appeals for the Third Circuit for consideration of Fifth Amendment due process and compensation issues, and on the application of the judicial doctrine of equitable mootness.

### OPINIONS BELOW
The opinion of the court of appeals affirming the district court's denial of a motion to reopen its dismissal of a bankruptcy court appeal on the basis of the judicial doctrine of equitable mootness (App. A1) is unreported. The order of the district court, acting as a court of appeal, denying *2 petitioner's motion to reopen the appeal following its dismissal for equitable mootness (App. A5) is also unreported.

### JURISDICTION
The judgment of the court of appeals was entered on December 6, 2004. (App. A8) A petition for rehearing was denied on January 25, 2005. (App. A10)

Petitioner believes that the jurisdiction of this Court is required by its decision in *Marbury v. Madison,* 5 U.S. (1Cr.) 137, (1803) that requires federal courts to decide constitutional issues. However, because of changes in this Court's rules limiting the circumstances for appellate review; this case is presented as a petition for a writ of certiorari.

### CONSTITUTIONAL PROVISIONS INVOLVED
The Fifth Amendment provides in part that "*No person shall ... be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.*" In this case, the petitioner argued that:
1) the cancellation of the common stock of Genesis Health Ventures Inc. by the bankruptcy court without providing the shareholders compensation violated the Takings Clause, and
2) the failure of the bankruptcy court and the United States Trustee to appoint an equity committee - with legal and financial advisors to participate with the legal and financial advisors of the senior lenders and unsecured creditors in negotiating the reorganization plan that cancelled shareholders stock - deprived shareholders due process in the taking of their property.

### *3 STATEMENT OF THE CASE

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

 This case is a pro se appeal of the United States Bankruptcy Court District of
Delaware's "cram down" confirmation of a reorganization plan in the joint
bankruptcy of Genesis Health Ventures Inc. and the Multicare Companies Inc. Genesis
shareholders were denied representation in the negotiations among the debtor,
senior lenders and unsecured creditors that produced a reorganization plan that
cancelled their stock without providing any compensation. Ninety four per cent of
the equity in the new Genesis was allocated to the senior lenders of Genesis and
Multicare. The District Court denied petitioner's request for a post-confirmation
equity committee to argue the appeal. (App. A12)

 The confirmation is termed a "cram down" because a 85.9% of the Genesis' unsecured
creditor vote, principally the junior bondholders, was against the plan. *In Re
Genesis Health Ventures, Inc., et al.,* 266 B.R. 591 598 (Bankr. D. Del.) The
petitioner and a junior bondholder appealed the confirmation. Both appeals were
dismissed by the District Court based on the judicial doctrine of equitable
mootness. Subsequently, a group of about two hundred and fifty junior bondholders
brought a fraud on the bankruptcy court suit that alleges that certain members of
Genesis senior management and certain senior lenders conspired to under-report
earnings. This lowered the investment banking valuations that the bankruptcy court
relied on in confirming the reorganization plan. [FN1]

     FN1. See http://www.richardhaskellvsgoldmansachsetal.com On December 31,
     2004, the enterprise value of the reorganized Genesis was about $750 hundred
     million dollars higher than its bankruptcy valuation. About $200 million
     corresponds to the market increase of the comparable companies used in the
     bankruptcy valuation. The $550 million difference is an estimate of the
     bankruptcy undervaluation and is consistent with the allegations in the
     bankruptcy fraud suit.

 *4 The petitioner's appeal was beset by unusual procedural circumstances that
became the only issue in the Third Circuit. After filing a timely notice of appeal,
the petitioner requested the bankruptcy court appoint a post-confirmation equity
committee to argue the appeal. Then after the District Court issued a briefing
schedule, the petitioner filed a motion for an equity committee in the District
Court. Genesis opposed both motions. After a significant delay, the District Court
denied the motion for an equity committee and rescheduled the opening brief. (App.
A12 & A14) The petitioner filed a timely opening brief.

 Rather than file a reply, Genesis notified the District Court of another appeal
with the same parties that the District Court had dismissed on the date it denied
petitioner's motion for an equity committee. It happened that nine weeks after the
petitioner's appeal was docketed, the bankruptcy court inexplicably filed a second
notice of appeal with the District Court showing the same parties as the earlier
docketed appeal. The District Court docketed this as a new appeal and on the same
day docketed Genesis' designations of the record. The same judge was assigned as in
the petitioner's appeal. This appeal is referred to as the "spurious" appeal.
Genesis filed an unopposed motion to dismiss the spurious appeal on the grounds of
equitable mootness that was granted by the District Court.

 Following letters to the District Court by the parties, the District Court applied
the equitable mootness ruling in the spurious appeal to petitioner's appeal. That
order also requested that parties disagreeing with the order file a motion to
reopen. The petitioner filed a motion to reopen and that motion was denied. The
petitioner appealed to the Third Circuit.

                    *5 A. The Third Circuit Opinion
 The Third Circuit noted that most of the petitioner's arguments on appeal

              © 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1060939
2005 WL 1060939 (U.S.)

concerned "*the application of the doctrine of equitable mootness in his case.* " (App. A3) Because the petitioner did not appeal the dismissal of the spurious appeal and the motion to reopen was filed more than ten days after the dismissal the Third Circuit concluded that it did not have jurisdiction to review equitable mootness. The Third Circuit review was limited to the District Court's denial of the motion to reopen. Using an abuse of discretion standard and finding none it affirmed. (App. A4)

The Third Circuit's decision relied on the erroneous fact that the petitioner had filed two notices appeals from "*the exact same bankruptcy judgment confirming the exact same reorganization plan*" and that Genesis had not shown bad faith in bringing the problem to the District Court's attention. (App. A4)

A. The Third Circuit Overlooked Constitutional Issues The Petitioner Raised In The District And Third Circuit Appeals

The Third Circuit opinion noted that most of the Appellant's arguments  "*concern the application of the doctrine of equitable mootness.*" (App. A3) Three of the four issues that the petitioner tried to raise in the circuit court appeal, however, concerned the application of the Fifth Amendment to the Genesis bankruptcy proceedings:
2. Do the due process provisions of the Fifth Amendment require the appointment of an equity committee in large company bankruptcy proceedings where shareholders' equity ownership is at stake; or is it sufficient to permit individual *6 shareholders to object and only be heard at the end of the confirmation hearing?
3. Do the due process provisions of the Fifth Amendment require the district court to hear an appeal from a shareholder whose property, the equity ownership of a bankrupt company, was taken by a reorganization plan confirmed by the bankruptcy court?
4. Does a Chapter 11 bankruptcy reorganization plan that cancels the ownership interests of equity holders without any compensation violate the Takings Clause of the Fifth Amendment?
*Brief For Appellant*, Case 04-1862, Third Circuit, p.1

In the District Court, the petitioner's motion for the appointment of an equity committee argued:
1) [a]ppointment of a committee of equity security holders is required by the due process provisions of the Fifth Amendment. The Supreme Court has held that citizens must be accorded due process when being deprived of their property by the government in furtherance of public policy, here provisions of the Bankruptcy Code. Participation in appellate proceedings challenging the taking of shareholders property is such required due process.
4) Merging the two companies caused much confusion as to the proper valuation methodology that established the enterprise values which determined the allocations among the senior lenders and unsecured creditors and left shareholders with a zero allocation. There is substantial issue whether *7 the valuation and allocations should be based on Genesis and Multicare as individually structured or on the reorganized company. The valuation differences amount to hundreds of millions of dollars. In addition, there is evidence that the debtor's counsel made a $200 million dollar error in determining the threshold enterprise value that made the Senior Lenders whole. Taken together, these errors total several hundred millions dollars and raise an issue that even under established bankruptcy priority that shareholders would be entitled to a relatively small but monetarily significant allocation. Without representation of counsel, shareholders could not adequately develop these issues at the August confirmation hearings. Representation by counsel is required to develop these issues on appeal.
*Motion For Appointment Of Official Committee Of Equity Security Holders For The*

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1060939                                                    Page 6
2005 WL 1060939 (U.S.)

*Purpose Of Appealing Confirmation Of The Genesis Reorganization Plan*, C.A. No. 01-718, District Court, District of Delaware, p. 2-3.

After the District Court denied this motion, the petitioner argued in his opening brief that the Bankruptcy Court's:

The Fifth Amendment provides that citizens may not be deprived of life, liberty, or property without due process of law. Subsequent court decisions have included the right to an impartial hearing, the right to call and cross examine witnesses, and the right to have a lawyer argue *8 one's case as fundamental elements of due process. Owners of the common stock of Genesis Health Ventures, Inc. were denied these fundamental protections in the jointly administered bankruptcy proceedings of Genesis and Multicare AMC, Inc. The proceedings facilitated a reorganization of the company's financial obligations that placed the shareholders ownership of Genesis in jeopardy. Bankruptcy proceedings that place ownership at risk entitle owners to the due process protections of the Fifth Amendment.
*Assignments Of Error And Appellant's Brief*, C.A. No. 01-718, District Court, District of Delaware, p. 2.

The petitioner's first argument in the motion to reopen the dismissal of the spurious appeal raised a due process issue.
It would violate Appellant's due process rights to dismiss the active case 01-718 based on this Court's findings in a spurious case 02-216 when the Appellant had not briefed the spurious case.
*Motion To Reopen*, C.A. No. 01-718, District Court, District of Delaware, p. 6. #19.

                        ARGUMENTS FOR REMAND
A. The Third Circuit's Jurisdiction Requires Consideration Of The Overlooked Constitutional Issues

The shareholder appeal of the Bankruptcy Court's confirmation of the Genesis and Multicare reorganization raised Fifth Amendment takings and due process issues in the District Court and the Third Circuit. Both courts ignored the *9 constitutional issues in dismissing the shareholder appeal on the basis of the judicial doctrine of equitable mootness. Since *Marbury v. Madison* was decided 1803, this Court has required the federal courts to decide constitutional issues that are raised in cases under its jurisdiction.

Article III Section 2. [1] of the Constitution states that: "*[t]he judicial Power shall extend to all Cases in Law and Equity, arising under this Constitution ....*" In 1803 in *Marbury v. Madison* chief justice John Marshall established the foundation of constitutional law.
It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule. If two laws conflict with each other the courts must decide on the operation of each. So if a law be in opposition to the constitution; if both the law and the constitution apply to a particular case, so that the court must either decide that case conformably to the law, disregarding the constitution; or conformably to the constitution, disregarding the law; the court must determine which of these conflicting rules governs the case. This is of the very essence of judicial duty.
If then the courts are to regard the constitution; and the constitution is superior to any ordinary act of the legislature; the constitution, and not such ordinary act, must govern the case to which both apply.
Those then who controvert the principle that the constitution is to be considered, in court, as a paramount law, are reduced to the necessity of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1060939
2005 WL 1060939 (U.S.)

maintaining that courts must close their eyes on the constitution, and see only the law.

*10 This doctrine would subvert the very foundation of all written constitutions. It would declare that an act, which, according to the principles and theory of our government, is entirely void; is yet, in practice, completely obligatory. It would declare, that if the legislature shall do what is expressly forbidden, such act, notwithstanding the express prohibition, is in reality effectual. It would be giving to the legislature a practical and real omnipotence, with the same breath which professes to restrict their powers within narrow limits. It is prescribing limits, and declaring that those limits may be passed at pleasure.

That it thus reduces to nothing what we have deemed the greatest improvement on political institutions - a written constitution - would of itself be sufficient, in America, where written constitutions have been viewed with so much reverence, for rejecting the constitution. But the peculiar expressions of the constitution of the United States furnish additional arguments in favour of its rejection.

The judicial power of the United States is extended to all courts arising under the constitution.

Could it be the intention of those who gave this power, to say that, in using it, the constitution should not be looked into? That a case arising under the constitution should be decided without examining the instrument under which it arises?

This is too extravagant to be maintained.

In some cases then, the constitution must be looked into by the judges. And if they can open it at *11 all, what part of it are they forbidden to read, or do they obey?

*Marbury v. Madison,* 5 U.S. (1Cr.) 137, 177-178 (1803)


Genesis is such a case, and according to Marshall's reasoning the District Court and the Third Circuit - by ignoring constitutional issues presented in the bankruptcy appeal - violated their judicial duty.


And that duty has not changed in 200 years. In 1957, for example, this Court examined the denial of passports to certain groups on the question whether this denial violated the Fifth Amendment rights of liberty to these citizens.

We deal here with a constitutional right of the citizen, a right which we must assume Congress will be faithful to respect. We would be faced with important constitutional questions were we to hold that Congress... had given the Secretary authority to withhold passports to citizens because of their beliefs or associations.

Kent v. Dulles, 357 U.S. 116 130 (1957)


This Court was able to decide the constitutional issues raised by the withholding of passports by the Secretary of State because the circuit court had reviewed and considered the constitutional issues in its opinion. In Genesis, the Third Circuit has ignored the constitutional issues raised in the shareholders appeal. The failure to decide constitutional issues itself denies shareholders their Fifth Amendment due process rights which this Court is obligated to rectify.


The Third Circuit maintains that its jurisdictional mandate is limited to considering the District Court's denial *12 to reopen "*because the* [petitioner's] *motion to reopen was filed more than ten days after the entry of the March 13, 2003 order, it did not toll the time for appeal from that order.* " (App. A3n2) The Third Circuit is wrong in thinking this procedural peculiarity is of any significance to its duty to decide constitutional issues. The Fifth and Seventh Circuits have both set aside similar jurisdictional issues to consider and decide constitutional issues arising from confirmation of a bankruptcy reorganization plan.

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1060939
2005 WL 1060939 (U.S.)

*In re Kendavis Holdings Co.,* 249 F. 3rd 383 (5th Cir. 2001), the Fifth Circuit reviewed and upheld due process claims in a bankruptcy case fifteen years after the bankruptcy court's order confirming the reorganization plan. In this case, a Kendavis employee discovered the deficiencies in his retirement compensation were due to a transfer of $20 million from the company's retirement plan in the bankruptcy reorganization. Twelve years after confirmation, the employee's suit precipitated reopening the bankruptcy. After establishing that the employee knew of the bankruptcy, the court fined the retired employee $40,000 for defying the court's injunction against claims arising before the confirmation. The Fifth Circuit reversed on the basis that the employee had not been provided constitutional due process: *"Under the Supreme Court's standard, we must analyze the particular facts of each case."* Id. 386

*In Re Kmart Corp.* 359 F. 3d 866 (7th Cir. 2004), the Seventh Circuit considered and denied due process arguments by a non-party appeal of bankruptcy court order. Rather than dismiss the appeal for lack of standing, the Seventh Circuit permitted the non-party to intervene in the circuit court. Id. 870 These recent Fifth and Seventh Circuit cases show that procedural difficulties, even if genuine, cannot eliminate the obligation of federal courts to decide constitutional issues.

*13 Genesis is a typical *Marbury* case where *"the constitution must be looked into by the judges."* Id. 178. The alleged procedural barrier cited by the Third Circuit is of no merit. This Court is required to remand this case to the Third Circuit for consideration of the Fifth Amendment Takings and Due Process issues.

B. The Third Circuit's Jurisdiction Requires Consideration On The Constitutional Application Of The Judicial Doctrine Of Equitable Mootness

The judicial doctrine of equitable mootness was crafted by the Third Circuit in the Continental Airlines bankruptcy [FN2] to foreclose viable appeals in situations where granting relief would require unscrambling a bankruptcy reorganization that was substantially completed before the appeal was taken.

    FN2. *In re Continental Airlines,* 91 F. 3d 553 (3rd Cir. 1996) (en banc.)

The Third Circuit affirmed the District Court's dismissal of the shareholder appeal on the basis of this doctrine without considering the fundamental question of whether a judicial doctrine could foreclose the Fifth Amendment rights of shareholders to compensation and due process in bankruptcy proceedings that cancelled their stock. Actually, denying shareholders their appeal on the basis of a judicial doctrine is a further violation of shareholders Fifth Amendment Due process rights.

The dissenting opinion in the 7-6 en banc *Continental* decision - while not considering an appellant with constitutionally protected right - had serious doubts about the judicially crafted remedy of equitable mootness. Writing for the dissent, it was Judge Alito's view that:
*14 [t]he majority's decision in this case creates a bad precedent for our circuit. The majority adopts the curious doctrine of "equitable mootness," which it interprets as permitting federal district courts and courts of appeals to refuse to entertain the merits of live bankruptcy appeals over which they indisputably possess statutory jurisdiction and in which they can plainly provide relief. According to the majority, there is no clear rule for determining when a bankruptcy appeal is "equitably moot" Instead, this is said to be a discretionary determination to be made in the first instance by the district court based on a weighing of five factors teat the majority has culled from the opinions of our "sister circuits." In my view, if the doctrine has any validity, it is more limited

2005 WL 1060939
2005 WL 1060939 (U.S.)

than the majority holds. (emphasis added)
  *In re Continental Airlines,* 91 F. 3d 553 567 (3rd Cir. 1996) (en banc.)

  Clearly, the doctrine could not be applied in cases like Genesis where
shareholders have asserted that their constitutional rights to compensation and due
process have been violated by the bankruptcy court's confirmation of a
reorganization plan that extinguished their ownership without compensation. In
cases where a citizen's constitutional rights are at stake, however, this Court in
*Marbury v. Madison, 5 U.S.* (1Cr.) 137 (1803) requires federal courts to make a
constitutional analysis.
  If then the courts are to regard the constitution; and the constitution is
superior to any ordinary act of the legislature; the constitution, and not such
ordinary act, must govern the case to which both apply. Id. 177.

  *15 In the shareholder appeal, the Third Circuit must consider whether its
doctrine of equitable mootness overrules the Constitution.

  Subsequent to the *Continental* decision, the Third Circuit has allowed bankruptcy
appeals to proceed where the relief requested would not require unscrambling of the
bankruptcy reorganization. See *In re PWS Holdings Corp.,* 258 F.3d 224 and *In Re
Zenith Electronics Corp.,* 329 F. 3d 338. The Petitioner's opening brief argued that
investment banker mistakes caused an undervaluation Genesis' enterprise value that
combined with debtor's errors in calculation of the hypothetical enterprise value
required to satisfy the senior lenders' claims provided distributions to the senior
lenders that were substantially greater than their claims. Courts could provide
relief by requiring that the senior lenders return their windfall gains to the
bankruptcy estate for distribution to lower ranking classes. An unscrambling of the
reorganized Genesis would not be required and equitable mootness would not apply.

  The Third Circuit avoided reviewing the application of equitable mootness because
in its view it lacked jurisdiction on this issue. In reaching this conclusion, the
Third Circuit relied on the bizarre set of procedural circumstances discussed
below.

  C. The Spurious Appeal And The Procedural Barrier Allegedly Limiting The Review Of
Equitable Mootness Issues Crumbles Under The Facts

  The Third Circuit's view of its limited jurisdiction rests on its conclusion that
the District Court did not abuse its discretion in applying its doctrine of Res
Judicata to dismiss the petitioner's appeal. The District Court's decision depended
on the spurious appeal being a genuine appeal *16 which it is not. Genesis
misrepresented that two separate notices of appeals were filed with respect to the
bankruptcy court's September 20, 2001 order confirming Genesis' reorganization plan
where in fact the petitioner filed only one. Genesis' Res Judicata arguments are
based on a bogus appeal that they in all likelihood helped to create.

  From Genesis' arguments, the Third Circuit concluded as facts that: "*[o]n
September 13, 2001, the Bankruptcy Court entered judgment confirming the plan ....*"
and that "*Hayes filed two notices of appeal from this judgment on September 13,
2001 and September 20, 2001*" (App. A2) The real facts are that the judgment
confirming the plan was entered on September 20, 2001 [FN3] and Hayes filed only
one notice of appeal and that was on September 18, 2001. [FN4] Hayes subsequently
amended his premature notice of appeal to reflect the correct date of the
bankruptcy court's order. [FN5] The so called September 13, 2001 notice of appeal,
and the foundation of the spurious case 02-00016, would not be *17 appealing
"*...the exact same bankruptcy judgment...*" as the so called September 20, 2001
notice of appeal, the foundation of case 01-0718. (App. A4) Clearly, the Third

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1060939                                                    Page 10
2005 WL 1060939 (U.S.)

Circuit's analysis is premised on a bogus appeal created by Genesis. [FN6]

> FN3. U.S. Bankruptcy Court District of Delaware Docket Report entry 338582335
> on September 20, 2001 states - "*Findings of Facts, Conclusions of Law and
> Order Confirming Debtors' Joint Plan of Reorganization Signed by Judge Wizmur
> on 9/20/01.*"
> The September 13, 2001, date reflects the bankruptcy court's opinion that
> held the plan was confirmable subject to certain modifications. Genesis
> subsequently modified the plan and the bankruptcy court then confirmed the
> plan on September 20, 2001.
>
> FN4. U.S. Bankruptcy Court District of Delaware Docket Report entry 338582358
> on September 18, 2001 states - "*Notice of Appeal. Receipt Number 055161, Fee
> Amount $105. Filed by James J. Hayes.*"
>
> FN5. U.S. Bankruptcy Court District of Delaware Docket Report Docket Report
> entry 338582359 on September 24, 2001 states - "*Amended Notice of Appeal.
> Receipt Number 055161, Fee Amount $105. Filed by James J. Hayes.*"
>
> FN6. The District Court characterized the problem as a mistake by the Clerk
> of the Court in double docketing this case in C.A. Nos. 01-718 JJF and 02-016
> JJF. (App. A-6) The district court clerk can hardly be faulted for separately
> docketing notices of appeal filed nine weeks apart. The real question is why
> the bankruptcy court clerk would delay sending the district court a notice of
> appeal by nine weeks. The delay is inexplicable without considering that on
> the same day that the District Court docketed this appeal it docketed
> Genesis' designations of the record for the appeal. This shows that Genesis
> knew the bankruptcy court clerk would make a late filing and just
> coincidentally designated the record for the supposed petitioner's appeal at
> the same time. More likely, the spurious appeal is bogus and was created by
> Genesis.

 The Third Circuit opinion concluded: "*Hayes did not argue any other circumstances,
and we find none on this record, warranting reopening the appeal.*" (App. A4)
However, the District Court opinion noted: "[t]he Appellant contends...it would
violate his due process rights to dismiss this case based upon the Court's
conclusions in a 'spurious' case." (App. A6) Had the Third Circuit analyzed this
constitutional issue it could have seen that the spurious appeal was so designated
because it was not filed by the petitioner, that it appealed a non-existent order,
and raised no issues. The dismissal of the spurious appeal has no possible bearing
on the petitioner's appeal and the decisions to the contrary can only be considered
a new violation of shareholders due process rights.

                         *18 REASONS FOR GRANTING WRIT
 A. The Third Circuit Decision To Ignore Constitutional Issues Conflicts With Other
Circuits

 Not surprisingly every circuit court of appeal has considered a broad spectrum of
constitutional issues raised in bankruptcy appeals. The circuits have uniformly
held that due process requirements apply to bankruptcy proceedings. *In re Barton
Industries,* 104 F. 3d 1241 (10th Cir. 1997), *In re Cabral,* 285 B.R. 563 (1st Cir.
BAP)

 The due process issues have ranged from the serious where a confirmed bankruptcy
plan was subordinated to constitutional due process to the bizarre. *In re Kendavis
Holdings Co.,* 249 F. 3rd 383 (5th Cir. 2001) the court determined that due process
precluded discharge of retiree creditor's unlisted post petition claim for

             ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

additional pension benefits against employer/chapter 11 debtor:
  Protection of an individual's due process right to adequate notice requires more
than a cursory review...
  ...
  Under the Supreme Court's standard, we must analyze the particular facts of each
case. Id. 386

  *In Re Kmart Corp.* 359 F. 3d 866 (7th Cir. 2004), judge Easterbrook permitted
Handleman, a non party, to intervene in a Seventh Circuit appeal to argue a bizarre
due process claim. Handlemen, a Kmart creditor, benefited as a designated critical
vendor from a bankruptcy court order allowing Kmart to immediately pay critical
vendors. The district court reversed the bankruptcy court and Kmart appealed to the
Seventh Circuit. Handleman argued that it was not a "party" in the district court
and, consistent with the *19 due process clause of the fifth amendment, could not
be bound by the district court's decision. Considering this novel due process
claim, Judge Easterbrook reasoned:
  [i]f the lack of personal notice about the proceedings before the district judge
deprived Handleman of due process, then Kmart's application to the bankruptcy judge
deprived about 47,000 unsecured creditors of the process! That would render the
critical vendors order void, and Handleman would be worse off... But there is no
constitutional obligation to make every creditor a party to every contested matter
in the bankruptcy.... Kmart vigorously represented the interests of Handleman and
the other vendors Kmart deemed "critical." Id. 870.

  The Seventh Circuit recognized that federal courts have an obligation to consider
constitutional issues whether serious or silly. An element of this consideration is
the written opinion with analysis that explains why the particular action does or
does not violate the constitution. The Third Circuit opinion ignored the
constitutional issues and in doing so conflicts with every circuit court of appeal
that has considered constitutional issues in bankruptcy appeals.

  In a broader spectrum of cases, circuit courts have consistently recognized their
duty to consider constitutional issues in cases under their jurisdiction. In *Stumpf
v. Mitchell,* 367 F. 3d. 594 (6th Cir. 2004), the court reviewed a death penalty
murder conviction for new Fifth Amendment and due process violations 20 years after
the fact, even after this Court, previously rejected an earlier cert. petition. The
Sixth Circuit concluded:
  ...that Stumpf's due process rights were violated *20 by the state's deliberate
action in securing convictions of both Stumpf and Wesley for the same crime, using
inconsistent theories. Id. 596.

  This case shows that federal courts' obligation to consider constitutional issues
is a continuing one in light of new facts and/or new legal precedent. Although this
Court granted a writ to review, it certainly won't admonish the Sixth Circuit for
considering and deciding the constitutional issues.

  In *Padilla v. Rumsfeld,* 353 F. 3rd 695 (2nd Cir. 2003), the Second Circuit cited
*Marbury v. Madison* in a recent affirmation of the responsibility of the federal
courts to decide constitutional issues.
  Where the exercise of Commander-in-Chief powers, no matter how well intentioned,
is challenged on the ground that it collides with the powers assigned by the
Constitution to Congress, a fundamental role exists for the courts. Id. 713 citing
*Marbury v. Madison,* 5 U.S. (1Cr.) 137 (1803).
  Based on the text of the Constitution and the cases interpreting it, we reject
the government's contention... Id. 718

  And this Court's review while reversing the Second Circuit's judgment required

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1060939
2005 WL 1060939 (U.S.)

that the order of dismissal be without prejudice allowing these constitutional claims to be filed in the proper jurisdiction. <u>Rumsfeld v. Padilla</u> 541 U.S. 984. This case is a fitting affirmation of Chief Judge Marshall's admonition: "*In some cases then, the constitution must be looked into by the judges.*" *Marbury* at 178. The Third Circuit stands alone in thinking that it can avoid looking at the Constitution by simply ignoring the constitutional issues raised in appeals under its jurisdiction.

**\*21  B. Bankruptcy Rules Create Opportunities For Post Bankruptcy Investors To Profit At The Expense Of Pre-Bankruptcy Investors**

Application of federal bankruptcy laws have a profound effect on the trading of distressed securities preceding and following the actual filing of a bankruptcy petition. The prices of these securities fall dramatically on the announcement or rumor of a bankruptcy filing as investors panic and sell rather than remain invested in a bankrupt company. Many institutional investors' charters require a sale when bond ratings drop below investment grade. Forced or panic selling overlooks or ignores the company's true worth. Attracted to bargains, investment professionals, who specialize in researching distressed securities scoop up these bonds or claims at discounted prices.

Because of the new informational and analytical requirements, bankruptcy investing is an arcane specialty dominated by hedge funds and others with large pools of capital. Bankruptcy investors utilize specialized knowledge to identify the particular securities favored by the bankruptcy rules and then acquire large or dominant positions in order to influence decision-making through appointment to the creditors committee. [FN7] Bankruptcy investors then use their dominance and expertise to get their legal and financial advisors selected as the creditors committee's legal and financial advisors. The bankruptcy investor now controls the process of negotiating the reorganization plan. Because of long-standing relationships, the bankruptcy investor's advisors have proven their proficiency in carefully shading the financial analyses provided as expert testimony to the bankruptcy court that justifies the favorable allocations for \*22 the bankruptcy investor in the restructured enterprise.

FN7. Bankruptcy rules provide that the largest creditors serve on the creditor committees.

The bankruptcy investor's financial and legal advisors also use their expertise and early preparation to preemptively foreclose the appointment of an equity committee that could counter balance the analyses of the creditors committee. Under bankruptcy rules, an equity committee is appointed at the discretion of the United States Trustee or on petition to the bankruptcy court. In both cases, timely legal argument and financial analyses by the creditor's committee is particularly helpful in "killing this baby in the cradle."

Historically, equity securities have been unfairly disfavored in bankruptcy proceedings, no doubt due to the effective representation of the creditor committee. There are rarely post bankruptcy concentrations of equity holdings that could act as a countervailing power. The major equity holders have sold out in anticipation that the equity would receive little or no participation in the reorganized enterprise. Without the resources provided by concentrated holdings, shareholders are simply not prepared to make the timely and well researched arguments needed to achieve appointment of an equity committee. Foreclosing an equity committee makes it easy for the bankruptcy investor to foreclose distributions to shareholders which necessarily enhances its windfall gains.

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1060939
2005 WL 1060939 (U.S.)

This gaming of the bankruptcy process has preceded to such a fine art that *The Turnaround Letter*, a long time and well regarded shareholder newsletter, advises its clients:

[t]he first rule of bankruptcy investing is to avoid the common stock of a company in Chapter 11, no matter how "cheap" it may seem. There is a tremendous temptation to say "Iridium's stock was trading at 50 a year ago, and so it must be cheap at 1 *23 or 2" or "At 1 or 2 how much lower can it go" Our responses to these statements are "Wrong!" and "To zero", respectively.

*The Turnaround Letter*, p. 1 Vol. 14 n. 3, Sept. 1999.

There are significant macro economic problems caused by the wealth transfer from shareholders to debt holders in successful bankruptcy reorganizations. The creation of windfall gains for debt holders by taking corporate ownership from shareholders without compensation lies at the heart of the problem. The denial of an equity committee facilitates these windfall gains while obscuring their reality. The enormity of the windfall gains seen retrospectively in the examples of Genesis and Kmart, discussed below, shows the reality of the problem.

C. Genesis And Kmart Are Examples Showing That The Denial Of Shareholders' Constitutional Rights To Compensation And Due Process Facilitates Enormous Gains For Bankruptcy Investors

The Bankruptcy Court accepted $1.75 billion as the enterprise value of the reorganized Genesis based on comparable company analyses by the debtors' investment bankers. The Bankruptcy Court concluded that $1.75 billion was not sufficient for the senior lenders to recover 100% of their claims. *In Re Genesis Health Ventures, Inc., et al.*, 266 B.R. 591 616 (Bankr. D. Del.) However, on December 31, 2004, Genesis enterprise value was about $2.5 billion. The question arises as to how much of this $750 million difference is due to undervaluation reflecting the investment bankers' bias or more likely the fraud alleged by Genesis's junior bondholders. Undervaluation creates windfall gains for the senior lenders at the expense of distributions for the junior bondholders and shareholders. The petitioner's review *24 of the valuations shows that about $550 million reflects undervaluation in the bankruptcy valuations and thus represents a windfall gain for the senior lenders. [FN8]

> FN8. The investment banking valuations depended on the market price multiples of two comparable companies, Beverly Enterprises and Omnicare, which were picked by the investment bankers as companies best representing Genesis long-term care and institutional pharmacy businesses. At December 31, 2004, the market price of Beverly stock had declined by 14.5% while Omnicare's stock had increased by 47%. These changes would increase Genesis's enterprise value by about $200 million, reflecting improved market valuation since the reorganization.

In addition to the huge windfall gains, the bankruptcy investors garnered a huge investment gain. Three months prior to the bankruptcy filing, Genesis bank loans were trading at 48% of their face value. Eighteen months later, the Bankruptcy Court valued the distributions exchanged for these loans at 88%. [FN9] Id. 616. The bankruptcy investor's huge gains came at the expense of junior bondholders who incurred losses on their investment and shareholders who lost their entire investment when their stock was cancelled by the reorganization plan. The enormous profit available to favored bankruptcy investors underlies the corruption of the bankruptcy process. Providing shareholders their constitutional rights to just compensation and due process through the appointment of an equity committee is a partial solution to a complex and widespread problem.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> FN9. Excluding adequate protection payments and administrative costs
> increases the senior lender recovery to 101 per cent. These balance sheet
> items as well as the cash on Genesis and Multicare's balance sheet must be
> subtracted from the claims to determine the hypothetical enterprise value
> required for a 100% senior lender recovery. These errors are the principal
> focus of the petitioner's appeal.

The Genesis bankruptcy is not an isolated example of bankruptcy investors gaming
the bankruptcy roles to obtain *25 huge profits at the expense of less favored
classes. On January 12, 2002, Kmart unexpectedly filed for bankruptcy protection
after a disastrous Christmas season. Two months prior to filing, Kmart's enterprise
value was about $8 billion with $3.75 billion equity. Three weeks after filing,
Kmart's enterprise value dropped to about $2.9 billion with $.89 billion equity.
Kmart's debt dropped from $1.85 billion to $.95 billion. Bank loans dropped by a
similar amount.

The drastic decline in bond prices attracted bankruptcy investors led by Eddie
Lampert and his hedge fund ESL Investments who purchased hundreds of millions of
Kmart debt and bank loans. Investors avoided Kmart's equity. Under bankruptcy
protection, Kmart restructured its retailing empire by closing 600 of its 2,100
stores. The bankruptcy investors used their dominant position in favored debt
issues to control the financial restructuring. Sixteen months after filing, Kmart's
reorganization plan was approved by the bankruptcy court. The equity in the
reorganized Kmart was distributed to the debt holders. Kmart's equity holders
received nothing.

Thanks to the relief provided by the bankruptcy rules, the reorganization of
Kmart's retail empire was a huge success. By October 2004, the enterprise value of
the new Kmart was about $7.2 billion, only about $800 million less than the
enterprise value of the old Kmart two months prior to its bankruptcy filing. And
the new Kmart had an impeccable balance sheet with $1.6 billion in net cash. This
achievement is even more remarkable considering that Kmart recognized more than
$2.1 billion in losses in the year preceding its bankruptcy filing.

The success in saving the enterprise stands in marked contrast to the failure of
the bankruptcy process to protect former shareholders, and debt holders who sold in
the panic *26 following the bankruptcy filing. Kmart's equity holders suffered a
catastrophic loss of $3.75 billion based on Kmart's stock value two months prior to
its bankruptcy filing. Panicky debt holders lost about half the value of their
investment. Bankruptcy investor Eddie Lampert and ESL Holdings recorded a gain of
$3.4 billion on their post bankruptcy acquisition of Kmart bonds and debt. Assuming
that Lambert's hedge fund purchased this debt at a 58% discount, this gain is
divided into a $2.2 billion windfall resulting from undervaluation of Kmart in
bankruptcy and a $1.2 billion investment gain from the panic selling following the
bankruptcy filing.

The Genesis and Kmart outcomes are contrary to Congressional intent of writing
bankruptcy laws to protect investors and creditors who had the misfortune of
supplying capital, goods, or labor to a failing enterprise. Federal courts have a
duty to see that the intent of Congress is fulfilled. But, complex bankruptcies
with dominant bankruptcy investors present courts inexperienced in investment
banking analysis with real challenges. Federal courts, however, have a more
fundamental duty to protect and defend the Constitution. Bankruptcy reorganization
plans which deny shareholders equity committees and/or deny shareholders an
allocation in a successful restructuring are prima facie violations of the Fifth
Amendment that can't be ignored by federal courts.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1060939
2005 WL 1060939 (U.S.)

D. Seitel Example Shows That Appointment Of Equity Committee Benefited Shareholders And Bondholders

The wisdom of providing Fifth Amendment due process is illustrated by the Seitel bankruptcy. Seitel is oil and gas exploration service company that leases seismic data from one of the largest seismic data libraries in North America. *27 The firm also participated in joint venture exploration with its data clients. After gross mismanaged and self dealing, debt holders forced the company into bankruptcy. Following the bankruptcy announcement, bankruptcy investors, in a rare move, acquired a dominant equity position and requested the appointment of an equity committee. The U.S. Trustee appointed an official equity committee shortly after the company filed its bankruptcy petition and significantly a week before the bankruptcy court authorized the debtor to retain legal and financial advisors.

The debtor proposed a reorganization plan that offered unsecured note holders about 71% of the face amount of the notes and equity holders $0.40 per share. The equity committee, with the assistance of its legal and financial advisors, advised shareholders vote against the debtor's plan. The committee informed shareholders that the payment to shareholders was inadequate and that it had prepared a superior alternative plan, which it would propose if the debtors' plan was defeated.

The debtors' plan was defeated, and the equity committee proposed a plan that allowed shareholders to retain all their equity and cashed out the unsecured note holders at 100% of face value. This plan was approved by the note holders and shareholders and was confirmed by bankruptcy court. Following confirmation, Seitel's common stock traded in excess of $4.50 per share before a warrant offering c ompleted the financing of the plan. (*In Re Seitel et. al.*, U.S.B. C. D.Delaware, No. 03-12227 PJW (2004))

The Seitel example shows that appointment of an equity committee in bankruptcy reorganizations furthers the intent of Congress in saving bankrupt firms from liquidation by reorganization and at the same time providing equitable distributions and allocations to the firm's pre-bankruptcy *28 creditors, bondholders and shareholders. The appointment of an equity committee early in the Seitel bankruptcy led to an alternative reorganization plan that improved the recovery of bondholders and shareholders over the plan produced by the debtor.

E. Recognition of Shareholders Constitutional Rights In Complex Bankruptcies Will Increase National Wealth

The widespread perception that equity investors will incur a total loss if their company files for bankruptcy protection impairs the efficiency of the market in valuing equities. As a consequence, equity investors will be overly cautious and reduce their bids for hundreds or thousands of companies with suspect balance sheets and/or high levels of debt. This rational behavior reduces market values and national wealth. Some companies will lose the ability to obtain new equity financing which would increase the number of bankruptcy filings, perpetuating the viscous cycle.

The Genesis and Kmart bankruptcies show how billions of dollars of shareholder wealth has been unfairly transferred to debt holders by bankruptcy investors gaming the bankruptcy process. Nor are these examples unique as shown by increasing number of hedge funds that have figured out how to game the bankruptcy process to provide huge windfall profits for themselves at the expense of shareholder losses. Correcting this problem, would let equity investors value companies on their economic merits irrespective of weak balance sheets and/or high levels of debt. In time, this would lead to increased stock market valuations and increased national

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1060939                                                    Page 16
2005 WL 1060939 (U.S.)

wealth.

By affirming that shareholders in bankruptcy have constitutional rights to just compensation and due process, *29 e.g. the early appointment of equity committees in complex bankruptcies, this Court can transform the current viscous cycle into a virtuous cycle. Investors will gain confidence to bid what they determine a company is worth regardless of the strength of the balance sheet. Bids for stock in companies with suspect balance sheets would increase, more new equity financing will be available to these companies resulting in fewer bankruptcies and increased national wealth.

                                CONCLUSION
For over 200 years this Court has required federal courts to decide the constitutional issues in cases arising under its jurisdiction.
   The judicial power of the United States is extended to all courts arising under the constitution.
   Could it be the intention of those who gave this power, to say that, in using it, the constitution should not be looked into? That a case arising under the constitution should be decided without examining the instrument under which it arises?
   This is too extravagant to be maintained.
 Marbury v. Madison, 5 U.S. (1Cr.) 137, 177-178 (1803)

In this case, both the District Court and the Third Circuit overlooked constitutional issues in dismissing a bankruptcy appeal that would have challenged the cancellation of shareholders stock as a taking that violated shareholders Fifth Amendment rights to due process and compensation.

Takings and Due Process considerations are not restricted to the Genesis bankruptcy. Most significant bankruptcy *30 filings attract specialized investors typically hedge funds who acquire dominant positions in creditor claims accorded preferential treatment by bankruptcy law. These bankruptcy investors use their influence to deny appointment of an equity committee for shareholders and provide biased valuations that result in large windfall gains for the bankruptcy investor at the expense of shareholders.

In the macro sense, the unfair treatment of shareholders in bankruptcy reduces national wealth as investors reduce prices they to pay for all companies with lower quality balance sheets. This in turn will cause more bankruptcy filings and more damage to the national economy.

For the foregoing reasons, this Court is required to remand this case to the Third Circuit for consideration of the constitutional and equitable mootness issues.

Hayes v. Genesis Health Ventures, Inc.
2005 WL 1060939
END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

FILED

OCT 1 1 '01

CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re GENESIS HEALTH VENTURES. INC.. et al.. Debtors. | ) ) ) ) | Chapter 11 Case No. 00-2692 (JWH) (Jointly Administered) |
| and | ) ) | |
| In re MULTICARE AMC, INC., et al.. Debtors. | ) ) ) ) | Chapter 11 Case No. 00-2494 (JWH) (Jointly Administered) |

## MOTION FOR APPOINTMENT OF OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS FOR THE PURPOSE OF APPEALING CONFIRMATION OF THE GENESIS REORGANIZATION PLAN

The undersigned. James J. Hayes. is and has been a holder of common stock of Genesis Health Ventures, Inc., and pursuant to Bankruptcy Code # 1102(a)(2). respectfully requests that the Court order that a committee of equity security holders of Genesis be appointed by the United States Trustee. The grounds for this motion are as follows:

1) The September 20, 2001 Order confirmation the Genesis reorganization plan terminated the property rights of common stockholders in a unique company with an enterprise value conservatively estimated at near two billion dollars.  The shareholders' loss of economic benefits from this profitable enterprise is contrary to the per se rules enunciated by the  U.S. Supreme Court in determining violations of the Fifth Amendment. Application of the per se rules would require common stockholders receive some allocation in the restructured Genesis.

2) Appointment of a committee of equity security holders is required by the due process provisions of the Fifth Amendment. The Supreme Court has held that citizens must be accorded due process when being deprived of their property by the government in furtherance of public policy. here provisions of the bankruptcy code.  Participation in appellate proceedings challenging the taking of shareholders property is such required due process.

#338582409
10/11/01

RD100

3) The motion is timely. This Court ruled that similar motions near the conclusion of the reorganization process were untimely and unrealistic and at that point would only serve to unduly delay these cases. Those objections are not valid at the beginning of the appellate process. The undersigned has filed a timely Notice of Appeal and the appointment of sharcholders at this time would not delay the appeal process. As noted in 1 above there is a Constitutional basis for the appeal which can only be decided at the appellate level.

4) This Chapter 11 proceeding is extremely and uniquely complex. The Genesis reorganization provided for a merger between Genesis and Multicare, a unique event in a bankruptcy proceeding. The merger caused much confusion on whether the valuations and allocations should be based on the companies individually structured or on the reorganized company. The valuation differences amount to hundreds of millions of dollars and significantly impact the fair and equitable provisions of subsection 1129(b)(2).

5) The costs of appointing a committee of equity security holders at the appellate stage is low and does not outweigh the need to furnish adequate representation for equity security holders of Genesis. Confirmation of the reorganization plan ended the major costs associated with the bankruptcy proceedings. Thus appointment of an equity committee at the appellate stage is a cost effective way to provide equity security holders adequate representation.

For the reasons stated herein and in the accompanying brief, the undersigned requests the Court to order the appointment of equity security holders of Genesis.

Respectfully submitted,

Dated September 28, 2001

James J. Hayes
Pro se

CERTIFICATE OF SERVICE

I certify a copy of the foregoing motion was mailed from the Northern Virginia Regional Post Office on September 28, 2001 to the following at the addresses shown.

James J. Hayes

Gary D. Holtzer
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

Mark D. Collins
Richards, Layton & Finger PA
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

Paul V. Shalhoub
Willkie Farr & Gallagher
787 Fifth Avenue
New York, NY 10019-6099

Robert S. Brady
Young Conaway Stargatt & Taylor
Wilmington Trust Co. 11th Floor
Wilmington, DE 19899-0391

Richard S. Toder
Morgan, Lewis & Bokius
101 Park Avenue
New York, NY 10178

Teresa Currier
Klett Rooney Lieber & Schorling
The Brandywine Bldg.
1000 West Street
Wilmington, DE 19801

Lisa Beckerman
Akin, Gumpp, Strauss, Hauer & Feld
590 Madison Ave.
New York, NY 10022

Laura Davis Jones
Pachulski, Stang, Ziehl, Young, & Jones
919 Market Street, 16th Fl.
Box 8075
Wilmington, DE 19899-8705

David S. Rosner
Kasowitz, Benson, Torres & Friedman
1633 Broadway
New York, NY 10019

Mark Minuti
Saul Ewing LLP
222 Delaware Ave., Suite 1200
P.O. Box 1266
Wilmington, DE 19899

Joseph McMahon
United States Trustee
601 Walnut Street, Suite 950
West Philadelphia, PA 19106

David F. Hudgens
Armbrecht Jackson
1300 Riverview Plaza
63 South Royal Street
Mobile, Alabama

Kathleen Miller
Smith Katzenstein & Furlow
800 Delaware Avenue
Wilmington, DE 19899

Timothy Walsh
LeBoeuf, Lamb, Green & MacRae
125 West 55th Street
New York, NY 10019

RD102

FILED

UNITED STATES BANKRUPTCY COURT, OCT 1 PM
DISTRICT OF DELAWARE

US BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| GENESIS HEALTH VENTURES, INC., et al., | ) | Case No. 00-2692 (JWH) |
| Debtors, | ) | (Jointly Administered) |
| | ) | |
| and | ) | |
| | ) | |
| In re | ) | Chapter 11 |
| MULTICARE AMC, INC., et al., | ) | Case No. 00-2494 (JWH) |
| Debtors. | ) | (Jointly Administered) |

## BRIEF IN SUPPORT OF MOTION FOR APPOINTMENT OF OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS FOR THE PURPOSE OF APPEALING CONFIRMATION OF THE GENESIS REORGANIZATION PLAN

Paragraph 1102(a)(2) of the Bankruptcy Code provides for the appointment of an equity shareholders committee and the attendant selection of counsel. This process ensures the protection of shareholder property in proceedings where creditors could unfairly benefit from reorganization plans that eliminate the property ownership of the shareholders. In the Genesis bankruptcy, no equity shareholders committee was appointed nor were shareholders notified that the Genesis reorganization was proceeding without shareholder representation. The shareholders were notified only after debtors and creditors negotiated a reorganization plan that eliminated shareholders' property ownership.

The Fifth Amendment to the U.S. Constitution provides that no person can be deprived of life, liberty or property without due process of law. In a bankruptcy, both the creditors and shareholders have property interests. The creditors have a property interest in the real property utilized in the operation of the business - land, buildings, equipment et. while the shareholders own the organization which utilizes the real assets. The Fourteenth Amendment to the U.S. Constitution provides citizens equal protection under the law.

#33858 2410
10/1/01

These Constitutional amendments require that shareholders and creditors be provided equal due process. But in the Genesis bankruptcy, the debtors estate paid for the costs of an Unsecured Creditors Committee[1], including the fees counsel, for more than a year to represent unsecured creditors in negotiations leading to formulation of a reorganization plan. In contrast, the shareholders were denied a committee of equity shareholders. The Supreme Court in Parrott v. Taylor, 451 U.S. 527 (1981) held that "the fundamental requirement of due process is the opportunity to be heard and it is an 'opportunity which must be granted at a meaningful time and in a meaningful manner.'" In the Genesis bankruptcy, the failure of the parties to appoint a shareholders committee at the same time and with similar resources as the Unsecured Creditors Committee denied shareholders the due process required by the Constitution.

The Supreme Court in Lynch v. Household Finance Corp., 405 US 538 held that "The Constitutional right to be heard is a basic aspect of the duty of government to follow a fair process of decision making when it acts to deprive a person of his possessions. The purpose of this requirement is not only to ensure abstract fair play to the individual. Its purpose, more particularly, is to protect his use and possession of property from arbitrary encroachment - to minimize substantively unfair or mistaken deprivations of property, a danger that is especially great when the State seizes goods simply by the application of and for the benefit of a private party." In the Genesis bankruptcy, the lack of shareholder representation allowed fundamental flaws[2] in the debtors' valuation to go undetected. Similar fundamental flaws in calculating creditor recoveries create the situation where the Genesis Senior Creditors could receive $100 million more than their claim. Such a windfall is contrary to the Fair and Equitable provisions contained in subsection 1129(b)(2) and illustrates how of denial of representation to one class could lead to the unjust enrichment of another class.

---

[1] In the three months after the plan was formulated, counsel for the creditors billed an average of $65,500 per month in fees and expenses. In addition, the Unsecured Creditors Committee retained an investment banking firm whose fee and expenses totaled $780,000

[2] The nature of these flaws will be discussed in the Valuation Issues Section that follows.

RD104

The takings clause of Fifth Amendment of the Constitution prohibits the taking of private property for public use, without just compensation. The reorganization provisions of the Bankruptcy Code were authorized by Congress to effect an important public policy of preserving the jobs and services provided by bankrupt companies that could be lost if the creditors foreclosed on their loans and caused liquidation of the company.

The reorganization process should require that shareholders give up portions of their equity to provide creditors greater value for their claims than could be recovered in a liquidation. If the parties could not reach agreement on allocations in the reorganized company, the court could impose allocations it deemed fair and equitable. In cases where shareholders maintain an ownership stake in the reorganized company, the courts determination that the shareholders allocation was fair and equitable would satisfy the "just compensation" requirement of the Constitution. However, cases which do not provide the shareholders ownership or other compensation in the reorganized company constitute a taking. The Supreme Court held this position in Lucas v. South Carolina Coastal Council, 505 US 1003, 112SCT 2886, 120L.Ed. 798 (1992). The Supreme Court found "the Fifth Amendment is violated when land-use regulation...denies an owner economically viable use of his land." The Court further explained "that there are good reasons for our frequently expressed belief that when the owner of real property has been called upon to sacrifice all economically beneficial uses in the name of the common good, that is to leave his property economically idle, he has suffered a taking." (emphasis added) Here the shareholders of Genesis suffered a taking in being required to give up all their equity in a profitable enterprise that shows great promise for future growth and prosperity without any compensation. These circumstances justify the appointment of an equity committee to represent the shareholders in an appeal.

## Valuation Issues

Valuation of the new Genesis stock was a key issue at the August 28, 2001 Hearing. Proponents of confirmation adopted low valuations insufficient even for the Senior Lenders

3

to recover their claims. The Subordinated Debenture holders adopted higher valuations that would have (except for a fundamental error[3] in the calculation of the Senior Lenders recovery) showed the Genesis Senior Lenders recovering significantly more than their claims. All the valuations are flawed by the misapplication of standard valuation techniques that caused a significant undervaluation of the new Genesis stock price. While the Becklean valuation is the most fundamentally sound; it provides only a minimum valuation as will be shown below. Without an equity committee, the shareholders did not have the resources for the expense of a front line investment banking firm which at least could have illuminated the problems in valuing a unique company like Genesis.

All the investment banking and valuation experts agreed the best methodology for valuing the new Genesis was the Comparable Company valuation. As succinctly explained by the Chilmark expert, any valuation technique is at best an estimate of what value investors in the market would place on the company. Analysis of how investors value comparable companies, with respect to different measures of cash flow, enables investment bankers to estimate the value of a company not currently trading in the market. Here the subject company is the new Genesis which is the combination of the old Genesis and Multicare. Investment bankers for the debtors, UBS Warberg and Credit Sussie/First Boston made valuations of the old Genesis and Multicare respectively. Neither of these experts valued the new Genesis. Counsel for the debtors argued the value of the new Genesis would be the sum of Warberg's valuation of old Genesis and CSFB's valuation of Multicare. But this explaination is certainly not how investors in the market would value the new Genesis. Investors - who would not even be aware of the separate cash flow streams of the old Genesis and Multicare - would make their investment decisions on the cash flows and prospects for the new Genesis. The valuations of Warberg and CSFB are not relevant to the problem of valuing the new Genesis and should be disregarded.

---

[3] The parties calculated recoveries by dividing the Genesis Senior Lender claims, for example, by the Genesis enterprise value. This method fails when, as here, the Genesis Senior Lenders receive a disproportionate allocation of the new Genesis stock. Nearly 2/3 of the Genesis Senior Lender recovery is in new stock versus less than ½ for the Multicare Senior Lenders. With a $1,900 million enterprise value for the new Genesis, the Genesis Senior Lender recovery is about 110% of their claim

4

The valuation of the new Genesis presented other problems. Genesis which combines a nursing home business with an institutional pharmacy business is a truly unique company. None of the experts identified a single comparable company trading in the market that could be evaluated to show what multiples investors would pay for the cash flows from this unique combination of businesses. Consequently the investment bankers valued the nursing home and institutional pharmacy businesses separately by comparison with Beverly, a nursing home operator and Omnicare an institutional pharmacy company. This separate line of business valuation suffers the same fundamental flaws as valuing Genesis and Multicare separately. Its similar to a liquidation valuation obtaining only minimum values as there is no consideration to the fact that the whole is worth more than the sum of the parts. Even the Becklean valuation should be considered a minimum valuation for the new Genesis as it values the nursing home and institutional pharmacy businesses separately.

Michael Walker, the founder and president of Genesis, has long had the vision of creating a unique company to serve a new industry, the eldercare industry. Such a company would expand the ancillary services provided to nursing home residents to nearby elders living independently. For example, Genesis' neighborcare pharmacy business could offer prescription drugs to its nursing home residents and at the same time serve the larger community like a retail pharmacy. From a business perspective, adding a neighborhood pharmacy business to a nursing home served by its own institutional pharmacy would be a low cost way of adding what after start up costs would be a business with higher margins than the institutional pharmacy and nursing home business standing alone.[4] The interest of Genesis management in purchasing the APS pharmacy business shows its continuing focus on building a superior elder care company. Investors anticipating the success of Genesis in becoming the superior company in a new industry could provide Genesis a premium valuation multiple, perhaps greater than either Omnicare or Manor Care, the premium valued companies in institutional pharmacy and nursing home industries. A premium multiple for

---

[4] There is evidence that Genesis is succeeding as its institutional pharmacy business has grown from less 1/3 the size of Omnicare's to more than ½ its size in less than three years, although its margins, probably hurt by start up costs, remain lower than Omnicare's.

RD107

the new Genesis could add about $400 million to Becklean's midpoint valuation of $1,950 million with each additional valuation multiple adding about $200 million.

## Conclusion

The valuation of unique and high potential company like the new Genesis is by its nature a speculative endeavor and best left to the multitude of investors in the market. However, alternative valuations that erroneously assume that the new Genesis is merely the sum of lowly valued parts is clearly incorrect and substantially undervalues the new Genesis. This undervaluation provides a huge windfall to the Senior Lenders at the expense of the Unsecured Creditors and Subordinated Debenture Holders who are recovering but a small fraction of their claims and Common Equity Holders whose property rights are being extinguished. Fortunately, there are innovative financial techniques that could solve this difficult valuation problem. The Senior Lenders, for example, could be required to give options on their new Genesis stock with the strike price set to provide them 100% of their claim plus a normal investment increase.

Now Charles Grimes, one of the Subordinated Debenture Holders, has filed a Notice of Appeal and it is likely that the unfairness caused by the undervaluation of Genesis will be a key issue. It is therefore the appropriate time for the Court to order the appointment of a committee of equity security holders so that the shareholders are at least adequately represented in the appeal. As the Supreme Court indicated in Parrott v. Taylor, 451 U.S. 527 (1981) "the fundamental requirement of due process is the opportunity to be heard and it is an 'opportunity which must be granted at a meaningful time and in a meaningful manner.'"

Respectively submitted

Dated September 28, 2001

James J. Hayes

Pro se

RD108

IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

------------------------------------------------ x
                                                  :
In re                                             :     Chapter 11 Case No.
                                                  :     00-2692 (JHW)
GENESIS HEALTH VENTURES,                          :
INC., *et al.*,                                   :     (Jointly Administered)
                                                  :
                                                  :
                            Reorganized Debtors.  :     Re: Docket Nos: 2409, 2410, 2445, and
                                                  :     2531
                                                  :
------------------------------------------------ x

## REORGANIZED DEBTORS' OBJECTION TO MOTION FOR APPOINTMENT OF OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS FOR THE PURPOSE OF APPEALING CONFIRMATION OF THE GENESIS REORGANIZATION PLAN

Genesis Health Ventures, Inc. ("GHV") and certain of its direct and indirect

subsidiaries, as reorganized debtors (collectively, the "Reorganized Debtors"), hereby object (the

"Objection") to the Motion for Appointment of Official Committee of Equity Security Holders

for the Purpose of Appealing Confirmation of the Genesis Reorganization Plan filed by James J.

Hayes ("Hayes"). In support of the Objection, the Reorganized Debtors respectfully represent as

follows:

### Background

1.      On June 22, 2000 (the "Commencement Date"), the Reorganized Debtors,

other than Healthcare Resources Corp. ("HRC"), each commenced a case under chapter 11 of

title 11 of the United States Code (the "Bankruptcy Code"). HRC commenced its chapter 11

case on July 31, 2000.

2.      On June 5, 2001, the Reorganized Debtors, together with Multicare AMC,

Inc., The Multicare Companies, Inc., and certain of their direct and indirect subsidiaries, filed a

joint plan of reorganization (as amended, the "Plan") and disclosure statement, pursuant to

section 1125 of the Bankruptcy Code As set forth below, the Plan was confirmed in October 2001 and has been substantially consummated The Reorganized Debtors are approaching making the final distributions under the confirmed Plan.

## A.     The First Appointment Motion.

3.     On August 27, 2001 -- just days before the confirmation hearing -- Hayes filed his first Motion for Appointment of Official Committee of Equity Security Holders [Docket No 2218] (the "First Motion") Because the primary issue on a motion to appoint an equity committee is "hopeless insolvency"[1] and valuation also was one of the prominent objections to the Plan, the Court heard argument on the First Motion in conjunction with the hearing on confirmation of the Plan (the "Confirmation Hearing") At the Confirmation Hearing, the Court denied the First Motion On September 20, 2001, this Court entered an order confirming the Plan On October 2, 2001 (the "Effective Date"), the Effective Date under the Plan occurred.

## B.     The Appeal of the Confirmation Order.

4.     On September 27, 2001, Hayes filed a Notice of Appeal of the Confirmation Order (the "Appeal") with the United States District Court for the District of Delaware (the "District Court") However, Hayes never moved for, nor was he granted a stay pending appeal Accordingly, distributions under the confirmed Plan were made as and when claims became allowed. Therefore, on September 30, 2002, the District Court dismissed the Appeal on grounds of equitable mootness Because the clerk of the District Court inadvertently docketed the Appeal twice, the District Court on March 12, 2003 dismissed the "second" identical appeal Hayes moved for reconsideration of the dismissal of the second Appeal, even

---

[1] See, e.g., In re Wang Labs, Inc., 149 B R 1 (Bankr D Mass 1992); 7 Collier on Bankruptcy ¶ 1102[2][a] at 1102-22

RLF1-2725767-1

RD110

though he never appealed nor moved for reconsideration of the first Appeal's dismissal. The District Court denied the motion for reconsideration on February 26, 2004

      5.     On March 25, 2004 -- eighteen months after the Appeal was dismissed -- Hayes finally filed a notice of appeal of the District Court's ruling to the Third Circuit Court of Appeals (the "Third Circuit Appeal"). The Third Circuit Appeal was docketed on March 31, 2004. The Reorganized Debtors intend to move to dismiss the appeal as untimely and equitably moot.

## C.    The Second Appointment Motion.

      6.     On October 5, 2001, Hayes filed the Motion and Brief in Support of Motion for Appointment of Official Committee of Equity Security Holders for the Purpose of Appealing Confirmation of the Genesis Reorganization Plan [Docket No. 2410](the "Motion") that is the subject matter of this Objection. As the Motion was not filed pursuant to the Local Rules of this Court and no hearing date nor objection deadline was set, the Reorganized Debtors have not yet objected, until now. However, on October 15, 2001, the Official Committee of Unsecured Creditors (the "Committee") filed its Response in Opposition to the Motion for Appointment of Official Committee of Equity Security Holders for the Purpose of Appealing Confirmation of the Genesis Reorganization Plan [Docket No. 2445](the "Committee Response"). Notwithstanding Local Rule 9006-1(d), which states that "no reply papers shall be filed unless ordered by the Court," on November 1, 2001, Hayes filed the Reply to Arguments of the Unsecured Creditors Committee Opposing Motion To Appoint Official Committee of Equity Security Holders For the Purpose of Appealing Confirmation of the Genesis Reorganization Plan [Docket No  2531](the "Reply")

      7.     On March 13, 2004, Hayes submitted a letter to the Court requesting a hearing on the Motion.

RD111

<u>Argument</u>

I.    **THE MOTION SHOULD BE DENIED FOR THE REASONS SET FORTH IN THE COMMITTEE RESPONSE.**

8.    The Committee Response fully sets forth the reasons why the Motion was ill fated even when it was filed in October 2001. Specifically, the Committee Response points out that the Court already denied Mr. Hayes' First Appointment Motion after finding that the Debtors were "hopelessly insolvent." The Committee Response also notes that essentially Mr. Hayes really was asking the Court to shift fees at an inappropriate time to do so.

9    Rather than burden the Court with duplicative argument, the Reorganized Debtors adopt, as if set forth in full herein, the Committee Response, which is attached hereto as Exhibit A for the Court's convenience. Additionally, the Reorganized Debtors note that the Motion is better viewed as a Motion for reargument of the denial of the First Appointment Motion. Viewed as such, the Motion is both procedurally defective because it was not timely filed[2] and does not even attempt to articulate a basis for the granting of the extraordinary remedy of reargument. See <u>In re Hechinger Investment Company of Delaware</u>, 303 B.R. 18, 23 (D. Del. 2003) (stating that motions for reconsideration or reargument should be granted only sparingly); <u>Karr v. Castle</u>, 768 F. Supp. 1087, 1090 (D. Del. 1991)(stating that motions for reargument should be granted only sparingly, in circumstances where the court has patently misunderstood a party or made an error not of reasoning but of apprehension).

II.   **THE MOTION IS EQUITABLY MOOT.**

10.   In the two in a half <u>years</u> since the Committee filed the Committee Response, an additional reason has emerged for the denial of the Motion. Specifically, Mr.

---

[2] See D. Del. LR 7.1.5 ("A motion for reargument shall be served and filed within ten days after the filing of the Court's opinion or decision.)"

4

RD112

Hayes failed to seek or obtain a stay pending appeal of the Confirmation Order. Accordingly, (i) the District Court dismissed Mr. Hayes' appeal (although, a year later, he belatedly has attempted to appeal that dismissal to the Third Circuit Court of Appeals), and (ii) the Reorganized Debtors have made substantially all of the distributions they are required to make under the Plan.

11. This matter is now equitable moot. See In re Innovative Clinical Solutions, Ltd., 302 B.R. 136, 140 (Bankr. D. Del 2003) (citing In re Continental Airlines, 91 F.3d 553, 560) (the foremost consideration in determining whether the doctrine of equitable mootness applies in the bankruptcy context is whether or not the plan has been substantially consummated). What would an equity committee do at this point? As Judge Farnan pointed out on appeal, the appeal itself cannot be maintained at this point because the purpose of the appeal is to determine whether any of the distributions may be made to the former equity security holders of the Reorganized Debtors. But substantially all of the distributions have already been made. In short, not only is there nothing for Mr. Hayes to appeal at this juncture, but there is nothing for an equity committee to negotiate. For the same reasons that the appeal itself is equitably moot, so is the Motion.

## II.     THE BONDHOLDER COMPLAINT IS IRRELEVANT.

12. Mr. Hayes' letter dated April 6, 2004, suggests that the recent complaint filed by certain bondholders styled Richard Haskell, et al. v. Goldman Sachs & Co., Mellon Bank, N.A., Highland Capital Management, L.P., Genesis Health Ventures, Inc. and George V. Hager (the "Haskell Litigation") supports the appointment of an equity committee. This argument is a red herring. The Haskell Litigation contends that the Debtors and the Court undervalued the Debtors by 25%. Even if Plaintiffs in the Haskell Litigation were successful -- which they plainly will not be, on the merits and for procedural reasons which will be briefed

5

RD113

before this Court at an appropriate time -- in no way does that suggest that equity would be in the money. Unsecured creditors in these cases received a dividend of approximately 7.5%. Thus, even if the Court somehow were to conclude, despite all of the procedural, legal and factual problems replete in the complaint in the Haskell Litigation, that the bondholders should have been paid *13 times* what they were paid pursuant to the Plan, equity still would have been out of the money and received nothing. Accordingly, the filing of the Haskell Litigation does not support the appointment of an equity committee.

WHEREFORE, the Reorganized Debtors respectfully request that the Court (i) deny the relief requested in the Motion, and (ii) grant the Reorganized Debtors such other and further relief as is just and proper.

Dated: April 23, 2004
      Wilmington, Delaware

                                  Mark D. Collins (No. 2981)
                                  Russell C. Silberglied (No. 3462)
                                  Etta R. Wolfe (No. 4164)
                                  RICHARDS, LAYTON & FINGER, P.A.
                                  One Rodney Square
                                  P.O. Box 551
                                  Wilmington, Delaware 19899
                                  (302) 651-7700

                                  - and -

                                  Michael F. Walsh
                                  Gary T. Holtzer
                                  Adam P. Strochak
                                  WEIL, GOTSHAL & MANGES LLP
                                  767 Fifth Avenue
                                  New York, New York 10153
                                  (212) 310-8000

                                  ATTORNEYS FOR THE REORGANIZED
                                  DEBTORS

6

# EXHIBIT A

RD115

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------x

| | |
|---|---|
| In re | Chapter 11 |
| GENESIS HEALTH VENTURES, INC., et al., | Case No. 00-2692 (PJW) |
| Debtors | (Jointly Administered) |

------------------------------------------ ---------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| MULTICARE AMC, INC., et al. | Case No. 00-02494 (JHW) |
| Debtors. | (Jointly Administered) |

------------------------------------------------------------------x

**RESPONSE OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF GENESIS HEALTH VENTURES, INC., ET AL.,
IN OPPOSITION TO THE MOTION FOR APPOINTMENT OF OFFICIAL
COMMITTEE OF EQUITY SECURITY HOLDERS FOR THE PURPOSE OF
APPEALING CONFIRMATION OF THE GENESIS REORGANIZATION PLAN**

The Official Committee of Unsecured Creditors (the "Committee") of Genesis Health

Ventures, Inc. ("Genesis" or "GHV") and certain of its direct and indirect subsidiaries

(collectively, the "Genesis Debtors;" collectively with Multicare AMC, Inc. and its subsidiary

debtors (the "Multicare Debtors"), the "Debtors"), by and through its undersigned counsel,

hereby files this Response in Opposition to the Motion for Appointment of Official Committee

of Equity Security Holders for the Purpose of Appealing Confirmation of the Genesis

Reorganization Plan (the "Motion"), filed by James J. Hayes ("Mr. Hayes") The Committee

respectfully submits as follows:

## BACKGROUND

1.    On June 22, 2000 (the "Petition Date"), the Debtors commenced their reorganization cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

2.    On July 12, 2000, the United States Trustee formed the Committee, which currently consists of the following members: American General Investment Management, L.P., GMS Group LLC, The Bank of New York, Abbott Laboratories, State Street Bank and Trust Company, and Service Employees International Union, AFL-CIO.

3.    On August 18, 2000, the Court entered an order authorizing the retention of Akin, Gump, Strauss, Hauer & Feld, L.L.P as co-counsel to the Committee  In September 2000, the Court entered an order authorizing the retention of Pachulski, Stang, Ziehl, Young & Jones P.C. as co-counsel to the Committee.

4    The Debtors filed a Joint Plan of Reorganization (the "Plan") on July 6, 2001. The Court conducted plan confirmation hearings on August 28 and August 29, 2001 (the "Confirmation Hearings")   On September 20, 2001, an Order was entered in this case confirming the Debtors' Joint Plan of Reorganization over several objections (the "Confirmation Order"). The Court published an opinion prior to entry of the Confirmation Order. *See In re Genesis Health Ventures, Inc, et al*, 266 B.R. 591 (Bankr D. Del. 2001).

5    Mr. Hayes was a holder of Common Stock of Genesis whose shares were extinguished pursuant to the Plan terms. *See Genesis*, 266 B.R at 598  Mr. Hayes filed a notice of appeal on September 18, 2001  Mr Hayes filed the instant Motion on October 1, 2001 in which he requests that the Court appoint a committee of equity security holders for purposes of appealing the Confirmation Order.

RD117

## ARGUMENT

A.    THIS COURT AND THE UNITED STATED TRUSTEE HAVE PREVIOUSLY DENIED MR. HAYES REQUESTS TO HAVE AN EQUITY COMMITTEE APPOINTED IN THE GENESIS CHAPTER 11 CASE BECAUSE THE DEBTORS ARE HOPELESSLY INSOLVENT

6.    On July 10, 2001, Mr.. Hayes requested that the United States Trustee appoint an Official Committee of Equity Security Holders ("Equity Committee")

7    On July 16, 2001, Akin Gump, as counsel to the Committee, advised the United States Trustee in writing that it opposed the appointment of an Equity Committee  On July 30, 2001, the Genesis Debtors, through their legal counsel, Weil Gotshal & Manges LLP, advised the United States Trustee in writing that they opposed the appointment of an Equity Committee.

8.    On August 2, 2001, the United States Trustee advised Mr. Hayes that the Trustee would not appoint an Equity Committee.

9.    On August 8, 2001, Mr. Hayes filed a Motion to Appoint an Official Committee of Equity Security Holders (the "First Hayes Motion").  The Committee responded to the First Hayes Motion in its Reply to the Objections to the Confirmation of Debtors Joint Plan of Reorganization (the "Reply").

10    In support of confirmation, the Committee directed the Court's attention to three separate enterprise valuations of the Genesis Debtors prepared by independent financial advisors (retained by the Genesis Debtors, the Genesis Senior Lenders and the Committee).  Each valuation expert concluded that the Genesis Debtors' estates were insolvent by many millions of dollars. In fact, the valuations concluded that the Genesis Debtors were so insolvent that their enterprise value did not even equal the amount of the secured debt, administrative expenses and priority claims owed to creditors, much less the amount of secured and unsecured debt owed to creditors.

RD118

11.    For the Genesis common stockholders to be entitled to any recovery, all secured and unsecured claims would have to be paid in full (including post-petition interest) and the three series of preferred stock would have to receive an appropriate recovery. As the Committee argued at the Confirmation Hearings, unless the valuations of the Genesis Debtors prepared by these experts understated the value of the estates by at least $625 million, there simply would be no value available for the Genesis common stockholders. Consequently, the Committee opposed the formation of an Equity Committee, the costs of which would be borne by the Genesis unsecured creditors.

12.    This Court denied the First Hayes Motion in the Confirmation Order because the appointment of an equity committee was unwarranted in light of the Court's adjudication of insolvency. Upon consideration of the First Hayes Motion and other shareholder objections to confirmation, the Court clearly explained that insolvency was the primary basis for refusing to appoint an additional committee:

> "The motions for a trustee and/or another committee come at the point of confirmation of the Debtors' plan. Neither objector has offered any evidence of the existence of value beyond the position of Senior Lenders and junior creditors. *I have concluded that debtors are insolvent and that there is no possibility of a recovery for equity interests.* At this late date, the appointment of additional professionals and their associated administrative expenses cannot be viewed as a benefit to the debtors' estates. The objections are overruled and the related motions denied."

*Genesis*, 266 B.R. at 620 (*emphasis added*).

13    The decision to appoint an equity committee begins with whether it appears that shareholder interests are adequately represented in a chapter 11 case. 11 U.S.C. §1102(a)(2)(1994). In addition to examining the number of shareholders and the complexity of the case, a bankruptcy court must consider whether the cost of the additional committee

RD119

significantly outweighs the concern for adequate representation. *See In re Wang Labs, Inc.*, 149 B.R. 1 (Bankr. D. Mass. 1992)(*citing In re Johns-Manville Corp.*, 68 B.R. 155, 159 (Bankr. S.D.N.Y. 1986). The bankruptcy court must balance the costs to the estate of an additional committee and its attendant professionals (*e.g. counsel, financial advisors, etc.*) with the likelihood of a shareholder recovery.

14.    The inherent difficulties posed by this balancing act has led to solvency becoming the primary issue in determining whether an official committee of equity security holders should be appointed in a chapter 11 case. *See, e.g., In re Wang Lab, Inc.; In re Emons Indus., Inc.*, 50 B.R. 692 (Bankr. S.D.N.Y. 1985); *see also* 7 *Collier on Bankruptcy* ¶ 1102.03[2][a] at 1102-22 ("The threshold consideration faced by the United States Trustee in determining whether to appoint a committee of equity security holders is whether there is sufficient equity in the estate to justify the cost and expense of a separate committee."). Solvency is generally addressed at the early stages of a case where the United States Trustee must rely on the debtor's schedules, representations concerning insolvency, and other public information to formulate a position on whether a shareholder recovery may be possible.

15.    Appointment of an equity committee in the face of undeniable evidence of insolvency is an unreasonable risk, the costs of which will be borne solely by estate creditors. The United States Trustee and a bankruptcy court are given great discretion in balancing the inherent risks and potential benefits of additional committees. Bankruptcy judges, as well as the United States Trustee, draw on debtor specific knowledge and institutional knowledge when confronted with these requests. Most, if not all, bankruptcy courts have recognized that appointment of an equity committee when a debtor is hopelessly insolvent is not permissible because the nil probability of a shareholder recovery is dwarfed by the virtual certainty that

RD120

creditor recoveries will be diminished by the equity committee's futile efforts. Judge Abram summarized this notion in *Emons Indus* by characterizing the appointment of an equity committee in the face of hopeless insolvency as a gift by estate creditors:

> "This court is of the view that generally no equity committee should be appointed when it appears that a debtor is hopelessly insolvent because neither the debtor nor the creditors should have to bear the expense of negotiating over the terms of what is in essence a gift. See Bankruptcy Code § 1129(b)(2)(B)(ii). The court has denied a motion for appointment of an equity committee in a large Chapter 11 case, subsequently confirmed, on that basis. The court has not altered its view of the correctness of this general rule even though in that case the plan confirmed provided for the participation of equity security holders."

*In re Emons Indus., Inc.*, 50 B.R. at 694.

16.    The futility of an equity committee under these circumstances is recognized in *Collier*:

> "Many chapter 11 debtors are hopelessly insolvent and the only mystery in the case will be to ascertain the extent of the creditors' loss. In such cases, the interests of existing stockholders will be wiped out in a plan and stockholders do not need a committee to look out for their interests."

7 *Collier on Bankruptcy* ¶ 1102.03[2][a] at 1102-22.

17.    The guesswork concerning insolvency occurring in the early stages of a chapter 11 case has been obviated in the instant case. This Court has had the opportunity to consider exhaustive evidence on the subject and as a result thereof, has adjudicated the Genesis Debtors insolvent. *See Genesis*, 266 B.R. at 620. In light of this Court's factual finding that shareholders are not entitled to any recovery from the Genesis Debtors, appointment of an Equity Committee at this juncture would be a colossal waste of estate assets, the costs of which will be borne solely by unsecured creditors.

**B. SENIOR LENDERS AND UNSECURED CREDITORS WHO SUPPORTED THE PLAN SHOULD NOT SHOULDER THE EXPENSE OF PROSECUTING MR. HAYES' APPEAL**

18. The Motion is an overt attempt by Mr. Hayes to foist the costs of prosecuting his appeal on to the shoulders of the Senior Lenders and unsecured creditors. The Committee encouraged unsecured creditors to support the Plan because it believed that it provided the best recovery available under the circumstances. Now in an ironic twist, unsecured creditors are being asked to bear the expense of attacking it. The Committee hired its own financial advisor, Houlihan Lokey Howard & Zukin ("Houlihan"), to estimate the enterprise value of the Genesis Debtors for purposes of contesting the valuation proposed by the Debtors. For self-evident reasons, the Committee scrutinized the enterprise valuations prepared by the Debtors' and Senior Lender's respective financial advisors. After vigorous evaluation, however, Houlihan's independent enterprise valuation was only slightly higher than the valuations propounded by the Debtors and the Senior Lenders. Realizing that the Senior Lenders were very likely undersecured, the Committee negotiated a settlement with the Senior Lenders whereby the unsecured creditors were allocated a portion of the distribution to which the Senior Lenders would have otherwise been entitled. The settlement terms were designed to maximize recoveries to Genesis unsecured creditors and provide for an expeditious confirmation.

19. The opinions of numerous valuation experts were entered into evidence at the Confirmation Hearing. Upon consideration of such expert testimony and opinion, the Court stated that, "[a]fter vigorous scrutiny of the evidence presented at the confirmation hearings, I am convinced that the Senior Lenders are undersecured and that the treatment of junior creditors and equity security holders proposed in the plan is consistent with the fair and equitable requirements for confirmation." *Id* at 610 (*emphasis added*); *see Id* at 616 ("under the debtors' plan, the

Senior Lenders will not recover 100% of their claims ... accordingly, there is no violation of the absolute priority rule.")

20.    Rebuked in his prior efforts, Mr. Hayes now contends that appointment is appropriate because "[t]he costs of appointing a committee of equity security holders at the appellate stage is low and does not outweigh the need to furnish adequate representation for equity security holders of Genesis." (Hayes Motion, ¶ 5)

21.    The Committee disagrees with Mr. Hayes assessment of the low "costs of appeal" and the need for representation at this stage of the bankruptcy case. First, Mr. Hayes fails to consider that the cost of an equity committee at this juncture has increased dramatically because the probability of a shareholder recovery is diminished by virtue of the confirmation order. The virtually nonexistent probability of a shareholder recovery in this bankruptcy case has become even more remote because this Court has, by way of adjudication, determined that shareholders are not entitled to any distribution. Mr. Hayes' efforts to receive a distribution on account of his equity interests face steeper obstacles on appeal, as the Court's adjudication of insolvency will not be set aside unless the finding is determined to be *clearly erroneous. See* FED. R. BANKR. P. 7052(a), 9014. In light of the valuation evidence presented at the Confirmation Hearings, this scenario appears extremely unlikely.

22.    Second, Mr. Hayes fails to grasp that his interests were adequately represented by the Committee under the particular facts and circumstances of this case. The Committee had every incentive to contest the Debtors' and Senior Lenders valuations in order to increase unsecured creditor recovery. The Committee's interests were aligned with those of Mr. Hayes in as much as a higher valuation would ultimately benefit shareholders if a 100% recovery were realized for unsecured creditors. The Committee's independent valuation revealed, however, the

likelihood that Senior Lenders were undersecured    Understanding the inexact science of business valuation and the risk that the Court would find unsecured creditors entitled to no distribution, the Committee negotiated a settlement with the Senior Lenders in order to ensure that a recovery for unsecured creditors would occur.  The distribution to unsecured creditors under the Plan is a far cry from a 100% dividend *See Genesis*, 266 B.R. at 598 (unsecured creditors of Genesis will receive a dividend of 7.34%, exclusive of the value of the New Warrants). The Committee's inability to negotiate a dividend even marginally approximating the full amount of unsecured claims suggests that shareholder interests were adequately represented, under the circumstances, in the bankruptcy case

23.    While unsecured creditors are statutorily entitled to the appointment of a committee under section 1102(a)(1) of the Bankruptcy Code, the appointment of other committees is discretionary. *See* 11 U.S.C. §1102(a)(2)(1994). The appointment of an equity committee in the face of hopeless insolvency is unreasonable, unwarranted, and arguably, an abuse of discretion. This Court carefully considered the opinions of several valuation experts, including the experts retained by individuals possessing economic interests similar to those of Mr. Hayes. Mr. Hayes is not entitled to receive a second bite at the apple courtesy of the Senior Lenders and unsecured creditors.

**WHEREFORE**, for all of the foregoing reasons, the Committee respectfully requests that this Court (i) deny the Motion before the Court, and (ii) grant the Committee such other and further relief as this Court deems just and proper.

Dated:  Wilmington, Delaware
          October 15, 2001

                              AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.
                              Lisa G. Beckerman, Esq.
                              Mark D. Taylor, Esq.
                              590 Madison Avenue
                              New York, New York 10022
                              Telephone: (212) 872-1000
                              Facsimile: (212) 872-1002

                              -and-

                              PACHULSKI, STANG, ZIEHL, YOUNG & JONES P.C.


                              Laura Davis Jones, Esq. (Bar No. 2436)
                              Rachel S. Lowy (Bar No. 3753)
                              919 North Market Street, 16th Floor
                              P.O. Box 8705
                              Wilmington, DE  19899-8705 (Courier 19801)
                              Telephone: (302) 652-4100
                              Facsimile: (302) 652-4400

                              Co-Counsel to the Official Committee of Unsecured
                              Creditors

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

FILED
JAMES J. WALDRON, CLERK

[JUL 1 9 2004

U.S. BANKRUPTCY COURT
CAMDEN, NJ
BY_____DEPUTY

IN THE MATTER OF )
) 00-2692
GENESIS HEALTH VENTURES, )
INC., ET AL., )
) Camden, New Jersey
            Debtor. ) May 13, 2004
)

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE JUDITH H. WIZMUR
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:          RUSSELL C. SILBERGLIED, ESQUIRE
                          Richards, Layton & Finger
                          One Rodney Square
                          Wilmington, Delaware    19899

For Shareholders:         JAMES J. HAYES
                          4024 Estabrook Drive
                          Annandale, Virginia    22003

Audio Operator:           NORMA SADER

Transcribed by:           DIANA DOMAN TRANSCRIBING
                          P. O. Box 129
                          Gibbsboro, New Jersey    08026
                          Off: (856) 435-7172
                          Fax: (856) 435-7124
                          E-mail: dianadoman@comcast.net

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

RD126

2

I N D E X

ARGUMENT:

By:  Mr. Silberglied       3, 14

By:  Mr. Hayes             6

THE COURT:

Statements                 20

Ruling                     23

RD127

Silberglied - Argument                                    3

1      THE COURT:  Please be seated.  Good morning.

2      MR. SILBERGLIED:  Good morning, Your Honor.

3      THE COURT:  On Genesis, may I have an appearance,

4   please.

5      MR. SILBERGLIED:  Yes.  For the record, Your Honor,

6   Russ Silberglied of Richards, Layton & Finger.  Your Honor, on

7   the agenda, there are only three items today.  And, the first

8   one listed on the agenda is listed as continued.  This is the

9   motion to vacate the automatic stay for a client -- for a

10  creditor named Windle (phonetic).  And, Windle has asked for

11  another continuance.  We might be able stipulate to this.

12  We're looking with -- looking at the issues with them.

13     THE COURT:  Let's hope so.

14     MR. SILBERGLIED:  Items number 2 and 3 are going

15  forward.  I don't know if Your Honor would rather hear number 3

16  first because it's unopposed, as opposed to number 2 which is

17  contested.

18     THE COURT:  That's fine.  We can do that.

19     MR. SILBERGLIED:  Item number 3 is the seventh

20  omnibus claims objection motion as it relates to the remaining

21  outstanding claims.  It was supposed to go forward today with

22  respect to both of the remaining outstanding creditors, which

23  were different departments of the State of New Jersey and

24  different departments in the Federal Government, mostly the

25  IRS.

Silberglied - Argument                    4

1    I understand from chambers that the IRS called

2    chambers and said that the attorney for the IRS had a death in

3    the family and, therefore, requested a continuance which, of

4    course, we're amenable to.  We are actually hopeful -- we

5    actually had thought we had worked out everything with the IRS.

6    So, we were somewhat surprised they even wanted to be here.

7    But, be that as it may, hopefully we can just get it done and

8    perhaps we can even do it by certification of counsel and a

9    form of order rather than having to go to another hearing.

10        But, with respect to the State of New Jersey, we have

11   worked out just about everything.  And, perhaps the easiest

12   thing is if I can hand up a form of order that really

13   summarizes it.

14        THE COURT:  That's fine.

15        MR. SILBERGLIED:  Thank you, Your Honor.  Your Honor,

16   there's been extensive reconciliations between the tax

17   department at Genesis and the various departments of New

18   Jersey, and those reconciliations and negotiations have been

19   fruitful.  And, as you will see in number one of the order, we

20   have listed claims A through P, various claims numbers of

21   different divisions of New Jersey that these are all New Jersey

22   agreeing to the -- to allow us to proceed with the objection as

23   unopposed.

24        In certain of them, I think the -- they agree that

25   they taxes were paid.  In others, they agreed that the taxes

Silberglied - Argument                              5

1   were -- you know, were reconciled as being different, and so on

2   and so forth.  But, in each instance in A through P, there has

3   been an agreement among the parties.

4            THE COURT:  Okay.

5            MR. SILBERGLIED:  With respect to item number 2,

6   claim number 549, this was a post-petition claim that was filed

7   as a pre-petition claim.  And, so the proposal is simply to

8   have it listed for completeness purposes as disallowed as an

9   unsecured claim with specific language that says this is

10  without prejudice to its treatment as a post-petition claim.

11           THE COURT:  Okay.

12           MR. SILBERGLIED:  And, item number 3 is also a

13  consensual change.  And, the only reason why it's not listed in

14  number 1 is because it's not being disallowed in its entirety

15  by agreement, but rather it's being reduced and allowed by

16  agreement of the parties.  Claim number 932 reduced to the

17  amount of 14,744.89 and allowed.

18           THE COURT:  Very good.  The order has been entered.

19           MR. SILBERGLIED:  Thank you, Your Honor.

20           THE COURT:  Thank you.  And, I take it that the -- we

21  do have another -- the next omnibus hearing scheduled?

22           MR. SILBERGLIED:  I believe we do not.  But, I

23  believe that Multicare has asked for a June 8 omnibus hearing.

24  So, perhaps it just makes sense to have Genesis and Multicare

25  on the same day.

Hayes - Argument                                    6

1       THE COURT:  That's fine.  I already have it on, but

2  we'll certainly assign it that day --

3       MR. SILBERGLIED:  Your Honor, is --

4       THE COURT:  -- at 2:00.

5       MR. SILBERGLIED:  2:00.  Thank you.  That brings us

6  to Mr. Hayes' motion for the appointment of an equity

7  committee.  And, since it's his motion, I'll cede the podium.

8       THE COURT:  Okay.  Mr. Hayes?  Good morning.

9       MR. HAYES:  Good morning, Your Honor.  I don't have

10 anything to add to any of my motions.

11      THE COURT:  Let me perhaps ask you some questions to

12 clarify the procedural posture.  I'll note that you filed this

13 motion way back when, September of 2001, I believe, after the

14 confirmation order -- the first motion was filed in August,

15 perhaps, 2001, and, that was rejected in the opinion approving

16 confirmation, is that correct?

17      MR. HAYES:  Yes, Your Honor.

18      THE COURT:  And, you followed that up --

19      MR. HAYES:  I actually filed -- the first request was

20 with the U.S. Trustee.

21      THE COURT:  Yes.

22      MR. HAYES:  And, he rejected it.  And, then I filed

23 it with the Court.

24      THE COURT:  That's noted.  And, then after the

25 opinion was issued and the order entered, you asked again --

Hayes - Argument                                      7

1      MR. HAYES:  Yes.

2      THE COURT:  -- for a committee to be appointed, is

3  that correct?

4      MR. HAYES:  Yes, Your Honor.

5      THE COURT:  And, that's the -- and, that was back in

6  September or early October of -- let's see, I did make note of

7  it.

8      MR. HAYES:  Of 2001.

9      THE COURT:  Of 2001, yes, back -- October 1st, 2001

10  was the date that was noted on your motion papers, correct?

11     MR. HAYES:  Yes.

12     THE COURT:  And, it wasn't listed -- there was a

13  response to it from the Creditors Committee back then.  And,

14  you replied to that back then.  But, it wasn't listed for

15  hearing, is that correct?

16     MR. HAYES:  Yes, Your Honor.

17     THE COURT:  And, years went by.  There was an

18  Appellate process that was ongoing.  Two appears were

19  apparently inadvertently filed by the clerk's office, appeals

20  that you initiated.  And, they were denied, and now you've

21  appealed to the Court of Appeals on the order of confirmation.

22     But, two and a half years went by before you inquired

23  by letter directed to me in March of 2004 to say what happened

24  to this motion, can we have this motion listed.  What -- how do

25  I understand that gap, that failure on your part to bring this

Hayes - Argument                                    8

1    matter forward for me to look at, to resolve, to bring to

2    resolution?

3            MR. HAYES:  Well, Your Honor, I thought the order was

4    pending.  I was, you know, hopeful that there would be a ruling

5    on it.  I didn't know that I had to request a hearing.

6            THE COURT:  I see.

7            MR. HAYES:  The reason that I sent the letter when I

8    did that brought -- I mean, the appeal before the District

9    Court had been completed, and I wanted to proceed with the

10   Appellate Court.

11           THE COURT:  Uh-huh.

12           MR. HAYES:  So, I thought that I would again request

13   -- find out what had happened, because I still think the

14   shareholders need an equity committee to pursue the appeal at

15   the Third Circuit.

16           THE COURT:  Uh-huh.  What is your reaction to the

17   argument that now, at this stage, -- and the District Court has

18   determined that the appeal to the order of confirmation is

19   equitably moot, because the two entities, Genesis and

20   Multicare, have effectively combined that there is -- it's like

21   unscrambling the egg, if you will -- and that, at this stage,

22   to believe that the Court of Appeals might do something else

23   with it is unlikely?

24           MR. HAYES:  I don't think the unscrambling an egg

25   analogy is out.  I mean, I had never intended, you know, to

1    stop the execution of the bankruptcy plan.  My argument is on

2    the merits were that the senior lenders receive more than 100

3    percent of their value of their notes.  And, if that was

4    determined on the merits, then it would be -- the senior

5    lenders would compensate the equity holders.  And, so there

6    would be no need, you know, to unscramble the egg, so to speak.

7         And, that's essentially what the junior subordinated

8    debenture holders are arguing in their fraud allegation.  I

9    mean, they -- they see that the extra value went to the senior

10   lenders.  And, so there's no reason to upset a ruling that, you

11   know involves, you know, thousands of --

12        THE COURT:  Isn't that --

13        MR. HAYES:  -- individual entities.

14        THE COURT:  Aren't there two different matters

15   though?  In other words, as a shareholder, presumably you could

16   join the Haskell suit to assert the same causes against the

17   senior lenders that are asserted by the subordinated bond

18   holders.  We'll take up where that stands.  And, I have been

19   apprised that the matter has been referred to me, and we'll

20   move forward with that.

21        So, that will be litigated.  And, if, indeed, either

22   the subordinated bond holders or any parties that join in that

23   suit -- for instance, shareholders who contend that senior

24   lenders received more than they were entitled to -- might

25   benefit from that result, that's one set of circumstances.

Hayes - Argument                    10

1    Your cause is to disturb the plan of -- the confirmed plan of

2    Genesis and Multicare to undo it and to install some other

3    arrangement between all of the parties involved in that entire

4    picture.  Isn't that a different scenario altogether?

5            MR. HAYES:  Well, I think there are two different

6    scenarios.  But, I don't think that the shareholders' fraud

7    suit is the same as the subordinated debenture holders.  I

8    think, if Genesis was fraudulently taken into bankruptcy,

9    that's what the shareholders' suit would be, that the company

10   was fraudulently taken into bankruptcy, it should never have

11   been in bankruptcy.  And, therefore, the whole process which

12   took away the shareholders' equity, shouldn't have gone

13   forward.

14           THE COURT:  And, is that a cause that is being

15   asserted by -- or that was asserted by shareholders after the

16   bankruptcy was filed or is being asserted by shareholders

17   anywhere?

18           MR. HAYES:  I have no knowledge of that.

19           THE COURT:  And, so how does that have to do with the

20   opportunity of shareholders to now tap the resources of the

21   reorganized debtor to fund such efforts?

22           MR. HAYES:  I mean, I see that potential litigation

23   as separate from what went on in the bankruptcy court.  I mean,

24   after the company declared bankruptcy in -- when was it -- May

25   of 2000, I mean, these equity securities, like all the other

Hayes - Argument                                                    11

1    securities, tend to trade. And, there are lots of equity

2    holders.

3            I mean, I had my equity in Genesis before it declared

4    bankruptcy. I maintained it after it declared bankruptcy.

5    But, there are other members -- equity members who just bought

6    their stock after it was -- after it was in bankruptcy. And,

7    so I think that, you know, their claim is with an equitable

8    distribution that arises from the bankruptcy, which --

9            THE COURT: People who bought in as equity holders

10   after the bankruptcy are entitled to protections like a

11   committee, is that your argument?

12           MR. HAYES: Yes. Yes. I mean, the same applies to

13   -- I mean, lots of the subordinated debt was acquired after the

14   bankruptcy. And, that was one of the big complaints. I don't

15   know --

16           THE COURT: And, if you'll refresh me --

17           MR. HAYES: And, the unsecured creditors had a

18   committee.

19           THE COURT: There was no committee for

20   subordinated --

21           MR. HAYES: Well, they were un --

22           THE COURT: -- bond holders.

23           MR. HAYES: -- they were unsecured creditors, and

24   they were on the Unsecured Creditors Committee.

25           THE COURT: They were on -- some of these

Hayes - Argument                                    12

1    subordinated bond holders were on the Unsecured Creditors

2    Committee, is that --

3              MR. HAYES:  Yes.

4              THE COURT:  Uh-huh.  Okay.  But, there was no

5    separate committee for subordinated bond holders, is that

6    correct?

7              MR. HAYES:  That's correct.  But, unless they did

8    have representation, it wasn't available to the equity

9    committee --

10             THE COURT:  Uh-huh.

11             MR. HAYES:  -- to the equity shareholders.

12             THE COURT:  Understood.  Anything else, sir?

13             MR. HAYES:  You know, the arguments that Genesis has

14   made in opposition to the Committee seem to revolve around

15   insolvency, and they argue that it was hopelessly insolvent.

16   And, they -- well, they've never defined what hopelessly

17   insolvent is, but they would like the Court to believe that

18   that's the only factor that has to do with appointment of an

19   equity committee.

20             And, the leading case on that is Emons.  And, in the

21   Emons case, there was an equity committee appointed, even

22   though the Court apparently felt that it was hopelessly

23   insolvent because they saw an ownership pattern in the

24   bankruptcy that was similar to what we have here.  They had

25   bond holders and equity holders that was institutionally held,

Hayes - Argument                          13

1    whereas the public were only the equity holders.  And, so they

2    didn't -- they had the conflicting interest that we have here.

3    And, so the Court in Emons appointed an equity committee.

4              THE COURT:  Uh-huh.

5              MR. HAYES:  And, then there's more recent cases that

6    list a number of other factors besides insolvency that argue

7    for the appointment of an equity committee.  And, I think, it

8    seemed, in my interpretation of it, the principle factor is

9    whether it -- whether the equity holders were represented --

10   maybe not by an equity committee, but the example given in -- I

11   think it was the Kalvar case was they felt that -- the Court

12   felt that the equity committee was represented by the officers

13   and directors of the company, who are also equity holders and

14   they're also active in the bankruptcy.  And, I guess that's a

15   judgment for the Court to make.

16             But, in this case, the officers and directors of the

17   company, they were mainly interested in working out special

18   deals that compensated them for their equity.  And, so they

19   abandoned the shareholders.  So, I think the -- you know, the

20   balance of the arguments argue in favor of an equity committee.

21             THE COURT:  Understood.  Thank you, sir.

22             MR. HAYES:  Thank you.

23             MR. SILBERGLIED:  For the record, once again, Russ

24   Silberglied of Richards, Layton & Finger.  Your Honor, some of

25   those arguments might have been arguments that could have been

Silberglied - Argument                    14

1   made in the summer or fall of 2000.  They're not arguments that

2   can be made in the spring of 2004.

3       I'm going to attempt to be brief here, because it was

4   obvious to me, from Your Honor's remarks, that you've read the

5   papers.  So, I'm going to try not to repeat them.  Basically,

6   in almost summary form, the motion is fraught with procedural,

7   as well as substantive problems.

8       It's seeking to appoint a committee three years post

9   confirmation.  It's seeking to appoint a committee for appeal

10  purposes, even though the committ -- even though the Court

11  already denied the formation of a committee for all purposes.

12  So, it's a collateral attack on a prior order of the Court that

13  could have been appealed.

14      The appeal Mr. Hayes wants a committee to prosecute

15  has been dismissed as equitably moot.  So, I'm not really sure

16  what a committee could do.  And, 99 percent of the

17  distributions have been made under the plan, so there's really

18  nothing left for a committee to do.

19      THE COURT:  Help me to understand that.  Is there a

20  hold back for claims unresolved?  Is that --

21      MR. SILBERGLIED:  There's a few of the -- for

22  instance, I believe there may be a small hold back for the few

23  remaining personal injury claims.  There's, of course, the IRS

24  claims and the New Jersey claims that we just finished with

25  today.  It's a handful of claims.  There's really nothing left.

Silberglied - Argument                                      15

1        THE COURT:  And, the Scherfel matter is still on

2   appeal?

3        MR. SILBERGLIED:  The Scherfel matter, I believe, is

4   still on appeal, although I'm not counsel of record in that

5   matter.  However, the Court estimated that claim at zero, which

6   was affirmed by the District Court.  And, the Third Circuit

7   said that no stay pending appeal was appropriate.

8        And, as a result, you know, we've reserved zero for

9   that claim, because, you know, three Courts have said that that

10  was appropriate to do.  Otherwise, we would have made 50

11  percent of the distributions or less.  It was a billion dollar

12  claim.

13       So, 99 percent of the distributions have been made.

14  And, getting to one of the points that Your Honor raised.  The

15  relief sought in the Haskell litigation is, in fact, different

16  than what would be in an appeal.  The Haskell litigation

17  doesn't and can't ask -- or the Haskell litigants don't and

18  can't ask this Court to unscramble the eggs.  They ask for

19  fraud damages.

20       Now, we think that's highly objectionable, and we've

21  moved to dismiss on any number of grounds, which I can talk

22  about if Your Honor is interested.  But, the point is that, if,

23  for whatever reason, the Court disagrees, the remedy that is

24  sought in the complaint is damages for fraud against a

25  reorganized entity, the bank group, and other lenders.  It's

1   not to reallocate distributions.

2          Now, to show you why that's a significant difference,

3   that's the whole reason why stays pending appeal are a remedy

4   that one could get.  The whole point of a stay pending appeal

5   of a confirmation order is that, if you don't get a stay

6   pending appeal, somebody is going to start to make

7   distributions.

8          And, that's why very often there's litigation in

9   confirmed plans about whether a stay pending appeal is or is

10  not appropriate.  Mr. Hayes never moved for one.  I will note

11  that somebody else did move for one which was Mr. Grimes, one

12  of the bond holders.  And, that motion was denied by this

13  Court.  Mr. Grimes moved again in the District Court for a stay

14  pending appeal, and that was denied by the District Court.

15         So, presumably, if Mr. Hayes had asked for one, it

16  would have been denied also for the very same reasons.

17  Whatever it is, he never asked.  And, as a result, we've made

18  99 percent of the distributions under the plan.  What's he

19  going to get for equity at this point?  You can't get the money

20  back, and he's not asking for fraud damages.

21         Now, by the way, before we get a fraud damages suit

22  on our hands, I just want to point out a couple of things in

23  response to what I've heard.  First of all, obviously solvent

24  entities may file for bankruptcy.  There's no prohibition in

25  the Bankruptcy Code against solvent entities filing for

Silberglied - Argument                                    17

1    bankruptcy.

2           So, even if Mr. Hayes, somehow or another, proved

3    that Genesis were solvent as of June of 2000, which it wasn't,

4    that's not fraud.  The company could have filed for bankruptcy

5    anyway.  And, what fraud?  This is the first we've ever heard

6    the stockholders claiming fraud, but there's no particularity.

7           If he's claiming fraud that's a securities fraud, --

8    I wouldn't have bought my shares if it -- you know, if it

9    weren't for these disclosures, and so on and so forth -- well,

10   that claim simply would have been subordinated under Section

11   510(b) back to equity, or he'd be in the exact same place he is

12   today anyway.  So, none of that makes any difference

13   whatsoever.

14          For all of those reasons, this motion ought to be

15   denied.  It's three years too late at least.  It's probably

16   four years too late.  But, it's certainly at least three years

17   too late.  And, I'll -- I'll just end on one last note.

18          There have only been two or three cases that we could

19   locate ever that have approved the formation of any level of

20   committee -- and none of them were an equity committee, by the

21   way -- post confirmation.  And, those were on very unique

22   facts, and there's a debate in the case law as to whether it's

23   even permissible statutorily to appoint a committee post

24   confirmation.  This case cert -- I mean, even if you could get

25   past the statutory construction arguments, this case certainly

Silberglied - Argument                                    18

1    isn't the case to become the third or fourth such case.

2              THE COURT:  Yes.  Thank you, Mr. Silberglied.  Let me

3    ask you one question, because it's troubling that at motion --

4    any motion, without any reference to the merits of this

5    particular motion, was out there unresolved for two and a half

6    years.  How did that happen here?  Can you help me to

7    understand what procedures were not followed and how this came

8    to be?

9              MR. SILBERGLIED:  Yes, Your Honor.  I was troubled by

10   that as well when I first saw Mr. Hayes' letter.  To be

11   perfectly honest, I did not know that this matter was

12   outstanding.  I think the problem was as follows:

13             The motion was not electronically filed.  I don't

14   believe it was even on the Court's docket at the time.  I think

15   it may have come up afterwards.

16             THE COURT:  When did Delaware go into electronic

17   filing?

18             MR. SILBERGLIED:  It was before this motion was

19   filed.  I can't tell you the precise date.  But, I remember,

20   for instance, that it was somewhere around the time that we

21   filed the plan.  So, that would be the spring of 2000, because

22   I remember the procedural glitches with the system going down

23   as we were trying to file the disclosure statement that's an

24   unfortunately vivid and painful memory.  So, yes, the e-filing

25   system was up and running full well at that time, and the

Silberglied - Argument                    19

1    motion wasn't e-filed.

2         I think it may have made it to the docket several

3    months later.  But, frankly, it was never called to my

4    attention.  I'm not clear as to whether -- I can't tell,

5    looking back at this three years later, whether my firm was

6    ever served with the motion or not.  I'm simply not sure.

7         THE COURT:  Well, --

8         MR. SILBERGLIED:  What I know is that -- at a

9    minimum, that the Creditors Committee received it, because the

10   Creditors Committee objected.  But, in any event, the

11   procedural way that motions get teed up under the Delaware

12   local rules is for somebody to put a notice of motion on top

13   and tee it up for a particular omnibus hearing so that the

14   parties understand -- the people responding understand when it

15   is that they're supposed to file an objection.

16        THE COURT:  Somebody meaning theoretically the

17   movant --

18        MR. SILBERGLIED:  The movant, absolutely.  It's the

19   movant's --

20        THE COURT:  -- would --

21        MR. SILBERGLIED:  -- responsibility under the local

22   rules.

23        THE COURT:  -- would alert, say, counsel for the

24   debtors that this -- they wanted to have this heard on the next

25   omnibus hearing date, let's say, or the like.

Silberglied - Argument / The Court - Statements          20

MR. SILBERGLIED: Yes, Your Honor.

THE COURT: Uh-huh.

MR. SILBERGLIED: So, that's the movant's responsibility under the local rules of Delaware. So, I think the reality is, if we had seen it, we probably would have objected, despite the inconsistencies or deficiencies under the local rules. We didn't see it. Otherwise, as I said, we likely would have.

But, the fact of the matter is that no notice of motion accompanied the motion, it wasn't e-filed, so we -- it just didn't come to our attention through the appropriate or the typical means. And, I think that's the explanation as to why no action was taken on it.

THE COURT: Understood. Thank you.

MR. SILBERGLIED: Thank you, Your Honor.

THE COURT: Let me reflect the procedural history here, because I do think it's important to situate this motion. The -- these cases were filed on June 22nd, 2000. And, about a year later, -- I have two dates, June 5th and July 6th. I'm not sure which is the right one. Perhaps July 6th was an amended version -- the plan of reorganization and disclosure statement were filed in the cases.

The confirmation hearings were scheduled for late August. I note that in July, -- July 10th, apparently, 2001, Mr. Hayes, the movant here, requested the United States Trustee

The Court - Statements                                    21

1   to appoint an equity security committee. That request was

2   opposed by counsel for the debtor and counsel for the Creditors

3   Committee -- the Unsecured Creditors Committee. And, the

4   United States Trustee denied the request on or about August

5   2nd, 2001.

6        That was followed a few days later, August 8th, 2001,

7   with a formal motion filed by Mr. Hayes to appoint a committee.

8   And, that motion was heard in conjunction of the confirmation

9   of the debtor's Chapter 11 plan. Again, that motion was

10  formally opposed by the Creditors Committee.

11       The -- as I said, we heard the confirmation questions

12  August 28th and 29th. I issued an opinion on September 12th,

13  2001, which, among other things, confirmed the plan that was

14  proposed and rejected the request by Mr. Hayes to appoint a

15  committee. An order to that effect was entered September 20th.

16       A notice of appeal was filed apparently on September

17  18th, and a motion, as we've noted, was filed by Mr. Hayes on

18  October 1st, 2001 to appoint the committee. And, we had no

19  hearing set. There was a response from the Creditors Committee

20  to the motion.

21       I assume that the motion was properly served, but the

22  motion was not put on the calendar. I'll accept Mr.

23  Silberglied's recitation or reference to the Delaware local

24  rules that imposes the obligation on the movant to arrange for

25  the matter to be placed on the motion list -- on the omnibus

The Court - Statements                                        22

list for that particular case so that it can be considered.

I do have another notice of appeal date, September 27th, from Mr. Hayes. I am not sure. Perhaps the September 18th date was by another appellant. In any event, there was a notice of appeal filed. Apparently, the notice of appeal was filed twice in the District Court by perhaps error of the District Court. Mr. Hayes, did you have clarification on that?

MR. HAYES: Well, as I recall, the first -- I filed the first one -- notice of appeal before the opinion was filed. I mean, the opinion --

THE COURT: Before the order was filed perhaps. Yes, September 18th. The order was filed September 20th. In other words, my opinion was published September 12th.

MR. HAYES: And, so I went back to the clerk and I just asked them to amend --

THE COURT: Yes. And, instead of amending, they incorrectly filed apparently another notice of appeal. So that, there were two appeals pending from you to the order of confirmation. The first appeal, I guess, was resolved September 30th, 2002 by the District Court with a decision by the District Court that the appeal should be dismissed on equitable mootness grounds.

The second appeal, which was -- really it looked like the same appeal, was dismissed March 12, 2003 on the basis that it was the same appeal that was filed earlier. And, a

The Court - Statements / Ruling                     23

reconsideration of that decision was denied on -- apparently on

February 26th, 2004. And, I believe that an appeal -- that you

filed an appeal to the Court of Appeals on March 25th, 2004.

In March -- March 13th, 2004, Mr. Hayes, the movant

corresponded with me to inquire about the status of this motion

and to reflect that the motion was pending and should be acted

upon. He alluded to a complaint that had been filed, I

believe, in the Southern District of New York -- I'm not sure

-- the Eastern District?

MR. SILBERGLIED: It was originally filed in the

State Court in New York and removed to the Southern District of

New York.

THE COURT: Okay. A suit by subordinated bond

holders in the Genesis matter pre-confirmation against senior

bond holders -- senior lenders rather -- in the case contending

that the senior lenders had exercised fraud in the process of

confirmation in the process of the valuation of the debtors and

that there ought to be damages paid by the senior lenders to

the plaintiffs in connection with that alleged fraudulent

activity.

Mr. Hayes relies in part on the allegations in that

complaint to support the proposition that a Creditors Comm --

that an equity security committee should be appointed to assist

the former equity security holders to assert their positions on

appeal to the Court of Appeals at this point. And, I will deny

1   that request.  I think that procedural and substantive bases

2   exist for that denial.  I agree with counsel for the debtors'

3   arguments in that regard.

4       Procedurally, this request is grossly untimely.  We

5   had -- I ruled on this matter when I rejected the quest for

6   equity security holder status at the time of confirmation.  I

7   ruled on it in my September 12, 2001 opinion.  In fact, one of

8   -- a basis for -- a ground for denying the request was that it

9   was untimely then back two and a half years ago, almost three.

10      Indeed, one of the arguments advanced by various

11  objectors, including perhaps Mr. Hayes at the time, was that

12  the reorganization process had been -- had gone forward too

13  quickly, that there was some untoward -- there was a suggestion

14  that the speed at which the process had gone forward suggests

15  some untoward activity by the proponents of the plan and those

16  who supported the plan.

17      And, I rejected that in a discussion of the good

18  faith of the plan and its proponents, noting that the case had

19  been pending for a year at that point and that the desire to

20  proceed expeditiously, barring some extraordinary presentation,

21  could not defeat a good faith presentation.  And, there was no

22  basis, other than a -- an allegation of bad faith to support

23  the concern about the speed with which the plan was proposed.

24      So, we had a year, as counsel for the debtor recalls,

25  for equity to come forward to seek representation, to seek to

1    assert its position.  Indeed, equity could always participate

2    in the case, could always obtain a representation on their own.

3    If there was a basis for the designation of a committee, that

4    could have been applied for sooner than the eleventh hour

5    basically.  Indeed, it was applied for in July initially

6    through the United States Trustee after the plan and disclosure

7    statement were submitted.

8            Indeed, perhaps equity will suggest -- equity

9    represented by Mr. Hayes here -- that it wasn't until then that

10   it became apparent that the intention of the debtors or the

11   senior lenders or a combination of them to, in effect,

12   extinguish equity -- it was not apparent to equity until then

13   that that would be the intent of the proponents of the plan.

14   And, that may be.  But, the opportunity to take an active role

15   through representation through a prospective committee had to

16   have been presented earlier in order to have any prospect of

17   achieving that result.

18           Indeed, in many cases, there may be a basis beyond

19   threshold demonstration of insolvency to warrant the

20   appointment of a committee.  There are cases cited in the

21   submissions in which there is serious contest about valuation.

22   And, indeed, in this case, we had at confirmation contest about

23   valuation, and that contest was -- in the words that I used --

24   vigorously scrutinized and resolved in the opinion.

25           The balance was then, when I denied the motion in the

The Court - Ruling                          26

1    September 12th opinion, substantially in favor of rejecting the

2    equity security holders request, not only because the

3    insolvency question, as I determined it to be resolved in the

4    opinion, so favored the basic contemplation that there was no

5    equity to reach shareholders, even in the most favorable

6    interpretation of the various expert opinions that were

7    received.

8         The fact there was, for the most part, a consensual

9    plan of the most substantial interests represented in the case,

10   compelled, in my mind, the drawing of the balance against the

11   constitution of a -- an equity security committee at that point

12   in the case and in that context.

13        And, things have only progressed to reduce the

14   opportunity of an equity security committee to be appointed

15   rather than enhanced, the passage of time alone certainly, the

16   fact that there was no stay pending appeal of the confirmation

17   order.  And, therefore, the process of consummation of the plan

18   went forward, distribution to the effect of -- as counsel

19   reflects -- 99 percent of what was to be distributed.

20        Mr. Hayes suggests that he is not seeking to disrupt

21   that distribution, but simply to reallocate the senior lenders'

22   receipts to others -- I'm not -- to whom -- I'm not sure, to

23   equity, presumably.  He doesn't insert in that analysis the

24   interests of the other parties -- that is, the unsecured

25   creditors, the subordinated bond holders -- who would precede

The Court - Ruling                                    27

1   any taking by equity in any event.

2          And, how you could take away what you have already

3   given in this context I'm not sure.  I have grave doubts that

4   such a procedure could be accomplished in a way that would not

5   require the unscrambling of the egg, if you will.  Indeed, the

6   concept of equitable mootness can be applied by the Bankruptcy

7   Court and has substantial application in this context.

8          I also agree wholeheartedly with counsel's concerns

9   about post-confirmation appointment of committees.  I think

10  that such a process may not be countenance within the framework

11  of the Bankruptcy Code.  And, even if it is, it would be

12  available only in the most extraordinary of situations.  And, I

13  cannot fit this set of facts into that kind of equation.

14         So, I will determine to deny the motion of the -- of

15  Mr. Hayes to appoint an equity security committee at this stage

16  and in this posture.

17         MR. HAYES:  May I be heard?

18         THE COURT:  Certainly.

19         MR. HAYES:  Your Honor, you know, the equity holders

20  were never a party to any of the bankruptcy proceedings.  As an

21  equity holder, I was first notified when the -- when the

22  notification was approved.  And, I responded at that time.  I

23  mean, I -- you know -- so, I think it's a false argument to

24  suggest that the equity holders --

25         THE COURT:  In other words, you mean you had no

RD152

Colloquy                                    28

1   knowledge about the bankruptcy and --

2            MR. HAYES:  I knew there was bankruptcy.  I didn't --

3            THE COURT:  That's all I'm saying.  I didn't say that

4   you were noticed of any plan to extinguish the interests of the

5   equity security holders or the like.  The simply fact that the

6   bankruptcy was filed a year earlier is all I was alluding to.

7            MR. HAYES:  And, then -- so, when the plan was

8   arrived at -- or -- that's when the equity holders were

9   notified and that's when they were notified of their rights.

10  That's when they were notified that the plan that had been

11  contemplated was going to extinguish their equity.

12           THE COURT:  Yes.  And, I noted that in my comments.

13  And, Mr. Hayes, at this point I have ruled.  So, I'm not

14  planning to revise my ruling.  You're welcome to make an

15  additional comment for the record if you like.

16           MR. HAYES:  But, it was after the time that -- after

17  the plan was conceived and approved, this is when the equity

18  market -- and this is what got my attention -- in comparable

19  health care companies appreciated by 60 percent that changed

20  all the valuations that they had all done.

21           And, when I asked the Trustee to appoint a committee,

22  the debtor responded about their mantra of there being hundreds

23  of millions of dollars insolvent.  And, that response is made

24  before any of the adjusted valuations were put forth.  And, I

25  was very angry when Mr. Walsh told me he walked into court --

Colloquy                                    29

1    you know, that he -- I felt that he had misrepresented to the

2    Trustee the status of the valuations.  And, his only comment

3    was, well, he didn't know.

4            THE COURT:  Well, Mr. Hayes, this is one of the

5    problems with your motion to begin with.  These new points of

6    information that we are not able to deal with deliberately,

7    were not included in the papers, were not available for

8    scrutiny or response.  Even if they were, I would not change my

9    ruling, because -- for all of the reasons that I have

10   expressed.  So, you can't add new items each -- with each level

11   of review.

12           MR. HAYES:  Your Honor, the equity holders have a

13   basic constitutional right to their property under the Fifth

14   Amendment.  Property cannot be taken without due process and

15   without compensation.  It's been done both in this case -- in

16   this hearing.

17           I mean, I -- I cannot believe that the Constitution

18   does not apply to Bankruptcy Court, the Constitution does not

19   apply to these principles of equity -- equitable mootness, the

20   Constitution does not apply to this priority scheme that leaves

21   the shareholders out.

22           THE COURT:  Well, there's no doubt that the

23   Constitution applies.  There's no doubt that due process was

24   afforded in this context.

25           MR. HAYES:  It was not.

Colloquy                                    30

1    THE COURT: Well, I beg to differ. Indeed, these
2  concerns were seriously considered at the confirmation hearing,
3  and decisions were made, and appeals were taken, and stays were
4  rejected, -- quests for stays, and the plan was consummated.
5  That is procedural due process, and it was afforded in this
6  case. I thank you, Mr. Hayes.
7    Moving then to the Haskell matter, I do note that
8  there was a propo -- there was a referral of the matter by
9  Judge Robinson here and that the parties have agreed to a -- a
10 schedule for response to the debtor's or the plaintiff's -- the
11 defendant's rather -- motion to dismiss, and that's fine.
12    As I calculated, it requires a hearing date in July
13 on the motion to dismiss. Is that an accurate assessment?
14 We're talking about an April 9th stipulation with less than 60
15 days to response, and then 20 days to reply, which brings us
16 towards the end of June, and so on, contemplating a July
17 hearing date.
18    MR. SILBERGLIED: I believe that's correct. Thank
19 you, Your Honor.
20    THE COURT: Okay. Let's make it Friday, July 16th at
21 11 a.m. You'll convey that to other parties?
22    MR. SILBERGLIED: Your Honor, I have two comments
23 about it. The first is whatever -- whatever date it is, there
24 are multiple parties. So, if I might -- I'm happy to take back
25 whatever date there is. But, if somebody who's not in the

Colloquy                                          31

1    courtroom has a conflict, might we get back with Your Honor on

2    that?

3              THE COURT:  Of course.

4              MR. SILBERGLIED:  The second thing is I personally

5    will be speaking at a conference actually in South America on

6    that day.

7              THE COURT:  Oh.

8              MR. SILBERGLIED:  I -- I'm not --

9              THE COURT:  How nice for you.

10             MR. SILBERGLIED:  Thank you, Your Honor.  I'm not

11   anticipating being the person arguing, so I suppose it's not

12   necessary for me to be here, although I would have liked to.

13   But, seeing as how there are multiple parties that we need to

14   coordinate with, perhaps I ought to keep that in abeyance and

15   simply notify chambers when I've spoken to other parties.

16             THE COURT:  If the date is not good, give me an idea

17   of what conflicts there are and what availability there is in

18   July for the parties that are directly involved, and I'll

19   certainly try to accommodate that.

20             MR. SILBERGLIED:  Thank you, Your Honor.

21             THE COURT:  Is there anything else on this record?

22             MR. SILBERGLIED:  No, Your Honor.  That's the last

23   item on the agenda.

24             THE COURT:  Thank you all.

25                         * * * * *

32

C E R T I F I C A T I O N

    I, Frances L. Maristch, court approved transcriber,
certify that the foregoing is a correct transcript from the
official electronic sound recording of the proceedings in the
above-entitled matter.

_____7/16/04_____

DATE

FRANCES L. MARISTCH

RD157

LEXSEE 2005 US DIST. LEXIS 14904

**IN RE: GENESIS HEALTH VENTURES, INC., et al., Debtors. JAMES J. HAYES, Appellant, v. GENESIS HEALTH VENTURES, INC., et al., Appellees.**

**Civil Action No. 04-0477-JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2005 U.S. Dist. LEXIS 14904*

**July 23, 2005, Decided**

**PRIOR HISTORY:** [*1] Chapter 11. Bankruptcy Case No. 00-2692-JHW.

**COUNSEL:** James J. Hayes, Pro se, for Appellant.

Mark D.Collins, Esquire, Russell C. Silberglied, Esquire and Christina M. Houston, Esquire of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware. Of Counsel: Adam P. Strochak, Esquire and Lisa R. Fine, Esquire of WEIL, GOTSHAL & MANGES LLP, Washington, D.C. Michael F. Walsh, Esquire and Gary T. Holtzer, Esquire of WEIL, GOTSHAL & MANGES LLP, New York, New York, for Appellees.

**JUDGES:** Farnan, District Judge.

**OPINIONBY:** Joseph J. Farnan Jr.

**OPINION:**

### MEMORANDUM OPINION

July 23, 2005
Wilmington, Delaware

Joseph J. Farnan Jr.
**Farnan, District Judge.**

Pending before the Court is an appeal of the May 13, 2004 Order of the United States Bankruptcy Court for the District of Delaware denying the motion of Appellant, James J. Hayes, for appointment of a post-confirmation equity committee. In addition, the Debtors, Genesis Health Ventures, Inc. and its affiliates ("Genesis") have filed a Motion For Damages And Costs For Frivolous Appeal Pursuant To Bankruptcy *Rule 8020* (D.I. 15). For the reasons discussed, the Court will dismiss this appeal, and in the alternative, affirm the May 13, 2004 Order [*2] of the Bankruptcy Court. In addi-

tion, the Court will deny the Motion For Damages And Costs filed by Genesis.

### I. Parties Contentions

By his appeal, Hayes contends that the Bankruptcy Court erred in declining to appoint a post-confirmation equity committee. Hayes contends that the Bankruptcy Court failed to consider whether the equity shareholders were adequately represented, whether the shares were widely held and publicly traded, the size and complexity of the bankruptcy proceeding, the timing of his request vis-a-vis the status of the case, and "new evidence" in the Haskell Complaint. Hayes also contends that the Bankruptcy Court's decision violates shareholders' due process rights under the *Fifth Amendment*.

In response, Genesis contends that Hayes' appeal should be dismissed under the doctrine of equitable mootness, because the Plan has been substantially consummated and Hayes did not obtain a stay of the confirmation order. Genesis also contends that Hayes' appeal is barred by the doctrine of res judicata and collateral estoppel. Specifically, Genesis refers the Court to two prior appeals filed by Hayes and dismissed by the Court. In addition, Genesis points out that [*3] the Third Circuit has affirmed this Court's dismissal of Hayes' appeal of the confirmation order, and therefore, Hayes' request to appoint an equity committee to litigate the appeal of the confirmation order is moot.

In the alternative to its procedural arguments in support of dismissal, Genesis contends that Hayes' appeal should be dismissed on the merits, because Genesis is "hopelessly insolvent." As a result, Genesis contends that the costs associated with the appointment of an equity committee outweigh the concern for shareholder representation.

### II. STANDARD OF REVIEW

The Court has jurisdiction to hear an appeal from the Bankruptcy Court pursuant to *28 U.S.C. § 158(a)*. In undertaking a review of the issues on appeal, the Court applies a clearly erroneous standard to the Bankruptcy Court's findings of fact and a plenary standard to its legal conclusions. See *Am. Flint Glass Workers Union v. Anchor Resolution Corp., 197 F.3d 76, 80 (3d Cir. 1999)*. With mixed questions of law and fact, the Court must accept the Bankruptcy Court's finding of "historical or narrative facts unless clearly erroneous, but exercise[s] 'plenary review [*4] of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" *Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 642 (3d Cir. 1991)* (citing *Universal Minerals, Inc. v. C. A. Hughes & Co., 669 F.2d 98, 101-02 (3d Cir. 1981))*. The appellate responsibilities of the Court are further understood by the jurisdiction exercised by the Third Circuit, which focuses and reviews the Bankruptcy Court decision on a de novo basis in the first instance. *Baroda Hill Inv., Inc. v. Telegroup, Inc. (In re Telegroup, Inc.), 281 F.3d 133, 136 (3d Cir. 2002)*.

### III. DISCUSSION

A. Whether Hayes' Is Entitled To Relief On The Issues Raised In His Appeal Of The Bankruptcy Court's May 13, 2004 Order

Under the doctrine of equitable mootness, "an appeal should . . . be dismissed as moot, even though effective relief could conceivably be fashioned, where implementation of that relief would be inequitable." *In re Continental Airlines, 91 F.3d 553, 559 (3d Cir. 1996)* (en banc). The equitable mootness doctrine is aimed at "preventing a court from unscrambling complex bankruptcy reorganizations when the [*5] appealing party should have acted before the plan became extremely difficult to retract." *Nordhoff Investments, Inc. v. Zenith Elecs. Corp., 258 F.3d 180, 185 (3d Cir. 2001)*. As adopted by the Third Circuit in Continental, the doctrine of equitable mootness requires the court to balance five factors which are unique to bankruptcy proceedings:

> (1) whether the reorganization plan has been substantially consummated; (2) whether a stay has been obtained; (3) whether the relief requested would affect the rights of parties not before the court; (4) whether the relief requested would affect the success of the plan; and (5) the public policy of affording finality to bankruptcy judgments

*Continental, 91 F.3d at 560*. The manner in which these factors are weighed depends on the facts and circumstances of each case. Id.

In *Grimes v. Genesis Health Ventures, Inc., 280 B.R. 339*, the Court concluded that an appeal of the confirmation order in the Genesis bankruptcy cases was equitably moot based on the Continental factors. The Court's conclusions in *Grimes* regarding the application of the *Continental* factors [*6] applies with equal force to this case. The Plan has been substantially consummated, and Appellant neither sought nor obtained a stay of the confirmation order. Because the confirmation order cannot be challenged, Appellant's request for the appointment of a post-confirmation equity committee to support the appeal of the Bankruptcy Court's September 20, 2001 confirmation order is equitably moot. n1

> n1 Appellant refers to "new evidence" in the form of the Haskell Complaint. However, the Haskell Complaint has been dismissed by the Bankruptcy Court in its entirety, and therefore, the Court is not persuaded that the allegations of the Haskell Complaint have relevance for this appeal.

In addition, the Court notes that the United States Supreme Court has denied Appellant's application for certiorari review of the Third Circuit's decision affirming the Court's dismissal of his appeal of the confirmation order in Civil Action No. 01-718-JJF. Because there is no avenue of appeal left for Appellant to pursue with respect [*7] to the confirmation order, Appellant's challenge to the Bankruptcy Court's denial of a post-confirmation equity committee to guide the appeal of the confirmation order, i.e. the underlying basis for this appeal, is also actually moot.

In the alternative, the Court concludes that the Bankruptcy Court correctly denied Hayes' request for the appointment of a post-confirmation equity-committee. The Bankruptcy Court's finding that Genesis is completely insolvent is supported by the valuation evidence presented to the Bankruptcy Court, and the Court concurs with the Bankruptcy Court's conclusion that the appointment of an equity committee is not warranted in the circumstances of this case. Accordingly, the Court will, in the alternative, affirm the May 13, 2004 Order of the Bankruptcy Court.

B. Whether Genesis Is Entitled To Damages And Costs In Connection With Litigating This Appeal

As for Genesis' Motion For Damages And Costs, the Court will deny Genesis' Motion. Although Hayes presented this issue to the Bankruptcy Court three times,

and presented it to the Court by motion in 01-718, Hayes did not specifically appeal an Order of the Bankruptcy Court addressing this issue until [*8] the instant appeal. Hayes' appeal was also not rendered actually moot until June 20, 2005, when the Supreme Court denied his application for certiorari review of the Third Circuit's decision affirming the Court's Order in Civil Action 01-0718-JJF. In these circumstances and given Hayes' status as a pro se litigant, the Court declines, at this juncture, to award damages and costs. Accordingly, the Court will deny Genesis' Motion For Damages And Costs.

## IV. CONCLUSION

For the reasons discussed, the Court will dismiss this appeal, and in the alternative, affirm the May 13, 2004 Order of the Bankruptcy Court. In addition, the Motion For Damages And Costs filed by Genesis will be denied.

An appropriate Order will be entered.

## FINAL ORDER

At Wilmington, this 23 day of July 2005 for the reasons discussed in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that:

1. The above-captioned appeal is **DISMISSED.**

2. In the alternative, the May 13, 2004 Order of the Bankruptcy Court is **AFFIRMED.**

3. The Motion For Damages And Costs For Frivolous Appeal Pursuant To Bankruptcy *Rule 8020* (D.I. 15) is **DENIED.**

Joseph J. Farnan Jr.  [*9]

UNITED STATES DISTRICT COURT

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GENESIS HEALTH VENTURES, INC., et al., | ) | Case No. 00-2692 (JIIW) |
| | ) | |
| | ) | |
| | ) | |
| Reorganized Debtors | ) | |
| | ) | |

## MOTION FOR APPOINTMENT OF PRE-FINAL DECREE EQUITY COMMITTEE

Pursuant to section 1102(a)(2) of chapter 11 of title 11 of the United States Code, 11 U.S.C. 101-1330, and the due process clause of Amendment V of the United States Constitution, James J. Hayes, a member of Genesis Equity Class respectfully requests this Court to appoint a Pre-Final Decree Equity Committee to represent the interests of the Genesis Common Stock Class: 1) in proceedings on the recently filed Motion For Reconsideration of the Genesis and Multicare Senior Lender Claims; and the Genesis and Multicare Senior Subordinated Note Claims; 2) a new Motion for Sanctions for Professional Misconduct pursuant to Rule 9001 of the Federal Rules of Bankruptcy Procedure; 3) a potential suit for damages on behalf of the Debtor against the Haskell defendants pursuant to 1103(c)(5) and 1109(b);, and a 4) potential Constitutional challenge to the confirmation pursuant to the Takings and Just Compensation Clauses of the Fifth Amendment.

RD161

#2306  12\15\05

### Background[1]

1.    On November 23, 2005, Reorganized Debtors filed their *Motion for Entry of a Final Decree* in the cases of Genesis Health Ventures, Inc. (Case No. 00-2692) and Multicare AMC Inc. (Case No. 00-2494)

2.    On December 5, 2005, Hayes filed by U.S. Mail a letter to this Court opposing the issuance of a Final Decree in the lead Genesis case, no. 00-2692 (JHW); and on December 7, Hayes sent the same letter opposing the issuance of a Final Decree in Multicare, case no. 00-2494(JHW). Also on December 7, Hayes filed a *Motion For Reconsideration of the Genesis and Multicare Senior Lender Claims; and the Genesis and Multicare Senior Subordinated Note Claims*.

3.    The Motion for Reconsideration noted Hayes' intention to file a *Motion for Sanctions for Professional Misconduct* pursuant to Rule 9001 of the Federal Rules of Bankruptcy Procedure.

4.    On July 18, 2004, two days after a hearing on the defendant's motion to dismiss the Haskell fraud complaint, Hayes sent a confidential letter to this Court. This letter enclosed an August 6, 2001 confidential letter to Genesis' President, Michael Walker, which criticized Debtors' counsel as showing "a serious lack of perception and competence... in the preparation and advocacy of their reorganization plan." The letter to this Court noted that the letter to Mr. Walker was provided to Genesis CFO, George Hager, an alleged conspirator in the Haskell fraud suit, who then provided the letter to Debtor's Counsel. My letter concluded: "the fact that the chairman ignored the

---

[1] The Background only includes information after this Court's May 13, 2004 bench decision denying a post-confirmation equity committee. At the hearing this Court noted that it had been apprised that case In *the matter of GENESIS HEALTH VENTURES INC.*, Debtors: Richard HASKELL, et al., Plaintiffs v. GOLDMAN, SACHS & CO. et al., has been referred to the Court.

2

increasing equity values of health care stocks and breached his fiduciary obligations to shareholders is circumstantial evidence there were illicit understandings among Genesis management and the Senior Lenders and that the Debtor's Counsel was a tacit co-conspirator in the alleged scheme."

5.    On May 3, 2005, this Court dismissed the case: *Richard HASKELL, et al, Plaintiffs v. GOLDMAN, SACHS & Co.; Genesis Health Ventures Inc.; Mellon Bank, N.A.; Highland Capital Management, L. P., George V. Hager Defendants in* its entirety. The opinion held the case against the debtor is time barred by *section 1144* and violated the order of confirmation, which enjoined claimants from prosecuting claims that occurred prior to the Effective Date. The defendants have appealed to the district court.

6.    The complaint listed a number of allegations that certain senior lenders had caused the understatement of Genesis' EBITDA that in turn caused the investment bankers to undervalue Genesis by hundreds of millions of dollars. The individual allegations and associated EBITDA reductions are shown in the table below:

| Bondholder Allegation | EBITDA Adj. ($ millions) | LT Care | Pharmacy | Reference p. no. |
|---|---|---|---|---|
| a) excessive insurance reserves | 16.7 | 7.5 | 9.2 | 68 |
| b) Multi Care management fees | 11.6 | 11.6 | 0.0 | 9 & 107 |
| c) Manor Care pharmacy sales | 11.0 | 0.0 | 11.0 | 117 |
| d) Mariner contract | 13.4 | 0.0 | 13.4 | 129 |
| g) discontinued health plan | 13.0 | 5.8 | 7.2 | 9 & 141 |
| h) pharmacy costs of goods sold | 26.0 | 0.0 | 26.0 | 146 |
| i) increased Medicare mix | 4.0 | 4.0 | 0.0 | 151 |
| j) additional personnel costs | 35.0 | 15.7 | 19.3 | 152 |
| f) management retention bonus | 6.0 | 2.7 | 3.3 | 39 |
| e) AGE loss | 3.0 | 1.3 | 1.7 | 135 |
| Total Adjustments | 123.0 | 41.1 | 81.9 | |
| Valuation Increase (Chilmark multiples) | 1,045.3 | 287.7 | 757.5 | |

3

RD163

The potential billion dollar understatement[2] is sufficient to fully pay all creditor claims and leave a substantial recovery for the equity class.

## Argument

### A. Statutory Support for Appointment of a Committee

7.    The principal inquiry in the appointment of an equity committee is whether the equity security holders are adequately represented.

> (2) ...the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders.
>
> 11 U.S.C. 1102(a) (2) (1994)

The question on whether shareholders have received adequate representation is a determination in the court's discretion.

> The statute involves two inquiries. It must first be determined whether the appointment of a committee is necessary to assure adequate representation.[3]
>
> *In re Wang Laboratories, Inc.*, 149 B. R. 1 2 (Bankr. D. Mass. 1992)

8.    In one of the few appeals on this fundamental issue, the District Court for the Southern District of New York concluded:

> the proper legal standard to apply in determining whether to appoint an official equity committee for equity shareholders is whether an official committee is necessary to provide adequate representations of the equity holders' interests.
>
> *In Re Johns-Manville Corp.*, 68 B.R. 155 163 (S.D.N.Y. 1986)

---

[2] The allocation of adjusted EBITDA between I.T Care and Pharmacy is pro rata, based on the revenue of these divisions.

[3] The second inquiry is "whether [the court] should exercise its discretion and make the appointment. Id. 2

4

RD164

9.    The Genesis equity class has not been represented either formally or informally since Genesis filed for bankruptcy on June 22, 2000. No court has held to the contrary. In denying shareholders a post-confirmation equity committee this Court expressed the concern "that such a process may not be countenance within the framework of the Bankruptcy Code. And, even if it is, it would be available only in the most extraordinary of situations. And, I cannot fit this set of facts into that kind of equation." [4]

10.    In reaching this conclusion, the Court is placing itself on the committee and then deciding what situations might warrant committee action. This Court concluded that a post-confirmation committee is warranted only in "extraordinary situations" and then could see no facts that would fit this situation. Sections 1103(c) (5), however, provides that an equity committee may "perform such other services as are in the interest of those represented." Section 1109(b) grants a committee the right to raise, appear, and be heard on any matter. Such language provides for a spectrum of activities from the mundane of asking the court to consider the priority of Senior Lender speculative claims, for example, to the spectacular of suing the Haskell defendants on behalf of the Debtor.

11.    In the second example, the Second Circuit held that 1103(c) (5) and 1109(b) implies a qualified right for committees to initiate suit, with approval of the Bankruptcy Court:

> Most bankruptcy courts that have considered the question have found an implied, but qualified right for creditors' committees to initiate adversary proceedings in the name of the debtor in possession under 11 U.S.C. 1103(c)(5)and 1109 (b)...We agree with these bankruptcy courts.

*Re STN Enterprises, 779 F.2d 901 904* (2nd Cir. Vt. 1985)

---

[4] Transcript of Hearing Before the Honorable Judith H. Wizmur, May 13, 2004, p. 27.

RD165

In other words, the Bankruptcy Code provides for the committee to decide what actions are necessary to represent the interests of its class and then to seek court approval for those actions. The Code simply does not contemplate the bankruptcy court being both judge and advocate.

12. Setting aside the notion that the court needs to approve the committee's activities as a condition in appointing a committee; the instant motion requires this Court to assess whether the interests of the equity class are adequately represented by the pro se efforts of a class member. Considering the complexity of the case, the cram down confirmation, the unresolved fraud allegations and the power the Bankruptcy Code provides of a committee under 1103(c)(5) and 1109(b) and the answer is clearly "No."

13. The *Motion For Reconsideration of the Genesis and Multicare Senior Lender Claims; and the Genesis and Multicare Senior Subordinated Note Claims*, now before the court, certainly falls within the confines sections 1103(c)(5) and 1109(b) as would a Motion for Professional Misconduct. Who but a committee for the unrepresented, could be expected to file a misconduct motion against parties who agreed on the financial underpinnings of the reorganization plan before the confirmation hearing and would not renegotiate the plan after market increases in health care stocks increased the debtors' estate by hundreds of millions of dollars?

14. This Court should appoint a committee even if it believes there is nothing for the committee to do.[5] Ethically, a newly appointed committee counsel could not pursue frivolous actions against the probity of the confirmation. If this is the case, then ratification of the confirmation by an equity committee would set the stage for a Final

---

[5] With $37 million authorized to pay compensation and expenses for parties supporting the plan, the relatively small additional cost of an equity committee cannot be a factor in resolving a continuing controversy with hundreds of millions of dollars at stake.

6

Decree that would really be final and not just another intermediate point in this saga. Given the complexities of the case; the challenges to the confirmation; the allegations of fraud; and continuing appeals: a final review of the case by an equity committee that has not participated in the confirmation would be a prudent exercise of this Court's discretion.[6]

### B. Constitutional Support for Appointment of a Committee

15.    This Court simply avoided the representational issues in its previous denials. It cannot do so now at the point of issuing a final decree. The Fifth Amendment provides in part that "*No person shall... be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.*"   The confirmed plan deprived the equity class of its ownership of Genesis in bankruptcy proceedings where it was not represented.  The equity class was also denied an equity committee to undertake an appeal.

16.    Although no authority has commented on what constitutes Constitutional due process in a chapter 11 bankruptcy proceeding, it must, at a minimum, require the representation by a committee provided by 1102(a) (2) at some point in the bankruptcy process.  Having failed to appoint a Committee earlier, the instant motion is the final opportunity to respect the equity holders Constitutional rights.

17.    Whether appointing an equity committee at the very end of a bankruptcy is sufficient to pass Constitutional muster will only be determined after the committee pursues all its remedies.  If unsuccessful, the committee would then be the first to test the

---

[6] Both Hayes and the Haskell plaintiffs' for independent reasons believe that the confirmed plan did not satisfy the fair and equitable provisions of subsection 1129(b) (2).

7

meaning of Fifth Amendment Due Process in a direct challenge to the confirmation; a challenge that could not dismissed by the judicial doctrine of equitable mootness.

18.    While not considering an appellant with a constitutionally protected right, the dissenting opinion in the 7-6 en banc *Continental* decision has serious doubts about the judicially crafted remedy of equitable mootness. Writing for the dissent, it is Judge Alito's view that:

> The majority's decision in this case creates a bad precedent for our circuit. The majority adopts the curious doctrine of "equitable mootness," which it interprets as permitting federal district courts of appeals to refuse to entertain the merits of live bankruptcy appeals over which they indisputably possess statutory jurisdiction and in which they can plainly provide relief. According to the majority there is no clear rule for determining when a bankruptcy appeal is "equitably moot" Instead, this is said to be a discretionary determination to be made in the first instance by the district court based on a weighing of five factors that the majority has culled from the opinions of our "sister circuits." **In my view, if the doctrine has any validity, it is more limited than the majority holds (Emphasis added.)**

*In re Continental Airlines*, 91 F. 3d 553 567 (3rd Cir. 1996) en banc.

19.  The undefined relationship between the Bankruptcy Code and the Constitution is illustrated by the *Marshall* case, where the Bankruptcy Court for the Central District of California found:

> There is a significant difference, with respect to the Bankruptcy Power, between property interests and contract rights. In the bankruptcy context, property rights enjoy at least a measure of protection under Due Process and Just Compensation Clauses of the Fifth Amendment.

*In re Marshall*, 300 BR 507 525 (Bkrtcy. C.D. Cal. 2003)

The *Marshall* court explained that "a measure of protection" was defined by a 1937 Supreme Court opinion:

8

RD168

But if Congress is acting within its bankruptcy power, it may authorize the bankruptcy court to affect those property rights, provided the limitations of the due process clause are observed.

*Wright v. Union Central Life Ins. Co.*, 304 U.S. 502 518 (1937)

20. With respect to the Just Compensation clause, the Rehnquist court favorably cited *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555 (1935):

The bankruptcy power is subject to the Fifth Amendment's prohibition against taking private property without compensation.

[T]he Fifth Amendment commands that, however great the Nation's need, private property shall not be thus taken even for a wholly public use without just compensation. If the public interest requires, and permits, the taking of property of individual mortgagees in order to relieve the necessities of individual mortgagors, resort must be had to proceedings by eminent domain; so that, through taxation, the burden of the relief afforded in the public interest may be borne by the public.

Id 602.

The foregoing discussion satisfies us that there is substantial doubt whether the retroactive destruction of appellees' liens in this case comports with the Fifth Amendment.

*United States v. Security Industrial Bank*, 459 U.S. 70 74 (1982)

21. But Congress in "establish[ing] ...uniform Laws on the subject of Bankruptcies..."[7] and the Federal Courts interpreting these laws both must respect the Constitution. In 1957, for example, the Supreme Court examined the denial of passports to certain groups on the question whether this denial violated the Fifth Amendment rights of liberty to these citizens.

We deal here with a constitutional right of the citizen, a right which we must assume Congress will be faithful to respect. We would be faced with important constitutional questions were we to hold that

---

[7] Article I, Section 8, Clause 4 of the Constitution

RD169

Congress...had given the Secretary authority to withhold passports to citizens because of their beliefs or associations.

Kent v. Dulles, 357 U.S. 116 130 (1957)

22.    Both the Rehnquist Court and the Burger Court follow the statutory interpretation presumption that Congress intends to respect the Constitution in constructing its laws:

> We consider the statutory question because of the "'cardinal principal that this Court will first ascertain whether a construction of the statute is fairly possible by which the constitution question can be avoided.'"

*United States v. Security Industrial Bank,* 70 78 (1982) citing: *Lorillard v. Pons,* 434 U.S. 575 578 (1978)

23.    We do not need to know how the potential conflicts between the Bankruptcy Code and the Constitution will ultimately be resolved to know that the Constitution supports the appointment of an equity committee on the instant motion. This Court's timeliness concerns in denying previous motions simply evaporate under Constitutional Due Process.

24.    In hindsight, perhaps it would have been better had the U.S. Trustee appointed an equity committee at the beginning, or failing that, had the Securities and Exchange Commission intervened to request the appointment of an equity committee. Perhaps the addition of another committee and additional lawyers and investment bankers would not have brought anymore clarity to a complicated and allegedly fraudulent situation. Perhaps now, with only the securities claims under challenge and specific fraud allegations on the table, is the best time to consider a final resolution. Whatever.

25.    The Constitutional right to representation does not expire. There is no

10

RD170

statute of limitations on the Constitution. *In re Kendavis Holdings Co.*, 249 F 3rd 383 (5th

Cir. 2001), the court reviewed and upheld due process claims in a bankruptcy case fifteen

years after the bankruptcy court's order confirming the reorganization plan:

> Protection of an individual's due process right to adequate notice
> requires more than a cursory review...

Id. 386

26.    The equity holders were not represented in the negotiations that produced

the reorganization plan; they were not represented at the confirmation hearings; they were

not represented in the appeal; but because their property was taken and they were not

provided due process under the Fifth Amendment they must now be represented by a

committee.

27.    WHEREFORE, James J. Hayes respectfully requests a) that this Court

appoint a Pre-Final Decree Equity Committee, and b) grant such other and further relief

as is necessary and proper.


Dated:  December 11, 2005
        Annandale, VA.

Respectfully Submitted,

James J. Hayes
Pro Se
4024 Estabrook Dr.
Annandale, VA 22003
(703) 941-4694

11

RD171

## CERTIFICATE OF SERVICE

I certify a copy of the foregoing Motion was mailed from the Northern Virginia Regional Post Office on December 11, 2005 to the following counsel:

Russell C. Silberglied
Richards Layton and Finger P.A.
One Rodney Square
Wilmington, DE 19899; and

Katherine B. Gresham
Assistant General Counsel Bankruptcy and Appellate Litigation
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549, and

Joseph McMahon
Office of the United States Trustee
844 King Street, Suite 2313
Wilmington, DE 19801, and

Roberta A. DeAngelis
Acting United States Trustee
833 Chestnut Street, Suite 500
Philadelphia, PA 19107

James J. Hayes

12

RD172

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GENESIS HEALTH VENTURES, INC., et al., | ) | Case No. 00-2692 (JHW) |
| | ) | |
| | ) | |
| | ) | |
| Reorganized Debtors | ) | |
| | ) | |

### NOTICE OF MOTION

To: Reorganized Debtors Genesis Health Ventures, Inc.

Please take notice that James J. Hayes has today filed the attached **MOTION**

**FOR APPOINTMENT OF PRE-FINAL DECREE EQUITY COMMITTEE** with

the United States Bankruptcy Court for the District of Delaware; 824 Market Street, 3rd

Floor; Wilmington, Delaware 19801.

Dated: December 11, 2005
        Annandale, Virginia

James J. Hayes
4024 Estabrook Drive
Annandale, VA 22003

Member of the Genesis Equity Class

RD173

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GENESIS HEALTH VENTURES, INC., et al., | ) | Case No. 00-2692 (JHW) |
| | ) | |
| | ) | |
| | ) | |
| Reorganized Debtors | ) | |
| | ) | |
| | ) | Chapter 11 |
| In re: | ) | |
| | ) | Case No. 00-2494(JHW) |
| MULTICARE AMC, INC., et al. | ) | |
| | ) | |
| | ) | |
| | ) | |
| Reorganized Debtors | ) | |

### GENESIS COMMON STOCK CLASS'S
### MOTION FOR RECONSIDERATION OF THE GENESIS AND MULTICARE
### SENIOR LENDER CLAIMS; AND THE GENESIS AND MULTICARE SENIOR
### SUBORDINATED NOTE CLAIMS

Pursuant to section 502(j) of chapter 11 of title 11 of the United States

Code, 11 U.S.C. 101-1330, Rule 3008 of the Federal Rules of Bankruptcy Procedure, the

Genesis Common Stock Class respectfully requests that the Court reconsider the orders

allowing the Genesis and Multicare Senior Lender Claims; and the Genesis and Multicare

Senior Subordinated Note Claims.

### Background

1.    On November 23, 2005, Reorganized Debtors filed their *Motion for Entry of*

*a Final Decree* in the cases of Genesis Health Ventures, Inc. (Case No. 00-2692) and

Multicare AMC Inc. (Case No. 00-2494)

#2303  12\12\05

2.    On August 31, 2005, James J. Hayes, a member of the Genesis common equity class, filed an appeal of this Court's denial of a post-confirmation equity committee: *James J. Hayes v. Genesis Health Ventures*, 3rd Cir. (Case No. 05-4005) An appellate briefing schedule has not been issued.

3.    This motion will be followed by a *Motion for a Pre- Final Decree Equity Committee*, to represent the interests of the Genesis Common Stock Class: 1) in proceedings on the instant motion; and 2) a Motion for Sanctions for Professional Misconduct pursuant to Rule 9001 of the Federal Rules of Bankruptcy Procedure.

4.    On May 3, 2005, this Court issued an opinion: *In the matter of GENESIS HEALTH VENTURES INC.*, Debtors: Richard HASKELL, et al., Plaintiffs v. GOLDMAN, SACHS & CO.; Genesis Health Ventures, Inc.; Mellon Bank, N.A.; Highland Capital Management, L.P.; George V. Hager Defendants.  This Court's dismissal has been appealed to the district court.

5.    The Haskell complaint alleged the following facts: a) by the summer of 2000, a group of investment banks and other financial institutions led by defendant Goldman Sachs & Co. had purchased from the original lending consortium about half of the outstanding Genesis Senior Loans at a massive discount from face value; b) the investment banks had acquired over 75% of the Genesis and Multicare Senior Lender Claims by the time the reorganization plan was confirmed; and c) the confirmed reorganization plan provided the investment banks with about 70% of the new equity in the reorganized Genesis.  The alleged facts imply that the confirmed Plan provided the investment banks an additional $133 million in cash, $79 million in new senior notes and $22 million in new convertible preferred stock.  The Senior Lenders distribution provided

2

investment banks, who never loaned Genesis anything, windfall profits of several hundred million dollars on an investment made shortly before and during the bankruptcy.

6.   The plaintiffs in the Haskell suit included 275 investors who collectively held about 53% of the Genesis Senior Subordinated Note Claims.  Like Goldman, many of the Haskell plaintiffs were drawn to their Genesis investment in the months preceding the bankruptcy.   These purchases in the secondary markets were an even more "massive discount" to face value than Goldman's purchase of the Senior Loans.   It is not known if the Haskell plaintiffs acquired any "Claims" subsequent to the bankruptcy.  The confirmed Plan provided the Note Claims 3.2% of the new Genesis common stock.

7.   The Table below shows end of month prices for the Genesis and Multicare Senior subordinated notes.  Two facts are important to this Court's reconsideration of Genesis and Multicare Claims: 1) the 2009 notes (Bold type in Table.) were issued at a discount in a private placement; and consequently 2) did not trade in the public markets.  The Disclosure Statement recognizes the "original issue discount" and the claim for this issue was reduced by about $ 4 million.[1]  All other Senior Loan and Subordinated Note Claims are equal to the instrument's face or contractual value.

| Genesis Notes | Moody's Rating | 2000 Prices | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | May | June | July | Hi | Low | Issued |
| Sr. sub. nt. 9.75 2005 | C | 16 5/8 | 15 1/2 | 20 1/2 | 37 3/8 | 11 1/2 | 6/15/95 |
| Sr. sub. nt. 9.25 2006 | C | 15 | 14 | 11 | 41 | 9 1/2 | 10/7/96 |
| **Sr. sub. nt. 9.875 2009\*** | **C** | -- | -- | -- | -- | -- | **12/19/98** |
| | | | | | | | |
| Multicare Notes | | | | | | | |
| Sr. sub. nt. 9.00 2007 | C | 5 | 4 | 6 | 20 | 2 1/5 | 8/4/97 |

\* Private placement issued at 96.16

*Mergent Bond Record*, U.S. Corporate Bonds Section (end of month prices)

---

[1] *Disclosure Statement for Debtors' Joint Plan of Reorganization*, July 6, 2001, p. 23.

3

8.    Based on estimates in the Disclosure Statement, the confirmed Plan provided the Subordinated note holders about 6.9% of their face value.[2] Thus, the speculators in the Genesis notes, including the Haskell plaintiffs, lost 56% of their investment in the bankruptcy, based on the average price of the two issues at the end of May 2000. (See Table above.) Investors who provided Genesis capital for its business in the December 1998 private placement lost 93% of their investment.

### Argument

9.    The confirmed Plan produced results that, on their face, are manifestly unfair both among members of the same class and between classes. Speculators in Senior Loans like Goldman gained windfall profits of hundreds of millions of dollars, while the original lenders, who provided Genesis the capital to build its business, incurred devastating losses. Original lenders in the Subordinated Note private placement lost 93% of their investment while the speculators' in this class lost only 56% of their investment. Speculators in the common and preferred stock lost their entire investment. The investment bank speculators enormous windfall profits from their Senior Loans comes at the expense of the members of every other securities class.

10.    The maldistribution of assets in bankruptcy is becoming increasingly common as speculators in bankruptcy debt become knowledgeable in gaming or manipulating the bankruptcy process to produce enormous profits for themselves while increasing the losses of every other impaired creditor. This summer, for example, the U.S. Bankruptcy Court for the Southern District of New York confirmed a bankruptcy plan that exchanged new Loral stock for $ 2 billion in old debt leaving nothing for the

---

[2] Based on 41 million shares of new common stock and an estimated value of $20.33 per share. *Disclosure Statement for Debtors' Joint Plan of Reorganization*, July 6, 2001 p. 34.

RD177

common stock interests.[3] The CEO of Loral Space and Communications, who argued at the confirmation hearing that his company was seriously undervalued by the debtors' experts summarized the inequity: "[t]here's something wrong with a system where one class of the constituency comes out with absolutely zero and another class – the creditors – gets a multiple of their investment back." [4]

11.     Section 502(j) of the Bankruptcy Code provides that a claim that has been allowed or disallowed may be reconsidered for "cause" and that a reconsidered claim may be allowed or disallowed according to the "equities of the case."[5] The enormous windfall profits captured by Goldman and other Senior Loan speculators at the expense every other creditor and shareholder is certainly cause for reconsideration. The equities of the case require reconsideration of the debt securities claims that exceed the price the claimant paid to acquire the debt security or claim. Under principles of equitable subordination, this Court may, after notice and a hearing, subordinate all or part of an allowed claim to all or part of another claim. 11 U.S.C. 510 (c) (1)

12.     Speculators who acquired Genesis Senior Loans and Subordinated Notes in secondary transactions are masquerading as Genesis creditors and have filed claims based on the amount of money provided Genesis by the original lenders. Treating the entire claim of speculators as equal in priority to the claims of the original lenders is contrary to every fairness provision in the Bankruptcy Code. The speculative gain – the difference between the amount of the loan and the secondary sale price – is equivalent to equity

---

[3] Debtors' Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, June 3, 2005, *In re Loral Space & Communications, et al., Debtors*, U.S Bankruptcy Court S.D.N.Y. Lead case 03-41710 (RRD)

[4] The Little Guy Loses Out In Loral's Bankruptcy Reorganization, *Barron's* Aug. 1, 2005, p. 25.

[5] The terms "cause" and "equities of the case" are not defined and will be determined on a case by case basis.

5

and is properly provided an equity priority. A prospective subordination hearing might consider dividing the claims of speculative creditors into two parts: 1) a priority claim with the same bankruptcy priority as the original instrument; and 2) a non-priority claim that would not participate in the distribution until the common and preferred stock holders recovered the pre-bankruptcy trading value of their issues.[6] After the recovery by equity holders, the remaining non-priority debt claims would be divided among the speculative debt holders and the common and preferred stockholder's, pro-rata, based on the pre-bankruptcy trading values of the respective financial instruments.

13.    The re-prioritization of the speculative part of debt creditors' claims would preserve the pre-bankruptcy market assessment of the contractual value of the firm's debt instruments. Re-prioritization is important to prevent debt class speculators with the highest bankruptcy priorities from gaming bankruptcy rules to extract windfall profits at the expense of debt creditors and stockholders with lower bankruptcy priorities.

14.    Gaming the bankruptcy process has devastating public policy implications. It creates opportunities for speculators to entice firms like Genesis with cash flows sufficient to meet current obligations, but relatively high amounts of distressed debt, to declare bankruptcy. Even the Debtor's counsel affirmed that: "obviously solvent entities may file for bankruptcy", confirming the opportunity for powerful speculators like Goldman to game the bankruptcy process.[7]    But putting solvent companies into bankruptcy to generate windfall profits for speculators comes at high public cost. For example, the Genesis bankruptcy's accumulated costs for legal,

---

[6] Under principles of equitable subordination, the court may, subordinate part of an allowed claim to all or part of another claim. 11 U.S.C. 510 (c) (1)

[7] Transcript of Hearing Before The Honorable Judith H. Wizmur, May 13, 2004, p. 16:23-25

6

investment banking and accounting professionals has exceeded $37 million.[8]  Then there are additional unquantifiable costs of usurping the resources of an overburdened Federal judiciary, and the high opportunity costs of employing highly talented professionals in work that substantially damages the national economy.

15.  The diminution of National wealth – caused by the undervaluation of firms with weak balance sheets or relatively high amounts of debt in the market is the biggest cost of speculators gaming the bankruptcy process.  This country is blessed with many astute investment professionals who – knowing the devastating consequences a bankruptcy has on the value of equity and junior debt – pre-emotively cause lower market prices of all firms with a possibility of a bankruptcy.[9]  Allowing speculators the full priority of a creditor's bankruptcy claim only enlarges the number of firms that are undervalued in the market.  Conversely, reducing the incentives to game the bankruptcy process by re-prioritizing the speculative portion of high priority debt claims reduces the number of "at risk" companies and increases National wealth.

### Conclusion

16.  WHEREFORE, the Genesis Common Stock Class respectfully requests this Court a) reconsider the orders allowing the Genesis and Multicare Senior Lender Claims; and the Genesis and Multicare Senior Subordinated Note Claims and b) grant such other and further relief as is necessary and proper.

---

[8] And this does not include the substantial costs generated by the Haskell fraud on the bankruptcy court litigation.

[9] Genesis is a good example how an efficient market works preemptively to depreciate the value of companies with a possibility of bankruptcy.  From the beginning of February to the end of March 2000, three months before the firm filed for bankruptcy, the Genesis common stock dropped 74% to levels it traded at during bankruptcy.  This example shows how the efficient market would depreciate the value of other firms with the possibility of a bankruptcy and in aggregate reduce National wealth.

7

RD180

Dated:  December 7, 2005
        Annandale, VA.

Respectfully Submitted,

*James J. Hayes*

James J. Hayes
Pro Se
4024 Estabrook Dr.
Annandale, VA 22003
(703) 941-4694

## CERTIFICATE OF SERVICE

     I certify a copy of the foregoing Motion was mailed from the Northern Virginia Regional Post Office on December 7, 2005 to the following counsel:

Russell C. Silberglied
Richards Layton and Finger P.A.
One Rodney Square
Wilmington, DE 19899; and

Robert S. Brady
Young Conaway Stargatt & Taylor LLP
1000 West Street, 17th floor
Wilmington, DE 19801

*James J. Hayes*

James J. Hayes

8

RD181

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GENESIS HEALTH VENTURES, INC., et al., | ) | Case No. 00-2692 (JHW) |
| | ) | |
| | ) | |
| | ) | |
| Reorganized Debtors | ) | |
| | ) | |
| | ) | Chapter 11 |
| In re: | ) | |
| | ) | Case No. 00-2494(JHW) |
| MULTICARE AMC, INC., et al. | ) | |
| | ) | |
| | ) | |
| | ) | |
| Reorganized Debtors | ) | |
| | ) | |

### NOTICE OF MOTION

To:    Reorganized Debtors Genesis Health Ventures, Inc.
       Reorganized Debtors Multicare AMC, Inc.

Please take notice that the Genesis Common Stock Class by one of its

members, James J. Hayes, has today filed the attached **Motion for Reconsideration of**

**the Orders Allowing the Genesis and Multicare Senior Lender Claims; and the**

**Genesis and Multicare Senior Subordinated Note Claims** with  the United States

Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington,

Delaware 19801.

Dated: December 7, 2005
       Annandale, Virginia

James J. Hayes
4024 Estabrook Drive
Annandale, VA 22003

Member of the Genesis Equity Class

RD182

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------x
In re:                              :      Chapter 11
                                    :
GENESIS HEALTH VENTURES, INC.,      :      Case No. 00-2692 (PJW)
et al.,                             :
                                    :
                                    :
          Reorganized Debtors.      :
-------------------------------------------------x
```

**REORGANIZED DEBTORS' (I) OBJECTION TO "MOTION FOR STAY
OF ORDER GRANTING REORGANIZED DEBTORS' CROSS MOTION FOR
SANCTIONS FOR THE PENDENCY OF THE APPEAL" AND (II) CROSS-MOTION
FOR THE ENTRY OF AN ORDER (A) IMPOSING FURTHER MONETARY
SANCTIONS AGAINST MR. HAYES, (B) BARRING MR. HAYES FROM FILING
ADDITIONAL PLEADINGS IN THIS CASE AND (C) RELIEVING THE
REORGANIZED DEBTORS OF THEIR OBLIGATION TO RESPOND
TO ANY ADDITIONAL PLEADINGS FILED BY MR. HAYES**

Genesis Health Ventures, Inc. (collectively with its former debtor affiliates, the "Reorganized Debtors") hereby (i) object to the "Motion for a Stay of Order Granting Reorganized Debtors' Cross Motion for Sanctions for the Pendency of the Appeal" (the "Stay Motion"), filed by Mr. James Hayes ("Hayes"), and (ii) move for the entry of an order (a) imposing further monetary sanctions against Mr. Hayes, (b) barring Mr. Hayes from filing any additional pleadings in this case without prior leave of Court and (c) relieving the Reorganized Debtors of any obligation to respond to any pleadings filed by Mr. Hayes absent the entry of an order directing them to do so (the "Cross-Motion").[1]  In support of this objection and Cross-Motion, the Reorganized Debtors respectfully represent as follows:

---

[1] Mellon Bank, N.A. will be filing a *Joinder in Reorganized Debtors' (I) Objection to Hayes' Motion to Stay Order Granting Sanctions and (II) Cross-Motion for Further Sanctions*

## INTRODUCTION

The Stay Motion is simply the latest in a long line of frivolous, repetitive pleadings filed by Mr. Hayes in these chapter 11 cases. Mr. Hayes, who purports to represent common stockholders (but in actuality is not joined by any other stockholder), has filed no less than four separate motions seeking the appointment of an equity committee -- three motions in this Court and an additional motion in the United States District Court for the District of Delaware (the "District Court"). Mr. Hayes' requests for the appointment of an equity committee have been denied at every level, including the U.S. Supreme Court's denial of Mr. Hayes' petition for a writ of certiorari. Undeterred by an award of sanctions against him, he has filed the current motion and an equally frivolous motion in the District Court. The Cross-Motion provided with this response unfortunately appears to be necessary to put an end to this waste of judicial resources as well as harm to the Reorganized Debtors in responding to these repeated, frivolous papers.

## BACKGROUND

Rather than belabor the Court with a detailed discussion of the numerous pleadings filed by Mr. Hayes (and the procedural history thereof), the Reorganized Debtors refer the Court to the "Reorganized Debtors' (I) Objection to (A) 'Motion for Reconsideration of the Orders Allowing the Genesis and Multicare Senior Lender Claims; and the Genesis and Multicare Senior Subordinated Note Claims' and (B) 'Motion for Appointment of Pre-Final Decree Equity Committee' and (II) Cross-Motion for Sanctions", a copy of which is attached hereto as Exhibit A.

Most recently, Mr. Hayes filed (i) a motion for reconsideration of the Reorganized Debtors' senior secured lenders' (the "Senior Lenders") claims pursuant to section 502(j) of the

2

RD184

United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and (ii) a fourth motion for the appointment of an equity committee. The Reorganized Debtors and Mellon Bank, N.A., as administrative agent for the Senior Lenders ("Mellon") each filed an objection in response to the motions and contemporaneously cross-moved for sanctions against Mr. Hayes in an effort to put an end to his abuse of the legal system and the costs being inflicted on the Reorganized Debtors' constituents in defending against his frivolous, repetitive motions. (Mellon's objection is attached hereto as Exhibit B). At a hearing held on January 19, 2006, the Honorable Judith H. Wizmur denied both of Mr. Hayes' motions and granted the cross-motion for sanctions, finding that this case represented "the quintessential case for the application of sanctions." See Jan. 19, 2006 Hrg. Tr. at 29.[2] In connection with her ruling, Judge Wizmur instructed counsel to the Reorganized Debtors and Mellon to submit affidavits as to the amount of their attorneys' fees. See id. at 27. Judge Wizmur stated that "Mr. Hayes may respond in terms of the amount of attorney's fees sought by the responders, and I will then enter an award on the papers." See id.

Rather than make the filing permitted by the Court, on February 2, 2006, prior to the entry of an order, Mr. Hayes prematurely filed a notice of appeal of the Court's January 19, 2006 bench ruling. On March 2, 2006, the Court entered an order denying Mr. Hayes' motions and granting the cross-motion, with an award of attorneys' fees in the amount of $20,000 (the "Order"). On March 15, 2006, Mr. Hayes filed the Stay Motion, asserting, among other things, that the Court lacked jurisdiction to enter the Order due to the pendency of the appeal that he prematurely filed.[3] The relief requested in the Stay Motion is nonsensical, at best, and represents

---

[2] A copy of the January 19, 2006 hearing transcript is attached hereto as Exhibit C.

[3] Mr. Hayes has also filed a motion with the District Court seeking to stay the briefing schedule in the appeal so that he may (i) file a motion for sanctions against the Reorganized Debtors' counsel and (ii) file a motion (purportedly under section 327(a) of the Bankruptcy Code) to disqualify the Reorganized Debtors' counsel from

Mr. Hayes' latest assault on the legal system and the good graces of this Court. Accordingly, the Reorganized Debtors hereby (i) object to the relief requested in the Stay Motion and (ii) cross-move for the entry of an order awarding the Reorganized Debtors' costs and fees in connection with responding to the Stay Motion and barring Mr. Hayes from filing any additional pleadings in these chapter 11 cases without first obtaining leave of Court.

## OBJECTION TO STAY MOTION

By the Stay Motion, Mr. Hayes requests that the Court stay its March 2, 2006 Order due to the pendency of the appeal. The Reorganized Debtors need not say much in response; obviously, the motion is frivolous for at least two independent reasons. First, the relief requested by Mr. Hayes is nonsensical, at best, and advanced in bad faith at worst. Under Mr. Hayes' novel theory, a party could avoid having an order entered against it simply by appealing the court's bench ruling before the order is entered. Of course, this creative strategy is flatly inconsistent with Fed. R. Bankr. Proc. 8002(a), which provides that "a notice of appeal filed after the announcement of a decision or order but before entry of the judgment, order or decree shall be treated as filed after such entry and on the date thereof." Thus, under Rule 8002(a), the appeal, despite being filed prematurely, is treated as having been filed <u>after</u> the Order was entered. Nothing divested this Court of jurisdiction to enter the Order.

Second, Mr. Hayes has failed to establish a single element necessary to support his request for injunctive relief. <u>See</u> <u>Copley Press, Inc. v. Peregrine Sys., Inc. (In re Peregrine Sys.)</u>, 312 B.R. 755, 756 (D. Del. 2004) (noting that a court must look at the following elements to determine whether to stay order: (i) likelihood that appellant will prevail on merits of appeal,

---

representing the Reorganized Debtors in connection with the appeal. Contemporaneously with the filing of this objection and Cross-Motion, the Reorganized Debtors will be filing a motion with the District Court seeking similar relief to that contained in this Cross-Motion.

RLF1-2997425-1

(ii) extent appellant will be irreparably harmed if stay is denied, (iii) extent to which other parties will suffer irreparably harm if stay granted and (iv) public interest). Accordingly, the Stay Motion should be denied.

## REORGANIZED DEBTORS' CROSS-MOTION

The Court should award fees and costs in connection with this objection and Cross-Motion. However, that alone will not suffice as it has now become apparent that the only way to prevent Mr. Hayes from filing frivolous pleadings is to enjoin him from doing so.

As Judge Wizmur recognized, pursuant to section 1927 of title 28 of the United States Code, a court may assess costs against any person that unreasonably and vexatiously multiplies the proceedings in a case. More specifically, section 1927 provides as follows:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927; see In re Volpert, 177 B.R. 81 (N.D. Ill. 1995) (holding that bankruptcy court has jurisdiction to award sanctions under 28 U.S.C. § 1927); Knepper v. Skekloff, 154 B.R. 75 (N.D. Ill. 1993) (same). A number of courts addressing the issue, including Judge Wizmur in connection with the previous cross motion, have held that a court's authority to issue sanctions under section 1927 extends to non-lawyer litigants. See, e.g., Brown v. Adidas Int., 938 F. Supp. 628 (S.D. Cal. 1996) (applying section 1927 to non-lawyer litigants appearing *in propria persona*); Odbert v United States, 576 FSupp 825 (E.D. Cal. 1983) (finding that section 1927 applied to petitioner appearing *in propria persona* either as party or as counsel). The Reorganized Debtors ask that the Court do so here again.

5

Additionally, it has become apparent that monetary sanctions will not deter Mr. Hayes, and accordingly further remedies are required. This Court has the inherent authority under section 1651 of Title 28 to issue all "writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651. Courts have repeatedly used this inherent authority to issue orders to manage their case loads and/or stem vexatious litigation. See, e.g., Armstrong v. Ruston (In re Armstrong), 309 B.R. 799 (10th Cir. B.A.P. 2004) cert denied, 125 S. Ct. 431 (2004), petition for rehearing denied, 125 S.C. 950 (2005) (appellate court upheld bankruptcy court's imposition of specific filing restrictions upon a pro-se chapter 11 debtor pursuant to 11 U.S.C. § 105 and 28 U.S.C. § 1651(a) whose record demonstrated he was a vexatious litigant who repeatedly attempted to challenge the confirmation order with repetitive and frivolous motions); Woodward v. June Dicks (In re Dicks), 306 B.R. 700 (Bankr. M.D. Fla. 2004) ("This Court has inherent authority to enjoin vexatious litigation by litigants who have settled on a course of conduct involving the repetitive filing of duplicative legal papers rearguing a position rejected a multitude of times by numerous trial and appellate courts, where such litigation causes needless expense to other parties, where the litigants have no objective, good-faith expectation of prevailing, and where the multiple filings place an unnecessary burden on the courts").[4]

Further, it is well settled that federal courts have the inherent power to enforce decorum and to sanction those who pursue vexatious litigation. As the Supreme Court has explained:

> Courts of justice are universally acknowledged to be vested by their
> very creation, with the power to impose silence, respect, and decorum,
> in their presence, and submission to their lawful mandates . . . . These

---

[4] The concepts underlying Fed. R. Bankr. Proc. 9011, which also apply to pro se litigants, further support this application.

> powers are governed not by rule or statute, but by control necessarily
> vested in courts to manage their own affairs so at to achieve the
> orderly and expeditious disposition of cases.

Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991) (internal citations omitted). Courts in this

Circuit have repeatedly upheld the authority of bankruptcy courts to impose monetary sanctions

on litigants and their counsel under the inherent power of the court, even when the criteria of

Rule 9011 has not been met. See Fellheimer, Eichen & Braveman, P.C. v. Charter Technologies,

Inc., 57 F.3d 1215, 1224-25 (3d Cir. 1995); D'Auria v. Minniti (In re John F. Minniti), 242 B.R.

843, 849 (Bankr. E.D. Pa. 2000); see also Mapother & Mathoper, P.S.C. v. Cooper (In re

Downs), 103 F.3d 472, 477 (6th Cir. 1996). This power includes the power to sanction parties

that pursue multiple and bad faith filings. "The inherent power to sanction bad-faith conduct is

separate and distinct source of authority, which is not displaced by federal statutes and rules. It

is broader than Rule 9011 sanctions and 'extends to a full range of litigation abuses.'" See

Deville v. Cardinale (In re Deville), 280 B.R. 483, 495 (9th Cir. B.A.P. 2002) (internal citations

omitted), aff'd 361 F.3d 539 (9th Cir. 2004).

      As Judge Wizmur recognized at the January 19, 2006 hearing, Mr. Hayes has a

history of filing frivolous and duplicative pleadings in these chapter 11 cases. The Reorganized

Debtors were hopeful that the Court's award of sanctions would send a clear message to Mr.

Hayes and discourage his continued abuse of the legal system and the filing of any additional

frivolous pleadings. As is evident from the recent filing of the Stay Motion and a similar motion

in the District Court, that has not been the case. Accordingly, the Reorganized Debtors

respectfully request the entry of an order directing Mr. Hayes to bear the Reorganized Debtors'

fees and costs in filing this pleading. Further, in light of Mr. Hayes' history of abuse of the legal

process before both this Court and the District Court, the Reorganized Debtors respectfully

request that the Court enter an order enjoining Mr. Hayes from filing any additional pleadings

7

without leave of Court and relieving the Reorganized Debtors of any obligation to respond to any such pleadings without an order of the Court directing them to do so.

WHEREFORE, the Reorganized Debtors respectfully request an order denying the Hayes Stay Motion, ordering Mr. Hayes to pay the costs and fees of this response, enjoining Hayes from filing any additional pleadings without leave of Court and relieving the Reorganized Debtors of any obligation to respond to any such pleadings without an order of the Court directing them to do so.

Dated: March 30, 2006
     Wilmington, Delaware

*Russell C. Silberglied*

Mark D. Collins (No. 2981)
Russell C. Silberglied (No. 3462)
Cynthia L. Collins (No. 4337)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899

and

Michael F. Walsh
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153

and

Adam P. Strochak
Joanne M. Guerrera
WEIL, GOTSHAL & MANGES LLP
1300 Eye Street, NW
Suite 900
Washington, D.C. 20005

Attorneys for Reorganized Debtors

8

RD190

# EXHIBIT A

RD191

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------x
In re:                                        :    Chapter 11
                                              :
GENESIS HEALTH VENTURES, INC.,                :    Case No. 00-2692 (JHW)
et al.,                                       :
                                              :
         Reorganized Debtor.                  :
---------------------------------------------x
In re:                                        :    Chapter 11
                                              :
NORRISTOWN NURSING AND                        :    Case No. 00-2716 (JHW)
REHABILITATION ASSOCIATES, L.P. :
                                              :    Re: Docket Nos. 2294, 2299, 2303 and 2306
         Reorganized Debtor.                  :    Hearing Date: January 19, 2006 at 9:30 a.m.
                                              :    Objection Deadline on Cross-Motion:  At Hearing
---------------------------------------------x

REORGANIZED DEBTORS' (I) OBJECTION TO
(A) "MOTION FOR RECONSIDERATION OF THE ORDERS
ALLOWING THE GENESIS AND MULTICARE SENIOR LENDER
CLAIMS; AND THE GENESIS AND MULTICARE SENIOR SUBORDINATED
NOTE CLAIMS" AND (B) "MOTION FOR APPOINTMENT OF PRE-FINAL
DECREE EQUITY COMMITTEE" AND (II) CROSS-MOTION FOR SANCTIONS

Genesis Health Ventures, Inc. ("GHV") and Norristown Nursing &

Rehabilitation Associates, L.P. ("Norristown", collectively with GHV, the "Reorganized

Debtors") hereby (I) object to (a) the Motion for Reconsideration of the Orders Allowing the

Genesis and Multicare Senior Lender Claims; and the Genesis and Multicare Senior

Subordinated Note Claims [Docket No. 2303], filed by Mr. James Hayes ("Hayes"), and (b)

the Motion for Appointment of Pre-Final Decree Equity Committee [Docket No. 2306] (the

"Fourth Equity Committee Motion"), filed by Mr. Hayes; and (II) cross-move for sanctions

against Mr. Hayes (the "Cross-Motion"). In support of this objection and the Cross-Motion,

the Reorganized Debtors respectfully represent as follows:

RLF1-2966509-2

RD192

## INTRODUCTION

On November 23, 2005, the Reorganized Debtors filed their motion for a final decree [Docket No 3022] (the "Final Decree Motion") seeking the entry of an order closing the above-captioned chapter 11 cases pursuant to section 350(a) of the United States Bankruptcy Code, 11 U S C. §§ 101-1532 (the "Bankruptcy Code") In response to the Final Decree Motion, Mr Hayes, who purports to represent common stockholders (but in actuality is not joined by any other stockholder), has filed, inter alia, (i) a motion for reconsideration of the Reorganized Debtors' senior secured lenders' (the "Senior Lenders") claims pursuant to section 502(j) of the Bankruptcy Code and (ii) the Fourth Equity Committee Motion The Reorganized Debtors object to each of these motions for the reasons set forth below

Additionally, the Reorganized Debtors have filed the Cross-Motion against Mr. Hayes for reimbursement of their costs and fees in filing this pleading. As discussed herein, Mr Hayes has previously filed three motions for the appointment of an equity committee -- two motions in this Court and an additional motion with the United States District Court for the District of Delaware (the "District Court") Mr. Hayes' requests for the appointment of an equity committee have been denied at every level, including the U S Supreme Court's denial of Mr Hayes' petition for a writ of certiorari Notwithstanding the denial of such requests, Mr Hayes has inconceivably filed a fourth motion for the appointment of an equity committee. The Reorganized Debtors' Cross-Motion is intended to finally put an end to Mr Hayes' abuse of the legal system and the costs he is inflicting on the constituents of these bankruptcy cases in pursuit of his frivolous, repetitive motions The Reorganized Debtors respectfully request that the Court send a clear message to Mr Hayes by ordering that he bear the Reorganized Debtors' costs and fees in filing this pleading

2

RD193

## RELEVANT BACKGROUND

1      On June 5, 2001, the Reorganized Debtors, together with certain of their affiliates, filed a joint plan of reorganization (as amended, the "Plan") and disclosure statement, pursuant to section 1125 of the Bankruptcy Code   The hearing to consider confirmation of the Plan was held on August 28-29, 2001 (the "Confirmation Hearing")   At the Confirmation Hearing, Mr Hayes objected to the Plan and, for the first time, moved for the appointment of an equity committee (the "First Equity Committee Motion")   On September 12, 2001, the Bankruptcy Court issued an opinion in which it concluded that it would confirm the Plan, overruled Mr Hayes' objection and denied the relief requested in the First Equity Committee Motion.

2      Immediately following the entry of the judgment, Mr Hayes filed a notice of appeal   On September 20, 2001, following the entry of an order confirming the Plan (the "Confirmation Order"), Mr. Hayes filed an amended notice of appeal   The only difference between the September 13th and September 20th notices of appeal was the handwritten notation on the latter reflecting that the "judgment, order or decree" appealed from was the Confirmation Order dated September 20, 2001 rather than the opinion on confirmation dated September 12, 2001   The filing of the second notice of appeal, however, resulted in the docketing of two separate appeals:  (i) Civil Action No. 02-216; and (ii) Civil Action No  01-718   The docketing of separate, duplicative appeals in the District Court generated considerable confusion among the parties and the District Court.  GHV proceeded under the impression that case number 02-016 was the operative appeal   Mr Hayes, and in some instances, the District Court, however, filed certain papers in case number 01-718.

3

RD194

3    On January 2, 2002, the District Court established a briefing schedule in case number 01-718, requiring appellant's brief to be filed by January 18, 2002. On that date, instead of filing an appeal brief, Mr. Hayes filed a motion with the District Court seeking the appointment of an equity committee (the "Second Equity Committee Motion") for the purpose of pursuing his appeal of the Plan and Confirmation Order and requesting a postponement of the briefing deadline. On January 30, 2002, GHV filed an opposition to the Second Equity Committee Motion and simultaneously filed a motion to dismiss Mr. Hayes' appeal on the ground of equitable mootness

4    On September 30, 2002, the District Court denied the Second Equity Committee Motion in an order entered in case number 01-718, on the grounds that the District Court had no authority to appoint an equity committee. On that same date, the District Court granted GHV's motion to dismiss Mr. Hayes' appeal in an order entered in case number 02-016, based on the doctrine of equitable mootness. Mr. Hayes did not appeal the District Court's order dismissing case number 02-016

5    On November 6, 2002, the District Court *sua sponte* entered a further scheduling order in case number 01-718 requiring appellant to file his opening brief by November 22, 2002. GHV, believing that Mr. Hayes' appeal had been fully resolved by the dismissal of case number 02-016, made an inquiry to the Clerk of the District Court, who advised that the second appeal (01-718) had been docketed in error. When Mr. Hayes filed a brief in case number 01-718, GHV wrote to the District Court, advising the District Court of its belief that 01-718 and 02-016 were in fact identical appeals from the same order of the Bankruptcy Court, and requesting guidance from the District Court as to whether it was necessary to file a separate motion to dismiss case number 01-718. Mr. Hayes responded to

4

RD195

the GHV letter stating that the doctrine of equitable mootness did not apply to the second appeal. On March 12, 2003, the District Court *sua sponte* entered an order in case number 01-718 concluding that case number 01-718 and case number 02-016 were in fact the same appeal, and dismissing case number 01-718 for the same reasons that it previously had dismissed case number 02-016.

6   After this Court dismissed case number 01-718, Mr. Hayes filed a motion to reopen that case. On February 26, 2004, the District Court issued a Memorandum Opinion denying Mr. Hayes' motion to reopen case number 01-718. Mr. Hayes appealed the February 26, 2004 Memorandum Order in case number 01-718 to the United States Court of Appeals for the Third Circuit (the "Third Circuit"). The appeal was fully briefed, and on December 6, 2004 the Third Circuit affirmed the District Court's decision in its entirety and later denied a motion for rehearing en banc. Mr. Hayes petitioned for certiorari in the Supreme Court, which was denied by the Supreme Court on June 20, 2005. Hayes v. Genesis Health Ventures, Inc., 125 S. Ct. 2947, 162 L.Ed.2d 868 (2005).

7.   On October 5, 2001, Mr. Hayes filed yet another motion for appointment of an equity committee (the "Third Equity Committee Motion") with the Bankruptcy Court. Mr. Hayes never set the Third Equity Committee Motion for hearing and it remained undecided for approximately two and one-half years. On March 13, 2004, Mr. Hayes sent a letter to Judge Wizmur "respectfully requesting a decision on his Motion to Appoint an Official Committee of Equity Security Holders." On April 23, 2004, GHV responded to the Third Equity Committee Motion.

8   On May 13, 2004, the Bankruptcy Court heard the Third Equity Committee Motion. Judge Wizmur again listened to arguments on this issue from both sides

5

RD196

and reviewed the history of Mr Hayes' appeals  The Bankruptcy Court ultimately denied Mr. Hayes' motion on both substantive and procedural grounds, finding that: (1) Mr Hayes' request for appointment of an equity committee was "grossly untimely;" (2) the doctrine of equitable mootness applied to the Plan; and (3) the appointment of a post-confirmation equity committee is only available in the most extraordinary situations, which was not the case here

9    Disregarding all of these rulings, Mr Hayes again appealed the Bankruptcy Court's denial of the appointment of an equity committee, and on April 27, 2005, the District Court *sua sponte* entered a scheduling order in case number 04-0477  On July 23, 2005, the District Court affirmed the Bankruptcy Court's denial of the appointment of an equity committee finding that the Bankruptcy Court had correctly denied Mr Hayes' request for the appointment of a post-confirmation equity committee  The District Court also noted that Mr Hayes had exhausted all avenues to challenge the confirmation order, his challenge to the Bankruptcy Court's denial to appoint a post-confirmation equity committee to guide the appeal of the confirmation order, was actually moot given that appeal the U.S Supreme Court denied Hayes' petition for a writ of certiorari on June 20, 2005

10    Not content with the District Court's ruling on August 23, 2005, Hayes filed a notice of appeal with the Third Circuit  A briefing schedule was circulated to the parties on January 6, 2006

6

RD197

## ARGUMENT

I.    THE REORGANIZED DEBTORS' OBJECTIONS TO THE HAYES' MOTIONS

A.    The Reorganized Debtors Join in the Objection of Mellon Bank,
      N.A. to Motion for Reconsideration of the Senior Lender Claims.

11    Mr Hayes has filed a motion for reconsideration of the Senior Lenders' claims pursuant to section 502(j) of the Bankruptcy Code   On January 10, 2006, Mellon Bank, N.A , acting as administrative agent for the Senior Lenders, filed the Objection of Mellon Bank, N A. to Motion for Reconsideration of the Senior Lender Claims (the "Senior Lender's Objection")   The Reorganized Debtors hereby join in the Senior Lender's Objection and incorporate by reference the positions adopted therein

B.    Mr. Hayes' Fourth Equity Committee Motion Should Be Denied for
      the Same Reasons That His Three Prior Motions Were Denied.

12    As discussed in detail above, Mr Hayes has filed two prior motions with this Court, and an additional motion with the District Court, requesting the appointment of an equity committee   Notwithstanding denial of the requested relief at every level, including the U S Supreme Court having denied his petition for a writ of certiorari, Mr Hayes filed the Fourth Equity Committee Motion requesting the appointment of an equity committee, this time for the "sole" purpose of challenging a ministerial motion to finally close these fully administered bankruptcy cases.

13    Mr Hayes' additional request for the appointment of an equity committee is even more "grossly untimely" than his last one, not supported by the facts of this case, barred by the doctrines of *res judicata* and collateral estoppel and moot as a result of the U S Supreme Court having denied his petition for a writ of certiorari   This Court is intimately familiar with the application of the relevant legal standards to this case, having

7

RD198

previously denied Mr Hayes' requests for such relief on September 12, 2001 and May 13, 2004, respectively  Accordingly, the Reorganized Debtors will not belabor the Court with additional briefing on such issues and hereby incorporate by reference their pleadings filed in connection with Mr Hayes' prior requests for the appointment of an equity committee

## II.    THE REORGANIZED DEBTORS' CROSS-MOTION FOR REIMURSEMENT OF THEIR FEES AND EXPENSES INCURRED IN FILING THIS PLEADING

14.    Pursuant to section 1927 of title 28 of the United States Code, a court may assess costs against any person that unreasonably and vexatiously multiplies the proceedings in a case  More specifically, section 1927 provides as follows:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct

28 U.S.C § 1927; see In re Volpert, 177 B R 81 (N D Ill 1995) (holding that bankruptcy court has jurisdiction to award sanctions under 28 U S C § 1927); Knepper v. Skekloff, 154 B R 75 (N.D Ill 1993) (same)  A number of courts addressing the issue have held that a court's authority to issue sanctions under section 1927 extends to non-lawyer litigants  See, e.g., Brown v Adidas Int , 938 F Supp 628 (S D Cal 1996) (applying section 1927 to non-lawyer litigants appearing in propria persona); Odbert v United States, 576 FSupp 825 (E D. Cal 1983) (finding that section 1927 applied to petitioner appearing in propria persona either as party or as counsel)

15    Additionally, a court has the inherent authority under section 1651 of Title 28 to issue all "writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law " 28 U S C § 1651  Courts have repeatedly

8

used this inherent authority to issue orders to manage their case loads and/or stem vexatious litigation  See, e.g., Armstrong v. Ruston (In re Armstrong), 309 B R  799 (10th Cir  B A P 2004) cert denied, 125 S  Ct. 431 (2004), petition for rehearing denied, 125 S.C  950 (2005) (appellate court upheld bankruptcy court's imposition of specific filing restrictions upon a pro-se chapter 11 debtor pursuant to 11 U.S.C.A  § 105 and 28 U.S.C.A  § 1651(a) whose record demonstrated he was a vexatious litigant who repeatedly attempted to challenge the confirmation order with repetitive and frivolous motions); Woodward v. June Dicks (In re Dicks), 306 B R  700 (Bankr  M.D  Fla  2004) ("This Court has inherent authority to enjoin vexatious litigation by litigants who have settled on a course of conduct involving the repetitive filing of duplicative legal papers rearguing a position rejected a multitude of times by numerous trial and appellate courts, where such litigation causes needless expense to other parties, where the litigants have no objective, good-faith expectation of prevailing, and where the multiple filings place an unnecessary burden on the courts ") [1]

16    The Reorganized Debtors respectfully request that the Court exercise its authority under each of these statutes by ordering Mr. Hayes to reimburse the Reorganized Debtors for their fees and costs incurred in filing this pleading  As discussed above, Mr Hayes has previously filed three separate motions for the appointment of an equity committee  Each of his motions has been denied, both at the Bankruptcy Court level and on multiple levels of appeal  Notwithstanding such results, Mr Hayes has filed a fourth motion for appointment of an equity committee  This must stop  Mr. Hayes' frivolous, repetitive motions are an abuse of the legal system, which have inflicted significant costs and expenses on the constituents of these bankruptcy cases and wasted many Courts' time    The

---

[1]  The concepts underlying Fed  R  Bankr  Proc  9011, which also apply to pro se litigants, further support this application

9

RD200

Reorganized Debtors should not be forced to incur additional legal fees in objecting to the Fourth Equity Committee Motion given the Court's previous decisions on the issue in these cases  Accordingly, the Reorganized Debtors respectfully request that the Court send a clear message to Mr  Hayes by ordering that he bear the Reorganized Debtors' fees in filing this pleading

[REMINDER OF PAGE INTENTIONALLY LEFT BLANK]

RLF1-2966509-2

RD201

## CONCLUSION

WHEREFORE, the Reorganized Debtors respectfully request that this Court enter an order (1) denying Mr Hayes' motion for reconsideration of the Senior Lenders' claims, (ii) denying the relief requested in the Fourth Equity Committee Motion, (iii) granting the Reorganized Debtors' Cross-Motion for sanctions and (d) granting such other and further relief as the Court deems just and proper

Dated: January 11, 2006
    Wilmington, Delaware

_/s/ Russell C. Silberglied_

Mark D Collins (No 2981)
Russell C. Silberglied (No 3462)
Cynthia L Collins (No 4337)
RICHARDS, LAYTON & FINGER, P A
One Rodney Square
P O. Box 551
Wilmington, Delaware 19899

and

Michael F Walsh
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153

and

Adam P Strochak
Joanne M. Guerrera
WEIL, GOTSHAL & MANGES LLP
1300 Eye Street, NW
Suite 900
Washington, D C 20005

Attorneys for Reorganized Debtors Genesis
Health Ventures, Inc. and Norristown Nursing
& Rehabilitation Associates, L P

# EXHIBIT B

## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------x
In re:                                     :    Chapter 11
                                           :
GENESIS HEALTH VENTURES, INC.,             :    Case No. 00-2692 (JHW)
et al.,                                    :
                                           :
        Reorganized Debtors                :
                                           :
-------------------------------------------x
-------------------------------------------x
In re:                                     :    Chapter 11
                                           :
MULTICARE AMC, INC., et al.                :    Case No. 00-2494 (JHW)
                                           :
                                           :
        Reorganized Debtors                :
                                           :
                                           :
-------------------------------------------x
```

## OBJECTION OF MELLON BANK, N.A. TO MOTION FOR
## RECONSIDERATION OF THE SENIOR LENDER CLAIMS

Mellon Bank, N.A. ("Mellon"), by its counsel, Morgan, Lewis & Bockius LLP and Klett Rooney Lieber & Schorling P.C., for its Objection to the Motion for Reconsideration of the Genesis and Multicare Senior Lender Claims and the Genesis and Multicare Senior Subordinated Claims dated December 12, 2005 (the "Motion"), filed by James J. Hayes ("Hayes"), respectively represents as follows:[1]

---

[1] Mellon is responding to the Motion although it was never served with the Motion. Mellon also joins in the Debtors' responses to this Motion and to Hayes' separate Motion for Appointment of Pre-Final Decree Equity Committee dated December 11, 2005

RD204

## RELEVANT FACTS

1.      Mellon acted as administrative agent for the senior secured lenders (the "Senior Lenders") under the prepetition and post-petition credit agreements of Genesis Health Ventures, Inc ("Genesis") and Multicare AMC, Inc. ("Multicare"). At confirmation of Genesis' and Multicare's joint plan of reorganization (the "Plan"), in excess of $1.2 billion and $443 million were due and outstanding under Genesis' and Multicare's prepetition credit agreements, respectively. In addition, under the post-petition credit agreements, Mellon, as administrative agent, and certain of the Senior Lenders provided Genesis and Multicare with debtor-in-possession financing up to the respective maximum amounts of $250,000,000 and $50,000,000.

2.      The Plan was confirmed by this Court by order entered on September 20, 2001. The Plan became effective and was substantially consummated on or about October 2, 2001.

3.      Hayes is a former common stock holder of Genesis who has litigated <u>pro se</u> against the Plan continuously and unsuccessfully since prior to the confirmation hearings. Among other things, Hayes filed an objection to the Plan, several motions for the appointment of an equity committee, and numerous appeals from the confirmation order and other orders of this Court, all of which were denied or dismissed.

RD205

## THE MOTION

4.    In the instant Motion,[2] Hayes for the first time seeks reconsideration of the Senior Lenders' claims pursuant to Section 502(j) of the Bankruptcy Code, more than four years after the Plan was substantially consummated

5    Many grounds, both substantive and procedural, exist requiring the denial of the Motion. However, the Court need look no further than the basic requirement of Section 502(j) - - that a claim may be reconsidered only "for cause" - - to determine that the Motion is utterly without merit

6.    The only discernable arguments that Hayes proffers as "cause" for reconsideration of the Senior Lender claims essentially reduce down to two points:  (a) the claims asserted in the action captioned Haskell, et al. v. Goldman, Sachs & Co., et al., Adv. No. 04-53375 (JHW) (the "Haskell Litigation") are a sufficient basis for reconsideration; and (b) certain of the Senior Lenders reaped "windfall profits" by purchasing their claims from the original lenders at a discount and should, therefore, be equitably subordinated.  (Motion ¶¶ 4-5, 9)  As set forth below, neither of these arguments constitutes cause for this Court's reconsideration of the Senior Lender claims

## ARGUMENT

7.    Section 502(j) of the Bankruptcy Code provides that claims in bankruptcy that have been allowed or disallowed may be "reconsidered for cause".  See 11 U.S.C § 502(j); Fed. R. Bankr. P  3008.  In order for such a motion for reconsideration to be

---

[2] Hayes has styled the Motion as brought by the "Genesis Common Stock Class" although no other former equityholder has joined in his Motion

RD206

granted, "cause" invoking in a timely manner "at least one" of the grounds set forth in either Fed. R. Civ. P. 59 or Fed. R. Civ. P. 60(b) must be articulated. See, e.g., In re Colley, 814 F.2d 1008 (5th Cir.), cert. denied, 484 U.S. 898 (1987); In re Motor Freight Express, 91 B.R. 705, 711 (Bankr. E.D.Pa. 1988); In re Rabzak, 79 B.R. 960, 964 (Bankr. E.D.Pa. 1987).

8.     Setting aside the patent staleness of the Motion, no grounds have been asserted for reconsideration of the Senior Lender claims

## I. The Haskell Litigation Has Been Dismissed
## And Is Not Cause For Reconsideration of the Claims

9.     This Court dismissed the Haskell Litigation in its entirety on grounds of res judicata, collateral estoppel, and the limitations period for revocation of confirmation orders set forth in Section 1144 of the Bankruptcy Code. See In re Genesis Health Ventures, Inc., 324 B.R. 510 (Bankr. D. Del. 2005). Accordingly, the Haskell Litigation and the claims asserted therein cannot in any manner constitute "cause" for reconsideration of the Senior Lender claims.

## II. Creditors Who Purchase Notes At a Discount
## Are Entitled to Claims in the Face Value of the Notes

10.     Hayes asserts that certain Senior Lenders reaped windfall profits because they purchased notes at a discount and then were treated as "equal in priority to the claims of the original lenders". (Motion ¶ 12). Hayes alleges that purchase of the notes at a discount constitutes cause for reconsideration of the Senior Lender claims and the

RD207

equitable subordination of such claims under Section 510(c) of the Bankruptcy Code.[3]
Id.

11.    However, the draconian remedy of equitable subordination is "not to be invoked lightly" and requires that there have been some form of egregious or inequitable conduct by the creditor whose claim is to be subordinated  See, e.g., Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims, 160 F.3d 982, 986-987 (3d Cir. 1998); In re After Six, Inc., 177 B.R. 219, 231 (Bankr. E.D Pa. 1995).

12.    Courts have routinely held that a creditor who purchases a note at a discount is entitled to a claim in the face amount of the note. See, e.g., In re Fairfield Exec. Assocs., 161 B.R. 595 (D N.J 1993); see also In re Pittsburgh Rys. Co., 159 F.2d 630 (3d Cir 1946), cert. denied, 331 U.S. 819 (1947) (a claim is determined by the consideration received by the debtor not the amount paid by the current holder of the claim)  By purchasing their notes at a discount, the Senior Lenders were guilty of no egregious or inequitable conduct and were entitled to allowed claims in the full face amount of the notes they acquired

13.    Thus, Hayes has failed to enunciate any cause for reconsideration of the Senior Lender claims, and the Motion is patently devoid of any merit.

---

[3] The form by which Hayes seeks such relief is also improper  A proceeding to equitably subordinate a claim must be brought as an adversary proceeding.  See Fed R. Bankr P 7001(7)

1-NY/1986469.4                                    4

RD208

## CONCLUSION

14.    For the reasons noted above, the Motion should be denied, and the Court should consider appropriate sanctions against Hayes pursuant to Fed. R. Bankr. P. 9011(b)(2) and 9011(c)(1)(B), together with such other and further relief as the Court deems just and proper.

Dated: January 10, 2006
          Wilmington, Delaware

Teresa K. D. Currier (3080)
KLETT ROONEY LIEBER &
SCHORLING, PC
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware 19801
(302) 552-4200

-and-

Richard S. Toder
Menachem O. Zelmanovitz
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, New York 10178
(212) 309-6000

Attorneys for Mellon Bank, N.A.

RD209

RD210

EXHIBIT C

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | . | Chapter 11 |
| | . | |
| GENESIS HEALTH VENTURES, INC., | . | Case No. 00-2692(JHW) |
| et al., | . | |
| | . | |
| Reorganized Debtors. | . | |
| | . | |
| | . | |
| IN RE: | . | Chapter 11 |
| | . | |
| GENESIS ELDERCARE CORP. | . | Case No. 00-2564(JHW) |
| | . | |
| | . | |
| Reorganized Debtors. | . | |
| | | |
| IN RE: | . | Chapter 11 |
| | . | |
| NORRISTOWN NURSING AND | . | Case No. 00-2716(JHW) |
| REHABILITATION ASSOCIATES, L.P.. | | |
| | . | |
| | . | |
| Reorganized Debtors. | . | January 19, 2006 |
| | . | 9:30 a.m. |
| | . | (Wilmington) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH H. WIZMUR
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

1           THE CLERK: All rise.

2           THE COURT: Please be seated.

3           MR SILBERGLIED: Good morning, Your Honor.

4           THE COURT: Good morning.

5           MR. SILBERGLIED: For the record, Russ Silberglied

6   of Richards, Layton, and Finger on behalf of the Reorganized

7   Debtors. We have a short agenda for today. The first matter

8   on the agenda is continued. A brief word as to why it's

9   continued in case Your Honor wanted an update, that is the

10  motion for entry of a final decree itself. The US Trustee

11  has pointed out that there are some quarterly operating

12  reports that were not filed, and we are working with the

13  company to get those quarterly operating reports filed.

14  There's been a series of post confirmation transactions at

15  the company, so employees are a little bit harder to find

16  than they once were. But we're working on it, and we hope to

17  go forward with that at the next hearing which actually Ms.

18  Collins reminded me on our way over here we don't have a next

19  hearing. So I don't know if Your Honor knows the next time

20  you're going to be in Delaware.

21          THE COURT: Turns out March 2nd might work. I might

22  be here on February 16th. It sounds like March 2nd might be

23  better for you.

24          MR. SILBERGLIED: March 2nd would be fine. Thank

25  you, Your Honor.

3

1          THE COURT: Let's make that 9 o'clock.

2          MR. SILBERGLIED: Thank you, Your Honor. The next

3    two items on the agenda are both motions of Mr. Hayes. He's

4    here. The first is with respect to the lenders themselves,

5    and the second is with respect to the appointment of an

6    equity committee, so I will cede the podium to Mr. Hayes.

7          THE COURT: Mr. Hayes.

8          MR. HAYES: Good morning, Your Honor.

9          THE COURT: Good morning  You've filed 2 motions

10   One, to reconsider the order allowing the senior lender

11   claims and two, to appoint an equity security committee. At

12   this point I am more than puzzled, disturbed, by these

13   motions, because, as I've read the amazing post confirmation

14   history of these issues, I'm appalled, really, that the

15   issues are coming back  And I say that with an understanding

16   that the reconsideration motion on the claims is really aimed

17   at, from your description of what you're looking for, a

18   restructuring of the plan, a re-prioritization of the

19   position of the secured lenders, a focus on your claim of

20   windfall on their part, of unfairness, of improper

21   allocations, and an adjustment of claims on those bases. In

22   terms of the equity security holder committee, it was well

23   laid out by the objection to your motion that you - - this is

24   the 4th time that you're here on that. Not - - perhaps 3

25   times before the Bankruptcy Court and one before the District

4

1   Court, with appeals to the Circuit. I'm not sure about the

2   status of the last appeal. That was apparently filed on the

3   denial of the District Court I think for - - on the motion

4   for appointment of an equity security committee. I could be

5   corrected on that. But you've been there, you've done that,

6   you've been denied your relief. Why should I consider this

7   again? What's different now? How many times, how many bites

8   at the apple do you get?

9           MR. HAYES: Your Honor, the equity clients in this

10  - - throughout this bankruptcy has been denied

11  representation. I don't think there's any dispute that at no

12  point - - at not time in the bankruptcy has the equity

13  interest been represented. That is - -

14          THE COURT: Well, the equity interest has appeared

15  and been heard in - - at the confirmation hearing. You,

16  yourself, presented objection to the plan, and your concerns

17  were addressed and denied. Your contention is not that there

18  has been no opportunity to be heard - -

19          MR. HAYES: No.

20          THE COURT: - - but no opportunity to be paid from

21  the estate for legal fees.

22          MR. HAYES: The equity class has not been adequately

23  represented.

24          THE COURT: Do you contend that there is an absolute

25  right to representation paid for by the estate in every case

5

1   for equity?

2       MR. HAYES: No. But in this case, since there was

3   no -- I mean, adequate representation, there are a number of

4   ways that it can be provided. The normal way, I mean, you

5   know, the shareholders are normally represented by company

6   management who has a fiduciary obligation to represent

7   shareholders interests. And in a normal case, the company

8   officers, in fulfillment of the fiduciary obligations provide

9   representations for the equity class. I mean, in the recent

10  Morale (phonetic) bankruptcy, which I cited, the chairman of

11  the company, Chairman Schwartz, argued that the valuations

12  prepared by the investment bankers were low. But in this

13  case, which is rather unusual, the officers of the company

14  have now been charged with conspiracy to commit fraud.

15      THE COURT: Have now been charged in the Haskell

16  (phonetic) matter? Is that what they're --

17      MR. HAYES: Well, that was the allegations.

18      THE COURT: Those are --

19      MR. HAYES: In the Haskell matter.

20      THE COURT: -- the allegations, and that complaint

21  I dismissed, I believe.

22      MR. HAYES: But you --

23      THE COURT: I think the District Court has affirmed,

24  if I'm not incorrect.

25      MR. SILBERGLIED: No, Your Honor. We're in the

6

1   middle of briefing in the District Court.

2           THE COURT: I see. So that's under appeal.

3           MR. HAYES: But your dismissal didn't address any of

4   the allegations.

5           THE COURT: That's correct. So how can I address

6   the allegations here. There were issues of *res judicata* and

7   collateral estoppel. Issues under 1144. What's different

8   here? Why - -

9           MR. HAYES: Well, the shareholders have a

10  constitutional right. Among all the creditors and

11  participants, the shareholders are the only ones whose

12  property rights are protected by the 5th Amendment of the

13  Constitution. And as - -

14          THE COURT: And have you - -

15          MR. HAYES:  - - a protected right - -

16          THE COURT:  - - addressed that issue before? Have

17  you - - is this the first time that you've raised the

18  constitutional dimensions of the shareholders opportunities?

19          MR. HAYES: I have attempted to raise it throughout.

20  But none - -

21          THE COURT: And you've been rejected.

22          MR HAYES:  - - of the courts - -

23          THE COURT: Have you not?

24          MR HAYES: None of the courts have addressed the

25  constitutional issue.

7

1    THE COURT: So that because they didn't address the

2    constitutional issue, because they decided that you were not

3    entitled, for any reason, to assert, because - - for a number

4    of reasons, including the timing of your request, that you

5    were not entitled to an equity security committee, including

6    back in September of 2001, including as late as May of 2004,

7    all of those times you had the opportunity - - you raised - -

8    you took the opportunity, whether you had it or not is

9    another question, you took the opportunity to raise the issue

10   of equity security committee on various grounds. I don't

11   recall that you raised the constitutional grounds in front of

12   me, but you might have raised it otherwise. It doesn't

13   matter whether it was taken up or not. You're quite right to

14   assert that as a basic proposition constitutional issues

15   don't go away by the passage of time. That's a valid

16   proposition. But in this context you can't just keep coming

17   back and thinking up new theories to raise the same request

18   for relief that you have all along.

19   MR. HAYES: I'm not raising new theories. I mean,

20   both the law and the constitution require that adequate

21   representation be provided to the equity class. No court has

22   said that the equity class has been provided adequate

23   representation.

24   THE COURT: There has, there was - - I did say, in

25   my confirmation opinion, that the value in the company - -

RD217

8

1   you may disagree with it, other people have disagreed with it

2   - - the proofs as I found them to be were that there was no

3   value to reach equity, and therefore equity could be - - the

4   plan as proposed could be confirmed, and the plan proposed

5   that there would be no distribution to equity.  That was the

6   decision.  If - - and that's the decision, I believe, was

7   appealed and approved.  And there it stands right or wrong.

8   And nobody can say whether a particular decision, in

9   retrospect, was right or wrong.  But there it stands as a

10  final judgment.  If that's so, then how can we say that the

11  equity was not adequately represented?

12          MR. HAYES: Well, adequate representation requires

13  some form of representation.

14          THE COURT: Well you represented the equity, didn't

15  you?  I mean you - -

16          MR. HAYES: I - -

17          THE COURT:  - - took it upon yourself.

18          MR. HAYES: Well nobody has said that it's adequate.

19  Everybody is saying my representation has been quite

20  inadequate.

21          THE COURT: Did you contemplate hiring an attorney

22  to help you make your presentation in the first instance?

23          MR. HAYES: Yes I did.  I have talked to attorneys

24          THE COURT: Um-hum.

25          MR. HAYES: $34 million is spent on professional

9

1    fees in this case. I'm an individual shareholder. I am not

2    wealthy. As part of adequate representation is having

3    representation equivalent to what, to what the other side

4    has. And I - - even if I'm considered to be representing, I

5    - - and I guess I don't see objecting. When I objected, I

6    didn't have any - - couldn't cross examine a witness,

7    couldn't present any evidence, couldn't do anything but

8    complain.

9            THE COURT: You didn't have the chance to cross

10   examine witnesses or - -

11           MR. HAYES: No.

12           THE COURT: - - at the hearing? At the

13   confirmation hearing?

14           MR. HAYES: No.

15           THE COURT: Did you - -

16           MR. HAYES: All the objectors were told that their

17   objections would be heard at the end of the proceeding. I

18   mean, it was kind of a - -

19           THE COURT: There was testimony presented, cross

20   examination of witnesses. Did you stand up and say, I would

21   like to cross examine a particular witness?

22           MR. HAYES: No. Because the Debtors' counsel said

23   - - told me what the procedure was.

24           THE COURT: I see.

25           MR. HAYES: Even the objectors - - well.

10

1          THE COURT: We did consider experts presented by

2  some of the objectors. Let me remind myself that - -

3          MR HAYES: But they weren't equity members.

4          THE COURT: They weren't equity  Did you have - -

5  do you understand that you had a chance to present expert

6  witnesses if you chose to do that?

7          MR. HAYES: No I didn't.

8          THE COURT: Let me ask you another question just to

9  round out the record. Before - - when was the first time

10  that you raised the issue of an equity committee? You'll

11  recall that you filed a motion before confirmation that was

12  ruled on in the context of confirmation asking for that

13  relief. That was in August of 2001. Did you raise the issue

14  before then?

15          MR HAYES: The issue of an equity committee?

16          THE COURT: Yes.

17          MR HAYES: No. I raised the issue of an equity

18  committee after - - immediately - - fairly soon after I had

19  gotten the disclosure statement that indicated that

20  shareholders were not going to participate in the

21  distribution. And I - - and almost on the same day. It was

22  kind of fortuitous. I'm not an attorney, and I don't - - I'm

23  an investor. I don't follow the bankruptcies of the

24  companies I happen to own  But it was somewhat fortuitous

25  that I was notified of the bankruptcy at the same time that I

11

1    had gotten a new copy of my Investor's Daily Graphs

2    (phonetic). As a part of the daily graphs, it shows stock

3    appreciation at certain indexes  And the leading performer

4    had been the healthcare index. And that's when I started

5    looking, reading the disclosure statement. Seeing that the

6    valuation of the company was done in April, and that since

7    April, the Healthcare index that I was looking at had

8    appreciated by 60%. I mean that told - - that significant

9    thing said, you know, everything in this disclosure statement

10    is inaccurate. Everything that it's based on.

11          THE COURT: And you did address me at confirmation,

12    did you not?

13          MR. HAYES: Yes

14          THE COURT: And I considered your comments. Let me

15    ask you this, you've - - the level of litigation that you've

16    conducted since then is quite impressive. You've traveled to

17    the District Court and to the Court of Appeals. On several

18    occasions you've asked for en banc consideration. You've

19    tried to have the Supreme Court weigh in on these issues.

20    You've really tried to exhaust your opportunities to have

21    these issues considered  How can I - - why wouldn't the - -

22    the attorneys are seeking sanctions against you saying enough

23    is enough, he's dragging us into this again, we've briefed

24    these issues up and down the chart of the Federal court

25    system, and we've received the same answer. Why shouldn't we

12

1  impose upon Mr. Hayes to pay our court fees at this point in

2  light of the fact that he's dragging us, again, yet again,

3  into court? What's my answer to that? Why shouldn't I say,

4  You know, you're right? I'm amazed at this history of up and

5  down. And back again.

6        MR. HAYES: I think their motion for sanctions is

7  completely out of order at this time.

8        THE COURT: Why?

9        MR. HAYES: Because it's prejudicing the Court

10  against the merits of the case.

11        THE COURT: In other words, I shouldn't consider the

12  fact that this - - these issues have been up and down and

13  around and through? That these issues have been - - don't I

14  have to consider that? Isn't there such a thing as finality,

15  and principles that govern the way that we do business in the

16  court system?

17        MR. HAYES: You know, there cannot be any finality

18  until the courts address the constitutional issues. Let me

19  - - this isn't in my brief, but it's part of what I prepared.

20  This Court cannot avoid the constitutional issues of adequate

21  representation of the equity clients. In <u>Marlboro versus</u>

22  <u>Madison</u> (phonetic) Chief Justice Marshall's opinion stated,

23  It is emphatically the province and the duty of the judicial

24  department to say what the law is. Those who apply the rules

25  to a particular case must, of necessity, expound and

13

1   interpret that rule.  If two laws conflict with each other,

2   the courts must decide on the operation of each.  So if a law

3   be in opposition to the constitution and both the law and the

4   constitution apply to a particular case so that the court

5   must either decide that a case conforming to the law,

6   disregarding the constitution, or conforming to the

7   constitution disregarding the law, the court must decide

8   which of these conflicting rules govern the case.  This is

9   the very essence of judicial duty.  None of the courts have

10  addressed one, whether the 5th Amendment applies to, or

11  whether the property of an equity holder is the property

12  that's under the definition of the 5th Amendment   There's no

13  opinion that talks about whether adequate representation is

14  required by the constitution.  About what adequate

15  representation is.

16          THE COURT: Understood.  Thank you Mr. Hayes.

17          MR. SILBERGLIED: For the record again, Russ

18  Silberglied on behalf of Genesis.  I'm not going to take a

19  lot of time, Your Honor   I'm going to respond to a couple of

20  points briefly, and then talk about the sanctions motion.  I

21  don't think Your Honor needs to hear much more from me about

22  the background of this, because it's quite clear Your Honor

23  has read the papers   A couple of points raised by Mr. Hayes.

24  One, this issue of nobody has addressed the constitutional

25  argument.  Leaving aside for a minute that there simply is no

14

1    constitutional argument here, and it's not a constitutional

2    issue, let's leave that aside for a moment. I believe what

3    Mr. Hayes read is word for word out of his brief to the 3rd

4    Circuit Court of Appeals. He briefed this to the 3rd Circuit

5    Court of Appeals. I don't recall specifically on what

6    grounds the 3rd Circuit rejected his argument, but suffice it

7    to say it did. It rejected it again en banc. He made the

8    same constitutional argument in his petition for cert.

9    (phonetic) to the United States Supreme Court, and cert. was

10   denied. This issue is finished. It's not equitably moot,

11   it's actually moot in the words of Judge Farnan. Second,

12   Your Honor, the point that Mr. Hayes made that he couldn't

13   cross examine witnesses and that he couldn't present

14   evidence. Frankly I don't remember whether he cross examined

15   or not, it's too long ago in my memory to remember that level

16   of detail. I do remember that he made oral argument. I do

17   remember, obviously, that counsel for Mr. Grimes, counsel for

18   GMS cross examined our witnesses and put on their own

19   witnesses as well. Cross examined Mr. Zelmonvitz's witnesses

20   as well. And what I would additionally add to the record,

21   Your Honor might recall that Mr. Hayes in fact did attempt to

22   introduce evidence to this Court in the form of the famous

23   cartoons that he submitted. Not only did Your Honor admit

24   those cartoons into evidence, but Your Honor - - but Mr

25   Hayes has also attached them to pretty much every appellate

1   brief he has filed since then. So it's flatly incorrect that

2   he didn't have the opportunity to present evidence. It's

3   flatly incorrect that he didn't present evidence. So I will,

4   then, skip over, in the remainder of my argument, why his two

5   motions today ought to be denied. I'm sure Mr. Zelmonvitz

6   might want to say something more on the motion leveled to his

7   client. I'm going to skip right to the sanctions portion,

8   unless Your Honor has questions about the first portion.

9           THE COURT: Please proceed.

10          MR. SILBERGLIED: Thank you, Your Honor. You know,

11  in short this does has to stop. Have to stop, excuse me. It

12  doesn't cost Mr. Hayes anything to file these motions because

13  he's not paying an attorney, but it most assuredly does cost

14  my client something. Courts expect responses. And that

15  means that my client must pay me or Weil Gotshal or somebody

16  else to respond to these motions. And it is inflicting a

17  cost upon us. It's inflicting a cost also on the federal

18  system because Your Honor has to keep hearing these, the

19  District Court has to keep hearing these, the 3rd Circuit has

20  to keep hearing these. And in short Mr. Hayes needs a

21  message that this is time to stop. If Your Honor has any

22  doubts whatsoever about what Mr. Hayes' intentions are if he

23  is not sanctioned today, all you have to do is open up to

24  paragraph 14 of his motion itself, and look at the sentence

25  that starts in the second to last line of page 6 in paragraph

16

1    14 where he says, quote, "Ratification of the - - and this is

2    the motion for today. Quote, "Ratification of the

3    confirmation by an equity committee would set the stage for a

4    final decree that would really be final and not just another

5    intermediate point in this saga." End quote. In other

6    words, he has absolutely no intention of letting a final

7    decree, if entered by Your Honor at the March hearing, stand

8    in his way of continuing to file these motions. He thinks

9    that that would be an intermediate point in the saga. That's

10   exactly why we need an order from your court awarding

11   sanctions.

12          THE COURT: As a point of procedure, if the appeals

13   are still pending, what opportunities do I have to enter a

14   final decree?

15          MR. SILBERGLIED: And that's - - perhaps that's for

16   the March hearing. We have put that in the motion. That

17   there was case law on the subject of being able to enter a

18   final decree when there's nothing currently pending in the

19   Bankruptcy Court as opposed to things that are on appeal to

20   appellate courts from the Bankruptcy Court. While I guess I

21   didn't necessarily spell it - - there are cases - -

22          THE COURT: I'm sure there are, and - -

23          MR. SILBERGLIED: - - and they're cited in that

24   motion

25          THE COURT: - - I'm not deciding the issue. My

17

1   facial expression is that there may be some doubt on the

2   issue since the jurisdictional opportunity to hear the case

3   comes up as it's opened, as it's referred from the District

4   Court  And so it's an interesting issue.

5        MR  SILBERGLIED: Well, understood, Your Honor.  And

6   I'll be prepared to speak more to those cases at the March

7   hearing.  But suffice it to say that I believe the proper

8   remedy would be - - we really don't think the Haskell case is

9   coming back.  We really don't think that the Hayes motion is

10  coming back on remand.  But that's my opinion, obviously.  If

11  it does, there's always the ability to reopen the bankruptcy

12  case.  Just as if somebody needs to file a motion.  You know,

13  if you enter the final decree in March and some creditor

14  comes and violates the confirmation order, and violates the

15  discharge injunction in May, well then what I would do, like

16  is done in many, many cases, is I would file a motion that

17  asks for the Court to reopen the case for the sole purposes

18  of hearing a motion for sanctions for violating discharge

19  injunction and confirmation order, or something of the like.

20       THE COURT: Yeah  You've cited §1927 - -

21       MR  SILBERGLIED: Yes, Your Honor.

22       THE COURT: - - of Title 28 as a basis for awarding

23  sanctions, and you're aware that there is some controversy

24  about whether the Bankruptcy Court qualifies as any court of

25  the United States.  There is case law around the country that

1   disagrees with that proposition. I gather that you're also

2   relying, for instance, on the United States Supreme Court

3   Chambers case for inherent authority of a court to address an

4   abuse of the process, if you will. In a limited way

5   Because we're not talking about 9011, it's not a separate

6   motion. Well, it is, I guess. But it's - -

7           MR. SILBERGLIED: It's a cross motion. It is a

8   separate motion. I mean, we could have done it as 9011.

9   Frankly, Your Honor, the main reason why we didn't do 9011 is

10  because the hearing was in 2 weeks, and 9011 doesn't

11  translate that well to a contested matter in a Bankruptcy

12  Court because you have to give it 20 days safe - - I think

13  it's 20 days - - whatever it is safe harbor notice. We would

14  have been more than happy to file a safe harbor notice and

15  proceed under 9011, but we didn't have sufficient time before

16  today's hearing. I think that the principles of 9011 apply.

17  I think 1927 itself, there is case law that supports it under

18  - -

19          THE COURT: I don't recall that the 3rd Circuit has

20  ever weighed in on the issue of whether a Bankruptcy Court

21  can utilize 1927. Am I right?

22          MR. SILBERGLIED: You're right, Your Honor. Or, at

23  least we uncovered no such case.

24          THE COURT: Yeah. I'm not aware of any, but anyhow.

25          MR. SILBERGLIED: So there are those principles.

19

1    And, you know, and of course there is the inherent power of

2    the Court, and there's equitable principles in 105 for Your

3    Honor to be able to control your own docket. And as we just

4    read from paragraph 14 of Mr. Hayes own motion, he's

5    admitting to the Court that he's going to keep filing

6    motions  And I think that, you know, 105 would also support

7    -- would support the issue in terms of the Court controlling

8    its own docket.

9            THE COURT: Indeed it would.  I'm confident of that

10   Thank you Mr. Silberglied.

11           MR. SILBERGLIED: Thank you, Your Honor.

12           THE COURT:  Other comments?  Sir.

13           MR. ZELMONVITZ: Menachem Zelmonvitz of Morgan Lewis

14   on behalf of Mellon Bank, the agent for the senior lenders.

15   I'll be very brief, Your Honor.  I just wanted to touch on

16   first of all the reconsideration motion, which is addressed

17   not only to our clients, but also actually to our opponents

18   in the Haskell litigation.  Because he's seeking to

19   essentially have their claims also reconsidered.  The basic

20   requirement, as we've noted in our short objection, is that

21   there has to be cause for reconsideration.  Absolutely no

22   cause has been shown.  The only one even suggested would be

23   either the Haskell litigation, which has been dismissed, and

24   secondly really the ability of some of the senior lenders, or

25   the other lenders, who have gotten a so-called windfall.  But

20

1   that is not the test. As the 3rd Circuit has said, a claim is

2   determined by the consideration received by the Debtor, not

3   the amount paid by the current holder of the claim. That's

4   been upheld by every case that I'm aware of. So that if you

5   purchase a note, you're entitled to a claim in the amount of

6   that note, not the amount of what you paid for that

7   particular claim.

8           THE COURT: What about cause in terms of

9   constitutional impairment?

10          MR. ZELMONVITZ: Well that really deals with also

11  the equity committee motion. And I don't understand where

12  there is a constitutional issue here. There's a right to

13  counsel. No one has deprived Mr. Hayes that right of

14  counsel. He could have gone out and retained his own

15  counsel. The issue here is do you pay for that counsel out

16  of the estate? The estate was not his money. The estate was

17  our client's money. And that's what Your Honor actually

18  found in the valuation part of the confirmation hearing. The

19  equity holders actually had no stake left in this company.

20  And therefore, it was not right to even suggest that they, or

21  their counsel, be paid from the estate. No one deprived him

22  of counsel. He had every right to go out and retain counsel.

23  Therefore, I don't see any issue here. Any constitutional

24  issue here whatsoever. And that was the second point which I

25  really wanted to get to, Your Honor. And the final thing I

21

1    wanted to mention is what Your Honor touched upon on the

2    final decree. We actually had a conversation yesterday. The

3    senior lenders are, to some extent, a little bit concerned to

4    make sure that this Court retains jurisdiction until the

5    Haskell litigation is over and done with. We do agree with

6    Mr. Silberglied that there is law out there which would allow

7    for the reopening of the case in the unlikely event of a

8    remand, which we agree with Mr Silberglied is very, very

9    unlikely. However, it may be for consideration by the Court

10   to at least leave one of the cases open so that there is

11   continuing jurisdiction. We can leave this of course for

12   further discussion for March 2nd

13           THE COURT: Indeed.

14           MR. ZELMONVITZ: Thank you, Your Honor

15           THE COURT: Thank you. If there are no other - -

16           MR. HAYES: May I respond to these?

17           THE COURT: You may, Mr Hayes. Come on up. Last

18   comment.

19           MR. HAYES: On the motion for reconsideration  I

20   mean, they're misreading what I propose in the

21   reconsideration. I am not saying - - I am not reducing the

22   claims of the secondary purchasers. They're retaining their

23   claims. I'm just dividing a claim into 2 parts. That's the

24   reconsideration proposal. Part of the claim would be - -

25   maintain the same priority as it has now, what I call the

1    speculative part of the claim would still remain a claim.  It

2    would be given a lower priority in a separate class with all

3    the speculative claims, which include the subordinated note

4    holders and the shareholders.  So I'm not reducing the claim.

5    And in the very case that, the Richfield Property Case, I

6    mean this parallels the way in which a mortgage obligation

7    which was secured by property as treated.  A valuation of the

8    property was less than the mortgage, and part of the claim is

9    considered as secured and part of it is considered as

10    unsecured.  I mean, this parallels that in every respect.

11         THE COURT: Understood.

12         MR. HAYES: And the second thing on cause.  These

13    claims, the assertion is made in the cases cited that cause

14    has to be from a Rule 60 cause, because Rule 60 is the normal

15    means for reconsideration.  But that only applies in cases

16    where the claims were considered in the first place.  These

17    claims were never considered, these claims were merely

18    asserted as - - and it didn't come out until, as far as I

19    know, until the Haskell litigation, that the secondary

20    claims, or secondary transactions in the loans was to the

21    extent that it is.  I mean, Haskell they just - - 75% of the

22    senior loan were acquired secondarily  That these senior

23    lenders, and these are the investment banks and these are the

24    defendants in the Haskell litigation, never paid Genesis

25    anything.  They acquired these claims in the secondary

23

1    market. And the claims were, senior lender claims are like

2    $1.4 billion, and 75% of that, and the allegation is made or

3    alleged that these loans were picked up at 50¢ on the dollar.

4    I mean, that's a $500 million shift in priority of claims.

5    And it would allow money to fully compensate the other senior

6    lenders who I think that the bankruptcy laws are trying to

7    protect. Creditors who actually provided capital to the

8    corporation and are trying to recover a hundred percent of

9    their claim, and are being prevented by doing so by

10   speculators who are asserting that their claim should be of

11   equal priority to those.

12           THE COURT: Thank you Mr. Hayes.

13           MR. HAYES: And - -

14           THE COURT: Did you - - go ahead.

15           MR  HAYES: And I think Mellon Bank has a conflict

16   of interest in representing only the defendants in the

17   Haskell litigation and ignoring the original senior lenders

18   who have a claim. Because they would be very much in support

19   of this motion.

20           THE COURT: I don't see them here. Thank you Mr

21   Hayes.

22           MR. HAYES: But - -

23           THE COURT: That's enough. Thank you, sir. I read,

24   Mr. Hayes, your recitation and you've included these

25   comments, many of them, in your papers. By these comments

24

1  you seek that I basically rewrite the Bankruptcy Code   That
2  I inject my own sense of what I think is fair, what I think
3  is appropriate, what I think may have been unfair in the
4  process into the equation of who gets what and how.  That's
5  not the way it works.  I am duty bound to apply the
6  Bankruptcy Code as Congress has passed it, and that's what I
7  will do.  There are 2 motions presented here.  One is a
8  motion to reconsider the order allowing the Genesis and
9  Multicare senior lender claims.  And we understand that
10  502(j) requires that cause be established in order to justify
11  such a reconsideration, if you will, and no such cause has
12  been provided here.  One suggestion is that because there are
13  allegations in a complaint that has been dismissed that one
14  senior lender, or several senior lenders, who were senior
15  lenders at the time of the confirmation achieved their
16  position at a discount, that that is a basis to warrant a re-
17  prioritization of the entire plan that was confirmed over 4
18  years ago.  That's mind boggling.  That's not available as an
19  opportunity for relief.  There is no opportunity to
20  reclassify into speculative and non-speculative portions.
21  There's no provision of the Bankruptcy Code that allows for
22  that.  Indeed, out there in the marketplace this may be an
23  area that generates abuse of one sort or another.  There have
24  been all kinds of, I think, articles and concerns expressed
25  about transfers of claims, about manipulation of the process.

25

1    And indeed it may be a proper area of congressional review
2    To determine whether any, excuse me, any control should be
3    applied, any modifications of the Bankruptcy Code
4    appropriate, to control or revise the processes by which
5    investors can operate. Right now we're operating in the
6    framework that it does not permit a division of a claim based
7    on the price at which the holder of the claim achieved that
8    interest. Not to mention that it's 4 years after
9    confirmation and what's sought is a complete revision of the
10   confirmed plan, which has been affirmed on appeal and which
11   cannot be disturbed at this point. So that motion must be
12   denied. On the motion for the appointment of pre-final
13   decree equity committee, I will not belabor this record to
14   recite the very lengthy and difficult history of attempts by
15   Mr. Hayes to have this issue considered. I will adopt the
16   recitation that has been provided in the response to the
17   motion. Suffice it to say that Mr. Hayes has turned the
18   system inside and out to try to obtain this particular
19   relief. Whether or not he has raised the constitutional
20   dimensions, to the extent that there are any, of the issue he
21   has had his chance, more than once and over the course of
22   years, to assert this position and it is time to stop  There
23   is no opportunity in this system to keep coming back to the
24   same issue. The same party, the same issue, the same
25   response. The response being that there was no entitlement

26

1    to have the estate pay for representation of equity in this
2    case.  There was every opportunity to retain representation.
3    Mr. Hayes, for one, chose to present his case on his own.  He
4    was heard at confirmation, he was heard on appeal at various
5    junctures.  Enough is enough.  Indeed there is the need for
6    sanctions, there is a need to impress upon Mr. Hayes the fact
7    that he cannot continue to try to assert issues in the
8    Bankruptcy Court, or in the District Court, or in the Court
9    of Appeals, without consequences.  Once you have an answer to
10   a question that you raise, a basic tenet of of our court
11   system, or our jurisprudence, is that you cannot continue to
12   come back to assert those issues again, and again, and again.
13   The consequence here, and I do rely on 105, indeed if 1470, I
14   think it is, is available, then that may also be a basis.
15   The kinds of activities that are seen here are clearly in
16   line with the proscription of that statute.  I'm sorry, 1927
17   I don't know where I got 1940.  Where a litigant unreasonably
18   and vexatiously multiplies the proceedings.  That's exactly
19   what we have here.  But even if, and there is frankly
20   reasonable basis to conclude that a Bankruptcy Court is not
21   quote, "any court of the United States", unquote, only
22   because - - and this I'm going on memory, I think it's 28 USC
23   451, I'm not positive about that cite - - defines, quote,
24   "any court of the United States", unquote, for purposes of
25   this statute.  And that statute does not include Bankruptcy

RD236

27

1   Courts. One could argue that it should, but nevertheless,

2   that kind of analysis is fairly straightforward. It's, you

3   know, not too complicated, and does cause a shadow to be

4   placed upon the application of this statute by the Bankruptcy

5   Court. Nevertheless, counsel is certainly correct to reflect

6   that 105 offers, and indeed I think compels, a Bankruptcy

7   Court to control proceedings, and to address issues of

8   vexatious and unreasonable litigation. And indeed it

9   dovetails on the Chambers' expressions in - - offered by the

10  United States Supreme Court. And there has been, I think, I

11  could be wrong on this, but I think unanimous support for the

12  proposition that Chambers and its recitation of the inherent

13  authority of all Federal Courts, where the tools otherwise

14  available are not present to rely on its inherent authority

15  to control the processes in its court, and that includes, for

16  instance, and I think this was the context of the Chambers

17  decision, the imposition of attorney's fees where litigation

18  is unreasonable and vexatious, to use the words of 1927. So

19  I think that that sanction is appropriate in this case. I

20  will ask counsel to submit affidavits of services, and of

21  course with a copy to Mr. Hayes. Mr. Hayes may respond in

22  terms of the amount of attorneys fees sought by the

23  responders, and I will then enter an award on the papers. I

24  don't believe there will be a need to address, by further

25  argument, any issues  So I would ask that the affidavit of

28

1    services be filed within 20 days, perhaps.  If that's doable.

2            MR. SILBERGLIED: We can certainly do that, Your

3    Honor.

4            THE COURT: And then Mr. Hayes, you're welcome to

5    take another 15 days to respond to those affidavits, if you

6    choose to do that.  Any questions?

7            MR. HAYES: May I be heard?

8            THE COURT: Your last comment, sir.  Come on up

9            MR. HAYES: Before you assess sanctions, I would

10   request that you refer to the case in re: <u>Ken Davis Holdings</u>

11   <u>Company</u> 249 f3rd 383, 5th Circuit, 2001.  I mean, this was an

12   issue that was at the heart of that case.

13           THE COURT: I'll gladly refer to it.  I stand by my

14   ruling.  If I look at that case, and I see that there's some

15   basis to depart from it, I will do that.  I believe I'm

16   familiar with the case.  Could you give me the name of it

17   again?

18           MR. HAYES: In re: <u>Ken Davis</u>, d-a-v-i-s, <u>Holdings</u>

19   <u>Company</u>.

20           THE COURT: Oh, no.

21           MR. HAYES: 249 f3rd 383.  It's an Oklahoma

22   bankruptcy case.

23           THE COURT: Actually no, I don't recall it.  I will

24   tell you that I've certainly looked closely at this issue,

25   generally and extensively over time.  So the issue is not new

29

1    to me. The 1927 issue, the inherent authority issue, the 105

2    aspects, the 9011 aspects, these are areas, these are

3    subjects that come up, as you might imagine, and I'm quite

4    confident that this is the quintessential case for the

5    application of sanctions. It is meant to, as I said, impress

6    upon you that you cannot return again and again without

7    consequences. Where the issues are the same, where you're

8    seeking the same relief, and where - - I don't want it

9    reargued now. I'm done. And I've ruled. And I thank you

10   all. If there's nothing else, the matter is adjourned.

11        MR SILBERGLIED: Thank you, Your Honor.

12        (Whereupon at 10:13 a.m. the hearing in this matter was

13   concluded for this date.)

14

15

16

17

18

19        I, Jennifer Ryan Enslen, approved transcriber for

20   the United States Courts, certify that the foregoing is a

21   correct transcript from the electronic sound recording of the

22   proceedings in the above-entitled matter.

23

24   _____          _____
     Jennifer Ryan Enslen
     18 Bar Drive
     Newark, DE 19702
     (302) 836-1905

# EXHIBIT D

RD240

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
---------------------------------------------------x
In re:                                  :      Chapter 11
                                        :
GENESIS HEALTH VENTURES, INC., :      Case No. 00-2692 (PJW)
et al.,                                 :
                                        :
              Reorganized Debtors.      :
---------------------------------------------------x
```

**ORDER GRANTING REORGANIZED DEBTORS AND MELLON BANK, N.A.'S
CROSS MOTION FOR THE ENTRY OF AN ORDER (A) IMPOSING FURTHER
MONETARY SANCTIONS AGAINST MR. HAYES, (B) BARRING MR. HAYES FROM
FILING ADDITIONAL PLEADINGS IN THIS CASE AND (C) RELIEVING THE
REORGANIZED DEBTORS AND MELLON OF THEIR OBLIGATION TO RESPOND
TO ANY ADDITIONAL PLEADINGS FILED BY MR. HAYES AND DENYING HAYES'
"MOTION FOR STAY OF ORDER GRANTING REORGANIZED DEBTORS'
CROSS MOTION FOR SANCTIONS FOR THE PENDENCY OF THE APPEAL"**

Upon consideration of the (1) *Motion for a Stay of Order Granting Reorganized*

*Debtors' Cross Motion for Sanctions for the Pendency of the Appeal,* filed by James J. Hayes on

March 15, 2006 (the "Stay Motion"); (2) *Reorganized Debtors' (I) Objection to "Motion for Stay*

*of Order Granting Reorganized Debtors' Cross Motion for Sanctions for the Pendency of the*

*Appeal" and (II) Cross Motion for the Entry of an Order (a) Imposing Further Monetary*

*Sanctions Against Mr. Hayes, (b) Barring Mr. Hayes from Filing Additional Pleadings in this*

*Case and (c) Relieving the Reorganized Debtors of their Obligation to Respond to any*

*Additional Pleadings Filed by Mr. Hayes* (the "Cross Motion"); and (3) *Mellon Bank, N.A.'s*

*Joinder in Reorganized Debtors' (I) Objection to Hayes' Motion to Stay Order Granting*

*Sanctions and (II) Cross-Motion for Further Sanctions*; the Court having reviewed the Stay

Motion and the Cross Motion and all pleadings relating thereto; the Court finding that (a) the

Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2), (c) notice of the motions were proper and

sufficient under the circumstances, and the Court having determined that just cause exists for the relief granted herein; and the Court having found that good and sufficient cause exists for denying the Stay Motion and for granting the Cross Motion and, it is hereby

ORDERED that the Stay Motion is denied; and it is further

ORDERED that the Cross Motion is granted; and it is further

ORDERED that Mr. Hayes shall not file any future pleadings in this case without first obtaining leave of the Court to file said pleading; and it is further

ORDERED that the Reorganized Debtors and Mellon Bank, as administrative agent for the Senior Lenders ("Mellon"), shall not be required to respond to any pleading filed by Mr. Hayes in this Court unless an order from this Court is entered directing the Reorganized Debtors or Mellon to respond to said pleading; and it is further

ORDERED that attorneys fees and costs are awarded to: (1) the Reorganized Debtors in the amount of _____ and (2) Mellon in the amount of _____. Mr. Hayes shall pay such fees and costs within 10 business days of the entry of this order, and send them to, respectively, Russell C. Silberglied, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801, on behalf of the Reorganized Debtors, and Menachem O Zelmanovitz, Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, NY 10178, on behalf of Mellon.

Dated: _____, 2006
     Wilmington, Delaware

                                      _____
                                      THE HONORABLE PETER J. WALSH
                                      UNITED STATES BANKRUPTCY JUDGE

2

                                                   **RD242**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------x
                                             :      Chapter 11
                                             :
In re:                                       :
                                             :      Case No. 00-2692 (PJW)
GENESIS HEALTH VENTURES, INC.,               :
                                             :
                                             :
            Reorganized Debtor.              :
---------------------------------------------x

**MELLON BANK, N.A.'s JOINDER IN REORGANIZED
DEBTORS' (I) OBJECTION TO "MOTION FOR STAY OF ORDER GRANTING
REORGANIZED DEBTORS' CROSS MOTION FOR SANCTIONS FOR THE
PENDENCY OF THE APPEAL" AND (II) CROSS MOTION FOR THE ENTRY OF AN
ORDER (A) IMPOSING FURTHER MONETARY SANCTIONS AGAINST MR.
HAYES, (B) BARRING MR. HAYES FROM FILING ADDITIONAL PLEADINGS IN
THIS CASE AND (C) RELIEVING THE REOGRANIZED DEBTORS OF THEIR
OBLIGATION TO RESPOND TO ANY ADDITIONAL PLEADINGS
FILED BY MR. HAYES**

Mellon Bank, N.A. ("Mellon"), by its counsel, Morgan, Lewis & Bockius LLP

and Klett Rooney Lieber & Schorling P.C., joining in the Reorganized Debtors' (I) Objection To

"Motion For Stay Of Order Granting Reorganized Debtors' Cross Motion For Sanctions For The

Pendency Of The Appeal" And (II) Cross-Motion For The Entry Of An Order (A) Imposing

Further Monetary Sanctions Against Mr. Hayes, (B) Barring Mr. Hayes From Filing Additional

Pleadings In This Case And (C) Relieving The Reorganized Debtors Of Their Obligation To

Respond To Any Additional Pleadings Filed By Mr. Hayes (the "Objection and Cross-Motion"),

respectfully represents as follows:

1.     Mellon acted as administrative agent for the senior secured lenders (the

"Senior Lenders") under the prepetition and post-petition credit agreements of Genesis Health

Ventures, Inc. and its affiliates (the "Reorganized Debtors").

65643                                                                          RD243

2.    Pursuant to an Order dated March 2, 2006, this Court denied the motions by Mr. James Hayes for the appointment of a pre-final decree equity committee and for reconsideration of the orders allowing the Senior Lenders' claims in the Reorganized Debtors' bankruptcy cases, and granted sanctions in the amount of $20,000 ($15,000 payable to Mellon for the benefit of the Senior Lenders) against Mr. Hayes for his continuing vexatious litigation (the "Order").

3.    Mr. Hayes appealed from the Order[1] and further filed a patently frivolous motion to stay said Order pending the appeal (the "Stay Motion").

4.    Although Mr. Hayes served Mellon with a copy of his notice of appeal, he failed to serve Mellon with the Stay Motion, despite the fact that he sought to directly affect thereby the right and interests of Mellon and the Senior Lenders.[2]

5.    In addition to its procedural deficiency, Mr. Hayes' Stay Motion, is substantively devoid of any merit. In order not to burden the Court with repetitious pleadings, Mellon hereby joins and incorporates herein the Reorganized Debtors' Objection and Cross-Motion.

6.    Accordingly, Mellon requests that the Court deny Mr. Hayes' Stay Motion, grant the Reorganized Debtors' and Mellon's cross-motion and impose appropriate

---

[1] Although Mr. Hayes filed his notice of appeal from the Court's oral determination at the hearing held on January 19, 2006, under Fed. R. Bankr P. 8002(a), the notice of appeal is to be treated as filed after entry of the written Order on March 2, 2006.

[2] Mr. Hayes also filed a similarly baseless motion with the District Court to stay briefing on his appeal, which motion he again failed to serve on Mellon.

sanctions upon Mr. Hayes, together with such other and further relief as this Court deems just and proper.

Dated: March 30ᵗʰ, 2006
      Wilmington, Delaware

                    **KLETT ROONEY LIEBER & SCHORLING**
                    **A Professional Corporation**

                    Teresa K.D. Currier (8080)
                    The Brandywine Building
                    1000 West Street, Suite 1410
                    Wilmington, Delaware  19801
                    (302) 552-4200

                            -and-

                    Richard S. Toder
                    Menachem O. Zelmanovitz
                    MORGAN, LEWIS & BOCKIUS LLP
                    101 Park Avenue
                    New York, New York  10178
                    (212) 309-6000

                    Attorneys for Mellon Bank, N.A.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          .  Chapter 11
                                .
GENESIS HEALTH VENTURES, INC., .  Case No. 00-2692(JHW)
et al.,                         .
                                .
        Reorganized Debtors. .
                                .
_____.
IN RE:                          .  Chapter 11
                                .
GENESIS ELDERCARE CORP.         .  Case No. 00-2564(JHW)
                                .
                                .
        Reorganized Debtors. .
_____.
IN RE:                          .  Chapter 11
                                .
NORRISTOWN NURSING AND          .  Case No. 00-2716(JHW)
REHABILITATION ASSOCIATES, L.P..
                                .
                                .
        Reorganized Debtors. .  January 19, 2006
                                .  9:30 a.m.
                                .  (Wilmington)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH H. WIZMUR
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1           THE CLERK: All rise.

2           THE COURT: Please be seated.

3           MR. SILBERGLIED: Good morning, Your Honor.

4           THE COURT: Good morning.

5           MR. SILBERGLIED: For the record, Russ Silberglied

6    of Richards, Layton, and Finger on behalf of the Reorganized

7    Debtors.  We have a short agenda for today.  The first matter

8    on the agenda is continued.  A brief word as to why it's

9    continued in case Your Honor wanted an update, that is the

10   motion for entry of a final decree itself.  The US Trustee

11   has pointed out that there are some quarterly operating

12   reports that were not filed, and we are working with the

13   company to get those quarterly operating reports filed.

14   There's been a series of post confirmation transactions at

15   the company, so employees are a little bit harder to find

16   than they once were.  But we're working on it, and we hope to

17   go forward with that at the next hearing which actually Ms.

18   Collins reminded me on our way over here we don't have a next

19   hearing.  So I don't know if Your Honor knows the next time

20   you're going to be in Delaware.

21           THE COURT: Turns out March 2nd might work.  I might

22   be here on February 16th.  It sounds like March 2nd might be

23   better for you.

24           MR. SILBERGLIED: March 2nd would be fine.  Thank

25   you, Your Honor.

1            THE COURT: Let's make that 9 o'clock.

2            MR. SILBERGLIED: Thank you, Your Honor.  The next

3    two items on the agenda are both motions of Mr. Hayes.  He's

4    here.  The first is with respect to the lenders themselves,

5    and the second is with respect to the appointment of an

6    equity committee, so I will cede the podium to Mr. Hayes.

7            THE COURT: Mr. Hayes.

8            MR. HAYES: Good morning, Your Honor.

9            THE COURT: Good morning.  You've filed 2 motions.

10   One, to reconsider the order allowing the senior lender

11   claims and two, to appoint an equity security committee.  At

12   this point I am more than puzzled, disturbed, by these

13   motions, because, as I've read the amazing post confirmation

14   history of these issues, I'm appalled, really, that the

15   issues are coming back.  And I say that with an understanding

16   that the reconsideration motion on the claims is really aimed

17   at, from your description of what you're looking for, a

18   restructuring of the plan, a re-prioritization of the

19   position of the secured lenders, a focus on your claim of

20   windfall on their part, of unfairness, of improper

21   allocations, and an adjustment of claims on those bases.  In

22   terms of the equity security holder committee, it was well

23   laid out by the objection to your motion that you - - this is

24   the 4th time that you're here on that.  Not - - perhaps 3

25   times before the Bankruptcy Court and one before the District

4

1    Court, with appeals to the Circuit.  I'm not sure about the

2    status of the last appeal.  That was apparently filed on the

3    denial of the District Court I think for - - on the motion

4    for appointment of an equity security committee.  I could be

5    corrected on that.  But you've been there, you've done that,

6    you've been denied your relief.  Why should I consider this

7    again?  What's different now?  How many times, how many bites

8    at the apple do you get?

9         MR. HAYES: Your Honor, the equity clients in this

10   - - throughout this bankruptcy has been denied

11   representation.  I don't think there's any dispute that at no

12   point - - at not time in the bankruptcy has the equity

13   interest been represented.  That is - -

14        THE COURT: Well, the equity interest has appeared

15   and been heard in - - at the confirmation hearing.  You,

16   yourself, presented objection to the plan, and your concerns

17   were addressed and denied.  Your contention is not that there

18   has been no opportunity to be heard - -

19        MR. HAYES: No.

20        THE COURT:  - - but no opportunity to be paid from

21   the estate for legal fees.

22        MR. HAYES: The equity class has not been adequately

23   represented.

24        THE COURT: Do you contend that there is an absolute

25   right to representation paid for by the estate in every case

1  for equity?

2         MR. HAYES: No.  But in this case, since there was

3  no - - I mean, adequate representation, there are a number of

4  ways that it can be provided.  The normal way, I mean, you

5  know, the shareholders are normally represented by company

6  management who has a fiduciary obligation to represent

7  shareholders interests.  And in a normal case, the company

8  officers, in fulfillment of the fiduciary obligations provide

9  representations for the equity class.  I mean, in the recent

10 Morale (phonetic) bankruptcy, which I cited, the chairman of

11 the company, Chairman Schwartz, argued that the valuations

12 prepared by the investment bankers were low.  But in this

13 case, which is rather unusual, the officers of the company

14 have now been charged with conspiracy to commit fraud.

15        THE COURT: Have now been charged in the Haskell

16 (phonetic) matter?  Is that what they're - -

17        MR. HAYES: Well, that was the allegations.

18        THE COURT: Those are - -

19        MR. HAYES: In the Haskell matter.

20        THE COURT:  - - the allegations, and that complaint

21 I dismissed, I believe.

22        MR. HAYES: But you - -

23        THE COURT: I think the District Court has affirmed,

24 if I'm not incorrect.

25        MR. SILBERGLIED: No, Your Honor.  We're in the

1   middle of briefing in the District Court.

2           THE COURT: I see.  So that's under appeal.

3           MR. HAYES: But your dismissal didn't address any of

4   the allegations.

5           THE COURT: That's correct.  So how can I address

6   the allegations here.  There were issues of *res judicata* and

7   collateral estoppel.  Issues under 1144.  What's different

8   here?  Why − −

9           MR. HAYES: Well, the shareholders have a

10  constitutional right.  Among all the creditors and

11  participants, the shareholders are the only ones whose

12  property rights are protected by the 5th Amendment of the

13  Constitution.  And as − −

14          THE COURT: And have you − −

15          MR. HAYES:  − − a protected right − −

16          THE COURT:  − − addressed that issue before?  Have

17  you − − is this the first time that you've raised the

18  constitutional dimensions of the shareholders opportunities?

19          MR. HAYES: I have attempted to raise it throughout.

20  But none − −

21          THE COURT: And you've been rejected.

22          MR. HAYES:  − − of the courts − −

23          THE COURT: Have you not?

24          MR. HAYES: None of the courts have addressed the

25  constitutional issue.

1          THE COURT: So that because they didn't address the

2     constitutional issue, because they decided that you were not

3     entitled, for any reason, to assert, because - - for a number

4     of reasons, including the timing of your request, that you

5     were not entitled to an equity security committee, including

6     back in September of 2001, including as late as May of 2004,

7     all of those times you had the opportunity - - you raised - -

8     you took the opportunity, whether you had it or not is

9     another question, you took the opportunity to raise the issue

10    of equity security committee on various grounds.  I don't

11    recall that you raised the constitutional grounds in front of

12    me, but you might have raised it otherwise.  It doesn't

13    matter whether it was taken up or not.  You're quite right to

14    assert that as a basic proposition constitutional issues

15    don't go away by the passage of time.  That's a valid

16    proposition.  But in this context you can't just keep coming

17    back and thinking up new theories to raise the same request

18    for relief that you have all along.

19          MR. HAYES: I'm not raising new theories.  I mean,

20    both the law and the constitution require that adequate

21    representation be provided to the equity class.  No court has

22    said that the equity class has been provided adequate

23    representation.

24          THE COURT: There has, there was - - I did say, in

25    my confirmation opinion, that the value in the company - -

1   you may disagree with it, other people have disagreed with it

2   - - the proofs as I found them to be were that there was no

3   value to reach equity, and therefore equity could be - - the

4   plan as proposed could be confirmed, and the plan proposed

5   that there would be no distribution to equity.  That was the

6   decision.  If - - and that's the decision, I believe, was

7   appealed and approved.  And there it stands right or wrong.

8   And nobody can say whether a particular decision, in

9   retrospect, was right or wrong.  But there it stands as a

10  final judgment.  If that's so, then how can we say that the

11  equity was not adequately represented?

12          MR. HAYES: Well, adequate representation requires

13  some form of representation.

14          THE COURT: Well you represented the equity, didn't

15  you?  I mean you - -

16          MR. HAYES: I - -

17          THE COURT:  - - took it upon yourself.

18          MR. HAYES: Well nobody has said that it's adequate.

19  Everybody is saying my representation has been quite

20  inadequate.

21          THE COURT: Did you contemplate hiring an attorney

22  to help you make your presentation in the first instance?

23          MR. HAYES: Yes I did.  I have talked to attorneys.

24          THE COURT: Um-hum.

25          MR. HAYES: $34 million is spent on professional

1    fees in this case.  I'm an individual shareholder.  I am not

2    wealthy.  As part of adequate representation is having

3    representation equivalent to what, to what the other side

4    has.  And I - - even if I'm considered to be representing, I

5    - - and I guess I don't see objecting.  When I objected, I

6    didn't have any - - couldn't cross examine a witness,

7    couldn't present any evidence, couldn't do anything but

8    complain.

9             THE COURT: You didn't have the chance to cross

10   examine witnesses or - -

11            MR. HAYES: No.

12            THE COURT:  - - at the hearing?  At the

13   confirmation hearing?

14            MR. HAYES: No.

15            THE COURT: Did you - -

16            MR. HAYES:  All the objectors were told that their

17   objections would be heard at the end of the proceeding.  I

18   mean, it was kind of a - -

19            THE COURT: There was testimony presented, cross

20   examination of witnesses.  Did you stand up and say, I would

21   like to cross examine a particular witness?

22            MR. HAYES: No.  Because the Debtors' counsel said

23   - - told me what the procedure was.

24            THE COURT: I see.

25            MR. HAYES: Even the objectors - - well.

1        THE COURT: We did consider experts presented by

2   some of the objectors. Let me remind myself that - -

3        MR. HAYES: But they weren't equity members.

4        THE COURT: They weren't equity. Did you have - -

5   do you understand that you had a chance to present expert

6   witnesses if you chose to do that?

7        MR. HAYES: No I didn't.

8        THE COURT: Let me ask you another question just to

9   round out the record. Before - - when was the first time

10  that you raised the issue of an equity committee? You'll

11  recall that you filed a motion before confirmation that was

12  ruled on in the context of confirmation asking for that

13  relief. That was in August of 2001. Did you raise the issue

14  before then?

15       MR. HAYES: The issue of an equity committee?

16       THE COURT: Yes.

17       MR. HAYES: No. I raised the issue of an equity

18  committee after - - immediately - - fairly soon after I had

19  gotten the disclosure statement that indicated that

20  shareholders were not going to participate in the

21  distribution. And I - - and almost on the same day. It was

22  kind of fortuitous. I'm not an attorney, and I don't - - I'm

23  an investor. I don't follow the bankruptcies of the

24  companies I happen to own. But it was somewhat fortuitous

25  that I was notified of the bankruptcy at the same time that I

1    had gotten a new copy of my Investor's Daily Graphs

2    (phonetic). As a part of the daily graphs, it shows stock

3    appreciation at certain indexes. And the leading performer

4    had been the healthcare index. And that's when I started

5    looking, reading the disclosure statement. Seeing that the

6    valuation of the company was done in April, and that since

7    April, the Healthcare index that I was looking at had

8    appreciated by 60%. I mean that told - - that significant

9    thing said, you know, everything in this disclosure statement

10   is inaccurate. Everything that it's based on.

11           THE COURT: And you did address me at confirmation,

12   did you not?

13           MR. HAYES: Yes.

14           THE COURT: And I considered your comments. Let me

15   ask you this, you've - - the level of litigation that you've

16   conducted since then is quite impressive. You've traveled to

17   the District Court and to the Court of Appeals. On several

18   occasions you've asked for *en banc* consideration. You've

19   tried to have the Supreme Court weigh in on these issues.

20   You've really tried to exhaust your opportunities to have

21   these issues considered. How can I - - why wouldn't the - -

22   the attorneys are seeking sanctions against you saying enough

23   is enough, he's dragging us into this again, we've briefed

24   these issues up and down the chart of the Federal court

25   system, and we've received the same answer. Why shouldn't we

1    impose upon Mr. Hayes to pay our court fees at this point in

2    light of the fact that he's dragging us, again, yet again,

3    into court?  What's my answer to that?  Why shouldn't I say,

4    You know, you're right?  I'm amazed at this history of up and

5    down.  And back again.

6           MR. HAYES: I think their motion for sanctions is

7    completely out of order at this time.

8           THE COURT: Why?

9           MR. HAYES: Because it's prejudicing the Court

10   against the merits of the case.

11          THE COURT: In other words, I shouldn't consider the

12   fact that this - - these issues have been up and down and

13   around and through?  That these issues have been - - don't I

14   have to consider that?  Isn't there such a thing as finality,

15   and principles that govern the way that we do business in the

16   court system?

17          MR. HAYES: You know, there cannot be any finality

18   until the courts address the constitutional issues.  Let me

19   - - this isn't in my brief, but it's part of what I prepared.

20   This Court cannot avoid the constitutional issues of adequate

21   representation of the equity clients.  In <u>Marlboro versus</u>

22   <u>Madison</u> (phonetic) Chief Justice Marshall's opinion stated,

23   It is emphatically the province and the duty of the judicial

24   department to say what the law is.  Those who apply the rules

25   to a particular case must, of necessity, expound and

1  interpret that rule.  If two laws conflict with each other,

2  the courts must decide on the operation of each.  So if a law

3  be in opposition to the constitution and both the law and the

4  constitution apply to a particular case so that the court

5  must either decide that a case conforming to the law,

6  disregarding the constitution, or conforming to the

7  constitution disregarding the law, the court must decide

8  which of these conflicting rules govern the case.  This is

9  the very essence of judicial duty.  None of the courts have

10  addressed one, whether the 5th Amendment applies to, or

11  whether the property of an equity holder is the property

12  that's under the definition of the 5th Amendment.  There's no

13  opinion that talks about whether adequate representation is

14  required by the constitution.  About what adequate

15  representation is.

16          THE COURT: Understood.  Thank you Mr. Hayes.

17          MR. SILBERGLIED: For the record again, Russ

18  Silberglied on behalf of Genesis.  I'm not going to take a

19  lot of time, Your Honor.  I'm going to respond to a couple of

20  points briefly, and then talk about the sanctions motion.  I

21  don't think Your Honor needs to hear much more from me about

22  the background of this, because it's quite clear Your Honor

23  has read the papers.  A couple of points raised by Mr. Hayes.

24  One, this issue of nobody has addressed the constitutional

25  argument.  Leaving aside for a minute that there simply is no

1    constitutional argument here, and it's not a constitutional

2    issue, let's leave that aside for a moment. I believe what

3    Mr. Hayes read is word for word out of his brief to the 3rd

4    Circuit Court of Appeals. He briefed this to the 3rd Circuit

5    Court of Appeals. I don't recall specifically on what

6    grounds the 3rd Circuit rejected his argument, but suffice it

7    to say it did. It rejected it again *en banc*. He made the

8    same constitutional argument in his petition for cert.

9    (phonetic) to the United States Supreme Court, and cert. was

10   denied. This issue is finished. It's not equitably moot,

11   it's actually moot in the words of Judge Farnan. Second,

12   Your Honor, the point that Mr. Hayes made that he couldn't

13   cross examine witnesses and that he couldn't present

14   evidence. Frankly I don't remember whether he cross examined

15   or not, it's too long ago in my memory to remember that level

16   of detail. I do remember that he made oral argument. I do

17   remember, obviously, that counsel for Mr. Grimes, counsel for

18   GMS cross examined our witnesses and put on their own

19   witnesses as well. Cross examined Mr. Zelmonvitz's witnesses

20   as well. And what I would additionally add to the record,

21   Your Honor might recall that Mr. Hayes in fact did attempt to

22   introduce evidence to this Court in the form of the famous

23   cartoons that he submitted. Not only did Your Honor admit

24   those cartoons into evidence, but Your Honor - - but Mr.

25   Hayes has also attached them to pretty much every appellate

1    brief he has filed since then.  So it's flatly incorrect that

2    he didn't have the opportunity to present evidence.  It's

3    flatly incorrect that he didn't present evidence.  So I will,

4    then, skip over, in the remainder of my argument, why his two

5    motions today ought to be denied.  I'm sure Mr. Zelmonvitz

6    might want to say something more on the motion leveled to his

7    client.  I'm going to skip right to the sanctions portion,

8    unless Your Honor has questions about the first portion.

9            THE COURT: Please proceed.

10           MR. SILBERGLIED: Thank you, Your Honor.  You know,

11   in short this does has to stop.  Have to stop, excuse me.  It

12   doesn't cost Mr. Hayes anything to file these motions because

13   he's not paying an attorney, but it most assuredly does cost

14   my client something.  Courts expect responses.  And that

15   means that my client must pay me or Weil Gotshal or somebody

16   else to respond to these motions.  And it is inflicting a

17   cost upon us.  It's inflicting a cost also on the federal

18   system because Your Honor has to keep hearing these, the

19   District Court has to keep hearing these, the 3rd Circuit has

20   to keep hearing these.  And in short Mr. Hayes needs a

21   message that this is time to stop.  If Your Honor has any

22   doubts whatsoever about what Mr. Hayes' intentions are if he

23   is not sanctioned today, all you have to do is open up to

24   paragraph 14 of his motion itself, and look at the sentence

25   that starts in the second to last line of page 6 in paragraph

1   14 where he says, quote, "Ratification of the - - and this is

2   the motion for today.  Quote, "Ratification of the

3   confirmation by an equity committee would set the stage for a

4   final decree that would really be final and not just another

5   intermediate point in this saga." End quote.  In other

6   words, he has absolutely no intention of letting a final

7   decree, if entered by Your Honor at the March hearing, stand

8   in his way of continuing to file these motions.  He thinks

9   that that would be an intermediate point in the saga.  That's

10  exactly why we need an order from your court awarding

11  sanctions.

12          THE COURT: As a point of procedure, if the appeals

13  are still pending, what opportunities do I have to enter a

14  final decree?

15          MR. SILBERGLIED: And that's - - perhaps that's for

16  the March hearing.  We have put that in the motion.  That

17  there was case law on the subject of being able to enter a

18  final decree when there's nothing currently pending in the

19  Bankruptcy Court as opposed to things that are on appeal to

20  appellate courts from the Bankruptcy Court.  While I guess I

21  didn't necessarily spell it - - there are cases - -

22          THE COURT: I'm sure there are, and - -

23          MR. SILBERGLIED:  - - and they're cited in that

24  motion.

25          THE COURT:  - - I'm not deciding the issue.  My

1    facial expression is that there may be some doubt on the

2    issue since the jurisdictional opportunity to hear the case

3    comes up as it's opened, as it's referred from the District

4    Court.  And so it's an interesting issue.

5         MR. SILBERGLIED: Well, understood, Your Honor.  And

6    I'll be prepared to speak more to those cases at the March

7    hearing.  But suffice it to say that I believe the proper

8    remedy would be - - we really don't think the Haskell case is

9    coming back.  We really don't think that the Hayes motion is

10   coming back on remand.  But that's my opinion, obviously.  If

11   it does, there's always the ability to reopen the bankruptcy

12   case.  Just as if somebody needs to file a motion.  You know,

13   if you enter the final decree in March and some creditor

14   comes and violates the confirmation order, and violates the

15   discharge injunction in May, well then what I would do, like

16   is done in many, many cases, is I would file a motion that

17   asks for the Court to reopen the case for the sole purposes

18   of hearing a motion for sanctions for violating discharge

19   injunction and confirmation order, or something of the like.

20        THE COURT: Yeah.  You've cited §1927 - -

21        MR. SILBERGLIED: Yes, Your Honor.

22        THE COURT:  - - of Title 28 as a basis for awarding

23   sanctions, and you're aware that there is some controversy

24   about whether the Bankruptcy Court qualifies as any court of

25   the United States.  There is case law around the country that

1   disagrees with that proposition.  I gather that you're also

2   relying, for instance, on the United States Supreme Court

3   Chambers case for inherent authority of a court to address an

4   abuse of the process, if you will.  In a limited way.

5   Because we're not talking about 9011, it's not a separate

6   motion.  Well, it is, I guess.  But it's - -

7          MR. SILBERGLIED: It's a cross motion.  It is a

8   separate motion.  I mean, we could have done it as 9011.

9   Frankly, Your Honor, the main reason why we didn't do 9011 is

10  because the hearing was in 2 weeks, and 9011 doesn't

11  translate that well to a contested matter in a Bankruptcy

12  Court because you have to give it 20 days safe - - I think

13  it's 20 days - - whatever it is safe harbor notice.  We would

14  have been more than happy to file a safe harbor notice and

15  proceed under 9011, but we didn't have sufficient time before

16  today's hearing.  I think that the principles of 9011 apply.

17  I think 1927 itself, there is case law that supports it under

18  - -

19          THE COURT: I don't recall that the 3rd Circuit has

20  ever weighed in on the issue of whether a Bankruptcy Court

21  can utilize 1927.  Am I right?

22          MR. SILBERGLIED: You're right, Your Honor.  Or, at

23  least we uncovered no such case.

24          THE COURT: Yeah.  I'm not aware of any, but anyhow.

25          MR. SILBERGLIED: So there are those principles.

RD263

1  And, you know, and of course there is the inherent power of

2  the Court, and there's equitable principles in 105 for Your

3  Honor to be able to control your own docket. And as we just

4  read from paragraph 14 of Mr. Hayes own motion, he's

5  admitting to the Court that he's going to keep filing

6  motions. And I think that, you know, 105 would also support

7  -- would support the issue in terms of the Court controlling

8  its own docket.

9          THE COURT: Indeed it would. I'm confident of that.

10  Thank you Mr. Silberglied.

11          MR. SILBERGLIED: Thank you, Your Honor.

12          THE COURT: Other comments? Sir.

13          MR. ZELMONVITZ: Menachem Zelmonvitz of Morgan Lewis

14  on behalf of Mellon Bank, the agent for the senior lenders.

15  I'll be very brief, Your Honor. I just wanted to touch on

16  first of all the reconsideration motion, which is addressed

17  not only to our clients, but also actually to our opponents

18  in the Haskell litigation. Because he's seeking to

19  essentially have their claims also reconsidered. The basic

20  requirement, as we've noted in our short objection, is that

21  there has to be cause for reconsideration. Absolutely no

22  cause has been shown. The only one even suggested would be

23  either the Haskell litigation, which has been dismissed, and

24  secondly really the ability of some of the senior lenders, or

25  the other lenders, who have gotten a so-called windfall. But

1    that is not the test.  As the 3rd Circuit has said, a claim is

2    determined by the consideration received by the Debtor, not

3    the amount paid by the current holder of the claim.  That's

4    been upheld by every case that I'm aware of.  So that if you

5    purchase a note, you're entitled to a claim in the amount of

6    that note, not the amount of what you paid for that

7    particular claim.

8            THE COURT: What about cause in terms of

9    constitutional impairment?

10           MR. ZELMONVITZ: Well that really deals with also

11   the equity committee motion.  And I don't understand where

12   there is a constitutional issue here.  There's a right to

13   counsel.  No one has deprived Mr. Hayes that right of

14   counsel.  He could have gone out and retained his own

15   counsel.  The issue here is do you pay for that counsel out

16   of the estate?  The estate was not his money.  The estate was

17   our client's money.  And that's what Your Honor actually

18   found in the valuation part of the confirmation hearing.  The

19   equity holders actually had no stake left in this company.

20   And therefore, it was not right to even suggest that they, or

21   their counsel, be paid from the estate.  No one deprived him

22   of counsel.  He had every right to go out and retain counsel.

23   Therefore, I don't see any issue here.  Any constitutional

24   issue here whatsoever.  And that was the second point which I

25   really wanted to get to, Your Honor.  And the final thing I

1   wanted to mention is what Your Honor touched upon on the

2   final decree. We actually had a conversation yesterday. The

3   senior lenders are, to some extent, a little bit concerned to

4   make sure that this Court retains jurisdiction until the

5   Haskell litigation is over and done with. We do agree with

6   Mr. Silberglied that there is law out there which would allow

7   for the reopening of the case in the unlikely event of a

8   remand, which we agree with Mr. Silberglied is very, very

9   unlikely. However, it may be for consideration by the Court

10  to at least leave one of the cases open so that there is

11  continuing jurisdiction. We can leave this of course for

12  further discussion for March 2nd.

13          THE COURT: Indeed.

14          MR. ZELMONVITZ: Thank you, Your Honor.

15          THE COURT: Thank you. If there are no other - -

16          MR. HAYES: May I respond to these?

17          THE COURT: You may, Mr. Hayes. Come on up. Last

18  comment.

19          MR. HAYES: On the motion for reconsideration. I

20  mean, they're misreading what I propose in the

21  reconsideration. I am not saying - - I am not reducing the

22  claims of the secondary purchasers. They're retaining their

23  claims. I'm just dividing a claim into 2 parts. That's the

24  reconsideration proposal. Part of the claim would be - -

25  maintain the same priority as it has now, what I call the

1    speculative part of the claim would still remain a claim.   It

2    would be given a lower priority in a separate class with all

3    the speculative claims, which include the subordinated note

4    holders and the shareholders.   So I'm not reducing the claim.

5    And in the very case that, the Richfield Property Case, I

6    mean this parallels the way in which a mortgage obligation

7    which was secured by property as treated.   A valuation of the

8    property was less than the mortgage, and part of the claim is

9    considered as secured and part of it is considered as

10   unsecured.   I mean, this parallels that in every respect.

11           THE COURT: Understood.

12           MR. HAYES: And the second thing on cause.   These

13   claims, the assertion is made in the cases cited that cause

14   has to be from a Rule 60 cause, because Rule 60 is the normal

15   means for reconsideration.   But that only applies in cases

16   where the claims were considered in the first place.   These

17   claims were never considered, these claims were merely

18   asserted as - - and it didn't come out until, as far as I

19   know, until the Haskell litigation, that the secondary

20   claims, or secondary transactions in the loans was to the

21   extent that it is.   I mean, Haskell they just - - 75% of the

22   senior loan were acquired secondarily.   That these senior

23   lenders, and these are the investment banks and these are the

24   defendants in the Haskell litigation, never paid Genesis

25   anything.   They acquired these claims in the secondary

1    market.  And the claims were, senior lender claims are like

2    $1.4 billion, and 75% of that, and the allegation is made or

3    alleged that these loans were picked up at 50¢ on the dollar.

4    I mean, that's a $500 million shift in priority of claims.

5    And it would allow money to fully compensate the other senior

6    lenders who I think that the bankruptcy laws are trying to

7    protect.  Creditors who actually provided capital to the

8    corporation and are trying to recover a hundred percent of

9    their claim, and are being prevented by doing so by

10   speculators who are asserting that their claim should be of

11   equal priority to those.

12           THE COURT: Thank you Mr. Hayes.

13           MR. HAYES: And - -

14           THE COURT: Did you - - go ahead.

15           MR. HAYES: And I think Mellon Bank has a conflict

16   of interest in representing only the defendants in the

17   Haskell litigation and ignoring the original senior lenders

18   who have a claim.  Because they would be very much in support

19   of this motion.

20           THE COURT: I don't see them here.  Thank you Mr.

21   Hayes.

22           MR. HAYES: But - -

23           THE COURT: That's enough.  Thank you, sir.  I read,

24   Mr. Hayes, your recitation and you've included these

25   comments, many of them, in your papers.  By these comments

1   you seek that I basically rewrite the Bankruptcy Code.  That

2   I inject my own sense of what I think is fair, what I think

3   is appropriate, what I think may have been unfair in the

4   process into the equation of who gets what and how.  That's

5   not the way it works.  I am duty bound to apply the

6   Bankruptcy Code as Congress has passed it, and that's what I

7   will do.  There are 2 motions presented here.  One is a

8   motion to reconsider the order allowing the Genesis and

9   Multicare senior lender claims.  And we understand that

10  502(j) requires that cause be established in order to justify

11  such a reconsideration, if you will, and no such cause has

12  been provided here.  One suggestion is that because there are

13  allegations in a complaint that has been dismissed that one

14  senior lender, or several senior lenders, who were senior

15  lenders at the time of the confirmation achieved their

16  position at a discount, that that is a basis to warrant a re-

17  prioritization of the entire plan that was confirmed over 4

18  years ago.  That's mind boggling.  That's not available as an

19  opportunity for relief.  There is no opportunity to

20  reclassify into speculative and non-speculative portions.

21  There's no provision of the Bankruptcy Code that allows for

22  that.  Indeed, out there in the marketplace this may be an

23  area that generates abuse of one sort or another.  There have

24  been all kinds of, I think, articles and concerns expressed

25  about transfers of claims, about manipulation of the process.

1    And indeed it may be a proper area of congressional review.

2    To determine whether any, excuse me, any control should be

3    applied, any modifications of the Bankruptcy Code

4    appropriate, to control or revise the processes by which

5    investors can operate.  Right now we're operating in the

6    framework that it does not permit a division of a claim based

7    on the price at which the holder of the claim achieved that

8    interest.  Not to mention that it's 4 years after

9    confirmation and what's sought is a complete revision of the

10   confirmed plan, which has been affirmed on appeal and which

11   cannot be disturbed at this point.  So that motion must be

12   denied.  On the motion for the appointment of pre-final

13   decree equity committee, I will not belabor this record to

14   recite the very lengthy and difficult history of attempts by

15   Mr. Hayes to have this issue considered.  I will adopt the

16   recitation that has been provided in the response to the

17   motion.  Suffice it to say that Mr. Hayes has turned the

18   system inside and out to try to obtain this particular

19   relief.  Whether or not he has raised the constitutional

20   dimensions, to the extent that there are any, of the issue he

21   has had his chance, more than once and over the course of

22   years, to assert this position and it is time to stop.  There

23   is no opportunity in this system to keep coming back to the

24   same issue.  The same party, the same issue, the same

25   response.  The response being that there was no entitlement

1    to have the estate pay for representation of equity in this

2    case.   There was every opportunity to retain representation.

3    Mr. Hayes, for one, chose to present his case on his own.   He

4    was heard at confirmation, he was heard on appeal at various

5    junctures.   Enough is enough.   Indeed there is the need for

6    sanctions, there is a need to impress upon Mr. Hayes the fact

7    that he cannot continue to try to assert issues in the

8    Bankruptcy Court, or in the District Court, or in the Court

9    of Appeals, without consequences.   Once you have an answer to

10   a question that you raise, a basic tenet of of our court

11   system, or our jurisprudence, is that you cannot continue to

12   come back to assert those issues again, and again, and again.

13   The consequence here, and I do rely on 105, indeed if 1470, I

14   think it is, is available, then that may also be a basis.

15   The kinds of activities that are seen here are clearly in

16   line with the proscription of that statute.   I'm sorry, 1927.

17   I don't know where I got 1940.   Where a litigant unreasonably

18   and vexatiously multiplies the proceedings.   That's exactly

19   what we have here.   But even if, and there is frankly

20   reasonable basis to conclude that a Bankruptcy Court is not

21   quote, "any court of the United States", unquote, only

22   because - - and this I'm going on memory, I think it's 28 USC

23   451, I'm not positive about that cite - - defines, quote,

24   "any court of the United States", unquote, for purposes of

25   this statute.   And that statute does not include Bankruptcy

27

1    Courts.  One could argue that it should, but nevertheless,

2    that kind of analysis is fairly straightforward.  It's, you

3    know, not too complicated, and does cause a shadow to be

4    placed upon the application of this statute by the Bankruptcy

5    Court.  Nevertheless, counsel is certainly correct to reflect

6    that 105 offers, and indeed I think compels, a Bankruptcy

7    Court to control proceedings, and to address issues of

8    vexatious and unreasonable litigation.  And indeed it

9    dovetails on the Chambers' expressions in - - offered by the

10   United States Supreme Court.  And there has been, I think, I

11   could be wrong on this, but I think unanimous support for the

12   proposition that Chambers and its recitation of the inherent

13   authority of all Federal Courts, where the tools otherwise

14   available are not present to rely on its inherent authority

15   to control the processes in its court, and that includes, for

16   instance, and I think this was the context of the Chambers

17   decision, the imposition of attorney's fees where litigation

18   is unreasonable and vexatious, to use the words of 1927.  So

19   I think that that sanction is appropriate in this case.  I

20   will ask counsel to submit affidavits of services, and of

21   course with a copy to Mr. Hayes.  Mr. Hayes may respond in

22   terms of the amount of attorneys fees sought by the

23   responders, and I will then enter an award on the papers.  I

24   don't believe there will be a need to address, by further

25   argument, any issues.  So I would ask that the affidavit of

1   services be filed within 20 days, perhaps.  If that's doable.

2         MR. SILBERGLIED: We can certainly do that, Your

3   Honor.

4         THE COURT: And then Mr. Hayes, you're welcome to

5   take another 15 days to respond to those affidavits, if you

6   choose to do that.  Any questions?

7         MR. HAYES: May I be heard?

8         THE COURT: Your last comment, sir.  Come on up.

9         MR. HAYES: Before you assess sanctions, I would

10  request that you refer to the case in re: <u>Ken Davis Holdings</u>

11  <u>Company</u> 249 f3rd 383, 5th Circuit, 2001.  I mean, this was an

12  issue that was at the heart of that case.

13        THE COURT: I'll gladly refer to it.  I stand by my

14  ruling.  If I look at that case, and I see that there's some

15  basis to depart from it, I will do that.  I believe I'm

16  familiar with the case.  Could you give me the name of it

17  again?

18        MR. HAYES: In re: <u>Ken Davis</u>, d-a-v-i-s, <u>Holdings</u>

19  <u>Company</u>.

20        THE COURT: Oh, no.

21        MR. HAYES: 249 f3rd 383.  It's an Oklahoma

22  bankruptcy case.

23        THE COURT: Actually no, I don't recall it.  I will

24  tell you that I've certainly looked closely at this issue,

25  generally and extensively over time.  So the issue is not new

1   to me.  The 1927 issue, the inherent authority issue, the 105

2   aspects, the 9011 aspects, these are areas, these are

3   subjects that come up, as you might imagine, and I'm quite

4   confident that this is the quintessential case for the

5   application of sanctions.  It is meant to, as I said, impress

6   upon you that you cannot return again and again without

7   consequences.  Where the issues are the same, where you're

8   seeking the same relief, and where - - I don't want it

9   reargued now.  I'm done.  And I've ruled.  And I thank you

10  all.  If there's nothing else, the matter is adjourned.

11          MR. SILBERGLIED: Thank you, Your Honor.

12      (Whereupon at 10:13 a.m. the hearing in this matter was

13  concluded for this date.)

14

15

16

17

18

19          I, Jennifer Ryan Enslen, approved transcriber for

20  the United States Courts, certify that the foregoing is a

21  correct transcript from the electronic sound recording of the

22  proceedings in the above-entitled matter.

23

24  _____                    _____  ..
    Jennifer Ryan Enslen
    18 Bar Drive
    Newark, DE 19702
    (302) 836-1905

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------x
In re:                                      :     Chapter 11
                                            :
GENESIS HEALTH VENTURES, INC.,              :     Case No. 00-2692 (JHW)
et al.,                                     :
                                            :     Re: Docket No. 2310
                  Reorganized Debtor.       :
                                            :
-------------------------------------------x
```

## ORDER GRANTING REORGANIZED DEBTORS' CROSS-MOTION FOR SANCTIONS AND DENYING (1) MOTION FOR RECONSIDERATION OF THE ORDERS ALLOWING THE GENESIS AND MULTICARE SENIOR LENDER CLAIMS; AND THE GENESIS AND MULTICARE SENIOR SUBORDINATED NOTE CLAIMS AND (2) MOTION FOR APPOINTMENT OF PRE-FINAL DECREE EQUITY COMMITTEE

Upon consideration of the (1) *Motion for Reconsideration of the Orders Allowing the Genesis and Multicare Senior Lender Claims; and the Genesis and Multicare Senior Subordinated Note Claims*, filed by James J Hayes on December 12, 2005 (the "Motion for Reconsideration") [Dkt No 2303]; (2) *Motion for Appointment of Pre-Final Decree Equity Committee* (the "Fourth Equity Committee Motion"), filed by James J Hayes on December 15, 2005 [Dkt No 2306]: (3) *Objection of Mellon Bank, N.A. to Motion for Reconsideration of the Orders Allowing the Genesis and Multicare Senior Lender Claims* ("Mellon Objection") [Dkt No 2309], filed on January 10, 2006 and (4) *Reorganized Debtors' (I) Objection to (a) the Motion for Reconsideration of the Orders Allowing the Genesis and Multicare Senior Lender Claims, and the Genesis and Multicare Senior Subordinated Note Claims and (b) the Motion for Appointment of Pre-Final Decree Equity Committee; and (II) Cross-Motion for Sanctions* ("Reorganized Debtors' Objection and Cross Motion") [Dkt No 2310], filed on January 11, 2006; the Court having reviewed the Motion for Reconsideration, Fourth Equity Committee

RLF1-2973288-1

RD275

Motion, the Mellon Objection and the Reorganized Debtors' Objection and Cross Motion and all pleadings relating thereto, and after holding a hearing regarding the relief requested in the motions; the Court finding that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), (c) notice of the motions were proper and sufficient under the circumstances, and the Court having determined that just cause exists for the relief granted herein; and the Court having found that good and sufficient cause exists for denying the Motion for Reconsideration and Fourth Equity Committee Motion and for granting the Cross Motion and, it is hereby

ORDERED that the Motion for Reconsideration is denied; and it is further

ORDERED that the Fourth Equity Committee Motion is denied; and it is further

ORDERED that the Cross Motion is granted; and it is further

ORDERED that attorneys fees and costs are awarded to: (1) the Reorganized Debtors in the amount of $ 5000 ; and (2) the Lenders in the amount of $ 15 000 . Mr. Hayes shall pay such fees and costs within 10 business days of the entry of this order, and send them to, respectively, Russell C. Silberglied, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801, on behalf of the Reorganized Debtors; and Menachem O. Zelmanovitz, Morgan Lewis & Bockius LLP, 101 Park Avenue, New York, NY 10178-0060, on behalf of the lenders.

Dated: 3/1 , 2006
Wilmington, Delaware

THE HONORABLE JUDITH H. WIZMUR
UNITED STATES BANKRUPTCY JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GENESIS HEALTH VENTURES, INC., et al., | ) | Case No. 00-2692 (JHW) |
| Debtors, | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| JAMES J. HAYES, | ) | |
| Appellant, | ) | |
| | ) | C.A. No. 06-103 JJF |
| v. | ) | |
| | ) | |
| | ) | |
| GENESIS HEALTH VENTURES, INC., et al., | ) | |
| Appellees. | ) | |
| _____ | ) | |

**Motion To Stay Briefing Schedule For Pro Se Appellant To Prepare A
Rule 9011 Motion To Sanction Debtors' Counsel And A Section 327
Motion To Disqualify Debtors' Counsel From Arguing This Appeal; Or
Alternatively, A 30-Day Extension, If The Sanctions Award Against
Appellant And The Motion To Reconsider Claims Are Stayed Until
After The Appeal For The Appointment Of A Pre-Termination Equity
<u>Committee Is Decided</u>**

### INTRODUCTION

1) Pursuant to this Court's March 9, 2006 Order that Appellant's Opening Brief

be filed within fifteen days of the date of this Order, James J. Hayes respectfully requests

that this Court stay the briefing schedule to provide adequate time for the Appellant to

prepare a motion pursuant to Rule 9011 of the Federal Rules of Bankruptcy Procedure



FILED

MAR 2 4 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

1

("F.R.B.P.") to sanction Debtors' counsel and another motion pursuant to 11 U.S.C. 327(a) to disqualify counsel from representing Genesis in this appeal. [1]

2) Alternatively, a 30-day extension to prepare the Opening Brief would suffice if this Court could set aside the sanctions issue and the appeal of the bankruptcy court's denial of the motion to reconsider the debt securities claims

3) Appellant has sought to work out a schedule with counsel for Genesis that would extend the briefing schedule and would stipulate an extensive record needed for full argument in the sanctions appeal. Counsel for Genesis would not agree with any extension of time nor consider stipulating to a record on appeal. There was no discussion of Appellant's decision to pursue sanctions against counsel or to disqualify counsel from arguing this appeal.

4) The conversations with Debtors' counsel were complicated, however, by the fact that the bankruptcy court, had filed on or about March 7, 2006 a written Order that assessed $20,000 in sanctions with $5,000 be paid to Debtors' counsel and $15,000 to the Senior Lenders' counsel that was to have been paid within ten days of the Order. Thus, when this Court issued its briefing schedule, the Appellant's time was focused on preparing a motion to stay the bankruptcy court order and this motion for extension. (Appendix Tab A) Debtors' counsel, however, was only interested in discussing the futility of further appeals while urging the Appellant to drop all his appeals in exchange for a waiver of the sanctions already awarded, and threatening to seek additional sanctions for continuing the appeals. (Appendix, Tab B) The conversations confirmed

---

[1] In pertinent part this section provides that the debtor "may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons to represent or assist the [debtor]..."

RD278

Appellant's long forming opinion that Debtors' counsel has little regard for their professional obligations in representing the debtors' varying constituencies but rather is wholly focused in maintaining business relationships with the Senior Lenders by surreptitiously representing the Senior Lender interests in a fraud on the bankruptcy court suit.

5) The fraud on bankruptcy court suit by 275 subordinated debenture holders headed by Richard Haskell alleges an Enron like accounting fraud. According to the complaint: "[t]he valuations of the Company, on which Court approval of the Plan was based, were based on fraudulent information." (*Haskell, et al. v. Goldman, Sachs & Co. et al.*, Complaint #4) (Enclosed as a Supplemental Appendix.) "Throughout this process defendants misled both the Court and the junior creditors at every turn. In fact, plaintiffs have subsequently discovered that both Budgeted EBITDA [earnings] projections and the LTM EBITDA were "cooked" to depress EBITDA and thereby depress the valuation of Genesis. Id. #8. "This action does not seek to set aside the Genesis Bankruptcy Plan or re-divide the Genesis 'pie'. Rather, it seeks to recover from the defendants the hundreds of millions of dollars of damages plaintiffs suffered as a result of defendant's misrepresentations to them, to the public and to the Bankruptcy Court." Id. #12. It is difficult to foresee circumstances where such an extensive fraud could be accomplished without an abundance of ethical lapses by the Debtors' counsel.

## ARGUMENT

6) The efforts of Debtors' counsel over several years to deny the equity class representation by an equity committee show a pattern of complicity in covering-up the fraud alleged by Haskell. Debtors' counsel, without further investigation, continues to

RD279

use the questioned valuations to argue that Genesis was "hopelessly insolvent" and that this is reason the bankruptcy court should continue denying equity holders representation of an equity committee and for appellate courts to affirm that decision.

### 11 U.S.C. Section 327 Requires Disqualification of Debtors' Counsel

7) Debtors' counsel, however, cannot be co-counsel for the Senior Lenders and Debtors' counsel at the same time. Debtors' counsel has the responsibility to act as a fiduciary to all the constituencies of the Debtors' estate including the equity holders. Upon learning of the *Haskell* allegations on or about January 27, 2004, Debtors' counsel knew or should have known that they had an "adverse interest" to the Debtors' estate in opposing the appointment of an equity committee. 28 U.S.C. 327(a) "requires that the professional retained by the [debtor] not hold or represent an interest adverse to the estate." If the Genesis estate was fraudulently undervalued as alleged by *Haskell*, the Senior Lenders received value in excess of their bankruptcy claims. If the allegations were proven, then the excess value would be returned to the estate. Debtors' counsel's ethical obligations required counsel to evaluate the *Haskell* allegations and if found credible to have initiated a fraud suit containing the *Haskell* allegations on behalf of the Debtors' estate.

8) The Debtors' counsel by opposing appointment of an equity committee or failing to initiate a fraud on the bankruptcy court on behalf of the Debtor acted on its adverse interest. "Total or partial disqualification ... is required without exception, if actual conflict of interest exists under 11 U.S.C.S. 327. *U.S. Code Service* 11 U.S.C.S. 327, n 36 summarizing: *In re Diamond Mortg. Corp.* 135 BR 78.

4

## Rule 9011 Requires Sanctions Against Debtors' Counsel

8) Rule 9011 F.R.B.P. also required Debtor's counsel to investigate the merits of the *Haskell* allegations and all subsequent court pleadings and arguments should have reflected the results of that investigation. With the bankruptcy still open, Debtors' counsel had access to the estate's resources to employ investment banking and accounting expertise to make the analysis required to assess the truth of the *Haskell* allegations.

9) Rule 9011 does not permit debtors' counsel to continue to rely on the bankruptcy court's confirmation of the critical valuations once credible information suggests these valuations were fraudulent. "Rule 9011 places an affirmative duty on attorneys ... to make a reasonable investigation of the facts and the law before signing and submitting any petition, pleading, motion or other paper." It prohibits "later advocating" a position that subsequent discovery or research reveals to be factually or legally baseless. *Collier On Bankruptcy*, 10:9011-9.

10) Rule 9011.04[2] [b] provides that the "reasonableness of an attorney's... investigation of the facts and the law will depend on the circumstances of the case.... However, an attorney who has had extensive involvement with the case will be held accountable for the knowledge that the involvement imparted or should have imparted, even if a reasonable investigation conducted by an attorney unfamiliar with the case might not have resulted in that level of knowledge." *Collier On Bankruptcy*, 10:9011-10 citing *Artco Corp. v. Lynnhaven Dry Storage Marina, Inc.*, 898 F. 2d 953 (4th Cir. 1990) *Southern Leasing Partners, Ltd. V. McMullan*, 801 F. 2d 783 (5th Cir. 1986). In the Genesis bankruptcy, the Debtors' counsel was paid $5.8 million in legal fees.

5

RD281

11) Debtors' counsel would have additional representational issues if Goldman Sachs were considered an "affiliate" or controlling owner of the Debtor. An affiliate is defined as voting ownership of 20%. Genesis is dominantly owned by the defendant investment banks. The *Haskell* complaint put the defendant bank ownership at 70% in 2001. (Supplemental Appendix # 8) Debtors' counsel with the country's largest bankruptcy practice could not be expected to investigate an investment bank affiliate that could be expected to be an important source of future business.[2] The only way Debtors' counsel could resolve their conflict is through the appointment of an independent counsel to investigate the alleged fraud. Even better would be to appoint an equity committee. With the lowest bankruptcy priority, an equity committee is most incented to manage the effort to evaluate and recover the estate's fraud losses.

### Bankruptcy Court's Sanctions Order is Invalid

12) Rule 9011 is the only sanctions provision in the Bankruptcy Code. The rule can be employed by any party or the court to insure that "the claims, defenses, and other legal contentions... are warranted by existing law or by non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law." The rule also provides that written motions are "not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;" *Collier On Bankruptcy*, 10:9011-1.

---

[2] As alleged in the *Haskell* complaint: "...Goldman perceived [Genesis] as an investment opportunity.... Goldman, for example, set up an entire division to invest in the debt of distressed companies.... This division invested in at least seven distressed companies in the healthcare industry....[In addition,] Goldman [provided Genesis] (i) underwriting and administering the DIP financing, (ii) underwriting the exit financing, and (iii) becoming the largest holder of the synthetic lease financing facility...Goldman's control over the fate of Genesis continued after Genesis emerged from bankruptcy, to this very day. ( Supplemental Appendix #'s 30 & 32)

RD282

13) In assessing sanctions against the Appellant, however, the bankruptcy court avoided the use of Rule 9011. At the hearing where the Motion for a Pre-Termination Equity Committee was denied and the Cross-Motion for Sanctions was granted, the Debtors' counsel explained:

> I mean, we could have done it as 9011. Frankly, Your Honor, the main reason we didn't do 9011 is because the hearing was in 2 weeks, and 9011 doesn't translate that well to a contested matter in a Bankruptcy Court because you have to give it 20 days safe – I think it's 20 days – whatever it is safe harbor notice. We would have been more than happy to file a safe harbor notice and proceed under 9011, but we didn't have sufficient time before today's hearing. I think the principles of 9011 apply.

Hearing Transcript 18:8-16, Appendix Tab C.

14) In other words, treating the sanctions question with the seriousness required by 9011 would not have permitted Debtors' counsel to stick a cross-motion for sanctions in a reply brief arguing the merits of appointing a Pre-Termination Equity Committee and another to Reconsider the Debt Securities Claims that was received by the Appellant four business days before the hearing on his motions. Rule 9011 would not have permitted Debtors' counsel to ambush a pro se appellant, prejudice a fair hearing of serious bankruptcy and constitutional representational and due process issues raised in Appellant's motions with the unfounded insinuation that: "Mr. Hayes' frivolous, repetitive motions are an abuse of the legal system." Indeed, most of the activity upon which the cross-motion was based occurred in this Court and was the basis for a similar cross-motion for sanctions then. Debtors' counsel did not inform the bankruptcy court that this Court had denied their earlier motion for sanctions.

15) On February 28, 2006, Debtors' counsel prompted the bankruptcy court to enter "at the earliest convenience" a proposed form of order submitted to the court on

7

February 8, 2006. (Appendix Tab D) In urging the bankruptcy court to enter a written order, Debtors' counsel failed to inform the bankruptcy court that on February 15, 2006 the district court had docketed the appeal of the bankruptcy court's bench decision. Under these circumstances, the bankruptcy court did not have the jurisdiction to issue a written order. "Generally a bankruptcy court has wide latitude to reconsider and vacate its own decision. [cite omitted] A pending appeal however, divests a bankruptcy court of jurisdiction." *In Re Adams Apple, Inc.* 829 F 2d 1484 1489 (9th Cir. 1987).

16) In addition, the proposed order asserted that the bankruptcy court had jurisdiction to order sanctions pursuant to 28 U.S.C. 157, finding at the hearing "this is a core proceeding pursuant to 28 U.S.C. [section] 157(b) (2)..." (Appendix Tab D) The itemized matters in 157(b) (2) did not include any matters related to sanctions and there was no mention of 157 at the hearing. (Transcript 26:9 - 27:19, Appendix Tab C) Without a finding that assessing sanctions is a core proceeding, "the bankruptcy courts does not have 'inherent power' under U.S.C.S. 157 to assess attorneys' fees against counsel who act in bad faith, vexatiously, wantonly, or for oppressive reasons." U.S. Code Service (Lawyers Ed.) 28 U.S.C.S. 157 n. 11 citing: *In re Richardson*, 52 B.R. 527 (B.C. W.D. Md. 1985)

17) The bankruptcy court's legal conclusions at the hearing was that 105 was the appropriate section of the Bankruptcy Code authorizing sanctions. "Nevertheless, counsel is certainly correct to reflect that 105 offers, and indeed I think compels, a Bankruptcy Court to control proceedings, and to address issues of vexatious and unreasonable litigation." (Transcript 27:5-8, Appendix Tab C) Thus, Debtors' counsel's

8

proposed order that the bankruptcy court adopted as its written order misrepresented the

bankruptcy court's legal conclusions.

## CONCLUSION

16.    For all the foregoing reasons, James J. Hayes respectfully requests this

Court a) stay the briefing schedule; at least with respect to the sanctions and claims issues

and/or  b) extend the briefing schedule for the appointment of an equity committee by 30

days.

Dated:  March 20, 2006
                 Annandale, VA.

                                                  Respectfully Submitted,

                                                  *James J. Hayes*

                                                  James J. Hayes
                                                  Pro Se
                                                  4024 Estabrook Dr.
                                                  Annandale, VA 22003
                                                  (703) 941-4694


## CERTIFICATE OF SERVICE

        I certify a copy of the foregoing Motion was mailed from the Northern
Virginia Regional Post Office on March 20, 2006 to the following counsel:

Russell C. Silberglied
Richards Layton and Finger P.A.
One Rodney Square
Wilmington, DE 19899; and

Adam P. Strochak
Weil, Gotshal & Manges LLP
1300 Eye Street, NW, Suite 900
Washington, DC 20005; and

*James J. Hayes*

James J. Hayes

Katherine B. Gresham
Assistant General Counsel
Bankruptcy and Appellate Litigation
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549

9

# APPENDIX

Bankruptcy Court Written Order Filed March 7, 2006............................................ Tab A

Weil, Gotshal & Manges March 10, 2006 ................................................................Tab B

January 19, 2006 Hearing Transcript ......................................................................Tab C

Certification of Counsel and Proposed Order............................................................ Tab D

RD286

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------x
In re:                                          :    Chapter 11
                                                :
GENESIS HEALTH VENTURES, INC.,   :    Case No. 00-2692 (JHW)
et al.,                                         :
                                                :    Re: Docket No. 2310
            Reorganized Debtor.       :
                                                :
---------------------------------------------------------x

## ORDER GRANTING REORGANIZED DEBTORS' CROSS-MOTION FOR SANCTIONS AND DENYING (1) MOTION FOR RECONSIDERATION OF THE ORDERS ALLOWING THE GENESIS AND MULTICARE SENIOR LENDER CLAIMS; AND THE GENESIS AND MULTICARE SENIOR SUBORDINATED NOTE CLAIMS AND (2) MOTION FOR APPOINTMENT OF PRE-FINAL DECREE EQUITY COMMITTEE

Upon consideration of the (1) *Motion for Reconsideration of the Orders Allowing the Genesis and Multicare Senior Lender Claims; and the Genesis and Multicare Senior Subordinated Note Claims,* filed by James J Hayes on December 12, 2005 (the "Motion for Reconsideration") [Dkt No. 2303]; (2) *Motion for Appointment of Pre-Final Decree Equity Committee* (the "Fourth Equity Committee Motion"), filed by James J Hayes on December 15, 2005 [Dkt No 2306]; (3) *Objection of Mellon Bank, N.A. to Motion for Reconsideration of the Orders Allowing the Genesis and Multicare Senior Lender Claims* ("Mellon Objection") [Dkt No. 2309], filed on January 10, 2006 and (4) *Reorganized Debtors' (I) Objection to (a) the Motion for Reconsideration of the Orders Allowing the Genesis and Multicare Senior Lender Claims, and the Genesis and Multicare Senior Subordinated Note Claims and (b) the Motion for Appointment of Pre-Final Decree Equity Committee; and (II) Cross-Motion for Sanctions* ("Reorganized Debtors' Objection and Cross Motion") [Dkt No 2310], filed on January 11, 2006; the Court having reviewed the Motion for Reconsideration, Fourth Equity Committee

Motion, the Mellon Objection and the Reorganized Debtors' Objection and Cross Motion and all pleadings relating thereto, and after holding a hearing regarding the relief requested in the motions; the Court finding that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), (c) notice of the motions were proper and sufficient under the circumstances, and the Court having determined that just cause exists for the relief granted herein; and the Court having found that good and sufficient cause exists for denying the Motion for Reconsideration and Fourth Equity Committee Motion and for granting the Cross Motion and, it is hereby

ORDERED that the Motion for Reconsideration is denied; and it is further

ORDERED that the Fourth Equity Committee Motion is denied; and it is further

ORDERED that the Cross Motion is granted; and it is further

ORDERED that attorneys fees and costs are awarded to: (1) the Reorganized Debtors in the amount of $ 5,000 ; and (2) the Lenders in the amount of $ 15,000 . Mr. Hayes shall pay such fees and costs within 10 business days of the entry of this order, and send them to, respectively, Russell C. Silberglied, Richards, Layton & Finger, P A., One Rodney Square, 920 North King Street, Wilmington, DE  19801, on behalf of the Reorganized Debtors; and Menachem O. Zelmanovitz, Morgan Lewis & Bockius LLP, 101 Park Avenue, New York, NY 10178-0060, on behalf of the lenders.

Dated: 3/1 , 2006
Wilmington, Delaware

THE HONORABLE JUDITH H. WIZMUR
UNITED STATES BANKRUPTCY JUDGE

2

RD289



# WEIL, GOTSHAL & MANGES LLP

1300 EYE STREET, NW

SUITE 900

WASHINGTON. DC 20005

(202) 682-7000

FAX: (202) 857-0939

AUSTIN
BOSTON
BRUSSELS
BUDAPEST
DALLAS
FRANKFURT
HOUSTON
LONDON
MIAMI
MUNICH
NEW YORK
PARIS
PRAGUE
PROVIDENCE
SHANGHAI
SILICON VALLEY
SINGAPORE
WARSAW

ADAM P. STROCHAK
DIRECT LINE (202) 682-7001
E-MAIL: adam.strochak@weil.com

March 10, 2006

OFFER OF COMPROMISE - - SUBJECT TO F.R.E. 408

James J. Hayes
4024 Estabrook Drive
Annandale, VA 22003

Re:     Genesis Health Ventures

Dear Mr. Hayes:

I enclose a copy of Judge Wizmur's order awarding sanctions against you in the amount of $20,000. I note that you now have two more appeals pending -- one in the district court and one in the Third Circuit. We will continue to seek sanctions for what we believe to be frivolous and vexatious litigation. As a good faith effort to put an end to this unnecessary litigation, the reorganized debtors will agree to waive the sanctions already awarded if you agree to dismiss all pending appeals and to refrain from filing any further motions, in any court. Counsel for Mellon Bank has advised me his client will consent to the same agreement. Please let me know by March 17 whether you will agree to this proposal.

Sincerely,

Adam P. Strochak

cc:    Russell Silberglied
       Menachem Zelmanovitz

RD291



RD292

1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

2

3    IN RE:                          .    Chapter 11
                                     .
4    GENESIS HEALTH VENTURES, INC., .    Case No. 00-2692(JHW)
     et *al.*,                       .
5                                    .
             Reorganized Debtors. .
6                                    .
     _____
7    IN RE:                          .    Chapter 11
                                     .
     GENESIS ELDERCARE CORP.         .    Case No. 00-2564(JHW)
8                                    .
9            Reorganized Debtors. .
                                     .
     _____
10   IN RE:                          .    Chapter 11
                                     .
11   NORRISTOWN NURSING AND          .    Case No. 00-2716(JHW)
     REHABILITATION ASSOCIATES, L.P..
12                                   .
             Reorganized Debtors. .       January 19, 2006
13                                   .    9:30 a.m.
                                     .    (Wilmington)
14

15                  TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE JUDITH H. WIZMUR
16            UNITED STATES BANKRUPTCY COURT JUDGE

17

18

19

20

21

22

23          Proceedings recorded by electronic sound recording;
              transcript produced by transcription service.

24

25

2

1    THE CLERK: All rise.

2    THE COURT: Please be seated.

3    MR. SILBERGLIED: Good morning, Your Honor.

4    THE COURT: Good morning.

5    MR. SILBERGLIED: For the record, Russ Silberglied

6    of Richards, Layton, and Finger on behalf of the Reorganized

7    Debtors. We have a short agenda for today. The first matter

8    on the agenda is continued. A brief word as to why it's

9    continued in case Your Honor wanted an update, that is the

10    motion for entry of a final decree itself. The US Trustee

11    has pointed out that there are some quarterly operating

12    reports that were not filed, and we are working with the

13    company to get those quarterly operating reports filed.

14    There's been a series of post confirmation transactions at

15    the company, so employees are a little bit harder to find

16    than they once were. But we're working on it, and we hope to

17    go forward with that at the next hearing which actually Ms.

18    Collins reminded me on our way over here we don't have a next

19    hearing. So I don't know if Your Honor knows the next time

20    you're going to be in Delaware.

21    THE COURT: Turns out March 2nd might work. I might

22    be here on February 16th. It sounds like March 2nd might be

23    better for you.

24    MR. SILBERGLIED: March 2nd would be fine. Thank

25    you, Your Honor.

3

1    THE COURT: Let's make that 9 o'clock.

2    MR. SILBERGLIED: Thank you, Your Honor.  The next

3    two items on the agenda are both motions of Mr. Hayes.  He's

4    here.  The first is with respect to the lenders themselves,

5    and the second is with respect to the appointment of an

6    equity committee, so I will cede the podium to Mr. Hayes.

7    THE COURT: Mr. Hayes.

8    MR. HAYES: Good morning, Your Honor.

9    THE COURT: Good morning.  You've filed 2 motions.

10   One, to reconsider the order allowing the senior lender

11   claims and two, to appoint an equity security committee.  At

12   this point I am more than puzzled, disturbed, by these

13   motions, because, as I've read the amazing post confirmation

14   history of these issues, I'm appalled, really, that the

15   issues are coming back.  And I say that with an understanding

16   that the reconsideration motion on the claims is really aimed

17   at, from your description of what you're looking for, a

18   restructuring of the plan, a re-prioritization of the

19   position of the secured lenders, a focus on your claim of

20   windfall on their part, of unfairness, of improper

21   allocations, and an adjustment of claims on those bases.  In

22   terms of the equity security holder committee, it was well

23   laid out by the objection to your motion that you - - this is

24   the 4th time that you're here on that.  Not - - perhaps 3

25   times before the Bankruptcy Court and one before the District

4

1    Court, with appeals to the Circuit. I'm not sure about the

2    status of the last appeal. That was apparently filed on the

3    denial of the District Court I think for - - on the motion

4    for appointment of an equity security committee. I could be

5    corrected on that. But you've been there, you've done that,

6    you've been denied your relief. Why should I consider this

7    again? What's different now? How many times, how many bites

8    at the apple do you get?

9         MR. HAYES: Your Honor, the equity clients in this

10   - - throughout this bankruptcy has been denied

11   representation. I don't think there's any dispute that at no

12   point - - at not time in the bankruptcy has the equity

13   interest been represented. That is - -

14        THE COURT: Well, the equity interest has appeared

15   and been heard in - - at the confirmation hearing. You,

16   yourself, presented objection to the plan, and your concerns

17   were addressed and denied. Your contention is not that there

18   has been no opportunity to be heard - -

19        MR. HAYES: No.

20        THE COURT: - - but no opportunity to be paid from

21   the estate for legal fees.

22        MR. HAYES: The equity class has not been adequately

23   represented.

24        THE COURT: Do you contend that there is an absolute

25   right to representation paid for by the estate in every case

5

1   for equity?

2           MR. HAYES: No.  But in this case, since there was

3   no - - I mean, adequate representation, there are a number of

4   ways that it can be provided.  The normal way, I mean, you

5   know, the shareholders are normally represented by company

6   management who has a fiduciary obligation to represent

7   shareholders interests.  And in a normal case, the company

8   officers, in fulfillment of the fiduciary obligations provide

9   representations for the equity class.  I mean, in the recent

10  Morale (phonetic) bankruptcy, which I cited, the chairman of

11  the company, Chairman Schwartz, argued that the valuations

12  prepared by the investment bankers were low.  But in this

13  case, which is rather unusual, the officers of the company

14  have now been charged with conspiracy to commit fraud.

15          THE COURT: Have now been charged in the Haskell

16  (phonetic) matter?  Is that what they're - -

17          MR. HAYES: Well, that was the allegations.

18          THE COURT: Those are - -

19          MR. HAYES: In the Haskell matter.

20          THE COURT:  - - the allegations, and that complaint

21  I dismissed, I believe.

22          MR. HAYES: But you - -

23          THE COURT: I think the District Court has affirmed,

24  if I'm not incorrect.

25          MR. SILBERGLIED: No, Your Honor.  We're in the

6

1  middle of briefing in the District Court.

2        THE COURT: I see. So that's under appeal.

3        MR. HAYES: But your dismissal didn't address any of

4  the allegations.

5        THE COURT: That's correct. So how can I address

6  the allegations here. There were issues of *res judicata* and

7  collateral estoppel. Issues under 1144. What's different

8  here? Why - -

9        MR. HAYES: Well, the shareholders have a

10  constitutional right. Among all the creditors and

11  participants, the shareholders are the only ones whose

12  property rights are protected by the 5th Amendment of the

13  Constitution. And as - -

14        THE COURT: And have you - -

15        MR. HAYES: - - a protected right - -

16        THE COURT: - - addressed that issue before? Have

17  you - - is this the first time that you've raised the

18  constitutional dimensions of the shareholders opportunities?

19        MR. HAYES: I have attempted to raise it throughout.

20  But none - -

21        THE COURT: And you've been rejected.

22        MR. HAYES: - - of the courts - -

23        THE COURT: Have you not?

24        MR. HAYES: None of the courts have addressed the

25  constitutional issue.

7

THE COURT: So that because they didn't address the constitutional issue, because they decided that you were not entitled, for any reason, to assert, because - - for a number of reasons, including the timing of your request, that you were not entitled to an equity security committee, including back in September of 2001, including as late as May of 2004, all of those times you had the opportunity - - you raised - - you took the opportunity, whether you had it or not is another question, you took the opportunity to raise the issue of equity security committee on various grounds. I don't recall that you raised the constitutional grounds in front of me, but you might have raised it otherwise. It doesn't matter whether it was taken up or not. You're quite right to assert that as a basic proposition constitutional issues don't go away by the passage of time. That's a valid proposition. But in this context you can't just keep coming back and thinking up new theories to raise the same request for relief that you have all along.

MR. HAYES: I'm not raising new theories. I mean, both the law and the constitution require that adequate representation be provided to the equity class. No court has said that the equity class has been provided adequate representation.

THE COURT: There has, there was - - I did say, in my confirmation opinion, that the value in the company - -

8

1   you may disagree with it, other people have disagreed with it

2   - - the proofs as I found them to be were that there was no

3   value to reach equity, and therefore equity could be - - the

4   plan as proposed could be confirmed, and the plan proposed

5   that there would be no distribution to equity.  That was the

6   decision.  If - - and that's the decision, I believe, was

7   appealed and approved.  And there it stands right or wrong.

8   And nobody can say whether a particular decision, in

9   retrospect, was right or wrong.  But there it stands as a

10  final judgment.  If that's so, then how can we say that the

11  equity was not adequately represented?

12      MR. HAYES: Well, adequate representation requires

13  some form of representation.

14      THE COURT: Well you represented the equity, didn't

15  you?  I mean you - -

16      MR. HAYES: I - -

17      THE COURT:  - - took it upon yourself.

18      MR. HAYES: Well nobody has said that it's adequate.

19  Everybody is saying my representation has been quite

20  inadequate.

21      THE COURT: Did you contemplate hiring an attorney

22  to help you make your presentation in the first instance?

23      MR. HAYES: Yes I did.  I have talked to attorneys.

24      THE COURT: Um-hum.

25      MR. HAYES: $34 million is spent on professional

9

1    fees in this case.  I'm an individual shareholder.  I am not

2    wealthy.  As part of adequate representation is having

3    representation equivalent to what, to what the other side

4    has.  And I - - even if I'm considered to be representing, I

5    - - and I guess I don't see objecting.  When I objected, I

6    didn't have any - - couldn't cross examine a witness,

7    couldn't present any evidence, couldn't do anything but

8    complain.

9         THE COURT: You didn't have the chance to cross

10   examine witnesses or - -

11        MR. HAYES: No.

12        THE COURT:  - - at the hearing?  At the

13   confirmation hearing?

14        MR. HAYES: No.

15        THE COURT: Did you - -

16        MR. HAYES:  All the objectors were told that their

17   objections would be heard at the end of the proceeding.  I

18   mean, it was kind of a - -

19        THE COURT: There was testimony presented, cross

20   examination of witnesses.  Did you stand up and say, I would

21   like to cross examine a particular witness?

22        MR. HAYES: No.  Because the Debtors' counsel said

23   - - told me what the procedure was.

24        THE COURT: I see.

25        MR. HAYES: Even the objectors - - well.

1          THE COURT: We did consider experts presented by

2    some of the objectors.  Let me remind myself that - -

3          MR. HAYES: But they weren't equity members.

4          THE COURT: They weren't equity.  Did you have - -

5    do you understand that you had a chance to present expert

6    witnesses if you chose to do that?

7          MR. HAYES: No I didn't.

8          THE COURT: Let me ask you another question just to

9    round out the record.  Before - - when was the first time

10   that you raised the issue of an equity committee?  You'll

11   recall that you filed a motion before confirmation that was

12   ruled on in the context of confirmation asking for that

13   relief.  That was in August of 2001.  Did you raise the issue

14   before then?

15         MR. HAYES: The issue of an equity committee?

16         THE COURT: Yes.

17         MR. HAYES: No.  I raised the issue of an equity

18   committee after - - immediately - - fairly soon after I had

19   gotten the disclosure statement that indicated that

20   shareholders were not going to participate in the

21   distribution.  And I - - and almost on the same day.  It was

22   kind of fortuitous.  I'm not an attorney, and I don't - - I'm

23   an investor.  I don't follow the bankruptcies of the

24   companies I happen to own.  But it was somewhat fortuitous

25   that I was notified of the bankruptcy at the same time that I

11

1    had gotten a new copy of my Investor's Daily Graphs

2    (phonetic). As a part of the daily graphs, it shows stock

3    appreciation at certain indexes. And the leading performer

4    had been the healthcare index. And that's when I started

5    looking, reading the disclosure statement. Seeing that the

6    valuation of the company was done in April, and that since

7    April, the Healthcare index that I was looking at had

8    appreciated by 60%. I mean that told - - that significant

9    thing said, you know, everything in this disclosure statement

10   is inaccurate. Everything that it's based on.

11          THE COURT: And you did address me at confirmation,

12   did you not?

13          MR. HAYES: Yes.

14          THE COURT: And I considered your comments. Let me

15   ask you this, you've - - the level of litigation that you've

16   conducted since then is quite impressive. You've traveled to

17   the District Court and to the Court of Appeals. On several

18   occasions you've asked for en banc consideration. You've

19   tried to have the Supreme Court weigh in on these issues.

20   You've really tried to exhaust your opportunities to have

21   these issues considered. How can I - - why wouldn't the - -

22   the attorneys are seeking sanctions against you saying enough

23   is enough, he's dragging us into this again, we've briefed

24   these issues up and down the chart of the Federal court

25   system, and we've received the same answer. Why shouldn't we

12

1    impose upon Mr. Hayes to pay our court fees at this point in

2    light of the fact that he's dragging us, again, yet again,

3    into court?  What's my answer to that?  Why shouldn't I say,

4    You know, you're right?  I'm amazed at this history of up and

5    down.  And back again.

6         MR. HAYES: I think their motion for sanctions is

7    completely out of order at this time.

8         THE COURT: Why?

9         MR. HAYES: Because it's prejudicing the Court

10   against the merits of the case.

11        THE COURT: In other words, I shouldn't consider the

12   fact that this - - these issues have been up and down and

13   around and through?  That these issues have been - - don't I

14   have to consider that?  Isn't there such a thing as finality,

15   and principles that govern the way that we do business in the

16   court system?

17        MR. HAYES: You know, there cannot be any finality

18   until the courts address the constitutional issues.  Let me

19   - - this isn't in my brief, but it's part of what I prepared.

20   This Court cannot avoid the constitutional issues of adequate

21   representation of the equity clients.  In Marlboro versus

22   Madison (phonetic) Chief Justice Marshall's opinion stated,

23   It is emphatically the province and the duty of the judicial

24   department to say what the law is.  Those who apply the rules

25   to a particular case must, of necessity, expound and

13

1    interpret that rule.  If two laws conflict with each other,

2    the courts must decide on the operation of each.  So if a law

3    be in opposition to the constitution and both the law and the

4    constitution apply to a particular case so that the court

5    must either decide that a case conforming to the law,

6    disregarding the constitution, or conforming to the

7    constitution disregarding the law, the court must decide

8    which of these conflicting rules govern the case.  This is

9    the very essence of judicial duty.  None of the courts have

10   addressed one, whether the 5th Amendment applies to, or

11   whether the property of an equity holder is the property

12   that's under the definition of the 5th Amendment.  There's no

13   opinion that talks about whether adequate representation is

14   required by the constitution.  About what adequate

15   representation is.

16        THE COURT: Understood.  Thank you Mr. Hayes.

17        MR. SILBERGLIED: For the record again, Russ

18   Silberglied on behalf of Genesis.  I'm not going to take a

19   lot of time, Your Honor.  I'm going to respond to a couple of

20   points briefly, and then talk about the sanctions motion.  I

21   don't think Your Honor needs to hear much more from me about

22   the background of this, because it's quite clear Your Honor

23   has read the papers.  A couple of points raised by Mr. Hayes.

24   One, this issue of nobody has addressed the constitutional

25   argument.  Leaving aside for a minute that there simply is no

1   constitutional argument here, and it's not a constitutional

2   issue, let's leave that aside for a moment.  I believe what

3   Mr. Hayes read is word for word out of his brief to the 3rd

4   Circuit Court of Appeals.  He briefed this to the 3rd Circuit

5   Court of Appeals.  I don't recall specifically on what

6   grounds the 3rd Circuit rejected his argument, but suffice it

7   to say it did.  It rejected it again *en banc*.  He made the

8   same constitutional argument in his petition for cert.

9   (phonetic) to the United States Supreme Court, and cert. was

10  denied.  This issue is finished.  It's not equitably moot,

11  it's actually moot in the words of Judge Farnan.  Second,

12  Your Honor, the point that Mr. Hayes made that he couldn't

13  cross examine witnesses and that he couldn't present

14  evidence.  Frankly I don't remember whether he cross examined

15  or not, it's too long ago in my memory to remember that level

16  of detail.  I do remember that he made oral argument.  I do

17  remember, obviously, that counsel for Mr. Grimes, counsel for

18  GMS cross examined our witnesses and put on their own

19  witnesses as well.  Cross examined Mr. Zelmonvitz's witnesses

20  as well.  And what I would additionally add to the record,

21  Your Honor might recall that Mr. Hayes in fact did attempt to

22  introduce evidence to this Court in the form of the famous

23  cartoons that he submitted.  Not only did Your Honor admit

24  those cartoons into evidence, but Your Honor - - but Mr.

25  Hayes has also attached them to pretty much every appellate

PENGAD · 1-800-631-6989    FORM FED·25

1  brief he has filed since then. So it's flatly incorrect that

2  he didn't have the opportunity to present evidence. It's

3  flatly incorrect that he didn't present evidence. So I will,

4  then, skip over, in the remainder of my argument, why his two

5  motions today ought to be denied. I'm sure Mr. Zelmonvitz

6  might want to say something more on the motion leveled to his

7  client. I'm going to skip right to the sanctions portion,

8  unless Your Honor has questions about the first portion.

9  THE COURT: Please proceed.

10  MR. SILBERGLIED: Thank you, Your Honor. You know,

11  in short this does has to stop. Have to stop, excuse me. It

12  doesn't cost Mr. Hayes anything to file these motions because

13  he's not paying an attorney, but it most assuredly does cost

14  my client something. Courts expect responses. And that

15  means that my client must pay me or Weil Gotshal or somebody

16  else to respond to these motions. And it is inflicting a

17  cost upon us. It's inflicting a cost also on the federal

18  system because Your Honor has to keep hearing these, the

19  District Court has to keep hearing these, the 3rd Circuit has

20  to keep hearing these. And in short Mr. Hayes needs a

21  message that this is time to stop. If Your Honor has any

22  doubts whatsoever about what Mr. Hayes' intentions are if he

23  is not sanctioned today, all you have to do is open up to

24  paragraph 14 of his motion itself, and look at the sentence

25  that starts in the second to last line of page 6 in paragraph

1    14 where he says, quote, "Ratification of the - - and this is

2    the motion for today.  Quote, "Ratification of the

3    confirmation by an equity committee would set the stage for a

4    final decree that would really be final and not just another

5    intermediate point in this saga." End quote.  In other

6    words, he has absolutely no intention of letting a final

7    decree, if entered by Your Honor at the March hearing, stand

8    in his way of continuing to file these motions.  He thinks

9    that that would be an intermediate point in the saga.  That's

10    exactly why we need an order from your court awarding

11    sanctions.

12        THE COURT: As a point of procedure, if the appeals

13    are still pending, what opportunities do I have to enter a

14    final decree?

15        MR. SILBERGLIED: And that's - - perhaps that's for

16    the March hearing.  We have put that in the motion.  That

17    there was case law on the subject of being able to enter a

18    final decree when there's nothing currently pending in the

19    Bankruptcy Court as opposed to things that are on appeal to

20    appellate courts from the Bankruptcy Court.  While I guess I

21    didn't necessarily spell it - - there are cases - -

22        THE COURT: I'm sure there are, and - -

23        MR. SILBERGLIED:  - - and they're cited in that

24    motion.

25        THE COURT:  - - I'm not deciding the issue.  My

17

1  facial expression is that there may be some doubt on the

2  issue since the jurisdictional opportunity to hear the case

3  comes up as it's opened, as it's referred from the District

4  Court.  And so it's an interesting issue.

5  MR. SILBERGLIED: Well, understood, Your Honor.  And

6  I'll be prepared to speak more to those cases at the March

7  hearing.  But suffice it to say that I believe the proper

8  remedy would be - - we really don't think the Haskell case is

9  coming back.  We really don't think that the Hayes motion is

10  coming back on remand.  But that's my opinion, obviously.  If

11  it does, there's always the ability to reopen the bankruptcy

12  case.  Just as if somebody needs to file a motion.  You know,

13  if you enter the final decree in March and some creditor

14  comes and violates the confirmation order, and violates the

15  discharge injunction in May, well then what I would do, like

16  is done in many, many cases, is I would file a motion that

17  asks for the Court to reopen the case for the sole purposes

18  of hearing a motion for sanctions for violating discharge

19  injunction and confirmation order, or something of the like.

20  THE COURT: Yeah.  You've cited §1927 - -

21  MR. SILBERGLIED: Yes, Your Honor.

22  THE COURT:  - - of Title 28 as a basis for awarding

23  sanctions, and you're aware that there is some controversy

24  about whether the Bankruptcy Court qualifies as any court of

25  the United States.  There is case law around the country that

RD309

18

1  disagrees with that proposition.  I gather that you're also

2  relying, for instance, on the United States Supreme Court

3  Chambers case for inherent authority of a court to address an

4  abuse of the process, if you will.  In a limited way.

5  Because we're not talking about 9011, it's not a separate

6  motion.  Well, it is, I guess.  But it's - -

7          MR. SILBERGLIED: It's a cross motion.  It is a

8  separate motion.  I mean, we could have done it as 9011.

9  Frankly, Your Honor, the main reason why we didn't do 9011 is

10 because the hearing was in 2 weeks, and 9011 doesn't

11 translate that well to a contested matter in a Bankruptcy

12 Court because you have to give it 20 days safe - - I think

13 it's 20 days - - whatever it is safe harbor notice.  We would

14 have been more than happy to file a safe harbor notice and

15 proceed under 9011, but we didn't have sufficient time before

16 today's hearing.  I think that the principles of 9011 apply.

17 I think 1927 itself, there is case law that supports it under

18 - -

19          THE COURT: I don't recall that the 3rd Circuit has

20 ever weighed in on the issue of whether a Bankruptcy Court

21 can utilize 1927.  Am I right?

22          MR. SILBERGLIED: You're right, Your Honor.  Or, at

23 least we uncovered no such case.

24          THE COURT: Yeah.  I'm not aware of any, but anyhow.

25          MR. SILBERGLIED: So there are those principles.

1  And, you know, and of course there is the inherent power of

2  the Court, and there's equitable principles in 105 for Your

3  Honor to be able to control your own docket. And as we just

4  read from paragraph 14 of Mr. Hayes own motion, he's

5  admitting to the Court that he's going to keep filing

6  motions. And I think that, you know, 105 would also support

7  - - would support the issue in terms of the Court controlling

8  its own docket.

9       THE COURT: Indeed it would. I'm confident of that.

10  Thank you Mr. Silberglied.

11       MR. SILBERGLIED: Thank you, Your Honor.

12       THE COURT: Other comments? Sir.

13       MR. ZELMONVITZ: Menachem Zelmonvitz of Morgan Lewis

14  on behalf of Mellon Bank, the agent for the senior lenders.

15  I'll be very brief, Your Honor. I just wanted to touch on

16  first of all the reconsideration motion, which is addressed

17  not only to our clients, but also actually to our opponents

18  in the Haskell litigation. Because he's seeking to

19  essentially have their claims also reconsidered. The basic

20  requirement, as we've noted in our short objection, is that

21  there has to be cause for reconsideration. Absolutely no

22  cause has been shown. The only one even suggested would be

23  either the Haskell litigation, which has been dismissed, and

24  secondly really the ability of some of the senior lenders, or

25  the other lenders, who have gotten a so-called windfall. But

1    that is not the test.  As the 3rd Circuit has said, a claim is

2    determined by the consideration received by the Debtor, not

3    the amount paid by the current holder of the claim.  That's

4    been upheld by every case that I'm aware of.  So that if you

5    purchase a note, you're entitled to a claim in the amount of

6    that note, not the amount of what you paid for that

7    particular claim.

8            THE COURT: What about cause in terms of

9    constitutional impairment?

10           MR. ZELMONVITZ: Well that really deals with also

11   the equity committee motion.  And I don't understand where

12   there is a constitutional issue here.  There's a right to

13   counsel.  No one has deprived Mr. Hayes that right of

14   counsel.  He could have gone out and retained his own

15   counsel.  The issue here is do you pay for that counsel out

16   of the estate?  The estate was not his money.  The estate was

17   our client's money.  And that's what Your Honor actually

18   found in the valuation part of the confirmation hearing.  The

19   equity holders actually had no stake left in this company.

20   And therefore, it was not right to even suggest that they, or

21   their counsel, be paid from the estate.  No one deprived him

22   of counsel.  He had every right to go out and retain counsel.

23   Therefore, I don't see any issue here.  Any constitutional

24   issue here whatsoever.  And that was the second point which I

25   really wanted to get to, Your Honor.  And the final thing I

1   wanted to mention is what Your Honor touched upon on the

2   final decree.  We actually had a conversation yesterday.  The

3   senior lenders are, to some extent, a little bit concerned to

4   make sure that this Court retains jurisdiction until the

5   Haskell litigation is over and done with.  We do agree with

6   Mr. Silberglied that there is law out there which would allow

7   for the reopening of the case in the unlikely event of a

8   remand, which we agree with Mr. Silberglied is very, very

9   unlikely.  However, it may be for consideration by the Court

10  to at least leave one of the cases open so that there is

11  continuing jurisdiction.  We can leave this of course for

12  further discussion for March 2nd.

13          THE COURT: Indeed.

14          MR. ZELMONVITZ: Thank you, Your Honor.

15          THE COURT: Thank you.  If there are no other - -

16          MR. HAYES: May I respond to these?

17          THE COURT: You may, Mr. Hayes.  Come on up.  Last

18  comment.

19          MR. HAYES: On the motion for reconsideration.  I

20  mean, they're misreading what I propose in the

21  reconsideration.  I am not saying - - I am not reducing the

22  claims of the secondary purchasers.  They're retaining their

23  claims.  I'm just dividing a claim into 2 parts.  That's the

24  reconsideration proposal.  Part of the claim would be - -

25  maintain the same priority as it has now, what I call the

22

1   speculative part of the claim would still remain a claim.  It

2   would be given a lower priority in a separate class with all

3   the speculative claims, which include the subordinated note

4   holders and the shareholders.  So I'm not reducing the claim.

5   And in the very case that, the Richfield Property Case, I

6   mean this parallels the way in which a mortgage obligation

7   which was secured by property as treated.  A valuation of the

8   property was less than the mortgage, and part of the claim is

9   considered as secured and part of it is considered as

10  unsecured.  I mean, this parallels that in every respect.

11          THE COURT: Understood.

12          MR. HAYES: And the second thing on cause.  These

13  claims, the assertion is made in the cases cited that cause

14  has to be from a Rule 60 cause, because Rule 60 is the normal

15  means for reconsideration.  But that only applies in cases

16  where the claims were considered in the first place.  These

17  claims were never considered, these claims were merely

18  asserted as - - and it didn't come out until, as far as I

19  know, until the Haskell litigation, that the secondary

20  claims, or secondary transactions in the loans was to the

21  extent that it is.  I mean, Haskell they just - - 75% of the

22  senior loan were acquired secondarily.  That these senior

23  lenders, and these are the investment banks and these are the

24  defendants in the Haskell litigation, never paid Genesis

25  anything.  They acquired these claims in the secondary

1   market.  And the claims were, senior lender claims are like

2   $1.4 billion, and 75% of that, and the allegation is made or

3   alleged that these loans were picked up at 50¢ on the dollar.

4   I mean, that's a $500 million shift in priority of claims.

5   And it would allow money to fully compensate the other senior

6   lenders who I think that the bankruptcy laws are trying to

7   protect.  Creditors who actually provided capital to the

8   corporation and are trying to recover a hundred percent of

9   their claim, and are being prevented by doing so by

10  speculators who are asserting that their claim should be of

11  equal priority to those.

12          THE COURT: Thank you Mr. Hayes.

13          MR. HAYES: And - -

14          THE COURT: Did you - - go ahead.

15          MR. HAYES: And I think Mellon Bank has a conflict

16  of interest in representing only the defendants in the

17  Haskell litigation and ignoring the original senior lenders

18  who have a claim.  Because they would be very much in support

19  of this motion.

20          THE COURT: I don't see them here.  Thank you Mr.

21  Hayes.

22          MR. HAYES: But - -

23          THE COURT: That's enough.  Thank you, sir.  I read,

24  Mr. Hayes, your recitation and you've included these

25  comments, many of them, in your papers.  By these comments

24

1    you seek that I basically rewrite the Bankruptcy Code.  That

2    I inject my own sense of what I think is fair, what I think

3    is appropriate, what I think may have been unfair in the

4    process into the equation of who gets what and how.  That's

5    not the way it works.  I am duty bound to apply the

6    Bankruptcy Code as Congress has passed it, and that's what I

7    will do.  There are 2 motions presented here.  One is a

8    motion to reconsider the order allowing the Genesis and

9    Multicare senior lender claims.  And we understand that

10   502(j) requires that cause be established in order to justify

11   such a reconsideration, if you will, and no such cause has

12   been provided here.  One suggestion is that because there are

13   allegations in a complaint that has been dismissed that one

14   senior lender, or several senior lenders, who were senior

15   lenders at the time of the confirmation achieved their

16   position at a discount, that that is a basis to warrant a re-

17   prioritization of the entire plan that was confirmed over 4

18   years ago.  That's mind boggling.  That's not available as an

19   opportunity for relief.  There is no opportunity to

20   reclassify into speculative and non-speculative portions.

21   There's no provision of the Bankruptcy Code that allows for

22   that.  Indeed, out there in the marketplace this may be an

23   area that generates abuse of one sort or another.  There have

24   been all kinds of, I think, articles and concerns expressed

25   about transfers of claims, about manipulation of the process.

FORM FED-25    PENGAD · 1-800-631-6989

25

1   And indeed it may be a proper area of congressional review.
2   To determine whether any, excuse me, any control should be
3   applied, any modifications of the Bankruptcy Code
4   appropriate, to control or revise the processes by which
5   investors can operate.  Right now we're operating in the
6   framework that it does not permit a division of a claim based
7   on the price at which the holder of the claim achieved that
8   interest.  Not to mention that it's 4 years after
9   confirmation and what's sought is a complete revision of the
10  confirmed plan, which has been affirmed on appeal and which
11  cannot be disturbed at this point.  So that motion must be
12  denied.  On the motion for the appointment of pre-final
13  decree equity committee, I will not belabor this record to
14  recite the very lengthy and difficult history of attempts by
15  Mr. Hayes to have this issue considered.  I will adopt the
16  recitation that has been provided in the response to the
17  motion.  Suffice it to say that Mr. Hayes has turned the
18  system inside and out to try to obtain this particular
19  relief.  Whether or not he has raised the constitutional
20  dimensions, to the extent that there are any, of the issue he
21  has had his chance, more than once and over the course of
22  years, to assert this position and it is time to stop.  There
23  is no opportunity in this system to keep coming back to the
24  same issue.  The same party, the same issue, the same
25  response.  The response being that there was no entitlement

1  to have the estate pay for representation of equity in this

2  case.  There was every opportunity to retain representation.

3  Mr. Hayes, for one, chose to present his case on his own.  He

4  was heard at confirmation, he was heard on appeal at various

5  junctures.  Enough is enough.  Indeed there is the need for

6  sanctions, there is a need to impress upon Mr. Hayes the fact

7  that he cannot continue to try to assert issues in the

8  Bankruptcy Court, or in the District Court, or in the Court

9  of Appeals, without consequences.  Once you have an answer to

10  a question that you raise, a basic tenet of of our court

11  system, or our jurisprudence, is that you cannot continue to

12  come back to assert those issues again, and again, and again.

13  The consequence here, and I do rely on 105, indeed if 1470, I

14  think it is, is available, then that may also be a basis.

15  The kinds of activities that are seen here are clearly in

16  line with the proscription of that statute.  I'm sorry, 1927.

17  I don't know where I got 1940.  Where a litigant unreasonably

18  and vexatiously multiplies the proceedings.  That's exactly

19  what we have here.  But even if, and there is frankly

20  reasonable basis to conclude that a Bankruptcy Court is not

21  quote, "any court of the United States", unquote, only

22  because - - and this I'm going on memory, I think it's 28 USC

23  451, I'm not positive about that cite - - defines, quote,

24  "any court of the United States", unquote, for purposes of

25  this statute.  And that statute does not include Bankruptcy

1  Courts.  One could argue that it should, but nevertheless,
2  that kind of analysis is fairly straightforward.  It's, you
3  know, not too complicated, and does cause a shadow to be
4  placed upon the application of this statute by the Bankruptcy
5  Court.  Nevertheless, counsel is certainly correct to reflect
6  that 105 offers, and indeed I think compels, a Bankruptcy
7  Court to control proceedings, and to address issues of
8  vexatious and unreasonable litigation.  And indeed it
9  dovetails on the Chambers' expressions in - - offered by the
10  United States Supreme Court.  And there has been, I think, I
11  could be wrong on this, but I think unanimous support for the
12  proposition that Chambers and its recitation of the inherent
13  authority of all Federal Courts, where the tools otherwise
14  available are not present to rely on its inherent authority
15  to control the processes in its court, and that includes, for
16  instance, and I think this was the context of the Chambers
17  decision, the imposition of attorney's fees where litigation
18  is unreasonable and vexatious, to use the words of 1927.  So
19  I think that that sanction is appropriate in this case.  I
20  will ask counsel to submit affidavits of services, and of
21  course with a copy to Mr. Hayes.  Mr. Hayes may respond in
22  terms of the amount of attorneys fees sought by the
23  responders, and I will then enter an award on the papers.  I
24  don't believe there will be a need to address, by further
25  argument, any issues.  So I would ask that the affidavit of

28

1    services be filed within 20 days, perhaps.  If that's doable.

2          MR. SILBERGLIED: We can certainly do that, Your

3    Honor.

4          THE COURT: And then Mr. Hayes, you're welcome to

5    take another 15 days to respond to those affidavits, if you

6    choose to do that.  Any questions?

7          MR. HAYES: May I be heard?

8          THE COURT: Your last comment, sir.  Come on up.

9          MR. HAYES: Before you assess sanctions, I would

10   request that you refer to the case in re: <u>Ken Davis Holdings</u>

11   <u>Company</u> 249 f3rd 383, 5th Circuit, 2001.  I mean, this was an

12   issue that was at the heart of that case.

13         THE COURT: I'll gladly refer to it.  I stand by my

14   ruling.  If I look at that case, and I see that there's some

15   basis to depart from it, I will do that.  I believe I'm

16   familiar with the case.  Could you give me the name of it

17   again?

18         MR. HAYES: In re: <u>Ken Davis</u>, d-a-v-i-s, <u>Holdings</u>

19   <u>Company</u>.

20         THE COURT: Oh, no.

21         MR. HAYES: 249 f3rd 383.  It's an Oklahoma

22   bankruptcy case.

23         THE COURT: Actually no, I don't recall it.  I will

24   tell you that I've certainly looked closely at this issue,

25   generally and extensively over time.  So the issue is not new

29

1    to me.  The 1927 issue, the inherent authority issue, the 105

2    aspects, the 9011 aspects, these are areas, these are

3    subjects that come up, as you might imagine, and I'm quite

4    confident that this is the quintessential case for the

5    application of sanctions.  It is meant to, as I said, impress

6    upon you that you cannot return again and again without

7    consequences.  Where the issues are the same, where you're

8    seeking the same relief, and where - - I don't want it

9    reargued now.  I'm done.  And I've ruled.  And I thank you

10   all.  If there's nothing else, the matter is adjourned.

11        MR. SILBERGLIED: Thank you, Your Honor.

12        (Whereupon at 10:13 a.m. the hearing in this matter was

13   concluded for this date.)

14

15

16

17

18

19        I, Jennifer Ryan Enslen, approved transcriber for

20   the United States Courts, certify that the foregoing is a

21   correct transcript from the electronic sound recording of the

22   proceedings in the above-entitled matter.

23

24   _____        1/30/06
     Jennifer Ryan Enslen
25   18 Bar Drive
     Newark, DE 19702
     (302) 836-1905

RD321



RD322

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------x
In re:                                          :
                                                :
GENESIS HEALTH VENTURES, INC.,                  :
et al.,                                         :
                                                :
        Reorganized Debtor.                     :
------------------------------------------------x
```

**Chapter 11**

**Case No. 00-2692 (JHW)**

Re: Docket No. 2310

## CERTIFICATION OF COUNSEL

The undersigned counsel hereby certifies as follows.

1.    On December 12, 2005 and December 15, 2005, respectively, James J. Hayes ("Hayes") filed the *Motion for Reconsideration of the Order Allowing the Genesis and Multicare Senior Lender Claims; and the Genesis Multicare Senior Subordinated Note Claims [Genesis Dkt. No. 2303/Multicare Docket No. 1792]* and the *Motion for Appointment of Pre-Final Decree Equity Committee [Genesis Dkt. No. 2306]*(collectively the "Hayes Motions").

2.    On January 10, 2006, Mellon Bank, N.A. ("Mellon Bank") filed the *Objection of Mellon Bank N.A. to Motion for Reconsideration of the Senior Lender Claims [Genesis Docket No. 2309/Multicare Docket No. 1794; filed 1/10/06]* (the "Mellon Bank Objection").  On January 11, 2006, Genesis Health Ventures, Inc. and their former debtor affiliates (collectively, the "Reorganized Debtors") filed their *Objection to (A) "Motion for Reconsideration of the Orders Allowing the Genesis and Multicare Senior Lender Claims; and the Genesis and Multicare Senior Subordinated Note Claims" and (B) "Motion for Appointment of Pre-Final Decree Equity Committee" and (II) Cross-Motion for Sanctions [Genesis Dkt. No. 2310]* (the "Cross Motion").

RD323

3.    At the January 19, 2006 hearing, the Court denied the Hayes Motions, granted the Cross Motion and announced that it would award the Reorganized Debtors and Mellon Bank their attorneys fees and costs for responding to the Hayes Motions. The Court requested that counsel for the Reorganized Debtors and Mellon Bank submit affidavits detailing their fees and costs associated with responding to the Hayes Motions by February 8, 2006 and allowed Hayes until February 23, 2006 to object to or otherwise respond to the affidavits of the Reorganized Debtors and/or Mellon Bank.

4.    On February 7, 2006, Mellon Bank's counsel filed affidavits in support of the award of attorneys' fees [Genesis Dkt. Nos. 2322 & 2323] ("Mellon Bank Affidavits"). On February 8, 2006, counsel for the Reorganized Debtors filed an affidavit in support of the Cross Motion [Genesis Dkt. No. 2325] (the "Reorganized Debtors' Affidavit").

5.    More than the allotted fifteen days have expired, and Mr. Hayes has not objected nor responded to the Mellon Bank Affidavits nor the Reorganized Debtors' Affidavit.

WHEREFORE, the Reorganized Debtors respectfully request that the proposed form of order which was attached to the Reorganized Debtors' Affidavit, and which for the convenience of the Court is also annexed hereto as Exhibit 1, be entered at the earliest convenience of the Court.

Dated: February 28, 2006
Wilmington, Delaware

Mark D. Collins (No. 2981)
Russell C. Silberglied (No. 3462)
Cynthia L. Collins (No. 4337)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware  19899
(302) 651-7700
(302) 651-7701

-and-

Michael F. Walsh
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000
(212) 310-8007

-and-

Adam P. Strochak
Joanne M. Guerrera
WEIL, GOTSHAL & MANGES LLP
1300 Eye Street, NW
Suite 900
Washington, DC 20005

Attorneys for Reorganized Debtors Genesis Health
Ventures, Inc. and Norristown Nursing & Rehabilitation
Associates, LP

# *EXHIBIT 1*

RD326

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------------x
In re:                                     :     Chapter 11
                                           :
GENESIS HEALTH VENTURES, INC., :           Case No. 00-2692 (JHW)
et al.,                                    :
                                           :     Re: Docket No. 2310
              Reorganized Debtor.          :
                                           :
------------------------------------------x
```

## ORDER GRANTING REORGANIZED DEBTORS' CROSS-MOTION FOR SANCTIONS AND DENYING (1) MOTION FOR RECONSIDERATION OF THE ORDERS ALLOWING THE GENESIS AND MULTICARE SENIOR LENDER CLAIMS; AND THE GENESIS AND MULTICARE SENIOR SUBORDINATED NOTE CLAIMS AND (2) MOTION FOR APPOINTMENT OF PRE-FINAL DECREE EQUITY COMMITTEE

Upon consideration of the (1) *Motion for Reconsideration of the Orders Allowing the Genesis and Multicare Senior Lender Claims; and the Genesis and Multicare Senior Subordinated Note Claims,* filed by James J. Hayes on December 12, 2005 (the "Motion for Reconsideration") [Dkt. No. 2303]; (2) *Motion for Appointment of Pre-Final Decree Equity Committee* (the "Fourth Equity Committee Motion"), filed by James J. Hayes on December 15, 2005 [Dkt. No. 2306]: (3) *Objection of Mellon Bank, N.A. to Motion for Reconsideration of the Orders Allowing the Genesis and Multicare Senior Lender Claims* ("Mellon Objection") [Dkt. No. 2309], filed on January 10, 2006 and (4) *Reorganized Debtors' (I) Objection to (a) the Motion for Reconsideration of the Orders Allowing the Genesis and Multicare Senior Lender Claims; and the Genesis and Multicare Senior Subordinated Note Claims and (b) the Motion for Appointment of Pre-Final Decree Equity Committee; and (II) Cross-Motion for Sanctions* ("Reorganized Debtors' Objection and Cross Motion") [Dkt. No. 2310], filed on January 11, 2006; the Court having reviewed the Motion for Reconsideration, Fourth Equity Committee

Motion, the Mellon Objection and the Reorganized Debtors' Objection and Cross Motion and all pleadings relating thereto, and after holding a hearing regarding the relief requested in the motions; the Court finding that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), (c) notice of the motions were proper and sufficient under the circumstances, and the Court having determined that just cause exists for the relief granted herein; and the Court having found that good and sufficient cause exists for denying the Motion for Reconsideration and Fourth Equity Committee Motion and for granting the Cross Motion and, it is hereby

ORDERED that the Motion for Reconsideration is denied; and it is further

ORDERED that the Fourth Equity Committee Motion is denied; and it is further

ORDERED that the Cross Motion is granted; and it is further

ORDERED that attorneys fees and costs are awarded to: (1) the Reorganized Debtors in the amount of _____; and (2) the Lenders in the amount of _____. Mr. Hayes shall pay such fees and costs within 10 business days of the entry of this order, and send them to, respectively, Russell C. Silberglied, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE  19801, on behalf of the Reorganized Debtors; and Menachem O. Zelmanovitz, Morgan Lewis & Bockius LLP, 101 Park Avenue, New York, NY 10178-0060, on behalf of the lenders.

Dated: _____, 2006
           Wilmington, Delaware

_____
THE HONORABLE JUDITH H. WIZMUR
UNITED STATES BANKRUPTCY JUDGE





4024 Estabrook Dr
Annandale, VA 22003

Office of the Clerk
U.S. District Court
J. Caleb Boggs Federal Building
844 N. King Street
Wilmington, DE 19801



RD329

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GENESIS HEALTH VENTURES, INC., et al., | ) | Case No. 00-2692 (JHW) |
| | ) | |
| | ) | |
| | ) | |
| Reorganized Debtors. | ) | |
| | ) | |

### MOTION FOR A STAY OF ORDER GRANTING REORGANIZED DEBTORS' CROSS MOTION FOR SANCTIONS FOR THE PENDENCY OF THE APPEAL

Pursuant to Rule 8005 of the Federal Rules of Bankruptcy Procedure (FRBP) James J. Hayes, a member of Genesis Equity Class, respectfully requests this Court to stay its March 2, 2006 Order Granting Reorganized Debtors' Cross-Motion For Sanctions.

### Relevant Facts

1) On February 15, 2006, the U.S. District Court for the District of Delaware docketed James J. Hayes appeal of the bankruptcy court's January 19, 2006 oral bench ruling that granted the reorganized debtors' sanctions. (the "Bench Decision") (Notice of Docketing attached.)

2) On March 2, 2006, this court filed its Order Granting Reorganized Debtors' Cross-Motion For Sanctions and Denying (1) Motion For Reconsideration of the Orders Allowing the Genesis And Multicare Senior Lender Claims; And The Genesis And Multicare Senior Subordinated Note Claims And (2) Motion For Appointment Of Pre-Decree Equity Committee. (the "Order For Sanctions")

1

RD330

\# 2337
3|20|06

3) The Order For Sanctions asserted jurisdiction "over this matter" pursuant to 28 U.S.C. 157 and 1334. The Order also asserted this is a "core proceeding" pursuant to 28 U.S.C. 157(b) (2).

### Argument

4) The bankruptcy court lacked jurisdiction to issue its March 2, 2006 Order for Sanctions because this order was issued after the appeal of the Bench Decision was docketed in the District Court on February 15, 2006.  "Generally a bankruptcy court has wide latitude to reconsider and vacate its own decision. [cite omitted] A pending appeal however, divests a bankruptcy court of jurisdiction." *In Re Adams Apple, Inc.* 829 F 2d 1484 1489 (9th Cir. 1987). Technically the 9th Circuit opinion would prohibit the bankruptcy court from issuing a stay; however, in this event the Order For Sanctions is invalid and unenforceable.

5) While the Order For Sanctions asserted that the bankruptcy court had jurisdiction "over this matter" pursuant to 28 U.S.C. 157; this statement over generalizes the situation. Bankruptcy court jurisdiction under 157 certainly includes the "core proceedings" itemized under 157(b) (2); however, the Motion For A Pre-Final Decree Equity Committee and the Debtors' Cross Motion For Sanctions are not classifications included on the itemized list. Consequently, to claim 157 jurisdiction on these two matters; the bankruptcy court is required to find that these are "core proceedings." This court's Order For Sanctions did not undertake this analysis and thus the bankruptcy court lacks jurisdiction on what without analysis must be considered "non-core proceedings." "A bankruptcy judge may hear a non-core proceeding and make proposed findings of fact and conclusions of law to the district court, but he may not enter a final order or

2

judgment. 28 U.S.C. 157(c) (1) *Howell Hydrocarbons, Inc. v. Adams,* 897 F. 2d 183 189 (5th Cir. 1990).

6) Other authority confirms that the "[b]ankruptcy court does not have 'inherent power' under 28 U.S.C.S. 157 to assess attorneys' fees against counsel who act in bad faith, vexatiously, wantonly, or for oppressive reasons." *United States Code Service (Lawyers Edition)*, 28 USCS 157 n.11 citing: In re Richardson (1985) (BC WD Md.) 52 BR 527.

7) The Motion For Reconsideration is certainly a "core proceeding" under 157(b)(2). However assessing sanctions for the filing this motion is another matter. Rule 9001 FRBP is available to bankruptcy courts for sanctioning motions in chapter 11 bankruptcies. This court's Order For Sanctions, however, did not avail itself of Rule 9001. Consequently, this court has no basis for assessing payment of fees to the lenders.

8) The Motion For A Pre-Final Decree Equity Committee cited "the due process clause of Amendment V of the United States Constitution" as one basis supporting this motion. Id. 1. In assessing sanctions for the filing of this motion, the bankruptcy court is sanctioning a citizen for asserting his constitutional rights. This issue was addressed: *In re Kendavis Holdings Co.*, 249 F. 3rd 383 (5th Cir. 2001). That case overturned bankruptcy court sanctions against an individual party in interest for violating a confirmation order because the bankruptcy court had not respected that individual's Fifth Amendment due process rights. The bankruptcy court exceeds its authority and jurisdiction in sanctioning a citizen for asserting the constitutional right for individual equity holders be represented by an equity committee in this case.

3

RD332

9) WHEREFORE, James J. Hayes respectfully requests this court to a) stay the sanctions part of its March 2, 2006 Order, and b) grant such other further relief as is necessary and proper.

Dated: March 15, 2006
        Annandale, Virginia

Respectfully Submitted,

James J. Hayes
Pro Se
4024 Estabrook Dr.
Annandale, VA 22003
(703) 941-4694


**CERTIFICATE OF SERVICE**

I certify a copy of the foregoing Motion was mailed from the Northern Virginia Regional Post Office on March 15, 2006 to the following counsel:

Russell C. Silberglied
Richards Layton and Finger P.A.
One Rodney Square
Wilmington, DE 19899; and

Adam P. Strochak
Weil, Gotshal & Manges LLP
1300 Eye Street, NW, Suite 900
Washington, DC 20005

James J. Hayes

4

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GENESIS HEALTH VENTURES, INC., et al., | ) | Case No. 00-2692 (JHW) |
| | ) | |
| | ) | |
| | ) | |
| Reorganized Debtors. | ) | |
| _____ | ) | |

## NOTICE OF MOTION

To:   Reorganized Debtors Genesis Health Ventures, Inc.

Please take notice that James J. Hayes has today filed the attached

**MOTION FOR A STAY OF ORDER GRANTING REORGANIZED DEBTORS'**

**CROSS MOTION FOR SANCTIONS FORTHE PENDENCY OF THE APPEAL**

with the United States Bankruptcy Court for the District of Delaware, 824 Market Street,

3rd Floor, Wilmington, Delaware 19801.

Dated: March 15, 2006
Annandale, Virginia

James J. Hayes
4024 Estabrook Drive
Annandale, VA 22003

Member of the Genesis Equity Class

RD334

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

**DOCKET ITEM # 2**

IN RE: Genesis Health Ventures Inc. et al

James J. Hayes
    Appellant

   v.

Genesis Health Ventures Inc. et al

    Appellee

)
)
)
)
)
)
)

Civil Action No. 06-103

Bankruptcy Case No.00-2692
    AP No.06-10

## NOTICE OF DOCKETING

A Notice of Appeal of the following order of the Bankruptcy Court dated 1/19/06 was docketed in the District Court on 2/15/06:

> Oral Bench Ruling on January 19, 2006, denying Mr. Hayes 1) Motion to Reconsider the Orders Allowing the Genesis and Multicare Senior Lender Claims; and the Genesis and Multicare Senior Subordinated Note Claims 2) Motion to Appoint Pre-Final Decree Equity Committee 3) Reorganized Debtors' Sanctions

In accordance with the Standing Order of the Court dated July 23, 2004, this case shall be referred to the Appellate Mediation Panel, and briefing will be deferred.

Documents prepared for mediation shall be submitted directly to the mediator and should not be filed with the Clerk's Office. Any attorneys of record who are not members of the Bar of this Court shall associate with local counsel in accordance with District of Delaware Local Rule 83.5.

      Peter T. Dalleo
      Clerk of Court

Date: February 16, 2006

To: U.S. Bankruptcy Court
   Counsel

RD335

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------x
In re:                                     :      Chapter 11
                                           :
GENESIS HEALTH VENTURES, INC.,             :      Case No. 00-2692 (PJW)
                                           :
                                           :
            Reorganized Debtor.            :      Re: Docket Nos. 2337 and 2339
-------------------------------------------x
```

## ORDER (I) DENYING, WITH PREJUDICE, MR. HAYES' "MOTION FOR STAY OF ORDER GRANTING REORGANIZED DEBTORS' CROSS MOTION FOR SANCTIONS FOR THE PENDENCY OF THE APPEAL" AND (II) DENYING, WITHOUT PREJUDICE THE "REORGANIZED DEBTORS' CROSS-MOTION FOR THE ENTRY OF AN ORDER (A) IMPOSING FURTHER MONETARY SANCTIONS AGAINST MR. HAYES, (B) BARRING MR. HAYES FROM FILING ANY ADDITIONAL PLEADINGS IN THIS CASE AND (C) RELIEVING THE REORGANIZED DEBTORS OF THEIR OBLIGATION TO RESPOND TO ANY ADDITIONAL PLEADINGS FILED BY MR. HAYES"

Upon consideration of (1) the *Motion for a Stay of Order Granting Reorganized Debtors' Cross Motion for Sanctions for the Pendency of the Appeal,* filed by James J. Hayes on March 20, 2006 (the "Stay Motion"); and (2) the *Reorganized Debtors' Cross-Motion for the Entry of an Order (a) Imposing Further Monetary Sanctions Against Mr. Hayes, (b) Barring Mr. Hayes from Filing Additional Pleadings in This Case and (c) Relieving the Reorganized Debtors of Their Obligation to Respond to Any Additional Pleadings Filed by Mr. Hayes* (the "Cross Motion"); the Court having reviewed the Stay Motion and the Cross-Motion and all pleadings relating thereto; and the Court having heard the statements of the parties in support of, or in response to, the Stay Motion and the Cross-Motion at a hearing before the Court on May 10, 2006 (the "Hearing");

IT IS HEREBY ORDERED THAT:

1.    The Stay Motion is denied, with prejudice, for the reasons stated on the record at the Hearing.

2.    The Cross-Motion is denied, without prejudice, for the reasons stated on the record at the Hearing.

3.    This Court shall retain jurisdiction over any and all matters arising from or related to the interpretation and/or implementation of this Order.

Dated: May 12, 2006
       Wilmington, Delaware

THE HONORABLE PETER J. WALSH
UNITED STATES BANKRUPTCY JUDGE

ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GENESIS HEALTH VENTURES, INC., et al., | ) | Case No. 00-2692 (JHW) |
| Debtors, | ) | |
| | ) | |
| | ) | |
| ——————————————————— | ) | |
| | ) | |
| JAMES J. HAYES, | ) | |
| Appellant, | ) | |
| | ) | |
| | ) | C.A. No. 06-103 JJF |
| v. | ) | |
| | ) | |
| | ) | |
| GENESIS HEALTH VENTURES, INC., et al., | ) | |
| Appellees. | ) | |
| ——————————————————— | ) | |

FILED

MAY - 1 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

scanned

## Pro Se Appellant's Motion to Disqualify Reorganized Debtors' Counsel from Representing the Reorganized Debtors or Alternatively Reversing the Bankruptcy Court's Denial of an Equity Committee

Pursuant to Section 327 (a) of Title 11 of the United States Code, 11 U.S.C. 327

(a), pro se appellant, James J. Hayes respectfully requests this Court disqualify the

Reorganized Debtors' Counsel, Richards Layton & Finger, P.A. and Weil, Gotshal &

Manges LLP from representing the Reorganized Debtors in the appeal of the bankruptcy

court's denial of a Pre-Termination Equity Committee. Section 327(a) requires in

pertinent part that debtors counsel not "represent an interest adverse to the estate,..."

Reorganized Debtors' Counsel's opposition to the appointment of a Genesis equity

committee is adverse to the interests of the Debtors' estate, and in fact represents the

Senior Lenders' interests in this bankruptcy. (Please see the attached Motion For

RD338

Appointment of Pre-Final Decree Equity Committee.) At this time, an equity committee is uniquely positioned to recover damages for the Reorganized Debtors' estate from a successful suit against the Senior Lenders based on the allegations in the fraud on the bankruptcy suit that was recently remanded to the bankruptcy court for further proceedings.[1]

The *Haskell* complaint alleged a conspiracy between Genesis management and certain Senior Lenders that led to the undervaluation of the Debtors' estate that transferred hundreds of millions of dollars of wealth from the junior bondholders and equity holders to the Senior Lenders. On March 29, 2006, the Hon. Kent Jordan vacated the bankruptcy court's decision that the fraud on the bankruptcy court claims against Senior Lenders; Goldman Sachs & Co., ("Goldman"), Highland Capital Management, L.P., ("Highland"), and Mellon Bank, N.A., ("Mellon") were barred by res judicata and collateral estoppel and remanded the case to the bankruptcy court for further proceedings.

Alternatively, this Court could simply reverse the bankruptcy court's denial of an equity committee. A Genesis equity committee could investigate Reorganized Debtors' counsels' actions in the bankruptcy proceedings, the merits of the fraud allegations, and whether the investment banks Goldman and Highland, who had acquired large positions in the Senior debt participations, were "affiliates" of the Reorganized Debtors. According to the *Haskell* complaint, Goldman "forc[ed] the companies [Genesis and its Multicare subsidiary] into bankruptcy and seize[d] control." (C 30) If the allegations are meritorious, an equity committee could institute a suit against the Senior Lenders to

---

[1] *Richard Haskell, et al., v. Goldman, Sachs & Co., et al.,* Bankr. Case No. 00-2692. ( Referred herein as "Haskell", "Haskell complaint" or referenced as "C")

RD339

recover the value the Senior Lenders received in excess of their claims for the Genesis

estate.

Dated: April 28, 2006
        Annandale, VA 22003

                                    Respectfully Submitted,

                                    *James J. Hayes*
                                    James J. Hayes
                                    4924 Estabrook Dr.
                                    Annandale, VA 22003
                                    Pro Se

## CERTIFICATE OF SERVICE

        I certify a copy of the foregoing Motion was mailed from the Northern
Virginia Regional Post Office on April 29, 2006 to the following counsel:

Russell C. Silberglied
Richards Layton and Finger P.A.
One Rodney Square
Wilmington, DE 19899; and

Adam P. Strochak
Weil, Gotshal & Manges LLP
1300 Eye Street, NW, Suite 900 Washington, DC 20005; and

Katherine B. Gresham
Assistant General Counsel
Bankruptcy and Appellate Litigation
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549

*James J. Hayes*
James J. Hayes

3

RD340

4024 Estabrook Dr.
Annandale, VA 22003



PRIORITY
MAIL
UNITED STATES POSTAL SERVICE ℠
www.usps.gov

LABEL 107R, OCT 1997



Office of Clerk
U.S. District Court
844 N. King Street, Lockbox 18
Wilmington, DE 19801



U.S. POSTAGE
PAID
MERRIFIELD, VA
22116
APR 06
RADDANT
$4.05
000-65500-53

0000
19801

RD341

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| | : | |
| GENESIS HEALTH VENTURES, INC., | : | Bankruptcy Case No. 00-2692-JHW |
| et al., | : | |
| | : | |
| Debtors. | : | |

————————————————————

| | | |
|---|---|---|
| JAMES J. HAYES, | : | |
| | : | |
| Appellant, | : | |
| | : | |
| v. | : | Civil Action No. 06-103-JJF |
| | : | |
| GENESIS HEALTH VENTURES, INC., | : | |
| et al., | : | |
| | : | |
| Appellees. | : | |

————————————————————————————

James J. Hayes, <u>Pro</u> <u>Se</u> Appellant.

Mark D. Collins, Esquire, Russell C. Silberglied, Esquire and
Cynthia L. Collins, Esquire of RICHARDS, LAYTON & FINGER, P.A.,
Wilmington, Delaware.
<u>Of Counsel</u>: Michael F. Walsh, Esquire of WEIL, GOTSHAL & MANGES
LLP, New York, New York.
Adam P. Strochak, Esquire and Joanne M. Guerrera, Esquire of
WEIL, GOTSHAL & MANGES LLP, Washington, D.C.
Attorneys for Appellees.

————————————————————————————

<u>MEMORANDUM OPINION</u>

May 23, 2006
Wilmington, Delaware

Farnan, District Judge.

Pending before the Court is a Motion filed by Appellant James J. Hayes, appearing pro se. Appellant's Motion is captioned as a Motion To Stay Briefing Schedule For Pro Se Appellant To Prepare A Rule 9011 Motion To Sanction Debtors' Counsel And A Section 327 Motion To Disqualify Debtors' Counsel From Arguing This Appeal; Or Alternatively, A 30-Day Extension, If The Sanctions Award Against Appellant And The Motion To Reconsider Claims Are Stayed Until After The Appeal For The Appointment Of A Pre-Termination Equity Committee Is Decided (D.I. 6) filed by Appellant, James J. Hayes. Genesis Health Ventures, Inc. and Norristown Nursing & Rehabilitation Associates, L.P. (collectively, the "Reorganized Debtors") have responded to the Motion by filing Appellees' (I) Objection To Appellant's Motion To Stay The Briefing Schedule Relating To This Appeal And (II) Cross-Motion For The Entry Of An Order (A) Imposing Monetary Sanctions Against Appellant, (B) Barring Appellant From Filing Any Additional Motions In Connection With This Appeal And (C) Relieving The Reorganized Debtors Of Their Obligation To Respond To Any Additional Pleadings Filed By Appellant (D.I. 8).[1]  For the reasons discussed, the Court will a

---

[1]    Since the filing of his Motion To Stay, Appellant has also filed the contemplated Motion To Disqualify Reorganized Debtors' Counsel from Representing The Reorganized Debtors or Alternatively Reversing The Bankruptcy Court's Denial Of An Equity Committee (D.I. 16). The Reorganized Debtors have filed a

2

deny Appellant's Motion and grant-in-part and deny-in-part the
Reorganized Debtors' Cross-Motion.

## I.    Parties' Contentions

By his Motions, Appellant contends that counsel for the
Reorganized Debtors should be disqualified from continuing to
represent the Reorganized Debtors in connection with the instant
bankruptcy appeal, because counsel for the Reorganized Debtors
has denied the equity class of shareholders representation by an
equity committee.  Appellant contends that by opposing the
appointment of an equity committee, the Reorganized Debtors'
counsel failed to represent all constituencies of the Reorganized
Debtors' estate and helped conceal the alleged fraud perpetrated
on the Bankruptcy Court by the subordinated debenture holders led
by Richard Haskell.  Appellant also contends that this alleged
conduct warrants sanctions against counsel for the Reorganized
Debtors.

In response, the Reorganized Debtors contend that Appellant
has engaged in a series of frivolous filings both in this Court
and in the Bankruptcy Court, and the Reorganized Debtors have
filed an Objection to Appellant's Motion To Stay and a Cross-
Motion for sanctions against Appellant.  The Reorganized Debtors

---

Response To Appellant's Motion To Disqualify Reorganized Debtors'
Counsel (D.I. 18), and to date, Appellant has failed to file a
Reply Brief.  For the reasons discussed infra, the Court will
deny the Motion To Disqualify.

3

RD344

contend that Appellant's contemplated motion for sanctions and
motion to disqualify counsel have no merit, but in any event,
they are irrelevant to the question of whether this appeal should
go forward.

In support of their request for sanctions, the Reorganized
Debtors point out that Appellant has filed four separate motions
seeking the appointment of an equity committee, one in this Court
and three in the Bankruptcy Court.[2]  The Bankruptcy Court's denial
of the appointment of an equity committee was affirmed at every
judicial level, and the United States Supreme Court denied
Appellant's petition for writ of certiorari.  The Reorganized
Debtors further point out that the Bankruptcy Court has granted
their motion for sanctions and awarded the Reorganized Debtors
$20,000 in attorneys' fees, finding that this case represented
"the quintessential case for the application of sanctions" as a
result of Appellant's vexatious and repetitive filings.  See Jan.
19, 2006 Hrg. Tr. at 29.

Appellant has failed to file a Reply Brief in support of his
Motion To Stay.  Instead, Appellant has filed the Motion To
Disqualify Reorganized Debtors' Counsel, which was contemplated
by his Motion To Stay.

---

[2]     Appellant has also filed a second request in this Court
to reverse the Bankruptcy Court's denial of an equity committee
as a form of alternative relief to his motion to disqualify
counsel.  (D.I. 16).

4

## II.   DISCUSSION

### A.   Whether A Stay Of This Appeal Is Warranted

On March 9, 2006, the Court entered a Briefing Order in this case requiring Appellant to file his Opening Brief within fifteen (15) days of the Court's Order. Appellant responded to the Court's Order by filing the instant Motion requesting a stay of this appeal, so that he can file motions to sanction and disqualify counsel for the Reorganized Debtors.

Appellant has already filed his Motion To Disqualify Reorganized Debtors' Counsel, and therefore, his Motion To Stay has been partially mooted. To the extent that his Motion To Stay is not moot, the Court finds no basis to stay this appeal to allow Appellant to file the contemplated sanctions motion. Appellant has not demonstrated that disqualification of counsel or sanctions are warranted in this case[3], and therefore, the Court is not persuaded that this appeal should be further delayed. Because the time-frame for the filing of Appellant's Opening Brief set by the Court's March 9 Order has already passed, the Court will set a new briefing schedule for this appeal.

---

[3]     See infra Part II.B. of this Memorandum Opinion.

5

B.    <u>Whether Appellees Are Entitled To An Order (1) Imposing
Monetary Sanctions, (2) Barring Appellant From Filing
Additional Motions In Connection With This Appeal, and
(3) Relieving The Debtors From Their Obligation To
Respond To Any Additional Pleadings Filed By Appellant</u>

In response to Appellant's request to stay the briefing in
this case, the Reorganized Debtors have filed a Cross-Motion for
sanctions pursuant to 28 U.S.C. § 1927 and 28 U.S.C. § 1651.
With respect to monetary sanctions, Section 1927 provides:

> Any attorney or other person admitted to conduct cases
> in any court of the United States or any Territory
> thereof who so multiplies the proceedings in any case
> unreasonably and vexatiously may be required by the
> court to satisfy personally the excess costs, expenses,
> and attorneys' fees reasonably incurred because of such
> conduct.

28 U.S.C. § 1927. Courts have extended Section 1927 to non-
lawyer litigants appearing <u>in propria persona</u>. Courts have also
utilized 28 U.S.C. § 1651 as a means of curbing repetitive and/or
frivolous filings by litigants. Section 1651 authorizes the
Court to issue all "writs necessary or appropriate in aid of
their respective jurisdictions and agreeable to the usages and
principles of law."

The Court understands that the Bankruptcy Court has
sanctioned Appellant pursuant to Section 1927 based on his
vexatious, repetitive and frivolous filings. In this Court,
Appellant has filed three previous appeals, Civil Action No. 01-
718, 02-016 and 04-477, along with several motions in those
appeals. Although Appellant has not prevailed with respect to

6

any of his filings, the Court is not persuaded, at this time, that Appellant's filings in this Court have been so vexatious as to warrant the imposition of monetary sanctions.  That being said, however, the Court will not will not tolerate further filings by Appellant that are duplicative, non-responsive to the Court's Orders or that result in the delay of this litigation. Accordingly, Appellant will be required to file a brief regarding the current appeal in accordance with an Order entered by the Court; however, the Court will not entertain further motions filed by Appellant in this action, unless Appellant first obtains leave of Court for such filings.  Motions filed by Appellant without leave of Court will be denied sua sponte.

To the extent Appellant wishes to file a motion for sanctions against counsel for the Reorganized Debtors, the Court declines to grant such leave.  Based on the proffer contained in Appellant's Motion To Stay and the content of his Motion To Disqualify Reorganized Debtors' Counsel, the Court concludes that there is no basis upon which to justify an award of sanctions against counsel for the Reorganized Debtors.

As for Appellant's pending Motion To Disqualify Reorganized Debtors' Counsel, the Court concludes that the Motion lacks merit.[4]  The primary ground upon which Appellant relies for

---

[4]     The Court also concludes that Appellant is not entitled to relief as a result of several procedural deficiencies with his motion.  First, counsel for the Reorganized Debtors are no longer

7

disqualification of counsel for the Reorganized Debtor is their alleged opposition to the appointment of an equity committee. The Court, however, is not persuaded that this opposition provides grounds for disqualification, particularly in light of the Bankruptcy Court's decisions, and this Court's decisions that such a committee is not warranted. As the Bankruptcy Court recognized, Appellant has repeatedly pressed the issue of an equity committee at all levels of the court system, and our system of justice does not permit the same issue to be relitigated once it has been adjudicated. See Jan. 19, 2006 Hrg. Tr. at 23-29. Accordingly, the Court will deny Appellant's motion to disqualify counsel and his alternative request for reversal of the Bankruptcy Court's decision denying the appointment of an equity committee.

## III. CONCLUSION

For the reasons discussed, the Court will deny Appellant's Motion To Stay Briefing Schedule For Pro Se Appellant To Prepare A Rule 9011 Motion To Sanction Debtors' Counsel And A Section 327 Motion To Disqualify Debtors' Counsel From Arguing This Appeal;

---

retained pursuant to Section 327 of the Bankruptcy Code. In addition, counsel was initially retained pursuant to an order entered by the Bankruptcy Court on July 24, 2000. Appellant did not object to that order, and did not file an appeal of that order. Thus, challenges to counsel's continued retention should first be addressed by the Bankruptcy Court. Accordingly, the Court will deny Appellant's Motion To Disqualify Reorganized Debtors' Counsel for these additional reasons.

8

Or Alternatively, A 30-Day Extension, If The Sanctions Award Against Appellant And The Motion To Reconsider Claims Are Stayed Until After The Appeal For The Appointment Of A Pre-Termination Equity Committee Is Decided.  The Court will sustain Appellees' Objection To Appellant's Motion To Stay The Briefing Schedule Relating To This Appeal and grant-in-part and deny-in-part Appellees' Cross-Motion For The Entry Of An Order (A) Imposing Monetary Sanctions Against Appellant, (B) Barring Appellant From Filing Any Additional Motions In Connection With This Appeal And (C) Relieving The Reorganized Debtors Of Their Obligation To Respond To Any Additional Pleadings Filed By Appellant.  The Court will also deny Appellant's Motion To Disqualify Reorganized Debtors' Counsel From Representing The Reorganized Debtors Or Alternatively Reversing The Bankruptcy Court's Denial Of An Equity Committee.

An appropriate Order will be entered.

9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                              :   Chapter 11
                                    :
GENESIS HEALTH VENTURES, INC.,:         Bankruptcy Case No. 00-2692-JHW
et al.,                             :
                                    :
          Debtors.                  :
_____:_____
JAMES J. HAYES,                     :
                                    :
          Appellant,                :
                                    :
     v.                             :   Civil Action No. 06-103-JJF
                                    :
GENESIS HEALTH VENTURES, INC.,:
et al.,                             :
                                    :
          Appellees.                :

                          O R D E R

     At Wilmington, this 23 day of May 2006 for the reasons

discussed in the Memorandum Opinion issued this date;

     IT IS HEREBY ORDERED that:

     1.   The Motion To Stay Briefing Schedule For Pro Se

Appellant To Prepare A Rule 9011 Motion To Sanction Debtors'

Counsel And A Section 327 Motion To Disqualify Debtors' Counsel

From Arguing This Appeal; Or Alternatively, A 30-Day Extension,

If The Sanctions Award Against Appellant And The Motion To

Reconsider Claims Are Stayed Until After The Appeal For The

Appointment Of A Pre-Termination Equity Committee Is Decided

(D.I. 6) is **DENIED**.

     2.   Appellees' Objection To Appellant's Motion To Stay The

Briefing Schedule Relating To This Appeal (D.I. 8-1) is

**SUSTAINED**.

3.   Appellees' Cross-Motion For The Entry Of An Order (A)
Imposing Monetary Sanctions Against Appellant is, (B) Barring
Appellant From Filing Any Additional Motions In Connection With
This Appeal And (C) Relieving The Reorganized Debtors Of Their
Obligation To Respond To Any Additional Pleadings Filed By
Appellant (D.I. 8-2) is **DENIED** to the extent monetary sanctions
are sought and **GRANTED** to the extent that non-monetary relief is
sought as outlined in the Court's Memorandum Opinion and this
Order.

4.   Appellant shall not be permitted to file further
Motions in this action without first obtaining leave of Court.
Motions filed by Appellant in this action without leave of Court
will be denied _sua_ _sponte_.  Appellees are not required to file an
answer to any Motion filed by Appellant in this action, unless
the Motion has been filed pursuant to leave granted by the Court.

5.   Appellant's Motion To Disqualify Reorganized Debtors'
Counsel From Representing The Reorganized Debtors Or
Alternatively Reversing The Bankruptcy Court's Denial Of An
Equity Committee (D.I. 16) is **DENIED**.

6.   The parties to this appeal shall adhere to the
following briefing schedule unless an otherwise agreed upon
schedule is filed within fifteen (15) days of the date of this
Order:

a.   Appellant's Opening Brief on appeal shall be filed
within **fifteen (15) days** of the date of this Order.

        b.    Appellees' Answering Brief on appeal shall be
filed within **fifteen (15) days** of receipt of the Opening Brief.

        c.    Appellant's Reply Brief on appeal shall be filed
within **ten (10) days** of receipt of the Answering Brief.

                                    _____
                                    UNITED STATES DISTRICT COURT

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-----------------------------------------------x
:
In re                                          :        Chapter 11 Cases No.
:
**GENESIS HEALTH VENTURES INC.**, *et al.*,    :        00-2692 (JHW)
:
Debtors.                             :
:        (Jointly Administered)
-----------------------------------------------x
:
In re                                          :        Chapter 11 Cases No.
:
**MULTICARE AMC, INC.**, *et al.*,             :        00-2494 (JHW)
:
Debtors.                             :
:        (Jointly Administered)
-----------------------------------------------x

## DISCLOSURE STATEMENT FOR
## <u>DEBTORS' JOINT PLAN OF REORGANIZATION</u>

| | |
|---|---|
| WEIL, GOTSHAL & MANGES LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>(212) 310-8000 | RICHARDS, LAYTON & FINGER P.A.<br>One Rodney Square<br>P.O. Box 551<br>Wilmington, Delaware 19899<br>(302) 658-6541 |
| Co-Attorneys for the Genesis Debtors<br>  as Debtors and Debtors in Possession | Co-Attorneys for the Genesis Debtors<br>  as Debtors and Debtors in Possession |

| | |
|---|---|
| WILLKIE FARR & GALLAGHER<br>787 Seventh Avenue<br>New York, New York 10019<br>(212) 728-8000 | YOUNG CONAWAY STARGATT &<br>TAYLOR LLP<br>11th Floor, Wilmington Trust Company<br>P.O. Box 391<br>Wilmington, Delaware 19899-0391<br>(302) 571-6600 |
| Co-Attorneys for the Multicare Debtors<br>  as Debtors and Debtors in Possession | Co-Attorneys for the Multicare Debtors<br>  as Debtors and Debtors in Possession |

Dated:  July 6, 2001

2335325_1.DOC

RD354

# TABLE OF CONTENTS

Page

I.  Introduction ...........................................................................................................................3

II. Treatment of Creditors and Shareholders Under the Plan of Reorganization....................5

    A.  Merger of Genesis and Multicare ....................................................................................5

    B.  Summary of New Capital Structure of Reorganized Genesis.............................................6

    C.  Summary of Classification and Treatment .......................................................................7

    D.  Allocation of Value Under the Plan of Reorganization ....................................................9

        1.  Senior Lender Deficiencies ......................................................................................10

        2.  Compromise and Settlement with Unsecured Classes...............................................11

        3.  Exceptions to the Liens of the Senior Lenders .......................................................11

    E.  Description of the Genesis Classes..................................................................................12

        1.  Genesis Other Secured Claims (Class G1) ..............................................................12

        2.  Genesis Senior Lender Claims (Class G2) ...............................................................16

        3.  Genesis Priority Non-Tax Claims (Class G3)...........................................................19

        4.  Genesis General Unsecured Claims (Class G4) .......................................................19

        5.  Genesis Senior Subordinated Note Claims (Class G5)..............................................20

        6.  Genesis Intercompany Claims (Class G6)................................................................21

        7.  Genesis Punitive Damage Claims (Class G7)...........................................................21

        8.  Genesis Series G Preferred Stock Interests (Class G8) ...........................................22

        9.  Genesis Series H Preferred Stock Interests (Class G9) ...........................................22

        10. Genesis Series I Preferred Stock Interests (Class G10)...........................................22

        11. Genesis Common Stock Interests (Class G11).........................................................22

    F.  Description of the Multicare Classes ...............................................................................23

        1.  Multicare Other Secured Claims (Class M1).............................................................23

        2.  Multicare Senior Bank Claims (Class M2).................................................................24

        3.  Multicare Priority Non-Tax Claims (Class M3) .........................................................25

        4.  Multicare General Unsecured Claims (Class M4)......................................................25

        5.  Multicare Senior Subordinated Note Claims (Class M5) ..........................................26

        6.  Multicare Intercompany Claims (Class M6) .............................................................26

        7.  Multicare Punitive Damage Claims (Class M7).........................................................27

        8.  Multicare Common Stock Equity Interests (Class M8)...............................................27

    G.  Administrative Expenses for the Genesis Debtors and the Multicare
        Debtors.........................................................................................................................27

i

RD355

## TABLE OF CONTENTS
### (continued)

|  |  |  | Page |
|---|---|---|---|
|  | 1. | Debtor in Possession Financing | 28 |
|  | 2. | Federal Medicare Claims | 28 |
|  | 3. | State Medicaid Claims | 29 |
|  | 4. | Fees and Expenses of Professionals | 29 |
|  | 5. | Payments to Employees | 29 |
|  | 6. | Fees and Expenses of Indenture Trustees | 29 |
| H. | | Securities to be Issued Under the Plan of Reorganization | 29 |
|  | 1. | New Senior Notes | 29 |
|  | 2. | New Convertible Preferred Stock | 30 |
|  | 3. | New Common Stock | 31 |
|  | 4. | New Warrants | 31 |
|  | 5. | New Multicare Common Stock | 31 |
| I. | | Deemed Consolidation of Certain Debtors for Purposes of the Plan | 32 |
|  | 1. | Genesis Debtors | 32 |
|  | 2. | Multicare Debtors | 33 |
|  | 3. | Proviso | 34 |
| J. | | Securities Law Matters | 34 |
|  | 1. | Issuance and Resale of New Securities Under the Plan of Reorganization | 35 |
|  | 2. | Listing | 37 |
|  | 3. | Secondary Stock Offering | 37 |
|  | 4. | Registration Rights | 37 |
| K. | | Settlement and Compromise | 37 |
|  | 1. | Settlement with the Federal Government | 37 |
|  | 2. | Settlement Between the Genesis Debtors and the Multicare Debtors | 38 |
| L. | | Reservation of "Cram Down" Rights | 39 |
| III. | | Voting Procedures And Requirements | 39 |
| A. | | Vote Required for Acceptance by a Class | 40 |
| B. | | Classes Not Entitled to Vote | 40 |
| C. | | Voting | 40 |
| IV. | | Financial Information, Projections, And Valuation Analyses | 41 |
| A. | | Introduction | 41 |

ii

RD356

**TABLE OF CONTENTS**
(continued)

Page

B.     The Genesis Debtors..........................................................................42
    1.     Operating Performance..........................................................42
    2.     Five Year Projections ...........................................................44
    3.     Going Concern Valuation .....................................................45

C.     The Multicare Debtors.....................................................................47
    1.     Operating Performance..........................................................47
    2.     Five Year Projections ...........................................................47
    3.     Going Concern Valuation ......................................................48

D.     Reorganized Genesis (Merger of Genesis and Multicare)........................50
    1.     Operating Performance..........................................................50
    2.     Five Year Projections ...........................................................50

V.     Business Description and Reasons for Chapter 11 ..................................51

A.     The Debtors' Businesses...................................................................51
    1.     Relationship Between the Genesis Debtors and the Multicare
        Debtors..............................................................................51
    2.     Pharmacy and Medical Supply Services (Genesis Debtors)..................52
    3.     Inpatient Services (Genesis Debtors and Multicare Debtors)................53
    4.     Other Services (Genesis Debtors and Multicare Debtors).....................53
    5.     Revenue Sources...................................................................54
    6.     Personnel ...........................................................................54

B.     Events Leading to the Commencement of the Chapter 11 Cases ....................55
    1.     Medicare Reimbursement.........................................................55
    2.     Medicaid Reimbursement.........................................................57
    3.     Debt Burden.........................................................................57

C.     Prepetition Negotiations ..................................................................58

D.     Pending Litigation and Other Proceedings ...........................................58
    1.     The Genesis and Vitalink Actions Against the Manor Care
        Entities..............................................................................58
    2.     The Vitalink Action Against Omnicare and Heartland .........................60
    3.     The Manor Care Action Against Genesis in Delaware.........................60
    4.     The Manor Care Action Against Genesis in Ohio...............................60
    5.     Age Institute .......................................................................61
    6.     Qui Tam Suits......................................................................61

iii

**TABLE OF CONTENTS**
**(continued)**

Page

7. Personal Injury and Employment Law Litigation ...................................... 62

8. Multicare Litigation ................................................................................ 63

9. Ordinary Course Litigation ...................................................................... 63

VI. Significant Events During the Reorganization Cases ......................................... 64

A. Filing and First Day Orders ......................................................................... 64

B. Appointment of the Creditors' Committee .................................................. 65

1. Genesis Creditors' Committee ............................................................. 65

2. Multicare Creditors' Committee ........................................................... 66

C. DIP Credit Agreements ................................................................................ 66

1. Genesis Debtors .................................................................................... 66

2. Multicare Debtors ................................................................................. 67

D. Cash Collateral Protection ........................................................................... 67

1. Genesis Debtors .................................................................................... 67

2. Multicare Debtors ................................................................................. 68

E. Key Employee and Executive Retention Programs ..................................... 68

1. First Retention Program ....................................................................... 69

2. Second Retention Program ................................................................... 69

F. Claims Process and Bar Date ....................................................................... 69

1. Schedules and Statements .................................................................... 69

2. Bar Date ................................................................................................ 70

G. ElderTrust Transactions ............................................................................... 70

H. CareFirst Transactions ................................................................................. 70

I. Swap Settlement .......................................................................................... 71

J. Alternative Dispute Resolution Procedures ................................................ 71

K. Settlement with the Multicare Debtors ....................................................... 72

L. Appointment of Fee Auditor ........................................................................ 73

M. Motion for Appointment of Trustee in the Multicare Reorganization Cases ............................................................................................................. 73

N. Potential Purchase of Pharmacy Business of Mariner Post-Acute Networks and Mariner Health Group ........................................................... 73

VII. Governance of the Reorganized Debtors ........................................................... 74

A. Board of Directors of Reorganized Genesis ................................................ 74

B. Senior Management of Reorganized Genesis ............................................... 74

iv

RD358

**TABLE OF CONTENTS**
(continued)

Page

VIII.  Other Aspects of the Plan of Reorganization ........................................ 75

  A.  Analysis of the Proposed Merger of Genesis and Multicare ......... 75

  B.  Mechanics of the Merger ...................................................... 76

  C.  Exit Facility -- Condition Precedent to Effective Date ............... 76

  D.  Distributions Under the Plan of Reorganization ....................... 77

      1.  Timing and Conditions of Distributions ......................... 77

      2.  Certain Claims Allowed ............................................ 78

      3.  Procedures for Treating Disputed Claims Under the Plan of
          Reorganization .................................................... 78

  E.  Treatment of Executory Contracts and Unexpired Leases ............ 79

      1.  Contracts and Leases Not Expressly Rejected are Assumed ...... 79

      2.  Cure of Defaults .................................................. 80

      3.  Rejection Claims .................................................. 80

  F.  Management Incentive Plan ................................................ 80

  G.  Releases ................................................................... 80

  H.  Effect of Confirmation ................................................... 81

      1.  Discharge of Claims and Termination of Equity Interests ..... 81

      2.  Indemnification ................................................... 82

      3.  Exculpation ....................................................... 82

  I.  Preservation of Certain Avoidance Actions ............................. 82

  J.  Miscellaneous Provisions ................................................ 82

IX.  Certain Factors To Be Considered .......................................... 82

  A.  Certain Bankruptcy Considerations ..................................... 82

  B.  Risks Relating to the Plan Securities .................................. 83

      1.  Variances from Projections ...................................... 83

      2.  Substantial Leverage; Ability to Service Debt ................. 83

      3.  Significant Holders ............................................... 83

      4.  Lack of Trading Market ........................................... 84

      5.  Dividend Policies ................................................. 84

      6.  Restrictions on Transfer ......................................... 84

  C.  Risks Associated with the Business ..................................... 84

X.  Confirmation of the Plan of Reorganization ............................... 85

v

RD359

## TABLE OF CONTENTS
### (continued)

Page

A.    Confirmation Hearing ........................................................................................ 85

B.    General Requirements of Section 1129 ............................................................ 86

C.    Best Interests Tests ......................................................................................... 87

D.    Liquidation Analyses ...................................................................................... 88

    1.    The Genesis Debtors ............................................................................. 89

    2.    Multicare Debtors ................................................................................. 94

E.    Feasibility ......................................................................................................... 99

F.    Section 1129(b) ................................................................................................ 99

    1.    No Unfair Discrimination ...................................................................... 99

    2.    Fair and Equitable Test ......................................................................... 99

XI.    Alternatives to Confirmation and Consummation of the Plan of Reorganization ......... 101

A.    Liquidation Under Chapter 7 ......................................................................... 101

B.    Alternative Plan of Reorganization ................................................................ 102

XII.    Certain Federal Income Tax Consequences of the Plan of Reorganization ................... 102

A.    Consequences to the Debtors ......................................................................... 103

    1.    Cancellation of Debt ............................................................................. 103

    2.    Limitations on Loss Carryforwards and Other Tax Benefits ............... 104

    3.    Alternative Minimum Tax ..................................................................... 107

    4.    Issuance of the New Senior Notes ........................................................ 107

B.    Consequences to Holders of Certain Claims .................................................. 108

    1.    Consequences to All Holders (Including Holders Whose Claims Are Against Any of the Multicare Debtors) Who Receive Cash, New Senior Notes, New Convertible Preferred Stock, New Common Stock, or New Warrants, Other Than Holders of Claims Against Genesis That Constitute "Securities" ........................... 108

    2.    Consequences to Holders of Genesis Senior Subordinated Note Claims and Genesis General Unsecured Claims That Constitute "Securities" ...................................................................................... 110

    3.    Consequences to Holders of Genesis Senior Lender Claims That Constitute "Securities" ......................................................................... 110

    4.    Distributions in Discharge of Accrued Interest ................................... 111

    5.    Market Discount ................................................................................... 111

    6.    Treatment of Distributions on New Convertible Preferred Stock and New Common Stock .................................................................... 112

RD360

**TABLE OF CONTENTS**
(continued)

Page

7.   Subsequent Sale of New Common Stock or New Convertible Preferred Stock ......................................................................... 114

8.   Conversion of New Convertible Preferred Stock ...................... 114

9.   Redemption of New Convertible Preferred Stock ..................... 115

10.  Ownership and Disposition of New Warrants ........................... 115

11.  Interest and Original Issue Discount on the New Senior Notes........... 116

12.  Information Reporting and Withholding ................................. 116

XIII.  Conclusion ................................................................... 117

vii

## GLOSSARY

The terms in the following table are used in the Disclosure Statement and Plan of Reorganization. These definitions are summaries. Please refer to the Plan of Reorganization for the complete definitions of these terms.

| | |
|---|---|
| *Administrative Expense Claim* | Any expense relating to the administration of the chapter 11 cases, including actual and necessary costs and expenses of preserving the Debtors' estates and operating the Debtors' businesses, any indebtedness or obligations incurred or assumed during the chapter 11 cases, allowances for compensation and reimbursement of expenses to the extent allowed by the Bankruptcy Court, claims arising under (i) that certain Revolving Credit and Guaranty Agreement, dated as of June 22, 2000, as amended, among Genesis, certain subsidiary Genesis Debtors named therein, Mellon Bank N.A., as administrative agent, and the lenders party thereto, or (ii) that certain Revolving Credit and Guaranty Agreement, dated as of June 22, 2000, as amended, among The Multicare Companies, Inc., certain subsidiary Multicare Debtors named therein, Mellon Bank N.A., as administrative agent, and the lenders party thereto, and certain statutory fees chargeable against the Debtors' estates. |
| *Bankruptcy Code* | Title 11 of the United States Code. |
| *Bankruptcy Court* | The United States Bankruptcy Court for the District of Delaware. |
| *Commencement Date* | The date the Debtors' chapter 11 cases were commenced (June 22, 2000, for all the Debtors other than Healthcare Resources Corp., whose Commencement Date is July 31, 2000). |
| *Debtors* | The Genesis Debtors and the Multicare Debtors. |
| *Disclosure Statement* | This document together with the annexed exhibit. |
| *Effective Date* | A business day selected by the Debtors on or after the date of confirmation of the Plan of Reorganization, on which any conditions to the effectiveness of the Plan have been satisfied or waived and there is no stay of the order confirming the Plan of Reorganization. |
| *Genesis* | Genesis Health Ventures, Inc. |
| *Genesis Debtors* | Genesis and the entities listed on Exhibit "A" to the Plan of Reorganization. |
| *Genesis General Unsecured Claim* | Any general unsecured claim against any of the Genesis Debtors. |
| *Genesis Senior Lender Claim* | Any claim against any of the Genesis Debtors based on the Genesis Senior Lender Agreements (as defined in the Plan of Reorganization) net of all postpetition cash payments made by the Genesis Debtors. |
| *Multicare* | Genesis ElderCare Corp. (the corporate parent of The Multicare Companies, Inc.). |
| *Multicare Debtors* | Multicare and the entities listed on Exhibit "B" to the Plan of Reorganization |
| *Multicare General Unsecured Claim* | Any general unsecured claim against any of the Multicare Debtors. |

| | |
|---|---|
| *Multicare Senior Lender Claim* | Any claim against any of the Multicare Debtors based on the Multicare Senior Lender Agreements (as defined in the Plan of Reorganization). |
| *New Common Stock* | New common stock of Reorganized Genesis to be issued under the Plan of Reorganization as described in section II.H.3 of this Disclosure Statement. |
| *New Convertible Preferred Stock* | New convertible 6% PIK preferred stock of Reorganized Genesis to be issued under the Plan of Reorganization as described in section II.H.2 of this Disclosure Statement. |
| *New Multicare Stock* | New common stock of Reorganized Multicare to be issued under the Plan of Reorganization as described in section II.H.5 of this Disclosure Statement. |
| *New Senior Notes* | New senior notes in the aggregate principal amount of $242.6 million to be issued under the Plan of Reorganization as described in section II.H.1 of this Disclosure Statement. |
| *New Warrants* | New warrants to purchase 11.1% of the New Common Stock to be issued under the Plan of Reorganization, as described in section II.H.4 of this Disclosure Statement. |
| *Plan of Merger* | The Plan of Merger among Genesis, Multicare Acquisition Corporation, and Multicare, as set forth in the Plan Supplement. The proposed merger is described in section II.A of this Disclosure Statement. |
| *Plan* or *Plan of Reorganization* | The Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code annexed as Exhibit A to this Disclosure Statement. |
| *Plan Securities* | The New Senior Notes, the New Convertible Preferred Stock, the New Common Stock, and the New Warrants. |
| *Plan Supplement* | A supplemental appendix to the Plan of Reorganization. The Plan Supplement will be filed with the Bankruptcy Court within 10 days before the hearing to confirm the Plan, but no later than 5 days before the last day to vote to accept or reject the Plan. Documents to be included in the Plan Supplement will be posted at www.ghv.com as they become available, but no later than 5 days before the last day to vote to accept or reject the Plan. After the Plan Supplement is filed, copies may be requested from the Voting Agent. |
| *Reorganized Genesis* | Genesis as reorganized as of the Effective Date in accordance with the Plan of Reorganization and after giving effect to the merger described in section II.A of this Disclosure Statement. |
| *Voting Agent* | See section I of this Disclosure Statement for contact information. |

## VI.

### Significant Events During the Reorganization Cases

**A.    Filing and First Day Orders**

On June 22, 2000, the Genesis Debtors (other than Healthcare Resources Corp.) and the Multicare Debtors filed their petitions under chapter 11 of the Bankruptcy Code. On June 23, 2000, the Bankruptcy Court entered certain orders designed to minimize the disruption of the Debtors' business operations and to facilitate their reorganization.

- *Case Administration Orders.* These orders (i) authorized separate joint administration of the Genesis Debtors' chapter 11 cases and Multicare Debtors' chapter 11 cases, (ii) established interim compensation procedures for professionals, (iii) granted an extension of the time to file the Debtors' schedules and statements, and (iv) authorized the mailing of initial notices and all other mailings directly to parties in interest and the filing of a list of creditors without claim amounts in lieu of a matrix.

- *Payments on Account of Certain Prepetition Claims.* The Bankruptcy Court authorized the payment of prepetition (i) wages, compensation, and employee benefits, (ii) sales and use taxes, (iii) claims of common carriers and warehousemen, (iv) claims of critical trade vendors, and (v) refunds to patients.

- *Business Operations.* The Bankruptcy Court authorized the Genesis Debtors and the Multicare Debtors to (i) comply with certain license and regulatory agency fee requirements, (ii) continue customer service programs, (iii) continue prepetition premium obligations under workers' compensation insurance and all other insurance policies, and bonds relating thereto, (iv) maintain existing bank accounts and business forms, (v) continue their existing cash management system, (vi) employ certain investment guidelines, (vii) provide adequate assurance to utility companies including the payment of certain prepetition claims, (viii) grant administrative expense status to undisputed obligations arising from the postpetition delivery of goods ordered in the prepetition period and make payment of such claims in the ordinary course of business, and (ix) maintain patient trust accounts.

- *Other Stipulations.* The Bankruptcy Court authorized a stipulation between one of the Genesis Debtors and Cardinal Distribution which provided for a long-term commitment by Cardinal Distribution to continue to ship inventory on credit terms in exchange for the payment over time of certain secured prepetition amounts owed to that company. That stipulation has been amended to provide additional postpetition credit to the Genesis Debtors. The Bankruptcy Court also authorized separate stipulations between the Genesis Debtors and certain agencies of the federal government and between the Multicare Debtors and those entities. These stipulations provided adequate protection to the federal government in the form of payment over time of certain prepetition overpayments alleged to have been made under the Medicare program. The stipulation with the Genesis Debtors was amended to reduce the amounts to be paid and provide the federal

> government with an administrative expense claim to the extent of additional amounts discovered.
>
> • *Bankruptcy Matters.* The Bankruptcy Court authorized the Genesis Debtors and the Multicare Debtors to (i) establish notice procedures and (ii) obtain interim postpetition financing under debtor in possession credit agreements on a superpriority basis for $250 million (for the Genesis Debtors) and $50 million (for the Multicare Debtors), pending further interim and final hearings.

On July 31, 2000, Healthcare Resources Corp. ("HRC"), one of the Genesis Debtors, filed a petition under chapter 11 of the Bankruptcy Code. On August 1, 2000, the Bankruptcy Court entered orders in HRC's reorganization case substantially similar to the orders entered on June 23, 2000 for the other Genesis Debtors. HRC is a party to the Genesis debtor in possession credit facility.

## B.    Appointment of the Creditors' Committee

On July 12, 2000, the United States Trustee for the District of Delaware, pursuant to its authority under section 1102 of the Bankruptcy Code, appointed a statutory committee of unsecured creditors in the Genesis reorganization cases and a separate committee in the Multicare reorganization cases.

### 1    Genesis Creditors' Committee

The Genesis creditors' committee currently consists of the following six members:

> American General Investment Management, L.P.
> 2929 Allen Parkway
> Houston, Texas 77019
>
> Abbot Laboratories
> 625 Cleveland Avenue
> Columbus, Ohio 43215
>
> GMS Group, LLC
> c/o LeBouf, Lamb, Greene & MacRae
> 125 West 55th Street
> New York, New York 10019
>
> Service Employees International Union, AFL-CIO
> c/o Cohen, Weiss and Simon, LLP
> 3030 W. 42nd Street
> 25th Floor
> New York, New York 10036
>
> State Street Bank and Trust Company
> 2 Avenue de Lafayette
> 6th Floor
> Boston, Massachusetts 02111

The Bank of New York
101 Barclay Street
Floor 21W
New York, New York 10286

The Genesis creditors' committee has retained Akin, Gump, Strauss, Hauer & Feld, L.L.P., 590 Madison Avenue, New York, New York 10022, and Pachulski Stang Ziehl Young & Jones PC, 919 N. Market Street, 16th Floor, P.O. Box 8075, Wilmington, Delaware 19899-8705, as its attorneys, and Houlihan Lokey Howard & Zukin, 2 First National Plaza, 20 South Clark Street, 21st Floor, Chicago, Illinois 60603-1881, as its financial advisors. The Genesis creditors' committee has actively participated in all aspects of the Genesis reorganization cases.

    2.    *Multicare Creditors' Committee*

The Multicare creditors' committee currently consists of the following three members:

Mackay-Shields Financial Corp.
9 West 57th Street
New York, NY 10019

HSBC Bank USA, as Indenture Trustee
452 Fifth Avenue
New York, NY 10018-2706

Gulf South Medical Supply, Inc.
4345 Southpoint Blvd
Jacksonville, FL 3216

The Multicare creditors' committee has retained Kasowitz, Benson, Torres & Friedman LLP, 1633 Broadway, New York, New York 10019, and Saul, Ewing, Remick & Saul LLP, 222 Delaware Avenue, Suite 1200, P.O. Box 1266, Wilmington, Delaware 19899-1266, as its attorneys, and Chanin Capital Partners, 11100 Santa Monica Blvd, Suite 830, Los Angeles, California 90025, as its financial advisors. The Multicare creditors' committee has actively participated in all aspects of the Multicare reorganization cases.

**C.    DIP Credit Agreements**

    *1.    Genesis Debtors*

On July 18, 2000, the Bankruptcy Court entered a final order (i) authorizing the Genesis Debtors to (a) obtain postpetition financing and (b) utilize cash collateral, and (ii) granting adequate protection to certain prepetition secured parties. In particular, the Bankruptcy Court approved that certain Revolving Credit and Guaranty Agreement, dated as of June 22, 2000, among Genesis, as borrower, the other Genesis Debtors, as guarantors, Mellon Bank, N.A., as agent, and the lender parties thereto. This agreement provided for maximum borrowings of $250 million and terminates on December 21, 2001. The obligations of the Genesis Debtors under this agreement are secured by substantially all the assets of the Genesis Debtors, subject to certain existing mortgages and inventory liens. The liens granted to the postpetition lenders are senior to the liens securing the Genesis Senior Lender Claims. As of the date hereof, the Debtors have drawn approximately $180,000,000 under their debtor in possession credit facility. The

borrowings under this facility have been used to make payments to the holders of the Genesis Senior Lender Claims, to issue letters of credit, to make payments to Cardinal Distribution, and to make other miscellaneous payments. See section II.E.2, above, for a description of those claims and the payments made. The Genesis Debtors amended certain covenants under their debtor in possession credit facility as of February 14, 2001, to bring those covenants into line with current performance and projections.

### 2.    Multicare Debtors

On July 18, 2000, the Bankruptcy Court entered a final order (i) authorizing the Multicare Debtors to (a) obtain postpetition financing and (b) utilize cash collateral, and (ii) granting adequate protection to certain prepetition secured parties. In particular, the Bankruptcy Court approved that certain Revolving Credit and Guaranty Agreement, dated as of June 22, 2000, among Multicare, as borrower, the other Multicare Debtors, as guarantors, Mellon Bank, N.A., as agent, and the lender parties thereto. This agreement provided for maximum borrowings of $50 million and terminates on December 21, 2001. The obligations of the Multicare Debtors under this agreement are secured by substantially all the assets of the Multicare Debtors, subject to certain existing mortgages and inventory liens. The liens granted to the postpetition lenders are senior to the liens securing the Multicare Senior Lender Claims. As of the date hereof, the Debtors have not drawn any funds under this debtor in possession credit facility, although letters of credit for approximately $2 million issued under the facility are outstanding. The Multicare Debtors have been paying the Genesis Debtors under the various service agreements on a current basis postpetition. The Multicare Debtors amended certain covenants under their debtor in possession credit facility as of February 14, 2001, to bring those covenants into line with current performance and projections.

### D.    Cash Collateral Protection

### 1.    Genesis Debtors

At the commencement of these chapter 11 cases, a number of third-party lenders, including the holders of the Genesis Senior Lender Claims, had an interest in the Genesis Debtors' receivables or other cash collateral. In order to provide for the continued use of such cash collateral, the Genesis Debtors agreed to provide certain protections to those third-party lenders. For the holders of the Genesis Senior Lender Claims, the protections consisted of the following:

- a superpriority administrative claim against the Genesis Debtors, immediately junior to the claims of the lenders under the debtor in possession credit facility

- liens on substantially all the property of the Genesis Debtors immediately junior to the claims of the lenders under the debtor in possession credit facility and existing third party liens

- payment of an amount equal to interest on the Genesis Senior Lender Claims at the contractual nondefault rate

- reimbursement for the reasonable fees and disbursements of counsel and consultants to the holders of the Genesis Senior Lender Claims and payment of certain administrative fees

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, Michael J. Merchant, hereby certify that on the 22nd day of June, 2006, I electronically filed the **Appendix to Answering Brief of Appellees genesis Health Ventures, Inc. and Its Former Debtor Affiliates** with the Clerk of the Court using CM/ECF which will send notifications of such filing to the following :

> Teresa K. D. Currier
> currier@klettrooney.com

> Russell C. Silberglied
> Silberglied@rlf.com

> Cynthia L. Collins
> ccollins@rlf.com

I, Michael J. Merchant, hereby certify that on the 22nd day of June, 2006, I sent via First Class Mail (Non-Local) and Federal Express (Non-Local) the **Appendix to Answering Brief of Appellees Genesis Health Ventures, Inc. and its Former Debtor Affiliates** to the following participants:

> **Via First Class Mail**

> Menachem O. Zelmanovitz
> Morgan, Lewis & Bockius LLP
> 101 Park Avenue
> New York, NY 10178
> (Counsel for Mellon Bank, N.A.)

> Michael F. Walsh
> Weil, Gosthal & Manges LLP
> 767 Fifth Avenue
> New York, NY 10153

Adam P. Strochak
Joanne M. Guerrera
Weil, Gotshal & Manges LLP
1300 Eye Street, NW
Suite 900
Washington, DC 20005

**Via Federal Express**

James J. Hayes
4024 Estabrook Dr.
Annandale, VA 22003

Michael J. Merchant (No. 3854)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 651-7700
merchant@rlf.com